**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 1:08-cv-00862 |
| VOA ASSOCIATES INC., LIBERTY INTERNATIONAL UNDERWRITERS, MICHAEL J. MADDEN and JEAN MADDEN, | ) ) ) ) | Honorable Matthew F. Kennelly  Magistrate Judge Geraldine Soat Brown |
| Defendants. | ) ) | |

**UNITED STATES FIDELITY AND GUARANT COMPANY'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Now comes UNITED STATES FIDELITY & GUARANTY COMPANY ("USF&G"), by and through its counsel, Karbal, Cohen, Economou, Silk & Dunne, LLC, and respectfully submits its Memorandum of Law in Support of its Motion for Summary Judgment.

## I.  INTRODUCTION

In the instant action, USF&G seeks a declaration that it no longer owes defense or indemnity coverage to Defendant, VOA Associates, Inc. ("VOA"), for an underlying lawsuit allegedly involving bodily injuries sustained by Michael J. Madden ("Madden") when he fell into an orchestra pit designed by VOA.  Pursuant to its contract, VOA's role on the project was limited to the provision of architectural services.  Pursuant to its general liability insurance policy (the "CGL Policy") issued to VOA, USF&G has been paying for VOA's defense under a reservation of rights.  Liberty Insurance Underwriters, Inc. ("Liberty"), VOA's professional liability carrier, has denied coverage for the Madden claim.[1]  The basis for USF&G's Motion is two-fold:  First, USF&G's CGL policy specifically excludes coverage for VOA's services as an architect and therefore, no coverage is available to VOA by application of the professional services exclusion.  Second, USF&G has learned that VOA failed to timely notify USF&G of

---

[1] USF&G filed this lawsuit against Liberty alleging, among other things, that Liberty owed a defense. However, USF&G has abandoned its claims against Liberty for reimbursement of defense fees and costs. USF&G reserves its rights and defenses to seek reimbursement from Liberty in the unlikely event USF&G is found responsible for indemnity, *i.e.*, the judgment against VOA.  (PL ST at ¶ 83, Ex. 37.)

Madden's alleged injury, resulting in late notice of the occurrence.  Accordingly, there is no coverage available to VOA under the USF&G policy.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

The following facts are taken from USF&G'S Local Rule 56.1 Statement of Material Facts (hereinafter "PL ST").  There are no relevant facts in dispute.

### A.    The USF&G Policy

USF&G issued policy No. BK01116165 to VOA, which was in effect May 1, 2002-2003 (the "USF&G Policy").  (PL ST at ¶ 8.)  The primary general liability coverage part of the USF&G Policy has limits of liability of $1,000,000/accident and $2,000,000/aggregate.  (Id. at ¶ 9, Ex. 1.)  The umbrella coverage of the USF&G Policy part has liability limits of $5,000,000. (Id. at ¶ 11, Ex. 3.)  The USF&G Policy contains a professional services exclusion in the primary coverage[2] which provides in pertinent part, that the insurance does not apply to:

I.    Professional Services

"Bodily injury," "property damage," "personal injury," or "advertising injury" due to rendering or failure to render any professional service by or on behalf of any insured. Professional service includes:

\*\*\*

(2)    Architect, engineer, surveyor, construction contractor or construction management service, including:

(a)    Preparing, approving, or failing to prepare or approve any map, drawing, opinion, report, survey, change order, design, specification, recommendation, permit application, payment request, manual, instruction, computer program for design systems, or selection of a contractor or sub-contractor;

(b)    Any supervisory, inspection, or quality control service;

(c)    Any study, survey, assessment, evaluation, consultation, observation, scheduling, sequencing, training, or inspection, including those for job safety; and

(d)    Any monitoring, testing, or sampling service necessary to perform any of the services including in exclusion I.2(a), (b), or (c) above.

(Id. at ¶ 10, Ex. 2.)

---

[2]  The USF&G umbrella coverage also contains a professional services exclusion.  (PL ST at ¶ 12, Ex. 3.)

The USF&G Policy also includes the following conditions:

**2.  Duties In The Event Of Occurrence, Offense, Claim or "Suit"**

(a)     You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  Notice should include:

      (1)     How, when and where the "occurrence" or offense took place;

      (2)     The names and addresses of any injured persons and witnesses; and

      (3)     The nature and location of any injury or damage arising out of the "occurrence" or offense.

(c)     You and any other involved insured must:

      (3)     Cooperate with us in the investigation, settlement or defense of the claim or "suit";

(Id. at ¶ 13, Ex. 1.)

**B.    The Liberty Professional Liability Policies**

Liberty issued a series of Architects, Engineers and Environmental Services Professional Liability Insurance Policies to VOA ("the Liberty Professional Liability Policies").[3]  (Id. at ¶¶ 14, 15.)  Each Liberty Policy has a limit of $2,000,000 per claim and $4,000,000 per year in the aggregate with a $200,000 per claim deductible.  (Id. at ¶ 16.)  The Liberty Professional Liability Policies are "claims made and reported" policies.  (Id. at ¶ 17.)

**C.    VOA's Professional Services Agreement with District 230**

On or about June 29, 1998, VOA entered into a contract titled "Agreement Between Owner And Architect" (the "Professional Services Agreement") with Consolidated High School District No. 230 ("Owner" or "District 230"), for the performance of architectural and design services for the Alonzo Staag High School, among others (the "Project").  (Id. at ¶ 18, Ex. 4.)  The Professional Services Agreement expressly limits VOA's work on the Project to the provision of architectural and design services.  (Id. at ¶ 19.)  VOA does not dispute that its services for the Project were, in fact, limited to architectural and design work.  (Id. at ¶ 23, Exs. 4 and 5.)

---

[3]  The Liberty Professional Liability Policies are identified as follows: Policy No. AEE196887-0103 (12/5/03-12/5/04); Policy No. AEE196887-0104 (12/5/04-12/05/05); Policy No. AEE196887-0105 (12/5/05-12/5/06); Policy No. AEE196887-0106 (12/5/06-12/5/07).  (Id. at ¶ 15.)

**D.**     <u>**Madden's Alleged Injury And The Underlying Litigation**</u>

On or about August 19, 2002, Michael J. Madden ("Madden"), an employee of District 230, was allegedly seriously injured when he fell into an orchestra pit designed by VOA at the Alonzo Staag High School.  (<u>Id.</u> at ¶ 24, Ex. 6.)  Shortly after this incident, VOA's project manager, Al Migon, was told of Madden's fall by Bob Hughes, the Owner's representative.  (<u>Id.</u> at ¶ 25, Exs. 7 and 8.)  VOA had no procedure for reporting accidents at job sites.  (<u>Id.</u> at ¶ 27, Exs. 8 and 9.)  Thus, Mr. Migon did nothing with this information (Migon Dep.) and VOA did not report the occurrence to USF&G.  (<u>Id.</u> at ¶ 28, Ex. 8.)

On or about January 13, 2003, Madden filed suit in the Circuit Court of Cook County styled <u>Michael J. Madden, et al. v. P.H. Paschen, et al.</u>, No. 03 L 000433 (the "Underlying Litigation").  (<u>Id.</u> at ¶ 29, Ex. 10.)  Madden's initial Complaint did not name VOA as a defendant.  (<u>Id.</u> at ¶ 30, Ex. 6.)  A year and a half later, on or about August 19, 2004, Madden filed a Third Amended Complaint, which for the first time named VOA as a defendant.  Madden's Third Amended Complaint alleged that VOA was the architect for the Project.  Pursuant to a reservation of rights, USF&G asked Kurt Beranek, Esq. ("Beranek") to defend VOA.  (<u>Id.</u> at ¶ 31, Ex. 6; Docket No. 59.)

On or about August 16, 2006, Madden filed his Fourth Amended Complaint, which again alleged that VOA was the architect for the Project, this time referencing the contract between VOA and the Owner and alleging negligent design of the orchestra pit in which Madden fell.  (<u>Id.</u> at ¶ 35, Ex. 15; Docket No. 59.)  A copy of the Fourth Amended Complaint was served on Beranek.  (<u>Id.</u> at ¶ 36, Exs. 11 and 15.)

VOA filed a motion for summary judgment in the Underlying Litigation, arguing that it had no responsibility for safety on the job site, that it had no duty to supervise or control Madden's work and that it designed the Project according to the owner's specifications, which did not include an orchestra pit cover.  (<u>Id.</u> at ¶ 37, Ex. 16; Docket No. 59.)

On or about March 6, 2007, the trial court granted VOA's motion for summary judgment as to any construction means or methods claims but denied the motion as to claims of negligent design.  (<u>Id.</u> at ¶ 38, Ex. 17; Docket No. 59.)  The Order of March 6, 2007 stated in pertinent part:

> This matter coming on to be heard on VOA's motion for summary judgment, due notice having been given and the court being fully advised in the premises,

IT IS HEREBY ORDERED:

For the reasons stated in the record:

1)      VOA's motion for summary judgment is granted as to §343[4] & §414[5] liability and its allegations set forth in the complaint, and

2)      VOA's motion for summary judgment is denied as to the plaintiff's allegations of negligent design/code violations.

(Id. at ¶ 39; Docket No. 59.)

The court granted summary judgment in favor of all defendants other than VOA.  (Id. at ¶ 40, Ex. 18.)  Thus, after this date, there were no claims pending against VOA with the exception of negligent design/code violations.  (Id. at ¶ 41, Exs. 17 and 18.)

On June 20, 2007, the trial of the underlying claim commenced.  (Id. at ¶ 42.)  On June 27, 2007, the jury was provided with the following relevant instructions:

"Professional Negligence" by an architect is the failure to do something that a reasonably careful architect would do, or the doing of something that a reasonably careful architect would not do, under circumstances similar to those shown by the evidence.

To determine what the standard of care required in this case, you must rely upon opinion testimony from qualified witnesses, and evidence of professional standards.  The law does not say how a reasonably careful architect would act under these circumstances.  That is for you to decide.

Plaintiff's Jury Instruction No. 9.

The plaintiff claims that he was injured and sustained damage, and that the defendant was professionally negligent in one or more of the following respects:

1)  Failed to design the stage with a pit cover or other fall protection;
2)  Signed a certificate of substantial completion when it was not safe to do so.

(Id. at ¶ 42, Ex. 19.)

---

[4]  §343 liability generally involves premises liability.
[5]  §414 liability generally involves liability where a contractor, in fact, controls the activities of the subcontractors or the injured party.

The jury returned a verdict finding VOA "professionally negligent" and awarded $1.6 Million against VOA.[6]  (Id. at ¶ 43, Exs. 19 and 20.)

E.       **VOA's Reporting of the Underlying Litigation To Its Insurers**

VOA was served with Madden's Third Amended Complaint on August 26, 2004. (Id. at ¶ 46, Ex. 6.)  VOA forwarded a copy of the Third Amended Complaint to VOA's external general counsel, Schiff Hardin.  (Id. at ¶ 47, Exs. 9 and 23.)  Paul Lurie, Esq. of Schiff Hardin advised VOA to tender the Third Amended Complaint to VOA's professional liability insurer, Liberty. (Id. at 48, Exs. 9 and 23.)  The Liberty Polices each stated a deductible of $200,000.  (Id. at ¶ 16.)  On or about August 31, 2004, VOA reported the Third Amended Complaint to its insurance broker, HRH AVA Insurance Agency now known as Willis HRH (hereinafter referred to as "AVA").  (Id. at ¶ 49, Exs. 24, 25 and 26; Docket No. 59.)  AVA has been VOA's insurance broker for up to twenty years.  (Id. at ¶ 50, Ex. 9.)  Theodore Schnell, VOA's Chief Financial Officer, advised AVA that he deemed the Third Amended Complaint to be a general liability claim but asked AVA for its advice as to which carrier to tender the lawsuit.  (Id. at ¶ 51, Exs. 27 and 28.)  AVA agreed with VOA's characterization of the Third Amended Complaint as involving only general liability and reported the Madden Lawsuit only to USF&G.  (Id. at ¶ 52, Ex. 27.)  As a matter of custom and practice, VOA relied on AVA to report claims and suits against VOA to VOA's insurance carriers.  (Id. at ¶ 53, Exs. 9, 27, 28 and 29; Docket No. 59)

In October and November of 2004, several discussions took place between USF&G's claim representative, Iris Robinson, and several VOA employees, including Jennifer Klomans and Theodore Schnell.  (Id. at ¶ 54, Exs. 30 and 31.)  In the first discussion, on September 17, 2004, Mr. Schnell advised Ms. Robinson that VOA had an attorney on the Madden case and VOA should be dismissed.  (Id. at ¶ 55, EXs. 30 and 31.)  Mr. Schnell was to send Ms. Robinson the contracts for the Project.  (Id. at ¶ 56.)  Mr. Schnell advised Ms. Robinson that he did not think there will be additional investigation.  (Id. at ¶ 57.)  Ms. Robinson asked to take photographs and statements, but Mr. Schnell advised Ms. Robinson to wait.  (Id. at ¶ 58.)  In a follow-up discussion between Ms. Robinson and Mr. Schnell on October 8, 2004, Mr. Schnell again advised Ms. Robinson that VOA had hired counsel and should be dismissed from the case. (Id. at ¶ 59, Ex. 30.)

---

[6]  VOA has appealed the verdict and judgment against it.  (PL ST at ¶ 44, Ex. 21.)  The Maddens also appealed the summary judgment order.  (Id. at ¶ 45, Ex. 22.)  These two appeals are currently pending.

In yet another follow-up discussion to VOA on November 3, 2004, Ms. Robinson had a discussion with Jennifer Klomans of VOA.  (<u>Id.</u> at ¶ 60, Exs. 30 and 31.)  During the discussion, Ms. Robinson advised Klomans that there were coverage issues with respect to VOA's role as an architect on the Project as the USF&G Policy had a professional services exclusion.  (<u>Id.</u> at ¶ 61.)  Ms. Robinson advised Klomans to tender the matter to VOA's professional liability carrier.  (<u>Id.</u> at ¶ 62, Ex. 31.)  Ms. Robinson also advised Klomans that she was going to close her file since VOA had already hired its own counsel for the Madden case.  (<u>Id.</u> at ¶ 63.)  Klomans responded that her superior (Schnell) was incorrect with that information and that VOA had received notice of default.  (<u>Id.</u> at ¶ 64.)  Klomans also advised that VOA's broker, AVA, stated there was no coverage under the professional liability policy (Liberty) and that VOA's CGL policy (USF&G) should cover the loss.  (<u>Id.</u> at ¶ 65.)

In light of Ms. Klomans' statement that VOA received notice of a default judgment, Ms. Robinson took action to appoint defense counsel to defend VOA under a reservation of rights.  (<u>Id.</u> at ¶ 66, Exs. 30 and 31.)  Beranek accepted the assignment to defend VOA under the reservation of rights.  (<u>Id.</u> at ¶ 68, Exs. 11, 12, 13 and 14.)  On or about January 13, 2005, Schiff Hardin also briefly appeared as defense counsel for VOA in the Underlying Litigation and withdrew its appearance on or about March, 2005.  (<u>Id.</u> at ¶ 70, Ex. 33; Docket No. 59.).  At all times, Beranek defended VOA without direction from USF&G.  (<u>Id.</u> at ¶ 71, Ex. 11.)

**F.      <u>USF&G's Reservation of Rights Letter</u>**

By letter dated May 4, 2005, USF&G reserved its rights with respect to the Underlying Litigation based on the professional services exclusion in the USF&G Policy.  (<u>Id.</u> at ¶ 72, Ex. 14.)  The reservation of rights letter was prepared by Iris Robinson and sent to VOA.  (Id. at 73-76, Exs. 31, 34, 35.)  The reservation of rights letter was also faxed to Beranek.  (<u>Id.</u> at ¶ 77, Exs. 11, 14 and 34.)  The letter advised VOA that the Underlying Litigation may seek damages that would be uncovered under the USF&G Policy.  (<u>Id.</u> at ¶ 78)  The letter specifically reserved the right to deny any duty to indemnify VOA to the extent that VOA's liability was found to have arisen out of any architectural, engineering or inspection activity.  (<u>Id.</u> at ¶ 79, Ex. 14.)  With respect to the retention of Beranek, the reservation of rights letter expressly advised VOA of a potential conflict of interest and gave VOA its choice of defense counsel.  (<u>Id.</u> at ¶ 80, Ex. 14.)  USF&G never received any indication from VOA that it was electing to be represented by different counsel.  (<u>Id.</u> at ¶ 81, Ex. 9.)

By letter dated September 28, 2007, USF&G requested that VOA release USF&G from funding the defense of the Underlying Lawsuit based on the professional services exclusion in the USF&G policy.  (Id. at ¶ 82, Ex. 36; Docket No. 59.)

### III.  LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  Once a motion for summary judgment has been filed, the burden shifts to the nonmoving party to show through specific evidence that a genuine issue of material fact remains for trial.  Celotex v. Catrett, 477 U.S. 317, 324 (1986). The nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; instead it must show that a genuine issue of material fact remains for trial.  Id.  Because there are no material facts in dispute and St. Paul is entitled to judgment as a matter of law, St. Paul's Motion For Summary Judgment should be granted.

### IV.  ARGUMENT

There is no coverage for VOA under the USF&G Policy for the architectural professional services VOA performed on the District 230 Project because the USF&G Policy excludes coverage for "injury or damage or medical expenses . . . that result from the performance of or failure to perform architect, engineer, or surveyor professional services by or for you."  (PL ST at ¶ 10, Ex. 2.)  Coverage for VOA is also precluded on the grounds that VOA's notice of the Madden occurrence was woefully late.  (Id. at ¶ 13, Ex. 1.)

As this Court is well aware, in Illinois, the duty to defend is generally determined by looking at the allegations of the underlying complaint and comparing the allegations to the relevant coverage provisions of the insurance policy.  Although the general rule states that an insurers duty to defend is determined by the allegations of the underlying complaint, there is an exception where an insurer may rely on facts outside of the underlying complaint (i.e., extrinsic evidence) to show the application of a policy exclusion that would otherwise preclude coverage. Provided that extrinsic evidence does not tend to prove "an issue crucial to the determination of the underlying lawsuit" it may be considered by the Court when making a determination concerning whether an insurer has a duty to defend the underlying lawsuit.  See, e.g., Fid. & Cas. Co. v. Envirodyne Engineers, Inc., 461 N.E.2d 471, 473-74 (Ill. App. Ct. 1983) (noting that it

was proper to review the duties of an engineer at a worksite to determine if a complaint was potentially covered triggering the duty to defend).  The duty to defend is broader than the duty to indemnify.  See Crum & Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1079 (Ill. 1993).  Where there is no duty to defend, there can be no duty to indemnify.  See e.g., id. at 1081.  "[W]here no duty to defend exists and the facts alleged do not even fall potentially within the insurance coverage, such facts alleged could obviously never actually fall within the scope of coverage."  Id.  Such is the case here where the USF&G Policy contains a professional services exclusion precluding coverage for VOA's provision of architectural and design services.

Applying the foregoing principles, and based upon a review of the Fourth Amended Complaint (PL ST at Ex. 15), the Professional Services Agreement (id. at Ex. 4), as well as the trial court's summary judgment ruling (id. at Ex. 17) and jury instructions (id. at Ex. 19) which left only design/professional negligence theories of liability against VOA, it is clear that VOA's duties at the Project were limited to excluded professional architectural services.  (Id. at ¶ 41, Exs. 17 and 18.)  As such, no coverage is provided under the USF&G Policy for the Underlying Litigation.  USF&G has paid significant defense fees and expenses to date and it wishes to be relieved of its duty to defend VOA via a declaration of no possibility of coverage.  In addition, because USF&G has no duty to defend VOA in the Underlying Litigation, it can have no duty to indemnify.

## A.   VOA's Potential Liability In The Underlying Litigation Arises From Expressly Excluded Professional Negligence

The Professional Services Exclusion in the USF&G Policy precludes coverage for architectural services.  (Id. at ¶ 10, Ex. 2.)  Pursuant to its contract, VOA's sole responsibility with regard to the Project was to provide architectural services.  (Id. at ¶¶ 18-19, Ex. 4.)  The Contract states:

> 2.6.6   The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction.

(Id. at ¶ 20, Ex. 4.)

Additionally, without question, the Underlying Litigation against VOA was based on its alleged failure to perform professional architectural services for the Project.  (Id. at ¶¶ 33, 35,

Exs. 6 and 15.)  The court in the Underlying Litigation dismissed at summary judgment all but the design claims against VOA.  (Id. at ¶¶ 37-41, Exs. 17 and 18.)  Moreover, the verdict against VOA was based solely upon VOA's alleged professional negligence in failing to design the orchestra pit where Madden fell with a cover or issuing a premature certificate of substantial completion.  (Id. at ¶¶ 42-43, Exs. 19 and 20.)  As a result, USF&G has no further defense obligation to VOA and can have no indemnity obligation because the Underlying Litigation simply does not involve covered claims.

In Prisco Serena Sturm Architects, Ltd. v. Liberty Mut. Ins. Co., the Seventh Circuit determined based on its review of the policy language, allegations and underlying contract that Liberty Mutual, the general liability carrier, had no obligation to defend an architectural firm based on an exclusion substantially similar to the exclusion at issue here. 126 F.3d 886, 893 (7th Cir. 1997).  Liberty argued that the professional services exclusion applied to obviate its duty to defend the architectural firm for failing to uncover defects in the general contractors work as part of its duty to certify the general contractors performance.  Id. at 888.  The Seventh Circuit found that the exclusion at issue specifically referred to architects when excluding professional services and, therefore, because the underlying suit alleged the failure of the architectural firm to perform professional services the exclusion clearly applied obviating the duty to defend in that case. Id. at 893.

In United States Fid. & Guar. v. Continental Cas. Co., a factually similar case, the Illinois Court of Appeals upheld the professional services exclusion in a commercial general liability policy under substantially the same facts.  505 N.E.2d 1072 (Ill. App. Ct. 1987).  In this case, USF&G was the general liability insurer and Continental was the errors and omissions insurer for an architectural firm.  The USF&G Policy excluded "professional services" by way of an endorsement which provided that: "insurance does not apply to bodily injury or property damage arising out of the rendering of or the failure to render any professional services by or for the named insured, including (1) the preparation or approval of maps, plans, opinions, reports, surveys, designs or specifications; and (2) supervisory, inspection or engineering services."  Id. at 1074.  After a subcontractor's employee sustained injuries resulting from a fall through a skylight at the construction site, the architectural firm tendered its defense to both USF&G and Continental.  Id.  Each insurer agreed to defend the firm under a reservation of rights subject to

the disposition of USF&G's action seeking a declaration that it had no duty to defend or indemnify the architect based on the professional services exclusion.  Id.

In holding that USF&G had no duty to defend or indemnify the architect, the court explained that the professional services exclusion in the policy expressly precluded coverage for bodily injury or property damage arising from the rendering or failure to render any professional services.  Id. at 1076.  The court further reasoned that the underlying complaint alleged that the insured was an architect and the allegations clearly indicated that liability was premised on the architect's performance of "professional services."  See id. at 1076.

Envirodyne, 461 N.E.2d 471 is also on point.  Envirodyne was sued for negligence related to a project on which they had consulted.  The complaint alleged Envirodyne had "erected, constructed, placed or operated or caused to be erected, constructed, or operated, a certain scaffold."  Id. at 473.  The general liability insurer sought a declaratory judgment that it was not obligated to defend this suit based on its professional liability exclusion.  Id. at 472.  By looking to the engineers' contracts for the project which limited the scope of work to engineering services, the court determined that the engineers' duties were limited to engineering services and did not include construction means and methods.  Therefore, the court determined that the claim was excluded from coverage under the general liability policy.  Id. at 473.

Like the exclusions at issue in Prisco, United States Fid., and Envirodyne, the exclusion stated in the USF&G Policy specifically excludes the professional services of architects.  Madden's Third and Fourth Amended Complaints allege that VOA was the architect for the Project.  (PL ST at ¶ 10, Ex. 2.)  Furthermore, the "Agreement Between Owner and Architect" makes it absolutely clear that VOA's sole role with respect to the project was to provide professional services as architect and that VOA had no responsibility for construction means and methods.  (Id. at ¶¶ 19-20, Ex. 4.)  Specifically, the Professional Services Agreement defines and limits VOA's duties as follows:

ARTICLE 2

SCOPE OF ARCHITECT'S BASIC SERVICES

2.1   DEFINITION

2.1.1   The Architect's Basic Services consist of those described in Paragraphs 2.2 through 2.6 and any other services identified in Article 13 as part of Basic Services, and include normal structural, mechanical and electrical engineering services.

*\*\**

2.2     SCHEMATIC DESIGN PHASE

2.2.1   The Architect shall review the program furnished by the Owner to ascertain the requirement of the Project and shall arrive at a mutual understanding of such requirements with the Owner.

2.3     DESIGN DEVELOPMENT PHASE

2.3.1   Based on the approved Schematic Design Documents . . . , the Architect shall prepare, for approval by the Owner, Design Development Documents consisting of drawings and other documents to fix and describe the size and character of the Project as to architectural, structural, mechanical and electrical systems, materials and such other elements as may be appropriate.

2.4     CONSTRUCTION DOCUMENTS PHASE

2.4.1   Based on the approved Design Development Documents . . . , the Architect shall prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project.

(Id. at ¶ 21, Ex. 4.)

Furthermore, as mentioned earlier, the Professional Services Agreement also states that the Architect is not responsible for construction means and methods.  (See id. at ¶ 20, Ex. 4.)

        VOA's work at the Project, from which the Underlying Litigation arises, falls within the professional liability exclusion of the USF&G Policy, which precludes coverage in this matter. The Court's grant of summary judgment to VOA dismissing all construction counts as well as the instructions to the jury leave no doubt that the only potential liability VOA's could incur arises from its professional services.  The Professional Services Agreement is clear that VOA was not to be engaged in or responsible for any construction work by stating, as cited above, that the architect, VOA, is not responsible for "control or charge" of the work or for "construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work . . . ."  (Id. at Ex. 4.)  The plain language of the Professional Services Agreement demonstrates that VOA provided only architectural services and not construction or any other non-professional services.  (See id.)

        Based on the judgment in the Underlying Litigation, and as confirmed by VOA's Professional Services Agreement with District 230, VOA's alleged and/or actual liability relates

solely to its performance of architectural services.  This type of liability is expressly excluded by the USF&G Policy because separate insurance products (*i.e.* professional services error and omission policies such as the Liberty Policies) are available to protect against such risks.  The professional services exclusion in the USF&G Policy is plain and unambiguous and, therefore, USF&G is entitled to summary judgment as a matter of law.

**B.      VOA's Notice Of Madden's August 19, 2002 Accident To USF&G Was Late As A Matter of Law.**

VOA's failure to notify USF&G of the Madden incident for over two years obviates coverage available to VOA.  It is well settled that a provision in an insurance contract requiring the insured to notify the insurer of a potential occurrence or suit against it is a "condition precedent to the triggering of the insurer's contractual duties."  Northbrook Prop. & Cas. Ins. Co. v. Applied Sys., Inc., 729 N.E.2d 915, 920-21 (Ill. App. Ct. 2000).  Notice provisions are valid prerequisites to coverage and not mere "technical requirement[s]."  N. Ins. Co. of N.Y. v. City of Chicago, 759 N.E.2d 144, 149 (Ill. App. Ct. 2001).  "Notice provisions in insurance policies serve the important function of allowing the insurer the opportunity to make a timely and thorough investigation of the insured's claim."  Kerr v. Illinois Cent. R.R. Co., 670 N.E.2d 759, 765 (Ill. App. Ct. 1996).  Thus, notice provisions are valid prerequisites to coverage and "not mere technical requirements," that "the insured is free to overlook or ignore with impunity."  Id.

The Illinois Supreme Court has held that an insured that breaches a policy's notice provision will be precluded from recovery under the policy.  See Country Mut. Ins. Co v. Livorsi Marine, Inc., 856 N.E.2d 338, 343 (Ill. 2006).  The duty to give notice arises when an insured knows or should know that a claim or lawsuit may be brought against it regardless of whether or not the insured would be liable.  Nat'l Bank v. Winstead Excavating of Bloomington, 419 N.E.2d 522, 524 (Ill. App. Ct. 1981).  The test is whether a reasonably prudent person would "foresee a lawsuit" and contact his or her liability carrier or attorney.  Twin City Fire Ins. Co. v. Old World Trading Co., 639 N.E.2d 584, 588 (Ill. App. Ct. 1993).  The factors that may be considered in determining whether an insured's notice was reasonable include: (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and in insurance matters; (3) the insured's awareness of an event that may trigger coverage; (4) the insured's diligence in ascertaining whether coverage is available under its insurance policy; and (5) the presence or absence of prejudice.  See Livorsi Marine, 856 N.E.2d at 344.  An insurer need not show

prejudice as a result of an insured's late notice of an occurrence. <u>Livorsi Marine</u>, 856 N.E.2d at 346. The Court in <u>Livorsi Marine</u> stated as follows:

> [T]he presence or absence of prejudice to the insurer is one factor to consider when determining whether a policyholder has fulfilled any policy condition requiring reasonable notice. We also hold that once it is determined that the insurer did not receive reasonable notice of an occurrence or a lawsuit, the policyholder may not recover under the policy, regardless of whether the lack of reasonable notice prejudiced the insurer.

<u>Id.</u>

Finally, Illinois courts routinely enforce notice provisions where a business faces potential liability but fails to timely notify its insurer. <u>See, e.g.</u>, <u>Montgomery Ward & Co., Inc. v. Home Ins. Co.</u>, 753 N.E.2d 999, 1004 (Ill. App. Ct. 2001) (insured retailer's delay of up to one year did not constitute insurance policy's notice requirement of "as soon as practicable").

The USF&G Policy requires that VOA provide notice of an occurrence "as soon as practicable." (PL ST at ¶ 13, Ex. 1.) VOA did not notify USF&G of Madden's August 19, 2002 accident until August 31, 2004, a delay of two years. Albert Migon, VOA's Project Manager, was aware of Madden's accident soon after it occurred. (<u>Id.</u> at ¶ 25, Exs. 7 and 8.) However, Mr. Migon did not investigate Madden's fall and did not ensure that the accident was reported to USF&G. The record before this Court establishes that the only notice VOA provided occurred on August 31, 2004, when VOA faxed the Third Amended Complaint to its insurance agent, AVA, who then forwarded the pleading to USF&G, two years after Madden's fall. (<u>Id.</u> at ¶ 49.) This is not notice "as soon as practicable". To state that VOA's reporting of the accident is merely late is a gross understatement. Such egregious delays have routinely been found to be late, as a matter of law. <u>See, e.g.</u>, <u>Livorsi Marine</u>, 856 N.E.2d at 348, <u>General Cas. Co. of Ill. v. Juhl</u>, 669 N.E.2d 1211, 1214 (Ill. App. Ct. 1996) (seven and one-half month delay unreasonable as a matter of law); <u>Montgomery Ward & Co., Inc.</u>, 753 N.E.2d at 1004 (late notice of potential claim to excess insurer, of eight months to one year, not "as soon as practicable").

VOA's two-year delay in notifying USF&G was late as a matter of law, and there can be no reasonable explanation or excuse. VOA, through its Project Manager, had prior knowledge in 2002 that a worker fell into an orchestra pit that VOA designed, yet VOA did not provide notice of the accident until VOA itself was sued in August 2004. Accordingly, VOA's breach of the

terms and conditions of the USF&G Policy relieves USF&G of any duty to defend or indemnify VOA.

## V.  **CONCLUSION**

For all of the foregoing reasons, USF&G's Motion for Summary Judgment should be granted and judgment as a matter of law should be entered in its favor.

Date:   April 8, 2009

Respectfully submitted,

**UNITED STATES FIDELITY & GUARANTY COMPANY**

By:   s:/Linda J. Carwile
      One of Its Attorneys

Rory T. Dunne
Linda J. Carwile
**KARBAL, COHEN, ECONOMOU,
SILK & DUNNE, LLC**
200 South Michigan Avenue, 20th Floor
Chicago, Illinois  60604
(312) 431-3700
(312) 431-3670 fax