# EXHIBIT 7

Page 1

```
 1    STATE OF ILLINOIS      )
                             )    SS.
 2    COUNTY OF COOK         )
 3              IN THE CIRCUIT COURT OF COOK COUNTY
 4              COUNTY DEPARTMENT - LAW DIVISION
 5
      MICHAEL J. MADDEN and      )
 6    JEAN MADDEN,               )
                                 )Case No. 03 L 000433
 7              Plaintiffs,      )
                                 )
 8         vs                    )
                                 )
 9    F.H. PASCHEN, S.N.         )
      NIELSON, INC., JACOBS      )
10    FACILITIES, INC., CLIFFS   )
      AND CABLES, LLC, AND       )
11    VOA & ASSOCIATES,          )
      INC.,                      )
12                               )
                Defendants.      )
13
14
15              The Discovery Deposition of ALBERT
16    MIGON taken before SHERRY L. JONES, a Certified
17    Shorthand Reporter pursuant to the provisions of
18    the Illinois Code of Civil Procedure and the
19    applicable rules of the Supreme Court to the
20    taking of discovery deposition at 222 North
21    LaSalle Street, Suite 430, Chicago, Illinois, at
22    the hour of 10:00 p.m., on the 7th day of
23    February of A.D., 2006.
24
```

PAVESICH & ASSOCIATES
(312) 214-1992

FBFK 1671
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

**Page 2**

```
 1  Present:
 2  HARMAN FEDICK & O'CONNOR LTD
      BY: MR. KEVIN W. O'CONNOR
 3  222 North LaSalle Street, Suite 430
      Chicago, Illinois 60601
 4  Appeared on behalf of the Plaintiffs;
 5  BRENNER, FORD, MONROE & SCOTT, LTD.
      BY: MR. KENNETH M. BATTLE
 6  33 North Dearborn Street, Suite 300
      Chicago, Illinois 60602
 7  Appeared on behalf of F.H. Paschen and S.N.
      Nielsen, Inc.;
 8
    HINSHAW & CULBERTSON LLP
 9  BY: MR. RICHARD VELAZQUEZ
      222 North LaSalle Street, Suite 300
10  Chicago, Illinois 60601
      Appeared on behalf of Jacobs Facilities, Inc.;
11
    FRATERRIGO, BERANEK, FEIEREISEL & KASBOHM
12  BY: MS. NADERH H. ELRABADI
      55 West Monroe Street, Suite 3400
13  Chicago, Illinois 60603
      Appeared on behalf of VOA & Associates;
14
    MECKLER BULGER & TILSON, LLP
15  BY: MR. ANDREW M. HUTCHINSON
      123 North Wacker Drive, Suite 1800
16  Chicago, Illinois 60606
      Appeared on behalf of Schuler & Shook;
17
    NYHAN, PFISTER, BAMBRICK, KINZIE & LOWRY, P.C.
18  BY: MR. DEAN BARAKAT
      20 North Clark Street, Suite 1000
19  Chicago, Illinois 60602
      Appeared on behalf of School District 230.
20
21
22
23
24
```

**Page 3**

```
 1              I N D E X
 2
    EXAMINATION OF ALBERT MIGON          PAGE
 3
 4  BY MR. O'CONNOR              6
      BY MR. BATTLE              107
 5  BY MR. VELAZQUEZ            110
      BY MR. HUTCHINSON          135
 6  BY MR. O'CONNOR             143
      BY MR. BATTLE             150
 7  BY MR. VELAZQUEZ           151
      BY MR. BARAKAT            153
 8  BY MS. ELRABADI            160
      BY MR. BARAKAT            166
 9
10
11
12
13
    EXHIBITS MARKED
14
    MIGON EXHIBIT NOS. 1 AND 2          4
15  MIGON EXHIBIT NO. 3              107
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1              (Whereupon, Migon Exhibit
 2           Nos. 1 and 2 were marked
 3           for identification.)
 4           (The witness was duly sworn.)
 5       MR. O'CONNOR:  Please state your name
 6  for the record.
 7       THE WITNESS:  Albert Migon.
 8       MR. O'CONNOR:  Let the record reflect
 9  that this is the discovery deposition of Albert
10  Migon taken pursuant to notice, taken pursuant
11  to Illinois Supreme Court rules, and all local
12  applicable rules of the Circuit Court of Cook
13  County.
14           Mr. Migon, you've given your
15  deposition at least once before, correct?
16       THE WITNESS:  Yes.
17       MR. O'CONNOR:  And that was in the
18  Regalado case?
19       THE WITNESS:  Yes.
20       MR. O'CONNOR:  Have you given it any
21  other time?
22       THE WITNESS:  No.
23       MR. O'CONNOR:  Because my understanding
24  is you gave that deposition relatively recently
```

**Page 5**

```
 1  in the last month or two, correct?
 2       THE WITNESS:  No, I think it was later
 3  than that.
 4       MR. O'CONNOR:  Okay.
 5           You still remember the ground rules
 6  about answering out loud and things of that
 7  nature?
 8       THE WITNESS:  Yeah, more or less.
 9       MR. O'CONNOR:  I won't go over all of
10  those.  The only thing I'll remind you is if I
11  ask you a question and if you don't understand
12  the question, please ask me to repeat it or
13  rephrase it.  Is that agreeable?
14       THE WITNESS:  Okay.
15       MR. O'CONNOR:  If I ask you a question
16  and you answer my question, I'm going to assume
17  that you understood my question and that your
18  answer was in response to the question I just
19  gave.  Is that fair?
20       THE WITNESS:  Okay.
21       MR. VELAZQUEZ:  Then also answer only if
22  you know.
23       THE WITNESS:  Okay.
24       MR. O'CONNOR:  I don't know if that
```

2 (Pages 2 to 5)

FBFK 1672
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 6

1  means anything to you.  What he is saying is if
2  you're going to guess at something, please don't
3  guess.  If you are going to give a best
4  approximation because we're talking about dates
5  and times, which is very difficult coming later,
6  you can certainly give your best approximation
7  on things.  Is that fair?
8          THE WITNESS:  Yes.
9              ALBERT MIGON,
10         called as a witness herein, having
11  been first duly sworn, was examined and
12  testified as follows:
13          E X A M I N A T I O N
14  BY MR. O'CONNOR:
15      Q   You still work for VOA, sir?
16      A   Yes.
17      Q   And what is your title?
18      A   Project architect.
19      Q   Are you licensed in Illinois?
20      A   No, I'm not.
21      Q   How long have you been a project
22  architect for VOA?
23      A   Probably about four years.
24      Q   Approximately four years?

Page 7

1      A   Approximately.
2      Q   Have you taken any part of the licensure
3  exam to become an architect?
4      A   Not yet.
5      Q   Have you applied?
6      A   I have.
7      Q   Before working for VOA who did you work
8  for?
9      A   A company called Special Projects
10  Group.
11      Q   Was that in an architectural field?
12      A   No, it was just like more renovation.
13      Q   Do you have any background or training
14  in a construction related field?
15      A   I work with my father just on
16  residential.
17      Q   What was your father's trade or
18  specialty?
19      A   Just carpentry.
20      Q   Don't say just carpentry.
21              Was he a union carpenter?
22      A   No, he wasn't.
23      Q   Was it something that he just did over
24  the years and became knowledgeable and was

Page 8

1  trained just based on his experience of doing it
2  over the years?
3      A   Right.
4      Q   You then as you grew up because your dad
5  was in the carpentry trade learned carpentry
6  from working with him?
7      A   Right, just summers.
8      Q   How many years did you do carpentry work
9  with your father?
10      A   Probably four years.
11      Q   What type of work did -- you said
12  residential housing?
13      A   Right, residential.
14      Q   Was it rehabbing?
15      A   Mostly rehabbing.
16      Q   Your dad would buy up a property, fix it
17  up, hopefully either keep it or rent it out or
18  turn around and sell it?
19      A   No.  Just someone would hire him and
20  they would just do some renovation inside or
21  something like that.  Usually it was, you know,
22  just working with an owner basically.
23      Q   Oh, I see.
24              Your dad was actually like a

Page 9

1  contractor --
2      A   Correct.
3      Q   -- for an owner?
4      A   Correct.
5      Q   You've got to let me finish my question.
6      A   I'm sorry.
7      Q   That's the one rule.  She can't take
8  down two people talking at once.  You probably
9  know what I'm asking, but you have to wait until
10  I'm finished.
11              Did you ever have to work during
12  those summers on scaffolds?
13      A   Not really.
14      Q   Did you work on any roofs?
15      A   Yeah, we did.
16      Q   In terms of your training on safety when
17  you are working on a roof or elevated place, is
18  that something that you were taught by your dad?
19      A   No.
20      Q   Did you just go up there without any
21  kind of harness?
22      A   Yes.
23      Q   You did?
24      A   Yes.

3 (Pages 6 to 9)

FBFK 1673
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 10

1    Q    Did you ever have an instance where you
2  fell from any particular height?
3    A    No.
4    Q    Has your dad, do you know?
5    A    No.
6    Q    Was it just you and your dad or did he
7  have other people working for him?
8    A    He did have a couple other people
9  working for him.
10    Q    Did he have an actual company name or
11  was he a sole proprietor?
12    A    Migon Construction is what it was
13  called, sole proprietor, I guess.
14    Q    He operated under that particular
15  name?
16    A    Correct.
17    Q    Did you ever work over a platformed area
18  where you would have potential for falling?
19    A    Not that I recall.  We did mostly inside
20  work.  You know, I mean on occasion if we had to
21  do an addition where somebody wanted a dormer or
22  something like that, then obviously we got on a
23  ladder to do the roof beams and things like
24  that, but that was about it.

Page 11

1    Q    During your work with your father you
2  learned of the words or the terms OSHA,
3  correct?
4    A    No.
5    Q    You never heard of it?
6    A    No, I didn't.
7    Q    What's your educational background?
8    A    I went to the Illinois Institute of
9  Technology and got a bachelor's of architecture
10  there.
11    Q    And what year?
12    A    I graduated in '94.
13    Q    And what years were you there?
14    A    From '89 to '94.  It was a five year
15  program.
16    Q    Did you go on for any additional
17  training after that?
18    A    No.
19    Q    Right after you finished school, who did
20  you go to work for, Special Projects Group?
21    A    Correct.
22    Q    What kind of projects were you working
23  on for Special Projects Group?
24    A    There was a variety of them.  They did

Page 12

1  like kitchen remodeling.  They did, you know,
2  bathrooms.
3    Q    Residential work?
4    A    More residential but some highrise
5  residential.
6    Q    It was highrise, low-rise, single family
7  homes?
8    A    Yes.  I mean, it was residential work.
9    Q    You left Special Projects Group in
10  approximately 2002 then?
11    A    No, in '97 it was.
12    Q    After '97 who did you go to work for?
13    A    VOA.
14    Q    You had said you were a project
15  architect for VOA for the next four years?
16    A    Yeah.  I mean, I started working there
17  in '97.  You're not a project architect right
18  off the back.  You're more or less a draftsman,
19  and then you just kind of work your way up.
20    Q    They call it an intern?
21    A    Right.  Well, technically you're just a
22  draftsman.  An intern is someone more that they
23  hire from school.  They do like a part-time
24  internship, you know, work for a few months and

Page 13

1  then they go back to school.  So, no, I wasn't
2  an intern.  I was hired as a draftsman.
3    Q    In '97 when you were hired as a
4  draftsman, what type of work did you do?
5    A    Basically drafting on the computer.
6    Q    Any particular types of projects?
7    A    I had started there in residential
8  renovation.
9    Q    My understanding is VOA does a lot of
10  health care related work?
11    A    There is a variety of studious.  We do
12  education.  We do some health care.  We do
13  residential, a variety of --
14    Q    So when you started out, you were in
15  that residential section?
16    A    Correct.
17    Q    That's kind of where your background
18  was?
19    A    Yes.
20    Q    How many years did you stay in that
21  residential section?
22    A    Well, it was -- the project lasted for
23  approximately a year and then, you know, the way
24  they work is, you know, if there is another

4 (Pages 10 to 13)

FBFK 1674
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

**Page 14**

1  project that comes on-line depending on who is
2  doing what and who is slowing down, they shift
3  people to that project.
4      Q    In '98 what project did you get shifted
5  to?
6      A    It was the Department of Natural
7  Resources office building project.
8      Q    Was this a large building?
9      A    Yes.
10     Q    How many stories?
11     A    It was just a four story building.
12     Q    And what was your aspect of that
13  project?
14     A    Basically it was just the drafting of it
15  at that time.
16     Q    Were you drafting the entire building,
17  the interior buildout?  What were you doing?
18     A    No, it was more some of the details and
19  stairs, some wall sections.
20     Q    Did somebody else at the company do the
21  actual structural aspects of it?
22     A    We had a consultant that -- I mean,
23  typically we hire a consultant for the
24  structure, so yes.

**Page 15**

1      Q    How long did that project last?
2      A    Probably -- I was on it until early 2002
3  basically.
4      Q    That was the sole project other than
5  maybe for a day you might have been called in to
6  do some little things; is that correct?
7      A    Yes, that's correct.
8      Q    Did you work on any school projects
9  before this one at Stagg High School or that
10  group of schools for District 230?
11     A    No, I didn't.
12     Q    Once you were done with this Department
13  of National Resources building, did you then get
14  moved over to the Stagg High School building?
15     A    Yes.
16     Q    When you came on board what -- do you
17  remember what month it was?
18     A    I think it was approximately February of
19  '02.
20     Q    Did you know who you were replacing?
21     A    Yes.
22     Q    Who were you replacing?
23     A    Dennis O'Malley.
24     Q    Did you know why you were replacing

**Page 16**

1  Dennis O'Malley?
2      A    He left the company.
3      Q    In February of '02 before you started,
4  what was explained to you your role was going to
5  be at that project?
6      A    Well, basically they kind of explained
7  that we had three schools that were currently
8  under construction, and basically it was just
9  going to be the project management portion of
10  it.
11     Q    By project management portion of it,
12  you're walking the sites, conversing with the
13  construction managers, and making sure things
14  are getting done appropriately?
15     A    Well, what we did was -- I mean, I had
16  change orders to review.  I had pay applications
17  for contractors to review.  We would have
18  project meetings on-site that I would have to
19  attend.  You know, then also walking through the
20  building, you know, just checking to see the
21  progress of the construction and, you know,
22  making sure that -- more or less the field
23  observation.
24     Q    When you started in February of '02 did

**Page 17**

1  you have project meetings for the Stagg School
2  specifically?
3      A    We did have them, yes.
4      Q    Were they on a weekly basis when you
5  started?
6      A    I thought they were on a weekly basis.
7      Q    At some point did it change from a
8  weekly basis to become less frequent?
9      A    Well, yeah.  When the construction was
10  finishing up, the schools kind of ended at
11  different periods, and Stagg I believe was the
12  first one more or less to get finished.  So I
13  think the meetings -- we no longer had weekly
14  meetings.  They may have been monthly or every
15  couple of weeks, but I don't recall.
16     Q    You were working with Ms. Fitzgerald on
17  that Stagg School?
18     A    Yes.
19     Q    She described that in May of 2002 that
20  she went off of this project.  Do you recall
21  that?
22     A    Yes.
23     Q    At the point she left the project were
24  you the primary one then overseeing what was

5 (Pages 14 to 17)

FBFK 1675
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 18

1  still remaining at that project?
2      A   Yes.
3      Q   In May of '02 after she left, were you
4  there on a daily basis?  Did you come biweekly,
5  couple times a week?  Did it depend on what was
6  going on?
7      A   I believe it was just more the weekly
8  basis.
9      Q   Did you have a particular day that you
10  would come by that particular project?
11      A   I don't recall.
12      Q   Would you spend a full day there?  Would
13  you spend a half a day?  What would you --
14      A   Well, depending on, you know, if the
15  construction was almost done, there would be no
16  reason to be there for a full day.  Typically if
17  it was just a meeting, then I was just there for
18  the meeting.
19      Q   Were you still walking the site after
20  she left at Stagg?
21      A   I don't recall exactly when she left
22  but, you know, if there was something that the
23  owner wanted us to look at then, yes, then I
24  would.

Page 19

1      Q   Let me put it this way.
2          School ended in May of 2002,
3  correct?
4      A   Yes.
5      Q   And then you have the summer portion?
6      A   Right.
7      Q   In the summer of 2002 did you on
8  occasion still walk through this site at Stagg
9  School?
10      A   I don't remember.  I mean, it would have
11  been dependent on where the construction was,
12  you know.  If there was still construction that
13  needed to be done and we hadn't done any punch
14  lists then, yes, I would.
15      Q   How about in the fall of 2002 when the
16  new school year started?  Do you recall walking
17  through at that point?
18      A   No, I don't.
19      Q   You don't recall one way or the other?
20      A   No, I don't recall that I was walking
21  through there.  I thought that the construction
22  was more or less done in there.
23      Q   Not in there.  You are saying in there.
24      A   In Stagg.

Page 20

1      Q   So you are saying at the time that the
2  students began coming back in you would have no
3  longer been on this project or you are saying
4  that you just wouldn't be walking it?
5      A   I wouldn't be at Stagg.  There was still
6  Sandburg that was under construction and hadn't
7  been completed yet, so I would have been at
8  Sandburg.
9      Q   When was the final payout for Stagg?
10  Wasn't it in 2003?
11      A   I don't know.
12      Q   Would you have been involved in the
13  final payout?
14      A   No, we weren't.
15      Q   Don't you have to sign off as the
16  architect saying that even the punch list items
17  are correct in such that you can give a sign off
18  to let the people get their final payment?
19      A   After a certain date the owner, you
20  know, didn't employ us anymore.  Our contract
21  basically ran out.  So we -- I know that we had
22  nothing to do with the final payout of Stagg or
23  actually any of the other schools.
24      Q   When did your contract run out?

Page 21

1      A   I think it was at the end of '02.
2      Q   December of '02?
3      A   December of '02.
4      Q   And at that point you recall that the
5  final payouts hadn't been done at that point?
6      A   Yeah, I don't believe they have been.
7      Q   When you came on this job, did you
8  review the contract that VOA had?
9      A   No, I didn't.
10      Q   So you had seen similar contracts I take
11  it?
12      A   Well, typically the architects have a
13  contract called the -- I believe it's a B201
14  with the owner.  So I had seen a previous one.
15  The project was already under construction.  I
16  didn't bother looking at it.
17      Q   Is it basically a form contract that you
18  guys use?
19      A   More or less, yes.
20      Q   Then you make some modifications or
21  additions depending on the project that you are
22  on?
23      A   Yes, sometimes they do that.
24      Q   I'll show you what I've marked as Migon

6 (Pages 18 to 21)

FBFK 1676
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 22

1   Group Exhibit 1, which has been tendered to me
2   as the contract for this particular project from
3   your attorneys.  If you can just take a look at
4   it and tell me if that's that the standard
5   contract that you are referring to?
6       MR. BATTLE:  Standard contract or the
7   particular contract?
8       MR. O'CONNOR:  Not the particular, the
9   standard contract.
10      THE WITNESS:  I can't be sure.
11  BY MR. O'CONNOR:
12      Q   Does it look similar to other ones that
13  you have seen?
14      A   It does, but typically I have seen the
15  ones that has the AIA documentation on the top,
16  and this one doesn't.
17      Q   Let me ask you first of all a few
18  questions in general.
19          You have been involved in projects
20  at least even since that time where you were
21  involved in the design phase of projects?
22      A   Yes.
23      Q   In the design -- in that -- in the
24  design phase of the project do you agree that

Page 23

1   the architect is to review with the owner
2   alternative approaches to design and
3   construction of the project?
4       A   Where is this at?
5       Q   I'm just -- I will ask you -- I'm
6   reading from something.  I'll just ask you the
7   general statement because I don't want to point
8   to something that you're not familiar with.
9       A   Can you repeat the question, please?
10      Q   Sure.
11          In the design phase of a project
12  would you agree that the architect, such as VOA,
13  shall review with the owner alternative
14  approaches to design and construction of the
15  project?  Is that one of the roles that VOA
16  plays?
17      A   Yes, I believe so.
18      Q   The architect also provides a
19  preliminary evaluation of the owner's program or
20  what they are submitting that they want to do?
21      A   Typically, yes.
22      Q   The architect typically is the
23  representative of and shall advise and consult
24  with the owner during construction until final

Page 24

1   payment to the contractor is due?  Is that the
2   typical situation?
3       A   Yes.
4       Q   And you explained in this situation
5   though your contract ran out before final
6   payment was due?
7       A   Yes.
8       Q   If the original contract provided that
9   the architect wasn't to be paid until the final
10  payment was due, would there have to be some
11  modification to the contract to end your
12  services early?
13      A   I'm not sure about that.  I don't know
14  exactly if the contract had been specified for a
15  certain amount of days.  There was a
16  construction schedule that had been done and
17  typically the contract -- for construction
18  administration and field observation it's
19  typically based on the construction line.  So
20  any time construction goes over the schedule,
21  typically we would ask the owner for additional
22  compensation, you know, due to the extended
23  schedule.
24      Q   And they may or may not want to have you

Page 25

1   there?
2       A   That's correct.
3       Q   Do you recall typically there being a
4   paragraph that says nothing contained in this
5   document shall relieve the architect from
6   responsibility or liability to the owner for any
7   failure of the architect to perform in
8   accordance with the terms of this agreement or
9   by standards of professional care?  Is that --
10      MR. BATTLE:  Are you asking him if
11  that's in the original contract or is that in
12  the form contract?
13  BY MR. O'CONNOR:
14      Q   Is that a typical statement?
15      A   I'm not sure.
16      Q   What is -- if you had read in the
17  contract that an architect has to perform in
18  accordance with the standards of professional
19  care, you've heard that term before, correct?
20      A   I've heard it asked at the last
21  deposition.
22      Q   All right.
23          And did you inquire of people back
24  at the office of what does conforming to the

7 (Pages 22 to 25)

FBFK 1677
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 26

1  standards of professional care mean after you
2  heard it?
3      A   No, I didn't.
4      Q   You as an architect, what does it mean
5  when -- if I would ask you what's the standard
6  of professional care of an architect, what would
7  you respond?
8      A   I'm not sure.
9      Q   In your schooling and training what
10  rules, codes, provisions does an architect
11  follow in performing their work?
12     A   Well, I mean, in schooling we really
13  didn't get into codes and that type of
14  information.  I mean, typically school taught us
15  mostly, you know, design.  There was a little
16  bit of, you know, professional practice is what
17  they call it where an architect would come in
18  and just kind of talk about the business; but
19  usually that stuff you learn after you start
20  working, you know, when you work with an
21  experienced person in the office.
22     Q   When VOA starts a project, you just
23  don't design something without considering the
24  codes and --

Page 27

1      A   Correct.
2      Q   Do you go to references?  Do you go to
3  standard forms that you guys have?  What do you
4  guys usually use?
5      A   Typically we do -- you know, there would
6  be a code analysis or we do -- whatever code the
7  project is required to be billed by, that's what
8  we use, you know, for building -- drawing the
9  drawings to comply by the code.
10     Q   What is the -- is there any general
11  codes or national standards that you guys abide
12  by?
13     A   There is a variety of them.  Chicago
14  building code has their own.  There is the IBC,
15  which is the, you know, Illinois building code.
16  There is a variety of them.  It just depends on
17  what -- sometimes they do it by region.  What
18  they mandate they use.  Sometimes they do it by
19  city.  So, you know, whatever region, they
20  mandate what kind of code you use.
21     Q   But you know on every project there are
22  certain codes that you've got to follow?
23     A   Yes.
24     Q   And you know that your work has to

Page 28

1  conform with those codes?
2      A   Yes.
3      Q   And if your work doesn't -- if something
4  the owner is asking you to do doesn't conform
5  with a particular code, the architect would have
6  to advise them of that, correct?
7      A   Yes.
8      Q   And you would have to advise them of
9  that.  If they insisted on going ahead and
10  having you draft something that didn't conform
11  with the code, what's the architecture's
12  responsibility at that point?
13     A   Well, we would hopefully tell them.
14     Q   You can't do it that way?
15     A   Right.
16     Q   You wouldn't allow them to use documents
17  that you drafted that didn't conform with a
18  code?
19     A   Right.
20     Q   Additional -- contention additional
21  services, are you familiar with that?
22     A   Yes.
23     Q   Can there be revisions, drawings, and
24  specifications or other documents that weren't a

Page 29

1  part of the original agreement?
2      A   Yes, there could be.
3      Q   Are those revisions, drawings, or
4  specifications required by the enactment or the
5  revision of any codes, laws, or regulations
6  after the preparation of the document that can
7  come up?
8      A   Yes.
9      Q   And if it does, as the architect and
10  you're asked to do some revision or some code
11  comes into effect, you'll notify the owner and
12  say that we have to revise something because of
13  some change?
14     A   Well, I guess it depends.  Because
15  typically when you start a project and you're
16  designing to the code that's current at the
17  time, that's what you're designing to.  You
18  know, codes can change over a year, over two
19  years.  So if you have a project that last five
20  years, you know, you're required to design by
21  the code that you designed at the time you
22  started the project.  They won't require you to,
23  you know, scrap everything that you've already
24  done just because the new codes come out and

8 (Pages 26 to 29)

FBFK 1678
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 30

1  that's what it is.
2      Q   An example might be if the fire
3  protection agency required three exit signs on a
4  particular floor and then they changed the code
5  to require four and it doesn't involve a
6  substantial change in the project, there may be
7  a requirement to update to the four signs,
8  correct?
9      A   If the owner would like, I mean, yes.
10  We typically would get direction from the owner
11  saying, you know, I know this was done this way.
12  Since then, you know, it's changed and we would
13  like to go by this change.  Then they would
14  direct us to that, yes.
15      Q   Someone has to notify you of the
16  change?
17      A   Yes, exactly.
18      Q   Then you guys have to design it in
19  accordance with the new code if that's what's
20  required?
21      A   Yes.
22      Q   Is it true that as an architect that
23  your drawings have to conform -- sorry.  Strike
24  that.

Page 31

1          Is it true that as an architect the
2  drawings and specifications have to conform with
3  all applicable federal, state, and local laws
4  statutes, ordinances, rules, regulations,
5  orders, or other legal requirements, including
6  but not limited to all zoning, building,
7  occupancy, environmental, and land use laws,
8  requirements, regulations, and ordinances
9  relating to the construction, use, and occupancy
10  of the project existing at the time of
11  preparation of the drawings and
12  specifications?
13      A   That's a little long.  Is there --
14      MS. ELRABADI:  Can you break that up?
15      MR. O'CONNOR:  Sure.  You can take a
16  look right there.
17      THE WITNESS:  Just the highlighted
18  portion?
19      MS. ELRABADI:  Can you say for the
20  record what you're reading from?
21      MR. O'CONNOR:  It's group -- it's Migon
22  Group Exhibit 1 of the contract, and it's page
23  24, Article 13, other conditions and services
24  under paragraph 13.4.

Page 32

1      MR. BATTLE:  Counsel, your question was
2  is that a true statement?
3      MR. O'CONNOR:  Yes.
4      THE WITNESS:  I would agree with that.
5  BY MR. O'CONNOR:
6      Q   In addition, the architect has to use
7  its best efforts to obtain at least -- at the
8  earliest practicable time review of the drawings
9  and specifications from any governmental agency
10  having authority over the project, quote,
11  unquote, authority?  Do you see that sentence?
12      A   Yes.
13      Q   Is that also a standard thing that the
14  architect has to do?
15      A   I would agree.
16      Q   Then I'm going to shift you to the rider
17  which comes at the end of this, and it has a
18  page two on it.  Under Section 7 it indicates
19  there that the system by which substantial
20  completion -- what the process is.  Does this
21  describe accurately the process -- and I'll
22  paraphrase it for you -- that when the
23  construction manager considers the contractor's
24  work or a portion thereof substantially

Page 33

1  complete, the construction manager with the
2  owner prepares a list of incomplete or
3  unsatisfactory items or a punch list?  Is that
4  what happens?
5      A   I don't remember that that was the way
6  it went.
7      Q   Okay.
8          On this project -- you are saying on
9  this project you don't recall it being operated
10  in that fashion?
11      A   Right, I don't recall it being operated.
12  I recall we did get a punch list from Jacobs,
13  but then we also did our own punch list.
14      Q   So in a sense you as the architect being
15  on-site were doing some of the punch list items
16  on behalf of the owner or doing the inspections
17  on behalf of the owner?
18      A   Yes.
19      Q   In essence in this paragraph you were
20  taking on the role or acting as the
21  representative of the owner in identifying some
22  of the punch list items?
23      A   Yes.
24      Q   You were the one consulting with the

9 (Pages 30 to 33)

FBFK 1679
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 34

1   construction manager to determine which punch
2   list items needed to be completed or not
3   completed?
4       A    What we did was we gave them a list of,
5   you know, some of the items that we had put on
6   our punch list, and they distributed it to the
7   contractors who were responsible for that
8   work.
9       Q    Much like -- that's what I'm saying.  In
10  this paragraph it's much like the owner would
11  have to do, submit a list to the contractor.
12  You as the owner representative were submitting
13  them on behalf of the owner?
14      A    Yes.
15      Q    When a certificate of substantial
16  completion is done, it has to be signed by
17  several people; isn't that true?
18      A    Yes, typically.
19      Q    It has to be signed by -- when you're
20  operating such as at this Stagg School, it has
21  to be signed by the architect, correct?
22      A    Yes.
23      Q    It has to be signed by the construction
24  manager?

Page 35

1       A    Yes.
2       Q    It has to be signed by the contractor
3   itself?
4       A    Yes.
5       Q    And it has to be signed by the owner?
6       A    Yes.
7       Q    Until all of those signatures are in
8   place, you don't have an agreement as to
9   substantial completion; isn't that true?
10      A    Well, we give -- we issue the initial
11  document.  We send that to the owner and I
12  believe it was the construction manager at the
13  time, and they would have been responsible for
14  getting signatures.
15      Q    But until it's actually signed, you
16  don't have a certificate of substantial
17  completion.  That's why it's a document that's
18  called a certificate, right?
19          MR. BATTLE:  Objection, he asked and
20  answered that question.
21          MR. VELAZQUEZ:  Join.
22  BY MR. O'CONNOR:
23      Q    Go ahead and answer.
24      A    No.  I mean, that's the certificate.  We

Page 36

1   are the ones issuing it.  So our signature says
2   that the building is substantially complete.
3       Q    Then what's the point of having other
4   people sign off on it?
5       A    Well, that's a matter -- I mean, I'm not
6   sure why they need to sign off.  It's just a
7   matter of them, I assume, showing them that
8   there is a certificate that's issued and they
9   agree to the punch list items, that they have to
10  correct them.
11      Q    I'm going to show you what's been
12  previously marked Elaine Fitzgerald Exhibit
13  No. 2.  Looking at Exhibit No. 2 it's just a two
14  page certificate of substantial completion
15  regarding this project, correct?
16      A    Yes.
17      Q    This document in and of itself is
18  actually incomplete because there should be
19  attached to it punch list items that are
20  enumerated that would tell what is left to be
21  done, correct?
22      A    Yes.
23      Q    Have you seen that document with the
24  punch list attached to it at all in this case?

Page 37

1       A    Typically, yes, we would.
2       Q    In this case have you -- do you recall
3   seeing that with the attachments to it?
4       A    Well, I was the one that issued this,
5   and I put a punch list with it.
6       Q    Do you know what would have been
7   contained in that punch list?
8       A    I don't remember.
9       Q    Are you talking about pages and pages?
10      A    Yes, pages.  I assume pages.
11      Q    I want to look at -- is this the one you
12  submitted in this case that has your name on the
13  bottom?
14      A    Yes, it has my name on the bottom.
15      Q    It has the date of 5/21/02 under your
16  name, correct?
17      A    Yes.
18      Q    On page two it has Paschen signing off
19  on it in August of '02.  Do you see that?
20      A    Yes.
21      Q    Do you know why Paschen signed off on it
22  three months after you did?
23      A    I don't know.
24      Q    And do you know if in this project the

10 (Pages 34 to 37)

FBFK 1680
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 38

1  owner ever signed off on this certificate?
2      A    I don't know.
3      Q    Do you know if Jacob's construction
4  manager ever signed off on this certificate?
5      A    That, I don't know either.
6      Q    Normally wouldn't a construction manager
7  have to sign off on the certificate?
8      MR. VELAZQUEZ:  Objection.  He has asked
9  and answered.
10  BY MR. O'CONNOR:
11      Q    Such as this?
12      A    Well, I mean, we're the ones that start
13  it.  So when they get it, they are going to have
14  to sign off on it, but basically what we do is
15  we attach the punch list.  So whether it's a
16  matter of them signing off on it when the punch
17  list is complete or, you know, when they get the
18  certificate, I'm not positive when the actual
19  sign off takes place.
20      Q    The construction manager is not
21  performing the actual work.  They are
22  supervising all the construction, correct?
23      A    Yes.
24      Q    Their role is in the technical

Page 39

1  day-to-day aspects of what's going on in the
2  project, right?
3      A    Yes.
4      Q    They have to either agree with your
5  punch list items or disagree.  They may even add
6  things to your punch list items; isn't that
7  true?
8      A    That's correct.
9      Q    So they may have their own punch list
10  items in addition to yours?
11      A    Yes.
12      Q    So until the construction manager and
13  yourself supply a full punch list of items, you
14  don't have an agreement as to the substantial
15  completion aspect of the project?
16      MR. BATTLE:  Objection to the term
17  agreement, and he has already testified to what
18  substantial completion certificate stands for.
19      MR. VELAZQUEZ:  Join.
20  BY MR. O'CONNOR:
21      Q    Go ahead.  You can answer the question.
22      A    Can you repeat the question?
23      MR. O'CONNOR:  Sure.
24          Can you repeat the question?

Page 40

1          (Whereupon, the record was
2           read by the court
3           reporter.)
4      THE WITNESS:  I wouldn't agree with
5  that.  I mean, we're the ones that initiate this
6  document, and we walk through the space, you
7  know, to check out everything if it's basically
8  complete so the owner can use it.  So, I mean,
9  since we are the ones issuing the document, when
10  we say it's substantially complete, that's the
11  date.  I mean, that's how I've always done it
12  and how we've been taught to do it.
13  BY MR. O'CONNOR:
14      Q    Then what aspect does the construction
15  manager punch list play a role in any of this?
16      MR. VELAZQUEZ:  Objection, foundation.
17      THE WITNESS:  Well, I mean, they are the
18  ones that are on the job.  Their punch list in
19  addition to ours still requires the contractor
20  to complete the work.  So they are basically
21  also monitoring the work, and if there is
22  something that they see that hasn't been done,
23  they are responsible -- I guess according to
24  whatever that rider was, they are also

Page 41

1  responsible to provide some sort of punch
2  list.
3  BY MR. O'CONNOR:
4      Q    So all this document says is from the
5  architectural standpoint that you're issuing
6  your aspect of a certificate of substantial
7  completion with your punch list document?
8      MR. BATTLE:  Objection.  The document
9  speaks for itself.
10      MR. VELAZQUEZ:  I join.
11      THE WITNESS:  Basically we're saying
12  that the building or the construction area that
13  we've issued the certificate of substantial
14  completion for, you know, basically says that
15  the work is complete to the point where the
16  owner can use it for its intended purpose.
17      MR. O'CONNOR:  We'll get to that in a
18  second.
19  BY MR. O'CONNOR:
20      Q    What I'm getting at is this is a
21  certificate issued by VOA that it's their
22  position that it's reached that point?
23      A    Yes.
24      Q    When it lists all these sections in

11 (Pages 38 to 41)

FBFK 1681
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 42

1  here, can you tell me what sections this is
2  referring to or what portions of the building?
3      A   Which sections?
4      Q   Up here. It says project or designated
5  portions shall include, and it has a list of
6  areas.
7      A   They are room numbers.
8      Q   The area that involved the theatre or
9  the staging area, was that the E section?
10     A   I don't recall.
11     Q   Was the theatre any of the S sections?
12     A   I'm not sure. They may have been rooms
13 that were adjacent.
14     Q   Do you recall any of the designation
15 that went for the theatre or staging area?
16     A   No, I don't. It's been a while.
17     Q   So you don't even know if this document
18 applies to the theatre or stage section area?
19     A   The only thing that would lead me to
20 believe it is area PA, performing arts. That
21 was what we, you know, designated performing
22 arts. So PA was the performing arts theatre.
23     Q   And what is the first, second, and third
24 floor relating to the performing arts theatre?

Page 43

1      A   I believe there was a first, second, and
2  third floor that corresponded to the theatre.
3      Q   The theatre itself only has one floor,
4  correct?
5      A   Yes, but there is a cat walk system.
6  There is — I think there was a floor
7  intermediate that may have been adjacent to it.
8  So that's basically what it would entail.
9      Q   Is there a reason that there would be
10 specific rooms designated and not other rooms?
11 Does that indicate that there is areas that may
12 not in the performing arts section be
13 substantially completed?
14     A   Well, this basically list the areas that
15 this certificate of substantial completion was
16 issued for.
17     Q   What I'm getting at is if it was the
18 entire performing arts section, you would just
19 be able to put area of entire performing arts
20 section and not designate the area, right?
21     A   Well, typically the reason you do
22 something like this would be so that you have
23 room numbers, and with a punch list someone can
24 take a look now that you've issued the room

Page 44

1  number on the punch list and they know exactly
2  what area was effected. So I think — I try to
3  do it where you list the room number on the
4  certificate and with the punch list you have a
5  room number that identifies, you know, if there
6  is any punch list items remaining in that
7  room.
8      Q   You said something earlier that's even
9  contained in this document and it's under the
10 exceptions on the — after the exceptions on the
11 following page. The second line says
12 substantial completion is the stage in the
13 process of the work when the work or
14 designated —
15     MS. ELRABADI:  Counsel, it said
16 progress.
17     MR. O'CONNOR:  Sorry.
18 BY MR. O'CONNOR:
19     Q   Substantial completion is the stage in
20 the progress of the work when the work or
21 designated portion thereof is sufficiently
22 complete in accordance with the contract
23 documents so the owner can occupy or utilize the
24 work for its intended use. Do you see that?

Page 45

1      A   Yes.
2      Q   Is that your definition of substantial
3  completion?
4      A   According to this, yes.
5      Q   In this project was that your definition
6  of substantial completion?
7      A   Yes.
8      Q   So that meant that the owner had to be
9  able to occupy and use the work area for its
10 intended purpose?
11     A   Yeah, they can utilize the spaces for
12 what they were designed to.
13     Q   In order to do that, you're aware of the
14 fact that the owner has to have an occupancy
15 permit, correct?
16     A   I believe so.
17     Q   They have to have at least a temporary
18 occupancy permanent, if not a full occupancy
19 permanent?
20     A   Okay.
21     Q   Correct?
22     A   I think so.
23     Q   You went through this document in your
24 other deposition, right?

12 (Pages 42 to 45)

FBFK 1682
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 46

1   A   Yes.
2   Q   I'll show you Moss Exhibit No. 5, which
3   is the two-page document from May 20, 2002.
4           First I want to note that the
5   May 20th document is the day before you signed
6   this certificate of substantial completion,
7   correct?
8   A   Yes.
9   Q   Does that jar your memory about when in
10  fact -- strike that.
11          Do you recall this person actually
12  going through the building?  Were you there?
13  A   No, I wasn't.
14  Q   Did a copy of this document get passed
15  along to you?
16  A   I didn't see it.  I know this was asked
17  at the last deposition, but I didn't see it,
18  no.
19  Q   So when you issued your certificate of
20  substantial completion, you did not have
21  knowledge of the document from the Fire
22  Protection Division?
23  A   No.
24  Q   If you had knowledge of the Fire

Page 47

1   Protection District's recommendations or what's
2   provided in that document, would you have added
3   the things on there to your punch list?
4   A   No.
5   Q   Looking at that document, it indicates
6   that it is an issue for a temporary occupancy
7   permit only, correct?
8   A   Okay.
9   Q   Is that true?
10  A   That's what it says there, yes.
11  Q   What is a temporary occupancy permit?
12  A   I don't know.
13  Q   As an architect has that term ever come
14  up with you before?
15  A   No, it hasn't.
16  Q   Do you understand what an occupancy
17  permit is generally?
18  A   I assume it allows the owner to occupy
19  the space.
20  Q   And if the owner can't occupy the space,
21  would you agree with me that it couldn't be used
22  for its intended use or for its designated
23  use?
24          MR. VELAZQUEZ: Objection, foundation.

Page 48

1           THE WITNESS: I'm sorry.  What was the
2   question?
3   BY MR. O'CONNOR:
4   Q   If an owner can't occupy the space,
5   would you agree with me that they can't utilize
6   it for its intended use?
7           MR. VELAZQUEZ: Objection, form and
8   foundation.
9           THE WITNESS: I wouldn't agree with
10  that.  I mean, when we go through it I'm issuing
11  a certificate of substantial completion based
12  on, you know, the design of the building, if
13  they built it according to the documents and
14  specifications.  I'm not there to see if it's
15  okay to be occupied, you know, I guess what
16  they're doing here.  I mean, that's not the
17  purpose for us to issue that certificate.
18  Q   Let's go back a second.
19          The performance arts theatre is used
20  to put on shows, presentations, correct?
21  A   Yes.
22  Q   It's for the general public to come in
23  and watch children performing theatre and other
24  things on the stage?

Page 49

1   A   Yes.
2   Q   That's its intended use?
3   A   Yes.
4   Q   And you understood that when you were
5   going through this project?
6   A   Yes.
7   Q   If it could not be occupied by students
8   or other people safely, would you agree that
9   it's not being -- it's not able to be utilized
10  for its intended purpose?
11          MR. VELAZQUEZ: Objection to form and
12  foundation.
13          MS. ELRABADI: I join.
14  BY MR. O'CONNOR:
15  Q   Go ahead.
16  A   What we're doing here I think is
17  something different than what the fire district
18  is doing.
19  Q   I want to get back to my question.
20          MR. BATTLE: Hold on.  Let him finish
21  his answer.
22          MR. O'CONNOR: That isn't an answer to
23  my question.
24          MR. BATTLE: But he didn't finish his

13 (Pages 46 to 49)

FBFK 1683
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 50

1   answer.  If he finishes and you determine that
2   that's not an answer to your question, you can
3   ask him a different question.
4          Continue.
5          THE WITNESS:  Basically, you know, it
6   appears that the fire district has the final say
7   in saying who can occupy the space and if it can
8   be occupied, not me.  I mean, the architect --
9   we're looking at this as saying substantial
10  completion is, you know, they've constructed the
11  building and we've got some punch list items but
12  the building can be used, you know.  I mean,
13  obviously this is another layer that I'm not
14  involved with.  I mean, the owner has to get an
15  occupancy certificate, and that doesn't come
16  from us.
17         MR. O'CONNOR:  Can you repeat my
18  question so I can get a correct answer to my
19  question?
20                     (Whereupon, the record was
21                      read by the court
22                      reporter.)
23  MR. VELAZQUEZ:  Same objection.
24  THE WITNESS:  Well, I wouldn't know if

Page 51

1   it was going to be occupied safely or not.  I
2   don't make that determination.
3   BY MR. O'CONNOR:
4       Q   So when you issue your certificate of
5   substantial completion, you're not certifying
6   that it could be occupied or used by the owner
7   safely?
8       A   That would be a fair statement.
9       Q   Even if you attach a list of items to be
10  corrected, am I correct that this document
11  provides that the failure to include any items
12  on such list does not alter the responsibility
13  of the contractor to complete all work in
14  accordance with the contract documents?
15      A   Yes, I agree.
16      Q   So in other words, if you guys miss
17  something when you went through on the punch
18  list, that doesn't relieve them of the liability
19  of doing everything they are suppose to do?
20      A   Right.
21      Q   Do you recall in this instance why this
22  document was signed by Paschen -- strike that --
23  why this document was, Exhibit No. 2 Fitzgerald,
24  was signed by you in May and not signed by

Page 52

1   Paschen until August?
2          MR. BATTLE:  Objection, asked and
3   answered, and it causes this witness to
4   speculate.
5          MR. VELAZQUEZ:  Join.
6          THE WITNESS:  I don't know.
7   BY MR. O'CONNOR:
8       Q   Is that typical of what you've seen in
9   the past, a three month --
10      A   I can't say.  I don't recall.
11      Q   You've now had a chance to look at Moss
12  Exhibit No. 5, and I think you've gone through
13  it I think you said at the other deposition?
14      A   Yes.
15      Q   Paragraph three, if you had been
16  provided with this document from the Fire
17  Protection District at the time, how would you
18  have interpreted paragraph three?
19      A   I don't know.  I wasn't there when they
20  were walking through this, so I am not going to
21  give an interpretation on it.
22      Q   You didn't -- you wouldn't be able to
23  understand what they mean by provide fall
24  protection over orchestra pit when not in use?

Page 53

1       A   I don't know.  I don't know what he
2   meant by it.
3       Q   What type of fall protection could you
4   provide over an orchestra pit when it's not in
5   use?
6       A   I don't know.
7       Q   As an architect if I asked you what kind
8   of fall protection could I provide over an
9   orchestra pit when it's not in use --
10      A   I don't know.
11      Q   Do you know anything about -- have you
12  ever heard of the term pit covers?
13      A   Yes, I have.
14      Q   What are pit covers used for?
15      A   I mean basically it's an extension of
16  the stage.
17      Q   Would a pit cover provide fall
18  protection over the orchestra pit when it's not
19  in use?
20      A   Possibly.
21      Q   Is there a type of lift or a floor that
22  can raise up in an orchestra pit?
23      A   I don't know too much about them.  I
24  mean, I know the ones that were eventually

14 (Pages 50 to 53)

FBFK 1684
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 54

1  installed in the District they just -- it was
2  just a panel that got put in there.
3      Q    You would agree with me that doing a
4  performing arts theatre that have orchestra pits
5  is a very specialized area?
6      A    Yes.
7      Q    And, in fact, that's why, is it your
8  understanding, that VOA had a relationship with
9  Schuler & Shook was because of the special
10 nature of this area?
11     A    Yes.
12     Q    And you were consulting with Schuler &
13 Shook because of their knowledge of doing
14 theatre or theatre type areas?
15     A    Well, I mean, VOA was, not me
16 personally.
17     Q    That's what I mean by that, VOA?
18     A    Yes.
19     Q    And were you conversing with Schuler &
20 Shook even up in 2002 on a regular basis as to
21 their recommendations as it applied to the
22 theatre area?
23     A    Well, I mean, at the time I started the
24 project typically what I had talked to them

Page 55

1  about was if there was a punch list that needed
2  to be done on the performing arts theatre.  If
3  there was a contractor that was finishing it up,
4  they would require under their contract to do a
5  walk-through similar to how we do and, you know,
6  provide a punch list on any items that were
7  unfinished.
8      Q    Would you walk through with a
9  representative of Schuler & Shook?  Would they
10 go on their own, sometimes together, sometimes
11 not?
12     A    It was a little bit of both.  I believe
13 their commissioning of the theatre, as they put
14 it, lasted a few days because they checked all
15 the sound equipment.  They checked all the
16 lighting, all the equipment that was suppose to
17 be working.  You know, so they did all of that.
18 If they were there doing their punch list and I
19 just happened to come in, I would see them; but
20 for the most part it wasn't like, you know, I
21 called them and they tell me they are going to
22 be here and here this day and, you know, we
23 would meet up and I would spend the whole day
24 with them.  It was more on occasion that I would

Page 56

1  run into them.
2      Q    Do you know what an orchestra pit filler
3  platform is?
4      A    A platform?
5      Q    Yes.
6      A    I'm not sure.  I know what an orchestra
7  pit filler is.
8      Q    I'll show you what I have marked Migon
9  Group Exhibit No. 2 with today's date and ask
10 you to take a look at that.
11          Have you seen that document
12 before?
13     A    No, I haven't.
14     Q    Take a look at it for a second.
15          Have you had a chance to look at
16 it?
17     A    Yes.
18     Q    When you came on this project was it
19 your understanding that Schuler & Shook was
20 involved in the project from even the design
21 phase?
22     A    Yes.
23     Q    And was it your understanding that
24 Schuler & Shook was consulted in the design

Page 57

1  phase specifically related to the theatre and
2  the buildout of the theatre area?
3      A    Yes.
4      Q    You know Bob Shook?
5      A    No, I don't.
6      Q    He's not the guy generally walking out
7  doing inspections, right?
8      A    I don't think so.
9      Q    You wouldn't hope so.
10          This document which is dated
11 August 4th of 1999 indicates on page three a
12 proposal for an orchestra pit filler platform,
13 and it gives a price next to it.  Do you see
14 that?
15     A    Yes, I do.
16     Q    In this document do you know what that
17 is referring to?
18     A    No, I don't.  I mean, I assume it's just
19 a pit filler.
20     Q    What is a pit filler?
21     A    It's just those panels that they use to
22 fill the area over a stage to extend it.
23     Q    Is that the same as a pit cover?
24     A    I assume, yes.  That's what I envision

15 (Pages 54 to 57)

FBFK 1685
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 58

1  as a pit filler.
2     Q   It's something to cover it when it's not
3  in use?
4     A   Correct.
5     Q   And you don't have any knowledge about
6  why it was talked about originally and not used
7  later in this particular --
8     A   No.  Like I said, I came on to the
9  project in February of '02.
10    Q   In February of '02 were you attending
11 the weekly meetings of the construction
12 manager?
13    A   Whenever I had started, yes, I started
14 to attend the meetings.
15    Q   Would it be yourself and Elaine
16 Fitzgerald, both of you, or it depends on who is
17 there?  How did that work?
18    A   Sometimes on occasion it would just be
19 her.  Sometimes it would only be me.  Sometimes
20 it would be both of us.
21    Q   And the meetings were held by Jacobs?
22    A   Yes.
23    Q   Who from Jacobs do you recall as being
24 the person that would lead the meeting?

Page 59

1     A   I think their superintendent's name was
2  Gerry.
3     Q   Meyer?
4     A   Gerry Meyer, yes, that's him.
5     Q   Do you recall at the meetings when you
6  first came on this project that the need for a
7  pit cover was discussed at those meetings?
8     A   I think when I had started, I don't
9  know if it was immediately, but the owner did
10 ask us to look into getting pit covers.
11    Q   And what did you understand -- strike
12 that.
13        Did you know that the -- why the
14 owner was asking you to look into that?
15    A   No, they just asked us to look into
16 it.
17    Q   Had you known at that time that they had
18 asked you -- that you guys had investigated it
19 at the beginning of the project?
20    A   No, I didn't.
21    Q   When you were asked to look into it, was
22 it something that had to be charged additional?
23 Was it something already contained in the
24 contract?  What was it?

Page 60

1     A   No.  I mean, I recall that Schuler &
2  Shook asked for additional services for the pit
3  fillers.
4     Q   Was it something where you had to have
5  an additional agreement with the owner that they
6  would pay you for it?
7     A   I don't recall.  I mean, I know they did
8  get compensated additionally.  I mean,
9  typically, yes, there would be some sort of
10 modification to our contract that would, you
11 know, identify the additional services being
12 requested for.
13    Q   And I'll show you what's been marked
14 Moss Exhibit No. 9.  You've seen that document
15 before?
16    A   It looks like the specification for the
17 pit fillers.
18    Q   Do you recall that Schuler & Shook
19 provided the specifications for the pit covers
20 after you were requested by the school district
21 to look into that?
22    A   Yes.
23    Q   And it says -- just to clarify what you
24 had said earlier, it says up in the right hand

Page 61

1  corner orchestra pit filler, right?
2     A   Yes.
3     Q   That's why you interpreted pit filler to
4  mean the same thing as that other document?
5     A   Yes.
6     Q   Do you know -- this is dated
7  April 17, 2002.  Do you know was it you yourself
8  that actually spurred Schuler & Shook to draft
9  this document?
10    A   Yes.
11    Q   What did you -- who did you convey it to
12 at Schuler & Shook and what was your
13 conversation to them?
14    A   Jeff Childs was the person that I had
15 contacted there, and I had just told him that
16 the owner was interested in getting the
17 specifications and just a layout for the pit
18 fillers.  So we had asked them to come up with
19 their specifications so they can send something
20 out to get priced.
21    Q   And they then in turn produced this
22 document?
23    A   Yes.
24    Q   And by this document I mean Moss Exhibit

16 (Pages 58 to 61)

FBFK 1686
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 62

1   No. 9.
2       Did they actually produce this
3   document or they produced another document that
4   VOA kind of conformed into this document?
5       A   Well, we -- they provided the
6   specification, and I didn't see any of this
7   stuff. This was -- must have been done by the
8   owner. Because my recollection was they had
9   asked us to give them the specification and
10  basically a drawing of what the pit filler
11  looked like. We gave that to the owner, and
12  then the owner was going to directly solicit
13  bids from manufacturers versus going through the
14  general contractor to get, you know, the bids
15  for these pit fillers.
16      Q   At the top it says VOA & Associates,
17  Incorporated?
18      A   Yes.
19      Q   And then it has certain things written
20  underneath it?
21      A   Yes.
22      Q   Which portion are you saying wasn't
23  yours or was yours?
24      A   This part here, the interior buildout

Page 63

1   portion. We never put that on there.
2       Q   Because you weren't contracting or
3   looking into pit covers for all three schools?
4   Is that an accurate statement?
5       A   Yes, yes, we weren't doing that.
6       Q   When they originally asked you to look
7   into Schuler & Shook, was it about all three
8   schools or about one?
9       A   Well, I believe it was going to be for
10  all three schools.
11      Q   And they came back -- was there ever any
12  price discussion as to what this would cost?
13      A   I don't recall. I mean, my
14  understanding was that these pit fillers they
15  can, you know, range from the Cadillac model to
16  the Ugo model. You know, they can be a
17  variety -- made a variety of ways, but I believe
18  the District was budget conscious. So they
19  probably got one of the lower end models.
20      So they had asked us to look into,
21  you know, the different types. I thought
22  Schuler & Shook may have looked into the kind of
23  pricing that they would get for doing like a
24  very high end one versus something that is a

Page 64

1   little bit more modest.
2       Q   I guess my question is were those price
3   numbers passed down to the school?
4       A   I don't recall. It may have been via
5   conversation, you know, just talking with Bob
6   Hughes, the owner's rep. I don't know if there
7   was anything ever in writing.
8       Q   Did VOA compare from Schuler & Shook --
9   take what they said would be used as a pit cover
10  and then look at the plans and make sure it
11  would fit or meet in with the design that was
12  currently there?
13      A   No, we wouldn't do that. I mean, we
14  relied on Schuler & Shook to, you know, give us
15  the specifications and the layout. Then however
16  the owner decided to solicit the bids -- I mean,
17  typically the company that manufactures the pit
18  covers, they would be the ones -- depending on
19  how they planned to make these covers, they
20  would have to design them. They would have to
21  engineer them. We just kind of provide a
22  diagrammatical layout, Schuler & Shook did. We
23  just gave the information to the owner, and he
24  is the one that sends them out to the

Page 65

1   companies.
2       Q   I'm going to show you at the end of
3   Exhibit No. 9 here there is first an E-mail it
4   looks like from Jeff Childs to yourself,
5   correct?
6       A   Yes.
7       Q   It's dated April 17, 2002?
8       A   Yes.
9       Q   It says Al please find a copy of the
10  spec for review. That's referring to the sheet,
11  the first pages of Moss No. 9, correct?
12      A   Yes.
13      Q   It then says something about VOA will
14  put some kind of front end on this. That's
15  talking about VOA putting some kind of markup on
16  the cost?
17      A   Well, it wasn't a markup. What that
18  means -- I think Jeff was under the assumption
19  that we were going to provide a front end,
20  meaning, you know, typically when you send a
21  project out to bid you have general conditions
22  that the manufacturer or contractor has to abide
23  by, and he thought we were going to do that. We
24  didn't do that. All I did was I took the

17 (Pages 62 to 65)

FBFK 1687
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 66

1  information, the file, and sent it to the
2  District because the District said that they
3  would put their front end on it. So that's what
4  he means by that.
5      Q   So the word front end on it means --
6  refers to the actual contract documents?
7      A   It's something that you put in the
8  specifications, terms and conditions, similar to
9  that.
10     Q   It has nothing to do with markup?
11     A   No, that has nothing to do with markup,
12  not on our end.
13     Q   He then asks you to return the signed
14  proposal?
15     A   Yes.
16     Q   That would be to authorize Schuler &
17  Shook to contract out to do that work?
18     A   Yes.
19     Q   Then there is an E-mail from yourself
20  back to Jeff Childs, 4/9 of '02 regarding, the
21  pit covers. Was that an E-mail that you
22  drafted?
23     A   Yes. I sent him the E-mail telling
24  him -- I think this is the one. Let me just

Page 67

1  take a quick look. Basically I had drafted that
2  E-mail to Jeff, you know, identifying that I had
3  a phone conversation with Bob Hughes, and he
4  told us to go with the pit covers basically
5  telling him that he would pay for the additional
6  services for Schuler & Shook. That's why I sent
7  that E-mail to release him.
8      Q   This is to release him to go look into
9  the project?
10     A   To design the pit fillers, to provide
11  the specifications and the drawing.
12     Q   So this one would have proceeded the one
13  that comes up on top?
14     A   Yes, correct.
15     Q   Then the April 19th E-mail is just Bob
16  Hughes approving the added service for the pit
17  fillers?
18     A   Yes, that's correct.
19     Q   That's the added service to look into
20  drawing up the specifications that were
21  eventually drawn up?
22     A   Yes.
23     Q   Was there ever any other E-mails
24  concerning the pit covers that would have went

Page 68

1  back and forth?
2      A   I don't recall. I tried to dig as many
3  of them up as I could. That is what I came
4  up.
5      Q   Would you have sent some E-mail at some
6  point that said to Schuler & Shook that the
7  school district decided to pursue them on their
8  own, don't do any more work on the pit covers?
9      A   No. The District wanted us to provide
10  the initial design, and really that was it.
11  What Schuler & Shook was contracted to do with
12  that was design the -- come up with the
13  specification, provide a drawing, and then when
14  the pit covers were eventually installed they
15  would go ahead and, you know, go out there to do
16  a punch list on them. They would also look at
17  the shop drawings when they came in from whoever
18  the District decided they were going to, you
19  know, hire for that work.
20     Q   So Schuler & Shook would still have some
21  involvement?
22     A   Yes, that's correct.
23     Q   Even if the school district went out and
24  actually bought it directly from the

Page 69

1  manufacturer, Schuler & Shook has to make sure
2  that it's going to conform or meet into this
3  particular theatre?
4      A   Well, that was part of what they had
5  asked the additional services for was that they
6  were going to, you know, provide the
7  specification, give a drawing for the
8  manufacturer to provide pricing on, and they
9  would also look at the shop drawings once the
10  District selected a manufacturer. Then after
11  that when they were all installed, he would come
12  out and take a look at the installation and
13  provide a punch list on the installation if
14  required.
15     Q   So after this E-mail, really the
16  District had to wait until Schuler & Shook got a
17  list of manufacturers that they could discuss
18  with about what they needed?
19     A   Let me take a look at this.
20     Q   The first E-mail you can take a look at
21  it. It points to that?
22     A   No. What we ended up doing -- the first
23  E-mail I had asked him to look at the
24  manufacturers, and all he did was he put that

18 (Pages 66 to 69)

FBFK 1688
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 70

1  inside of the specifications.  So all of the
2  information was inside of the specs already.
3      Q    Well, let me ask you this.
4          This E-mail here -- oh, I see it.  I
5  have listed four acceptable manufacturers?
6      A    Yes.  So that's what he said.  I think I
7  had asked him to provide some manufacturers
8  here, and he listed them directly in the
9  specifications.  So these were the four
10 manufacturers that they have worked with,
11 and these manufacturers provide this type of pit
12 filler.
13     Q    Do you know if those manufacturers sent
14 back bids?
15     A    I don't know.  We weren't involved in
16 reviewing any of the bids from the pit filler
17 manufacturers.
18     Q    You were involved in the project when
19 the actual pit filler was installed?
20     A    Yes, I was still around, yes.
21     Q    SECOA was the one that was chosen?
22     A    I don't recall which one.
23     Q    Do you recall when the pit cover was
24 actually installed?

Page 71

1      A    No, I don't.
2      Q    Was it that summer?  Was it at the start
3  of the next school year in 2002?
4      A    I thought it was in the summer, maybe
5  towards the end of the summer.
6      Q    Just before school opened?
7      A    I believe so.
8      Q    Was there an issue once the pit cover
9  was ordered from the manufacturer, a certain
10 aspect of getting all the people together who
11 were going to install it or who was going to put
12 it in?
13     A    That, I don't know.  The District
14 apparently contracted -- they selected a
15 manufacturer, and I don't know if the
16 manufacturer gave them a quote for installation
17 or if they had to hire somebody to install it.
18 So I don't know.
19     Q    Do you know if you had to pass on any
20 information to Schuler & Shook about which one
21 was going to be used or how it was going to be
22 used?
23     A    The only thing we would have received
24 from the District is a shop drawing.  Basically

Page 72

1  when they selected a manufacturer the
2  manufacturer had to provide a drawing showing
3  how they were going to lay it out, what the pit
4  filler was going to look like and, you know, I
5  think the weights of each panel piece.
6      Q    Then you guys would --
7      A    So I sent that to Schuler & Shook.
8      Q    Then you would respond back to say that
9  this is adequate or not adequate structurally or
10 architecturally, correct?
11     A    Correct.  What we would do is they would
12 review the shop drawing, and they would put
13 their stamp on it saying that they have looked
14 at it and, you, know it conforms with the
15 specifications.
16     Q    And then after it's installed, you would
17 be doing a punch list thing making sure it's
18 installed properly?
19     A    Yes, Schuler & Shook did that.
20     Q    On your behalf?
21     A    Yes.
22     Q    And were you with them when they did
23 that?
24     A    No, I wasn't.

Page 73

1      Q    Would they have reported back to you
2  after they did that?
3      A    Yes.
4      Q    Then you would report back to the owner
5  that it meets with your approval or doesn't or
6  whatever the punch list items are?
7      A    Yes.
8      Q    You were aware of Regalado falling in
9  the pit area at or near the time that it
10 happened?
11     A    Yes.
12     Q    How did you become aware of it?
13     A    I just heard it from the owner.
14     Q    And did you know that he had fallen from
15 the stage area down into the pit?
16     A    Well, that's what they told us.
17     Q    And did the owner express some concern
18 about safety at that point of the pit not being
19 covered?
20     A    No.
21     Q    Did you have any concern about the pit
22 not being covered having heard that somebody
23 fell in there?
24     A    Well, I mean, I knew that they were

19 (Pages 70 to 73)

FBFK 1689
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 74

1  looking at pit fillers, so I didn't have any
2  concern.
3      Q    Was one of the reasons for the pit's
4  cover a safety issue so people wouldn't fall in
5  there?
6      A    That, I don't know. Nobody told us that
7  it was a safety issue. The District just asked
8  us to look into get pricing, and we looked at
9  getting the design for it.
10     Q    After you had heard that man fell, did
11  you consider the pit cover, in addition to part
12  of the design, also a safety issue?
13     A    No.
14     Q    Did you hear about a student falling in
15  during a graduation ceremony, falling into the
16  pit?
17     A    No, I didn't.
18     Q    After Mr. Madden fell into the pit, did
19  you hear about his incident?
20     A    I did hear from the owner's rep, Bob
21  Hughes.
22     Q    And what was said by Bob Hughes?
23     A    I mean, basically he just fell in there.
24  I don't know. I think he backed into it or

Page 75

1  something like that.
2      Q    Was there any issue of safety that came
3  up at that point?
4      A    No.
5      Q    In designing a project as an architect,
6  is one aspect of what you're considering is that
7  you're doing a safe design?
8      A    Well, I don't think that's what we
9  consider. I mean, what we're asked to do is
10  designed by code.
11     Q    And the code regulations are designed to
12  comply with safety? It's one of the issues of
13  the code?
14     A    I don't know. I can't comment on it
15  because I'm not a code writer.
16     Q    When you design things, sometimes you
17  meet the codes, sometimes you exceed the code,
18  correct?
19     A    That's true.
20     Q    And is some of the reasons that you
21  exceed the code is because based on an
22  architect's knowledge, training, and experience
23  you feel that a particular design is a safer
24  aspect to approach on a case?

Page 76

1      A    I mean, I don't think that's the case.
2  Sometimes, you know, a code mandates you have a
3  certain amount of accessible bathrooms.
4  Sometimes because you anticipate -- a design
5  makes sense doing it this way and you put an
6  extra one in. I don't think safety is what
7  we're talking about when we're designing
8  something. It's basically applicable code,
9  accessibility, things of that nature.
10     Q    As part of this project did Consolidated
11  High School District 230 have its own safety
12  rules and procedures?
13     A    I'm not aware of that.
14     Q    When you came on the job, you were not
15  made aware that you needed to follow the school
16  district's safety provision?
17     A    No.
18     Q    You had meetings with Elaine Fitzgerald,
19  correct?
20     A    When, during the project?
21     Q    During the project --
22     A    Yes.
23     Q    -- when she was there.
24          And you mentioned you went to the

Page 77

1  progress meetings, correct?
2      A    Yes.
3      Q    At the progress meetings themselves some
4  of the issues that would come up are safety.
5  Some of the issues would be progress of the
6  work?
7      A    I believe so, yes.
8      Q    With Elaine Fitzgerald the issues --
9  what would you be two talking about when you had
10  your meetings?
11     A    Typically it was just stuff that was
12  observed in the field, whether they are working
13  on this area or that area or if there was a
14  question that would come up, you know, if there
15  was a conflict with the drawings or, you know,
16  just something in the field.
17     Q    You didn't have set times to do that.
18  It would come up when you needed to discuss
19  things?
20     A    Right. We knew when our weekly meetings
21  were and who was going to cover or if we were
22  both going. So, you know, if she was there and
23  she came back to the office, she would basically
24  tell me, you know, what happened or if there was

20 (Pages 74 to 77)

FBFK 1690
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 78

1  any issue that came up.
2      Q    During the weekly -- other than the
3  weekly progress meetings, did you go to any
4  other meetings?
5      A    Well, we had an owner's meeting every
6  Wednesday morning typically.
7      Q    What was addressed at the owner's
8  meetings every Wednesday morning?
9      A    It varied.  Basically Jacobs Facilities
10 was there with us.  Sometimes the schedule was
11 discussed.  Sometimes, you know, the budget was
12 discussed, but it was mostly like those items.
13     Q    Was anybody else besides VOA, Jacobs,
14 and the owner at those weekly meetings?
15     A    Just those three people.
16     Q    And at those meetings was the issue of
17 the pit covers ever discussed?
18     A    I don't recall.
19     Q    They may or may not have been?
20     A    They may or may not have been.
21     Q    Were issues of safety or concern that
22 the owners had for students or the project or
23 what was going on raised at those Wednesday
24 meetings?

Page 79

1      A    Not that I recall, no.
2      Q    Was safety a big concern when school was
3  going on?
4      A    I don't know.  I mean, we had nothing to
5  do with it, so it may have been but not, you
6  know, with VOA.
7      Q    When you were at the meetings, you
8  weren't hearing about the school saying we have
9  got a lot of students around, we want to make
10 sure it's safe at this particular aspect of the
11 project?  You didn't hear those at those
12 meetings?
13     A    No.  Typically where the construction
14 was going on those areas were locked off.
15     Q    Do you need a break?
16     A    I can use water.
17          (Recess taken.)
18 BY MR. O'CONNOR:
19     Q    During the construction project was it
20 your understanding that the person who was
21 running the actual physical part of the job was
22 Gerry Myers?
23          MR. VELAZQUEZ:  Objection to foundation,
24 form.

Page 80

1          THE WITNESS:  I just knew he was the
2  superintendent on the job, that he was more or
3  less coordinating all of the contractors.
4  BY MR. O'CONNOR:
5      Q    In terms of if an issue came up about
6  safety, was it him who would address it?
7      A    I don't know.
8          MR. VELAZQUEZ:  Objection to foundation
9  and form.
10 BY MR. O'CONNOR:
11     Q    He was doing all of the scheduling?
12         MR. VELAZQUEZ:  Same objection.
13         THE WITNESS:  I believe.  I think Jacobs
14 was.  I'm not sure if him directly was doing
15 that.
16 BY MR. O'CONNOR:
17     Q    We will talk about Jacobs in general
18 instead of him in particular.
19         Was Jacobs doing all of the
20 scheduling of the work?
21     A    Yes.
22     Q    Coordinating the contractors?
23     A    Yes, that was my understanding.
24     Q    If an issue arose between two different

Page 81

1  sets of contractors, was it Jacobs that would
2  resolve it?
3      A    It depended on what it was.
4      Q    If two people are scheduled to work in
5  the same area at the same time?
6      A    That was theirs.
7      Q    If one person was doing something that
8  interfered with another person's job, would it
9  be Jacobs that would take care of that?
10     A    Yeah, they would have to resolve that.
11     Q    In other words, if you were walking
12 through the building and someone came up to you
13 and said, hey, that guy is working over my head
14 and dropping something on my head, you would
15 point and say go talk to Jacobs?
16     A    I didn't know who was responsible for
17 that, but I would just tell them that it's not
18 my job.
19     Q    Would you point them or direct them to
20 somebody?
21     A    I don't know.  I mean, I wouldn't.  I'm
22 not sure who -- for that type of question who
23 dealt with it.
24     Q    You wouldn't say go see your foreman, go

21 (Pages 78 to 81)

FBFK 1691
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 82

1  see Jacobs, go see somebody else?
2      A    Everybody knew who the responsible party
3  was for coordinating everything, so I would
4  assume they would know who to talk to.
5      Q    When you say everyone knew, who did
6  everyone know, Jacobs?
7      A    Yeah, everyone knew Jacobs was the CM.
8      Q    Did Jacobs walk around with a white
9  hat?
10     A    Yes.  They did have something that said
11 Jacobs on their hard hat.
12     Q    In other words, when they were walking
13 around everyone took notice and knew who they
14 were?
15     A    Yes.
16     Q    Kind of puts a mad scramble among all of
17 the younger guys?
18     A    Maybe.
19     Q    Did you walk around with Jacobs at
20 times?
21     A    Yes, at times we did.
22     Q    What did you walk around with Jacobs
23 for?
24     A    If they had a question for us, if there

Page 83

1  was something on the drawings that may not have
2  worked in the field, they would ask us about
3  something, things like ceiling height conflict,
4  for example.
5      Q    A modification that needed to be made
6  that couldn't be accounted for at the time that
7  you did your drawings, that's what you're
8  talking about?  A modification that would need
9  to be made in the field that couldn't have been
10 accounted for when you were doing your
11 drawings?
12     A    Correct, correct.
13     Q    If something -- if Jacobs had the
14 opinion that something you designed didn't meet
15 up with a certain code, would they bring that to
16 your attention?
17     A    I would hope so.
18     Q    You would expect them to?
19     A    I'm not saying that we would expect them
20 to, but if they did, you know, I would hope they
21 would.
22     Q    In other words, they wouldn't just go
23 ahead and change something or you wouldn't
24 expect them to go ahead and change something

Page 84

1  because they thought it was up to a certain
2  code?  They would consult with you?
3      A    Yes, they typically would.
4      Q    Was it your understanding that one of
5  the job duties of Jacobs is if they identified a
6  code or an issue such as that that they would
7  consult with you?
8          MR. VELAZQUEZ:  Objection, foundation.
9          THE WITNESS:  Yeah, I don't know what
10 their contract involved.
11 BY MR. O'CONNOR:
12     Q    I am just asking your general
13 understanding of what they were doing on the
14 project.  Was it your understanding that if they
15 came across a code issue or other issues similar
16 to that, that they would address that with
17 you?
18         MR. VELAZQUEZ:  Same objection.
19         THE WITNESS:  Yes.
20 BY MR. O'CONNOR:
21     Q    My understanding is you didn't read any
22 contracts in this case, right?
23     A    No, I didn't.
24     Q    Did anyone tell you what your duties and

Page 85

1  responsibilities were on this project?
2      A    Nobody told me.  I mean, on the previous
3  project that I worked on for the Department of
4  Natural Resources Office I, you know, was doing
5  the construction administration.  So I was doing
6  on-site observation, and just the experience and
7  everything I learned from that project I carried
8  it on to this one.
9      Q    Do your duties and responsibilities as a
10 field person doing site inspections basically
11 remain the same?
12     A    Yes.
13     Q    Who assigned you to be on this
14 project?
15     A    The principal in charge, Paul Hansen.
16     Q    Did Paul Hansen come to the site?
17     A    When I was on it, I don't recall him
18 coming, no.
19     Q    When you say he is the principal, he was
20 the licensed architect over the project?
21     A    Well, his -- the way our office is I
22 guess broken up is a principal heads a studio,
23 and the studio heads ten or fifteen people or
24 whatever it is.  Sometimes they either practice

22 (Pages 82 to 85)

FBFK 1692
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 86

1   just education or they practice the health care.
2   So he was the principal in charge of, you know,
3   this education project.
4       Q    And is he a licensed architect?
5       A    Yes, he is.
6       Q    Are all the principals over the various
7   sections licensed architects?
8       A    Yes, they are.
9       Q    One of the requirements of the State
10  requirement is that you operate under a licensed
11  architect as a nonlicensed architect, correct?
12      A    Yes.
13      Q    So if you had a question or concern, you
14  would go back to Paul Hansen, correct?
15      A    Yes.
16      Q    Did any questions or issues come up when
17  you were on this project where you had to
18  actually go back to Paul Hansen?
19      A    There were but, I mean, I don't recall
20  exactly what they were.  I mean, him and I
21  talked regularly.  I would give him updates on
22  how the project is going and, you know, things
23  of that nature.
24      Q    So he was at least aware of issues and

Page 87

1   things going on with the project?
2       A    Yes.
3       Q    Was he aware of the issue of the pit
4   covers coming up?
5       A    Yes, he was aware of that and that the
6   owner had asked us to look into getting pit
7   covers for the school.
8       Q    Was it your understanding that Paul
9   Hansen was on this project from day one?
10      A    Yes.
11      Q    And Paul Hansen never expressed to you
12  anything about the pit covers ever coming up
13  before that day?
14      A    No, no.
15      Q    Was he the one that directed you as to
16  how to like charge for the additional cost, how
17  to approach it in terms of the pit cover?
18      A    Well, initially what happened was when I
19  had asked Schuler & Shook about it, they are the
20  ones that asked us for the additional services.
21  So they are the ones that initiated it.
22      Q    So then you had to go back to Paul and
23  say how do I handle this?
24      A    Yes.  I just asked him.  I said they are

Page 88

1   asking for money and I'm just going to ask the
2   owner for it.
3       Q    Who prepared the documents relative to
4   that?  Did that come from Paul or did that come
5   from you?
6       A    I don't know.
7       Q    You didn't do it?
8       A    No, I didn't do it.
9       Q    Would there normally have to be some
10  kind of documents authorizing that?
11      A    Authorizing what?
12      Q    The additional work or the additional
13  looking into the thing or did that come directly
14  from Schuler & Shook or how did that work?
15      A    Schuler & Shook asked us.  They sent a
16  proposal to us of how much it was going to be
17  for doing that work.
18      Q    And then you would have to submit your
19  own proposal back to the owner?
20      A    Yes.
21      Q    And what you're telling me is that
22  somebody at your company did that but it wasn't
23  you?
24      A    Yeah.  I assume somebody did, yes, but

Page 89

1   it wasn't me.
2       Q    Can you tell me in August of 2002 what
3   work was being performed in the theatre area?
4       A    I don't remember.  I don't know if there
5   is anything going on at Stagg.  I mean towards
6   that time I was more involved with Sandburg
7   because that was one of the last schools that
8   was being completed.
9       Q    Am I correct then you don't recall
10  exactly what work was going on in August?
11      A    That's a correct statement.  I don't
12  recall.
13      Q    If the contractors were in there, they
14  would have been doing the things that were
15  listed on the items that were enumerated that
16  needed to be completed in that area?
17      A    Right.  If they were there, they were
18  probably completing punch list items.
19      Q    Can a punch list item -- am I correct
20  that some punch list items may take a few
21  minutes and some may take days to correct?
22      MR. BATTLE:  Objection.  That calls for
23  speculation.
24      MR. VELAZQUEZ:  Join.

23 (Pages 86 to 89)

FBFK 1693
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 90

1    THE WITNESS: I don't know. I mean, I'm
2  sure it depends on what it is.
3  BY MR. O'CONNOR:
4    Q   I'm asking your experience.
5    A   Typically, no. We have had punch lists
6  that have been out there for a year and they
7  haven't been done. If you say a few minutes, I
8  would say no.
9    Q   What I'm getting at is they are not
10 something where somebody can necessarily come
11 back in one day and fix a few things and be
12 done --
13    MR. BATTLE: Objection, calls for
14 speculation.
15    MR. O'CONNOR: Can I finish my question?
16    MR. BATTLE: Yes, you can.
17 BY MR. O'CONNOR:
18    Q   It can take a period of time, correct?
19    MR. BATTLE: Objection. It calls for
20 speculation as to which punch list items you're
21 talking about.
22    MR. VELAZQUEZ: Join.
23    THE WITNESS: It depends. I don't know.
24 It depends on what it is, and it depends on how

Page 91

1  long the list is.
2  BY MR. O'CONNOR:
3    Q   You had a chance to -- did I show you
4  that document? I'm going to show you what I've
5  previously marked Fitzgerald Exhibit No. 1, and
6  it's dated May 12, 2002. It has your name on
7  it.
8        Do you recognize that document?
9    A   I don't recall, but I'm sure if it's got
10 my name on it I must have gotten a copy of it.
11    Q   This is a job site report done by
12 Schuler & Shook.
13    A   Okay.
14    Q   Correct?
15    A   Yes.
16    Q   And they list 62 items, if I remember my
17 numbers correctly, some of which have
18 subsections to them that needed to be completed
19 in the theatre area.
20    A   Okay.
21    Q   Is that correct?
22    A   Yes.
23    Q   Do you know what caused them to generate
24 this particular document, or was this just one

Page 92

1  of their normal field inspections?
2    A   No. I believe -- what's the date on
3  this? This may have been in preparation for the
4  punch list. We would have -- if the contractor
5  told us that they are completed with the space
6  and we've got requests by Jacobs to come and do
7  our punch list, we would ask them to do their
8  punch list because that was part of their
9  contract to do the punch list in the performing
10 arts theatres.
11    Q   And to provide the specific list of what
12 they felt needed to be completed?
13    A   Okay, yes.
14    Q   Under Number 11 it talks about steps in
15 the house are difficult to see. Due to carpet
16 pattern demarcation lines must be added on to
17 the steps to differentiate the change in
18 elevations. Do you see that?
19    A   Yes, I do.
20    Q   Do you know what that's referring to?
21    A   I think it's the stairs that walk down
22 the aisles in the theatre.
23    Q   Was there an issue about being able to
24 decipher the steps due to lighting and the color

Page 93

1  of the stairs?
2    A   According to this, yes.
3    Q   It indicates -- under Section 30 it says
4  fluorescent work lights, fixture types SN, in
5  the orchestra pit must be installed. Do you
6  know what that is referring to?
7    A   I guess the work lights in the orchestra
8  pit.
9    Q   Were there general lights, work lights,
10 both types?
11    A   I don't know. I mean, they designed the
12 lighting also for the pit. So I don't remember
13 if they were work lights or, you know, general
14 lights or what.
15    Q   Because if -- was there times if you
16 turn on the lights you could make the orchestra
17 pit go dark?
18    A   I believe so.
19    Q   When you walked through did you rely on
20 Schuler & Shook as to the lighting issues,
21 whether they were adequate, whether there was
22 sufficient lighting in the theatre area?
23    A   Well, I relied on them to provide a
24 punch list depending on what they designed. I

24 (Pages 90 to 93)

FBFK 1694
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 94

1 mean, if they designed -- I believe they also
2 provided the lighting design. So they were the
3 ones that would, you know, identify if a light
4 wasn't installed correctly or if it wasn't
5 installed at all.
6     Q    Are there times on projects where you
7 would go through and there is a lighting
8 installation pattern, and when it actually gets
9 installed you look back at it and the lighting
10 is not adequate or sufficient? Has that
11 happened to you on any project?
12     A    No.
13     Q    Generally that's -- on a project you or
14 someone at your company is creating the lighting
15 configuration?
16     A    We typically would get a lighting
17 designer, and they would run the calculations on
18 how much light is being provided by a certain
19 type of fixture or typically now the lighting
20 manufacturers all you do is you give them your
21 drawing file and they will tell you exactly if
22 you have the correct amount of light or not.
23     Q    Did you ever go through and walk through
24 the theatre area around this time to determine

Page 95

1 whether the lighting was adequate or not?
2     A    No. I wouldn't know what to look for
3 with the lighting because I didn't design it. I
4 mean, I relied on Schuler & Shook to provide
5 that type of information on the punch list.
6     Q    As you walked through did any -- did you
7 have any lighting issues that stuck out in your
8 mind?
9     A    No. I mean, when we were walking
10 through I recall the lights being on, so I don't
11 know. I didn't see any, but then again I'm not
12 a theatre expert.
13     Q    Did you actually -- when you walked
14 through, would you walk up on to the stage near
15 the pit area?
16     A    Yes.
17     Q    Was that a regular part of your walk
18 that you would do?
19     A    What do you mean regular walk?
20     Q    When you're doing your walk-throughs and
21 you're going through on the project, would you
22 regularly walk up on the stage? Would you walk
23 down in front of it?
24     A    I would just be in the theatre if I

Page 96

1 needed to be in there if they are doing a punch
2 list or something like that. I wouldn't walk
3 through the theatre specifically just to get
4 from point A to point B.
5     Q    What I'm getting at is unless you're
6 looking for something on a punch list that's up
7 on the stage area itself, you wouldn't have
8 occasion to be up on the stage?
9     A    Correct.
10     Q    Do you recall when the last time before
11 August 19th of 2002 you would have been up on
12 that stage area itself?
13     A    I don't recall.
14     Q    Do you recall that there was temporary
15 railings put up by the construction people at
16 some point during the project, two by fours, to
17 block off the orchestra pit from the stage
18 area?
19     A    I don't remember that.
20     Q    Do you recall there being flower pots
21 put up along the area of the orchestra pit to
22 block off from the stage area?
23     A    No, I don't.
24     Q    Have you had a chance to look at

Page 97

1 previously some of the photos of that?
2     A    I saw some photos at the last deposition
3 but I don't know -- I thought it was just some
4 two by fours or something.
5     Q    I'm showing you what was previously
6 marked Madden Exhibit No. 2 with a date of 12/11
7 of '03. Do you see that -- you recognize that
8 photo?
9     A    That's the theatre, yes.
10     Q    Do you recognize those two by fours and
11 the caution tape?
12     A    You know, I think I do, yeah. I recall
13 that -- I don't remember if it was at Stagg, but
14 I thought I recalled that they did do something
15 similar to that.
16     Q    At the other projects that you were on
17 did they do similar blocking off of the pit area
18 when they were working on this?
19     A    Well, that's what I don't remember if it
20 was over here or if it was at one of the
21 schools.
22     Q    That's what I'm asking you. At the
23 other schools did they normally block off the
24 pit area when they were working on the stage,

25 (Pages 94 to 97)

FBFK 1695
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 98

1 the contractors?
2    A   I don't remember.
3    Q   Let me show you what's been previously
4 marked as Madden Exhibit No. 3 with a date of
5 12/11/03. Do you recognize that photo?
6    A   No, I don't.
7    Q   Do you recognize the wood at least in
8 the pit area or the wood shown in that picture
9 as what surrounded the pit area?
10    A   Yes. That's the trim that was put
11 around it.
12    Q   And was there any sort of lip between
13 the pit area and the stage area such before you
14 went off the stage area into the pit?
15    A   What do you mean a lip?
16    Q   Any sort of raised portion, a lip, or
17 was it just straight across?
18    A   No, I think it was just straight
19 across.
20    Q   I'm showing you flowers that I'll tell
21 you that have been described or placed along the
22 area between the stage and the pit area during
23 one of the ceremonies that were going on by the
24 school. You don't ever recall seeing that?

Page 99

1    A   No, I don't.
2    Q   Was there any -- strike that.
3        In order to put in the pit cover,
4 there wasn't any structural change that needed
5 to be made to the original pit itself or the
6 area around it, am I correct?
7    A   Well, I don't believe anything
8 structural. I think what they ended up having
9 to do is just take some of the trim off to be
10 able to install the filler, and then there was
11 some sort of a support that was put around the
12 entire perimeter for the pit filler to sit on.
13    Q   That support would go somewhere on the
14 bottom of the trim or the middle of the trim
15 somewhere along to hold it up?
16    A   I don't remember exactly where. I mean,
17 it was somewhere -- I think they maybe had to
18 modify the trim to be able to put that filler
19 in.
20    Q   The distance from the top of the theatre
21 to the bottom of the pit, how high was it?
22    A   I don't remember the actual height.
23    Q   Were you down in the pit area?
24    A   Yes, I was.

Page 100

1    Q   And it was taller than you?
2    A   Yes, it was.
3    Q   If you put your hand up, was it even
4 taller than putting your hand up?
5    A   That, I don't recall.
6    Q   It was in excess of six feet?
7    A   I would say yes.
8    Q   Was it more or less than ten feet, if
9 you know?
10    A   I don't remember.
11    Q   Looking at Madden Exhibit No. 11, by
12 looking at the photograph can you tell what
13 stage of the construction or what time of year
14 that photo was taken?
15    A   I don't know. I mean, it looks like --
16 well, they have got everything covered, so they
17 might have been cleaning it or in the final
18 stages of it.
19    Q   You would be guessing at that point?
20    A   Yeah, I would be guessing.
21    Q   At least you know it was the stage of
22 construction where they had put in the chairs,
23 correct?
24    A   Yes.

Page 101

1        MR. VELAZQUEZ: Objection. He said that
2 it could be either cleaning or towards the
3 end.
4        THE WITNESS: I mean, they had
5 everything covered up. They could have been
6 cleaning it.
7 BY MR. O'CONNOR:
8    Q   You described for me some of the people
9 that you had contact with as you were on the
10 project. Did you ever have contact with any of
11 the building engineers or building custodians?
12    A   No, I didn't.
13    Q   You don't know Mr. Madden?
14    A   No, I don't.
15    Q   If he walked in the door, you wouldn't
16 recognize him?
17    A   No, I wouldn't.
18    Q   Were there occasions where you had to
19 have -- get access to certain portions of the
20 building or get information about certain
21 portions of the building from the building
22 itself -- the school itself?
23    A   There may have been, but if I did I
24 would just speak to the principal or whoever was

26 (Pages 98 to 101)

FBFK 1696
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 102

1  the contact person.
2      Q    Do you remember who that was?
3      A    No, I don't.
4      Q    So your conversations with that person
5  would have been very limited?
6      A    Yes.
7      Q    Who else as you were on this project did
8  you have contact with other than the people that
9  you've named so far for me that you can
10 recall?
11     A    From Jacobs it would have been John
12 Szott I think his name was and then --
13     Q    What was his position?
14     A    I think he dealt more with the contract
15 side of the project, you know, and possibly some
16 scheduling.  I think Ken was the project
17 manager, Ken Ruckus or something like that.  I
18 mean, I guess from Jacobs' side that was really
19 it.
20     Q    Did you deal with anyone from Paschen's
21 side?
22     A    Matt mainly, Matt Moss.
23     Q    How often would you discuss things with
24 him when you were on the project?

Page 103

1      A    Not too often.  I think more so when --
2  from what I recall, Matt was left on the project
3  to kind of finish up the punch list items and,
4  you know, as the project was slowing down they
5  kind of kept him as the contact guy from
6  Paschen.  So sometimes, you know, if he had
7  questions, we would walk the building together.
8  If he had questions on the punch list, you know,
9  about a certain item that he may have not
10 understood, he would contact me or I would meet
11 with him, but that was basically about it.
12     Q    So sometimes you would discuss issues
13 concerning the punch list items with Matt Moss
14 directly.  Sometimes it would go through
15 Jacobs?
16     A    Yes.
17     Q    Was that mainly the person you dealt
18 with from Paschen?
19     A    Yes.
20     Q    Was there anybody else?
21     A    I don't recall.  I mean, he is the one I
22 remember most because I probably had the most
23 dealings with him.
24     Q    Did the school officials you dealt with

Page 104

1  appear to have any specialized knowledge in the
2  area of theatre or how to design?
3      A    No, I don't recall.
4      Q    Am I correct that the school was relying
5  on VOA to provide their consultation on the
6  theatre and then VOA in turn was relying on
7  Schuler & Shook?
8      A    Yes.
9      Q    If Schuler & Shook would have
10 recommended to VOA to put in the pit cover for
11 safety reasons, would you have passed that
12 information along to the school?
13     A    If they said something to us, sure.
14     Q    If there was a safety issue concerning
15 having a pit cover or not having a pit cover,
16 would you have expected Schuler & Shook to bring
17 that to your attention?
18     A    Well, I would expect that they would
19 have provided us a design that met code.  I
20 mean, whether it's safe or not, I don't know.
21 We contracted them for us to get a design from
22 them that met the code, and that's what we would
23 have expected from them.
24     Q    Am I correct that what you're telling me

Page 105

1  is that as long as your design meets code there
2  is no concern on the part of VOA about safety?
3      A    Correct.
4      Q    Do you understand the code provisions to
5  be the minimum requirements that you need to
6  follow in order to meet the guidelines of that
7  particular agency?
8      A    Yes.
9      Q    Was it ever -- strike that.
10          You wouldn't know what the school
11 district asked in terms of the level of
12 compliance with those codes that they wanted in
13 the beginning because you weren't involved with
14 that --
15     A    Right, I wasn't around.
16     Q    Back to Fitzgerald No. 1 in terms of the
17 62 items listed in this job report.  Would you
18 know the time it would take to complete all of
19 these items?
20     A    No, I wouldn't know.
21     Q    Do you know when the punch list items in
22 the theatre area were actually completed?
23     A    No, I don't.
24     Q    Because you left by that time?

27 (Pages 102 to 105)

FBFK 1697
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 106

1 A Yeah. I mean, we did whatever we could
2 up to a certain point, and then when the owner
3 told us he wasn't going to pay us anymore money
4 and our contract ran out, that was when we
5 stopped.
6 Q I just want to make it clear that as of
7 December of 2002 when you left, the punch list
8 items were not completed in the theatre area by
9 that time?
10 A I don't remember. I don't remember if
11 they were or not.
12 Q You remember that the punch list items
13 for the entire project wasn't completed by that
14 time?
15 A Yeah. I mean, I believe there were
16 areas that there were still items that were
17 outstanding. As an example like some of the
18 schools that were completed later, you know, we
19 issued punch lists, and then Jacobs was trying
20 to get all the contractors back to complete
21 them, but I know that they weren't completed by
22 the time we left the job.
23 Q In December of '02?
24 A Right.

Page 107

1 Q But you don't recall whether there was
2 any still left in the area of the theatre?
3 A That, I don't remember.
4 Q Is there any point in time where you can
5 tell me that you recall there being work still
6 being done in the theatre area? In other words,
7 November, October, September --
8 A I don't remember.
9 MR. O'CONNOR: Okay. That's all that I
10 have.
11 MR. BATTLE: Can you mark this as Migon
12 Exhibit 3.
13 (Whereupon, Migon Exhibit
14 No. 3 was marked for
15 identification.)
16 MR. O'CONNOR: For the record, Migon
17 Exhibit No. 3 is identical to Fitzgerald Exhibit
18 No. 2.
19 MR. BATTLE: I believe so.
20 E X A M I N A T I O N
21 BY MR. BATTLE:
22 Q You've seen this certificate of
23 substantial completion before; is that
24 correct?

Page 108

1 A Yes.
2 Q I just want to ask you a few questions
3 about it.
4 Have you issued certificates of
5 substantial completion other than for this
6 project?
7 A Yes, I have.
8 Q And what is the indication to you that
9 that means when you issue a certificate of
10 substantial completion?
11 A Basically that the work has been
12 completed up to a certain point to abide by the
13 contract documents and there is punch list items
14 still remaining but that the work has been
15 completed at that point for the owner to use it
16 as it was intended to be used.
17 Q And this certificate, does it indicate
18 that the work has been completed pursuant to
19 VOA's architect drawings?
20 A Yes.
21 Q And once you, you meaning VOA, signed
22 this document, at that point that area is
23 substantially complete. Is that a fair
24 statement?

Page 109

1 A Yes.
2 Q Is that your signature that appears on
3 that statement?
4 A Yes, it is.
5 Q Can you tell me the date on that
6 statement?
7 A It says 5/21/02.
8 Q As of May 21, 2002, would you agree with
9 me that this -- these areas listed here were
10 substantially completed?
11 A Yes.
12 MR. O'CONNOR: I object. As it relates
13 to VOA?
14 THE WITNESS: Yes.
15 BY MR. BATTLE:
16 Q Now, when you issue a certificate of
17 substantial completion, it can apply to several
18 different areas at one given time because
19 construction is ongoing in numerous areas; is
20 that right?
21 A Yes.
22 Q So this being issued applies to the
23 theatre, plus some other rooms within the actual
24 school?

28 (Pages 106 to 109)

FBFK 1698
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 110

1    A    That's correct.
2    Q    And those rooms are enumerated here.
3  There are a number of them, correct?
4    A    Yes.
5    Q    Now, to your knowledge does anyone else
6  besides the architect issue a certificate of
7  substantial completion?
8    A    No.
9    Q    And once this certificate is issued, is
10  that particular area or section turned back over
11  to the owner?
12    A    That's correct.
13    Q    You mentioned that in August of 2002
14  there wasn't much construction going on at Stagg
15  and you were over at Sandburg working?
16    A    Yes.
17    Q    Do you remember anything going on in the
18  theatre at that time?
19    A    I don't remember.
20    MR. BATTLE:  Thank you, sir.  That's all
21  that I have.
22             E X A M I N A T I O N
23  BY MR. VELAZQUEZ:
24    Q    With respect to the certificate of

Page 111

1  substantial completion, Exhibit 3, the date of
2  the architect -- the date of the architect's
3  signature is the date that governs the date of
4  turnover to the owner?
5    A    That's my understanding.
6    Q    And that would be regardless of what
7  other date any of the other entities on the
8  certificate signed the certificate?
9    A    Yes.
10    Q    Do you know when Mr. Madden's accident
11  occurred?
12    A    No, I don't.
13    Q    If you were to assume that the accident
14  occurred in August of 2002, how many months or
15  how much time between the date of substantial
16  completion and turnover and the date of the
17  accident did the District have possession of the
18  performing arts theatre?
19    A    If May 21st was the substantial -- you
20  are saying in August?
21    Q    Yes.
22    A    About three months more or less.
23    Q    And in those three months the District
24  could have accessed the performing arts theatre

Page 112

1  as they wished?
2    A    Yes.
3    Q    Did you ever see -- did you ever see
4  people -- employees of the District that worked
5  in the building at Stagg High School?
6    A    Yes.
7    Q    Did they have a uniform or something
8  that differentiated them from other people on
9  the project?
10    A    I mean, I don't remember -- when you say
11  employees, I mean, I worked more with the
12  administrative staff.  Those were the people I
13  am referring to, so I don't recall them wearing
14  any uniform.
15    Q    What about the maintenance personnel or
16  the engineers?
17    A    I don't remember if they wore one or
18  not.
19    Q    Now, within the three months between the
20  date of substantial completion and the date of
21  Mr. Madden's accident, would the school have had
22  an opportunity to erect barricades if they
23  wanted?
24    A    Sure.

Page 113

1    Q    And then also they could have put up
2  warning signs?
3    A    I would agree with that.
4    Q    Or planters?
5    A    Sure.
6    Q    And that would have been anywhere in the
7  performing arts theatre?
8    A    Yes.
9    Q    Even on the edge of the stage near the
10  edge into the orchestra pit?
11    A    Yes.
12    Q    Now, once there is substantial
13  completion granted, no entity has possession of
14  the area anymore?
15    A    Basically it's turned over to the owner.
16  That's my understanding.
17    Q    So Jacobs would not have been in
18  possession of the performing arts theatre after
19  the date of substantial completion?
20    A    Right.
21    Q    And the date was May 21, 2002?
22    A    Right.
23    Q    Being that the owner was now in
24  possession after May 21, 2002, they could have

29 (Pages 110 to 113)

FBFK 1699
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 114

1   hosted a school function if they wanted to?
2       A   Yes, that's correct.
3       Q   And do you know if they did?
4       A   I was made aware that they did, but
5   prior to the last deposition I wasn't even aware
6   of that.
7       Q   It was at the prior Regalado deposition
8   that you became aware?
9       A   Yes.
10      Q   And with respect to that function, if
11  they wanted to, the District could have put up
12  ropes around the edge of the orchestra pit?
13      A   They could have, yes.
14      Q   Now, the possession of the owner after
15  substantial completion, that's exclusive of
16  possession from the architect, from the
17  construction manager, and from any other
18  contractors?
19      A   Can you rephrase it?
20      Q   Well, exclusive in that the architect,
21  the construction manager, and the contractors
22  don't have possession over that area anymore?
23      A   That's correct.
24      Q   I know that you said something about

Page 115

1   having to come back periodically, but you
2   weren't too sure about how often you were at the
3   project at Stagg around August of 2002. After
4   May 21, 2002, did you have occasion to go back
5   to Stagg?
6       A   The only reason would be if a contractor
7   said that they were done with a punch list. We
8   would get something from Jacobs asking for us to
9   reinspect the area so we can sign off on it, but
10  that would be really the only reason to
11  follow-up on punch list items.
12      Q   So is it fair to say that after May 21st
13  and following up with punch list items, you did
14  go back to Stagg?
15      A   Yes, on occasion.
16      Q   During any of those times after
17  May 21st did you have occasion to go to the
18  stage area?
19      A   Yeah, I believe I did.
20      Q   Do you know if you were on the stage
21  area before August of 2002?
22      A   I would have to say yes.
23      Q   When you were on the stage area were you
24  ever -- say you are sitting from the audience

Page 116

1   portion of the performing arts theatre facing
2   the stage, facing the stage from the audience
3   perspective at the end of the stage. Had you
4   ever been on the stage at that point, the rear
5   of the stage from the viewer's perspective?
6       A   Yes. On the stage or --
7       Q   Yeah, on the stage.
8       A   I guess I'm not sure what you mean.
9       Q   Okay.
10          Say for example there is the front
11  and the back, with the front being the edge of
12  the stage that is adjacent to the orchestra pit
13  and the back of the stage being the area where,
14  you know, maybe there is props or, you know, the
15  area behind the curtains, that sort of thing.
16  Did you have occasion to be on stage towards the
17  back of the stage?
18      A   Yes, I have.
19      Q   And did you ever have occasion to walk
20  from the back of the stage area towards the
21  front of the stage?
22      A   Yes.
23      Q   When you were doing that, were you
24  walking in the performing arts theatre with the

Page 117

1   lights on or off?
2       A   They were on.
3       Q   When the lights were on, were you able
4   to discern where the stage ended and where the
5   orchestra pit began?
6       A   Yes. I mean, there was that line of
7   trim that was a lighter color that kind of
8   demarcated the end of the floor.
9       Q   And then aside from the lighter color or
10  the trim, was it just obvious that it was
11  open?
12      A   Yes.
13      Q   And do you know how deep the stage was
14  from the front to back?
15      A   I don't recall.
16      Q   Would you say it was 50 feet deep or
17  shorter?
18      A   I think it was probably shorter than
19  that.
20      Q   Would you say 40 feet?
21      A   Maybe around there.
22      Q   At what point walking towards the stage
23  can you -- do you realize or did you realize
24  that there is the pit that is adjacent to the

30 (Pages 114 to 117)

FBFK 1700
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 118

1  front of the stage?
2       MR. O'CONNOR:  I just object.  I think
3  he knew it the whole time.  He designed it.
4       MR. VELAZQUEZ:  Okay.  So bad
5  question.
6  BY MR. VELAZQUEZ:
7    Q   At what point from walking from the back
8  of the stage towards the front can you see or
9  recognize that the stage ends and the pit
10  begins?
11   A   I mean, that's kind of a hard thing to
12  answer.
13   Q   Can you see it from the back of the
14  stage?
15   A   You can certainly see the trim, but I
16  don't know.  I mean, I would have to be standing
17  there to respond to that question.
18   Q   Okay.
19       Is it at some point before you reach
20  the front of the stage?
21   A   Yes, yes.
22   Q   Is it before you reach the midway point
23  between front -- between back and front walking
24  from back to front?

Page 119

1    A   I am sure somewhere at the mid point you
2  will be able to see it because you have a piece
3  of wood that's a light color at the front of the
4  stage that kind of demarcates the end of the
5  stage.  So, you know, I guess I am -- unless you
6  can't see the color.  That would be the only way
7  that you wouldn't know.
8    Q   So then at least in approximation you
9  could recognize that the stage ends and that the
10  orchestra pit begins when you're about 20 feet
11  away from the edge of the stage, front of the
12  stage?
13   A   You can discern that the stage ends -- I
14  don't know exactly how many feet, but you can
15  discern that the stage ends if you are walking
16  from the back to the front.
17   Q   When you went back to the stage area
18  after May 21, 2002, did you ever at any point
19  see any signs erected?
20   A   Like I said, I recall that there was,
21  you know, some of that caution tape that was put
22  on there, the yellow tape, and that there was
23  some sort of posts that were put up along the
24  front of it.  I don't remember if it was at

Page 120

1  Stagg or if it was at one of the other schools,
2  but I do recall that there was something
3  there.
4    Q   And do you recall if that was before --
5  I guess first off, you're not sure if it was
6  Stagg High School?
7    A   You're right.  I'm not sure if it was
8  Stagg.
9    Q   And then with respect to the time frame
10  that you saw it, regardless of whether it was
11  Stagg, do you recall if you saw the caution tape
12  before or after May 21, 2002?
13       MR. O'CONNOR:  Objection, asked and
14  answered.  You already asked him that, and he
15  said it was after.  That was your last
16  question.
17       MR. VELAZQUEZ:  No, he just said that he
18  recalled seeing them.
19       THE WITNESS:  I recall it was after the
20  21st, after the substantial completion.
21  BY MR. VELAZQUEZ:
22   Q   Now, after May 21, 2002, when you went
23  back to the stage area, did you ever have
24  occasion to tell the owner you should erect

Page 121

1  signs or barricades or anything like that?
2    A   No.  I mean, I wouldn't -- that wouldn't
3  be for me to do.
4    Q   Would that be because it's up to the
5  school to decide what to do with the stage
6  area?
7    A   Well, at that time it's already -- they
8  are the ones using the building.  So, I mean,
9  they would know what's best for their own use.
10   Q   Now, after May 21, 2002 when the stage
11  area was substantially completed and turned
12  over, if there was a light bulb that would have
13  burnt out, would that have been something that
14  the owner as possessor would have addressed?
15   A   Yeah, that would be up to them to do.
16   Q   What about maybe squeaky doors in the
17  performing arts theatre?
18   A   I mean, I guess that's -- it depends on
19  the circumstances.  There is obviously warranty
20  items that if something breaks you have a
21  certain warranty period in which the contractor
22  is responsible to fix it.  The squeaky door,
23  that just may be their janitor spraying WD40 on
24  the hinge or something like that.  A scenario

31 (Pages 118 to 121)

FBFK 1701
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

TEAMSTERS' LOCAL UNION 705 and TEAMSTERS' LOCAL UNION 710                    DISPUTE

Page 122

1   like that I would say that that's part of the
2   District's responsibility.
3        Q    Did you ever see after May 21, 2002
4   employees of the District in the performing arts
5   theatre area?
6        A    I don't recall.
7        Q    As far as Jacobs is concerned, Jacobs
8   didn't have any duties related to design for the
9   project entirely?
10       A    Right, they didn't have any
11  responsibility.
12       Q    And Jacobs didn't -- Jacobs wasn't
13  present to do physical work on the District 230
14  project?
15       A    Yeah, that was my understanding.  They
16  were just there for supervision.
17       Q    Jacobs didn't hire electricians?
18       A    No.
19       Q    Or sheet metal workers?
20       A    No.
21       Q    Now, with respect to the fire chief's
22  letter, do you know what, if any, jurisdiction
23  the fire chief has to make -- to send letters?
24       A    I'm not sure.

Page 123

1        Q    So you're not sure if he is sending a
2   letter based on a fire code?
3        A    No, I'm not.  I mean, you know, I guess
4   my understanding was that they had to go through
5   him to get the occupancy certificate, so that
6   was the only understanding that I had of it.
7        Q    When was that your understanding that --
8   when was that your understanding that the fire
9   chief was involved for purposes of an occupancy
10  permit?
11       A    Basically they had told us to, you know,
12  do our punch list but that the District would
13  have to call the fire chief or someone in the
14  fire department to walk through the building or
15  the area before they could actually let students
16  in it.
17       Q    And do you know who actually issues the
18  occupancy permit?
19       A    I assume it's the fire department.  I
20  don't know.
21       Q    That's okay.
22            And if it's not the fire department
23  that issues the occupancy permit, do you know
24  for certain that the fire department is part of

Page 124

1   the process for the occupancy permit?
2        A    Well, I mean, just seeing what
3   transpired, yes, but I didn't know prior to this
4   that that's what it was.  I've been on other
5   projects where they are not required to
6   walk-through, but every jurisdiction or region
7   is a little bit different.
8        Q    So would you defer to an employee of the
9   entity that issues the occupancy permit to
10  explain what the process is?
11       A    Yes, that's fair to say.
12       Q    With respect to that letter, you stated
13  that you had never seen it before?
14       A    Right.
15       Q    As far as the performing arts theatre is
16  concerned and as far as you know, everything
17  that was designed -- was designed according to
18  code?
19       A    Yes, as far as I know.
20       Q    So nothing was substandard or in
21  violation of the code?
22       A    Right, correct.
23       Q    Do you know offhand what code it was?
24       A    I don't know.

Page 125

1        Q    Now, do you know whether or not the
2   items listed on that letter were just
3   recommendations that were being made by the fire
4   chief?
5        A    I don't know.  I mean, you know, they
6   were addressed to Jacobs, and I think Jacobs was
7   the one who walked through the building with
8   us.
9        Q    So you can't say whether those items
10  were listed because the fire chief thought he
11  should recommend the change or because the items
12  were necessary in order to comply with some
13  code?
14       A    I mean, I don't know if they were
15  necessary to comply with a code.  I mean, if the
16  intent on that letter was to issue an occupancy
17  permit, the items he probably listed were to,
18  you know, satisfy him to get that permit in
19  place.  So that's kind of my understanding of
20  it.
21       Q    But you're not sure what authority he
22  has then?
23       A    No, I don't.
24       Q    Now, with respect to the items listed on

32 (Pages 122 to 125)

FBFK 1702
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 126

1  the letter, the decision to oblige the fire
2  chief, that would have been made by the owner?
3      A    When you say oblige the fire chief --
4      Q    Well, for example, comply. The decision
5  to comply with -- the decision to comply with
6  the fire chief's items listed on that letter,
7  which is labeled Moss No. 5 in the Madden case,
8  the decision for compliance with those items
9  would have been made by the District?
10     A    I mean, the letter is addressed to
11 Gerry, so I think Gerry was the contact person
12 with the fire department here. So, I mean, I
13 assume since Gerry was the superintendent, he
14 would be the one, you know, making sure these
15 items get completed.
16     Q    And the thing is though if those items
17 go beyond the scope of the project documents,
18 Jacobs doesn't have any authority to modify the
19 project documents and fulfill these items?
20     A    I mean, I guess, you know, if it went
21 above and beyond what was on the drawings then,
22 yes, you know, basically they would tell -- I
23 would think they would tell the owner that, hey,
24 you know, these are above and beyond and we've

Page 127

1  got to do this in order to comply, what do you
2  want us to do, do you want us to spend the money
3  and do them.
4      Q    Sorry. Are you finished?
5      A    I was just going to say there could have
6  been additional items that the fire chief saw at
7  the time of his walk-through that may not have
8  been, quote, an issue but it may have been
9  something to resolve his concerns.
10     Q    And do you know if any of those items
11 were above and beyond the contract documents?
12     A    I don't know.
13     Q    Now, as far as the pit cover is
14 concerned, it's the owner that would have made
15 the decision whether or not to install the pit
16 cover?
17     A    Yes.
18     Q    And that's for a number of reasons, one
19 being budget concerns you said earlier, I
20 think?
21     A    I don't know if I said that.
22         MR. BARAKAT: Objection, speculation.
23 BY MR. VELAZQUEZ:
24     Q    One of the things that the District was

Page 128

1  taking into account was cost?
2      A    Yeah. I mean, it's typical on any
3  project.
4         MR. BARAKAT: And I would continue to
5  object as to speculation as to what the District
6  was taking into account in this particular
7  witness's knowledge.
8         MR. VELAZQUEZ: I think he testified
9  earlier that the District was budget
10 conscious.
11 BY MR. VELAZQUEZ:
12     Q    With respect to the meetings that
13 everybody was involved with that I think you
14 referred to as being held by Jacobs, the purpose
15 of those meetings wasn't safety specifically?
16     A    Yeah, from what I recall we kind of went
17 through open items, issues that may have been
18 involved. I mean, I think they may have had
19 some portion of the meeting that addressed
20 something on safety.
21     Q    The primary purpose was to discuss the
22 progress of the project?
23     A    Yes.
24     Q    Now, with respect to the specifics for

Page 129

1  the pit filler which I think --
2         MR. O'CONNOR: Right here.
3         THE WITNESS: The specifications you
4  said?
5  BY MR. VELAZQUEZ:
6      Q    Yes, I think they are the specs for the
7  pit filler.
8      A    I think this is the field report.
9      Q    This is the one. This document is Moss
10 No. 9.
11         Now, are those the specifications
12 for the actual filler that was installed?
13     A    I believe so.
14     Q    And the date on that document is
15 April 17, 2002?
16     A    Yes.
17     Q    Do you know if -- well, at the point
18 that the District requested VOA to inquire into
19 the possibility for a pit cover, at that point
20 does it become an addendum to the contract
21 documents?
22     A    Addendum to the contract documents?
23     Q    In other words, is an inquiry -- does an
24 inquiry make the pit filler part of the

33 (Pages 126 to 129)

FBFK 1703
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 130

1  contract?
2      A   I mean, at that point it's not an
3  addendum. An addendum is typically issued
4  before the contract is awarded. What it becomes
5  is a modification to the contract.
6      Q   And do you know if this became a
7  modification to the contract as of the
8  April 17th date or is the April 17th date just a
9  day that the specs were submitted to VOA and the
10 owner for the purpose of consideration -- was
11 considering possibilities for pit covers?
12     A   This was just when they had prepared the
13 documents for us to give to the owner.
14     Q   So the pit cover which -- which from
15 what I gather from earlier testimony it was
16 eventually installed?
17     A   Yes, it was.
18     Q   Do you know at what point the
19 specifications for the pit filler became an
20 addendum to the contract documents?
21     A   I mean, I don't know. Basically we
22 issued them, you know, on this date. We had --
23 our contract was with Schuler & Shook, so they
24 had sent us a proposal, and we would have signed

Page 131

1  it and sent it back to them saying they are
2  going to get paid for the additional work.
3      Q   Is that additional work in terms of the
4  additional work of investigating it, of looking
5  into the possibilities, or additional work for
6  overseeing the actual installation?
7      A   No, what it was --
8          MR. BARAKAT: At this point I'm going to
9  object. He already testified earlier that the
10 additional work that Schuler & Shook was paid
11 for was to create the specification and do the
12 walk-through at the end after it was installed.
13         You can answer, if you know.
14         THE WITNESS: Basically that's what they
15 were paid for was to come up with the
16 specification, the layout drawing, and they
17 would look at the shop drawings when they came
18 in; and then after the pit fillers were
19 installed, they would go and take a look at the
20 installation and provide a punch list if
21 required.
22 BY MR. VELAZQUEZ:
23     Q   Do you know what the date of that
24 proposal was?

Page 132

1      A   I don't know off the top of my head,
2  no.
3      Q   Do you know if -- at the point that this
4  is prepared and submitted, there is still not a
5  decision or -- strike that.
6          At the time that this was prepared,
7  the pit filler was still not a formal part of
8  the contract, correct?
9          MR. O'CONNOR: I object. I don't know
10 what you mean by that.
11         MR. VELAZQUEZ: Let me rephrase it. I'm
12 trying to think of the best way to ask this.
13 BY MR. VELAZQUEZ:
14     Q   When the District makes a request for an
15 inquiry, requests VOA to look into possibilities
16 for whatever, X, VOA or anybody else that's
17 working with VOA looks into those possibilities.
18 They come up with a possibility and state this
19 is what we think could work. They state that to
20 the owner. Just because the owner has requested
21 and VOA or whatever architect would be working
22 for whatever owner -- just because an architect
23 proposes a possible solution to the owner's
24 inquiry, it doesn't make the potential solution

Page 133

1  part of the actual contract documents?
2      A   Right, right. I mean, you know, the
3  proposal that was given to the owner basically
4  identified that this is what they are going to
5  do. This is above and beyond what we were
6  contracted for and this is what it's going to
7  cost you for Schuler & Shook to complete the
8  work.
9      Q   So would it be fair to say that the
10 specifications for the pit filler became a
11 formal part of the contract documents after that
12 April 17, 2002 date?
13     A   I mean, I guess I would say yes.
14     Q   And do you know one way or the other --
15 if you don't know, that's okay. Do you know who
16 it became formal -- whether or not the pit
17 filler specifications became formal or
18 formalized for the contract documents before or
19 after May 21, 2002, the date of substantial
20 completion?
21     A   I don't know. I mean, you know, if
22 something came out of our office to the owner
23 that said sign this for us to continue, I'm not
24 aware of it. So I don't know the answer to

34 (Pages 130 to 133)

FBFK 1704
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 134

1  that.
2      Q    The installation of the actual pit
3  cover, do you know if that was something that
4  the owner took upon themselves separately or was
5  that also through the actual project?
6      A    My understanding was that it wasn't
7  through the project, that it was separate.
8  Because one of their concerns was there could
9  have been a potential markup on each of the pit
10  fillers for each school.  So typically, you
11  know, when you ask the general contractor to
12  provide something, he is going to go to some
13  sort of installer who is going to provide a
14  markup to him.  The general is going to provide
15  a markup on top of that.  The owner is getting a
16  markup twice.
17          One of the options was the school
18  could go directly to one of these manufacturers
19  and take care of it that way.  So, you know, I
20  guess looking at it that way did it ever become
21  a formal part of the project?  I don't know, but
22  I was under the impression that the owner went
23  directly to the manufacturer and left everybody
24  out of it to go ahead and have these pit fillers

Page 135

1  purchased and installed.
2      Q    So then is it your understanding that
3  the owner dealt directly with the contractor and
4  the contract with that contractor was not part
5  of the contracts which VOA, Jacobs Facilities,
6  and Paschen had with respect to District 230?
7      A    That was my understanding, but I haven't
8  looked at the contract, so I don't know.
9          MR. VELAZQUEZ:  That's all that I have
10  for now.
11          E X A M I N A T I O N
12  BY MR. HUTCHINSON:
13      Q    Hi, Mr. Migon.  My name is Andy
14  Hutchinson.  I represent Schuler & Shook.
15          I understand you said you haven't
16  seen any contracts related to the jobs.  I take
17  it that includes VOA's contract with Schuler &
18  Shook?
19      A    Yeah, I didn't.
20      Q    Do you know who at VOA was responsible
21  for contracting with Schuler & Shook?
22      A    I'm not sure.
23      Q    But you're aware that Schuler & Shook
24  was a consultant to VOA?

Page 136

1      A    Yes, I am aware of that.
2      Q    And VOA paid Schuler & Shook for their
3  services?
4      A    Yes.
5      Q    Do you know if VOA used any other
6  consultants prior to Schuler & Shook on the
7  project?
8      A    I don't know.
9      Q    You testified earlier that the school
10  relied on VOA for the theatre and VOA relied on
11  Schuler & Shook for their services?
12      A    Yes.
13      Q    Are you aware of any work done by
14  Schuler & Shook directly with or for the school
15  district that VOA was not involved with?
16      A    No, I don't.
17      Q    Do you know of any work by Schuler &
18  Shook related to the theatre for anyone else
19  other than VOA?
20      A    No, I don't.
21      Q    So it's safe to say that as VOA's
22  Consultant that all Schuler & Shook's work with
23  respect to Stagg was part of VOA's contract?
24      A    Yes.

Page 137

1      Q    VOA was not responsible for safety on
2  the job site?
3      A    Right.
4      Q    So Schuler & Shook also had no
5  responsibility for safety on the job site?
6      A    No.
7      Q    Are you aware of any OSHA codes or other
8  building codes related to the need for a pit
9  cover or lift?
10      A    No, I don't.
11      Q    Referring to Migon Exhibit 2, the
12  transmittal from 1999, you had not seen that
13  document before?
14      A    No, I haven't.
15      Q    Were you aware of any other early
16  submissions by Schuler & Shook that related to a
17  pit lift or filler as part of the design
18  element?
19      A    No.
20      Q    Do you know who Tim McGrath is?
21      A    Yes, I do.
22      Q    Who is he?
23      A    He was the project manager that was on
24  the job when it started.

35 (Pages 134 to 137)

FBFK 1705
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 138

1    Q   Is he still at VOA?
2    A   No, he is not.
3    Q   Do you know when he left?
4    A   I think it was about a year after
5  construction. I'm not sure what year though.
6    Q   But you and Mr. McGrath were at VOA at
7  the same point in time?
8    A   Yes.
9    Q   Just different projects?
10    A   Yes.
11    Q   Did you ever discuss the pit cover with
12  Mr. McGrath?
13    A   No, I didn't.
14    Q   Do you know who the Talaske Group is?
15    A   They are a sound consultant.
16    Q   Do you know who Gary Madaras is?
17    A   I have heard of his name.
18    Q   You don't --
19    A   I don't know if he is the project
20  manager or who.
21    Q   Referring to Moss Exhibit 9, is it your
22  testimony that Schuler & Shook prepared that
23  document?
24    A   Yes.

Page 139

1    Q   You said there was part of the heading
2  there that was not in there that VOA would have
3  put in there?
4    A   Right.
5    Q   Can you clarify that?
6    A   Yes. Basically what we had received
7  from Schuler & Shook was the orchestra pit
8  filler, and I believe this may have been done in
9  the District where it says interior buildout
10  consolidated high school district, et cetera, et
11  cetera. I didn't think that we put that on
12  there. That may have been part of what the
13  District did in providing their front end.
14    Q   That also includes the three high
15  schools named in bold at the top?
16    A   Right.
17    Q   Do you know what that JAC is below
18  there?
19    A   I don't know.
20    Q   You are saying this April 17th
21  specification is not an addendum to the VOA,
22  Schuler & Shook contract?
23    A   No, it's not an addendum. I wouldn't
24  consider it an addendum.

Page 140

1    Q   Was it Jeff Childs at Schuler & Shook
2  that requested more money for the additional
3  orchestra pit work?
4    A   Yes.
5    Q   And you said earlier that the school did
6  not tell you why it wanted the pit cover?
7    A   No, they didn't specify a reason for
8  it.
9    Q   But Schuler & Shook did produce this
10  specification after the request was progressed
11  through VOA --
12    A   Yes.
13    Q   -- to them?
14        Do you know if there ever was an
15  addendum to the agreement between VOA and
16  Schuler & Shook which related specifically to
17  the pit filler or cover?
18    A   I thought there was some sort of
19  proposal that was sent from Schuler & Shook to
20  our office for signature.
21    Q   Did you ever see the proposal?
22    A   I think I did, but I don't believe I
23  signed it.
24    Q   You also said earlier that the cover was

Page 141

1  installed near the end of December?
2    A   Yes.
3    Q   You were not present for that?
4    A   No, I wasn't present for the
5  installation.
6    Q   Who at the school district told you that
7  the school would issue the pit filler documents
8  for bids?
9    A   Bob Hughes.
10    Q   Do you know if Schuler & Shook reviewed
11  any shop drawings?
12    A   Yes, I do recall that.
13    Q   Do you know if they were passed on to
14  VOA then?
15    A   They were after they reviewed them.
16    Q   Did you review those shop drawings?
17    A   I basically took a quick look at them
18  but they are the -- Schuler & Shook were the
19  ones who had more knowledge on it since this was
20  a specialty item and not VOA.
21    Q   Would only Schuler & Shook have stamped
22  the shop drawings for approval or would VOA have
23  done that?
24    A   We would have done so also.

36 (Pages 138 to 141)

FBFK 1706
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 142

1     Q    Do you know who stamped the shop
2   drawings?
3     A    It probably would have been me.
4     Q    Do you know if Schuler & Shook prepared
5   a punch list for the cover after it was
6   installed?
7     A    I don't remember.
8     Q    But you do think that that was part of
9   their duties to prepare one after it was
10  installed?
11    A    Yes.
12    Q    Do you know who at VOA would have seen
13  that punch list?
14    A    I mean, I think -- if it had been issued
15  towards the end of the summer, it probably would
16  have been me because the other people that were
17  working on the job they already -- I believe
18  already had started working on another project.
19  I kind of became the sole person involved with
20  the three schools since the construction started
21  dwindling down, and we didn't need to have a
22  full-time person working on each school, but it
23  would have been me if there was a punch list.
24    Q    When you say you were the sole person

Page 143

1   left from VOA, was there anybody else besides
2   Elaine Fitzgerald who had been there that had
3   left?
4     A    They just moved on to another project in
5   our office, but we had a person who was at
6   Andrew High School.  His name was John Waters,
7   and at Sandburg there was a John Williamson.
8     Q    So it was only Elaine Fitzgerald and
9   yourself at Stagg?
10    A    Yes.
11    Q    MR. HUTCHINSON:  That's all that I have.
12        MR. VELAZQUEZ:  Do you have more?
13        MR. O'CONNOR:  I just have a few more.
14          E X A M I N A T I O N
15  BY MR. O'CONNOR:
16    Q    Elaine described the guy that came from
17  the fire district.  She called him Rocko.  Do
18  you recall the name Rocko?
19    A    I don't know.
20    Q    His name was Russell, but they called
21  him Rocko.
22    A    I don't remember.
23    Q    Is there a chance if he would have came
24  through that he would have done more than one

Page 144

1   inspection that she would have gone through as
2   opposed to you?
3     A    That could be possible.
4     Q    Let me just ask you about a substantial
5   completion, and I'll give you a hypothetical.
6         If you have a building that needs to
7   be completed and there is several bathrooms but
8   one bathroom on the first floor is not finished,
9   you could block off that portion and still let
10  the owner use the building and issue a
11  certificate of substantial completion?
12        MR. BATTLE:  Objection to an incomplete
13  hypothetical.
14        MR. VELAZQUEZ:  Join.
15        MR. BATTLE:  You can answer.
16        THE WITNESS:  Looking at that what you
17  can do -- yes, but what we would do is we would
18  exclude it from the substantial completion list.
19  In other words, I wouldn't put it on there being
20  substantially complete.
21  BY MR. O'CONNOR:
22    Q    In other words, you would have to look
23  at the attachment that goes to the substantial
24  completion list to decide whether that area of

Page 145

1   the particular building that you are saying is
2   substantially complete is part of the
3   agreement?
4         MR. BATTLE:  Objection.  I don't think
5   that's his testimony.  I think he said he
6   wouldn't put it on the list if it wasn't
7   completed.
8         MR. VELAZQUEZ:  Join.
9         THE WITNESS:  I wouldn't put it on the
10  list if it's not complete.  I mean, there is an
11  example.  The one that we looked at we have room
12  numbers identified of what is completed and
13  what's on the substantial completion.  In Area A
14  as an example if I have got two rooms that are
15  incomplete and they have got a lot of work left,
16  I won't put it on there because they can't
17  occupy it.
18  BY MR. O'CONNOR:
19    Q    Let me give you a hypothetical.  25
20  percent of the stage area can't be used because
21  there was something that needed to get done in
22  that one portion of it but the rest of the
23  theatre area was completed.  Would you be able
24  to issue a certificate of substantial

37 (Pages 142 to 145)

FBFK 1707
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 146

1  completion?
2       MR. BATTLE:  Objection to the form,
3  foundation, incomplete hypothetical, and --
4       THE WITNESS:  I don't know how to answer
5  that question.  I mean, I don't know what's not
6  complete -- what you are saying is complete and
7  what's not complete.
8  BY MR. O'CONNOR:
9       Q   If someone couldn't use the actual stage
10  area but could use the rest of the auditorium,
11  would you issue a substantial completion?
12       A   We would exclude anything that would not
13  be complete.
14       Q   So you could issue a substantial
15  completion document, but it would exclude the
16  area of the stage if the stage was not
17  complete?
18       A   If it was its own area, sure, I guess we
19  could do that.  We could put an exclusion on
20  what wasn't included in that, and the owner
21  wouldn't be able to occupy it or use it for its
22  intended purpose.
23       Q   Given that hypothetical, in your
24  substantial completion document, where would

Page 147

1  that have been placed?
2       A   Where it says exceptions on the
3  following page here.  Here are the exceptions
4  that we would have listed saying, you know, this
5  area is not ready or something like that.  If
6  it's a room -- if it's its own separate room
7  with a room number, which is how the drawings
8  really show everything, then we would identify
9  that.  That room wouldn't just appear on here.
10  It wouldn't be put on here.  Certain areas, as
11  long as they were deemed substantially complete,
12  could be used.  I mean, we would write an
13  exception on what wasn't usable or what was
14  usable.
15       Q   Do you recall that the school district
16  on this project said that they wanted to use
17  that auditorium for their graduation ceremony?
18       A   I don't remember that.  We obviously
19  substantialled the building, and I understand
20  that there was an event that followed the
21  following week or something like that.
22       Q   Was it your understanding that the
23  reason that you were being asked to issue that
24  substantial completion was because there was

Page 148

1  some event the following week that was going to
2  happen?
3       A   Yeah, they had asked us to look at --
4  everybody try to get this date -- the work done
5  and for us to issue the certificate because
6  there was some function that they wanted to do
7  or something like that.
8       Q   Would you agree with me that if the
9  function didn't involve use of the stage, in
10  other words putting on a theatre production,
11  that the school district could use the chairs
12  and the auditorium and present things without
13  using the stage area?
14       A   Can you repeat that?
15       Q   Sure.
16           Would you agree with me that if the
17  school intended to use the function to have a
18  gathering place for people to use the seating in
19  the theatre area, weren't necessarily going to
20  use the stage area for a theatre production but
21  were going to do some other kind of awards or
22  ceremony, would you agree that that would be a
23  use of that building even though they couldn't
24  use the stage?

Page 149

1       A   I think they could use the stage.
2       Q   At the point when you issued this
3  substantial completion, do you know whether that
4  stage at that point was ready for a theatre
5  production to be put on?
6       A   Well, we got a punch list from Schuler &
7  Shook.  I mean, they were the people we were
8  looking for to tell us yes or no.  There was
9  nothing on there that they identified to me that
10  said, no, you can't use it.  To my knowledge,
11  you know, everything would be used as
12  intended.
13       Q   So in your opinion at that point the
14  stage could have been used for a theatre
15  production?
16           MR. BATTLE:  Objection.  He just asked
17  and answered that question.
18           THE WITNESS:  I mean, that's my
19  understanding of it, yes.
20  BY MR. O'CONNOR:
21       Q   That would be irrespective of the punch
22  list items?
23       A   Yes, irrespective.  The punch list items
24  are just items that could be a nick in the wall.

38 (Pages 146 to 149)

FBFK 1708
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 150

1 It could be a broken ceiling tile, but that
2 doesn't stop the owner from using the space.
3         MR. O'CONNOR:  That's all that I have.
4         MR. BATTLE:  Let me get a couple points
5 of clarity.
6                E X A M I N A T I O N
7 BY MR. BATTLE:
8     Q    Do you know exactly what's needed to put
9 on a theatre production?
10     A    No, I don't.
11     Q    Do you know exactly what's needed from
12 construction workers to complete construction
13 pursuant to VOA drawings?
14     A    I mean, you are saying like if --
15     Q    Like if you walked through can you use
16 your VOA drawings and determine if an area is
17 substantially complete pursuant to those
18 drawings?
19     A    Yes, you could.
20     Q    And that's the reason why you issue your
21 certificate of substantial completion?
22     A    Right.
23     Q    Is that correct?
24     A    Yes, that's correct.

Page 151

1     Q    With respect to the whole honors night
2 issue before your previous deposition, you
3 didn't know anything about it or didn't remember
4 it?
5     A    No, I didn't remember.
6     Q    Do you remember any other events or
7 anything that the school district may have done
8 in that area after you issued your
9 certificate?
10     A    I don't remember.
11         MR. BATTLE:  Fair enough.  That's all I
12 have.  Thanks.
13         MR. VELAZQUEZ:  Just a couple more
14 questions, and then that's it.
15                E X A M I N A T I O N
16 BY MR. VELAZQUEZ:
17     Q    With respect to John Szott, you referred
18 to him as somebody who was involved with the
19 contract from Jacobs' perspective?
20     A    Yes.
21     Q    With Gerry Myers, you referred to him as
22 the superintendent for Jacobs?
23     A    Yes.
24     Q    Would you refer to John Szott or Gerry

Page 152

1 for any testimony or opinions regarding what
2 Jacobs' contractual duties were for District 230
3 for the Stagg High School project?
4     A    I would talk to John more so than I
5 would talk to Gerry about that.
6     Q    I asked it wrong.
7         With respect to opinions as to what
8 Jacobs' duties were for the District 230
9 project, is that something that you would defer
10 to John Szott or Gerry Myers to set forth in
11 terms of testimony?
12         MR. O'CONNOR:  I would object as to it
13 relates to the contract documents.
14         THE WITNESS:  I don't really understand
15 it.  I really don't understand what you're
16 trying to ask.
17         MR. VELAZQUEZ:  Sure.
18 BY MR. VELAZQUEZ:
19     Q    With respect to what duties Jacobs had
20 on this project, is that something that you
21 would let John Szott, as somebody involved with
22 contracts, or Gerry Myers, as a superintendent
23 for Jacobs -- is that something that you would
24 let those two explain to everyone else here?

Page 153

1     A    Yes, yes.  I would say John Szott would
2 have better knowledge of that.
3     Q    That would also include the duty or lack
4 thereof regarding safety?
5     A    I believe so.
6         MR. VELAZQUEZ:  Okay.  Thank you.
7         MR. BARAKAT:  I just have a couple of
8 questions.
9                E X A M I N A T I O N
10 BY MR. BARAKAT:
11     Q    You were not involved in the initial
12 design phase of the Stagg High School project?
13     A    No, I wasn't.
14     Q    Did you have an opportunity to take a
15 look at those documents?
16     A    Not until I hopped on the project.
17     Q    Do you have a recollection of those
18 documents as you sit here today?
19     A    I looked at them before the previous
20 deposition, but that was like the last time.
21     Q    Did you look at them for this
22 deposition?
23     A    No, I didn't.
24     Q    In general when VOA presents drawings

39 (Pages 150 to 153)

FBFK 1709
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 154

1  and specifications to an owner, those drawings
2  and specifications are to follow the local codes
3  necessary for that building to be built?
4      A   Yes.
5      Q   Is that something that VOA does or do
6  they hire consultants to do that?
7      A   To do the code review?
8      Q   Right.
9      A   It varies.  Sometimes we do it.
10  Sometimes we do hire a code consultant.
11      Q   Do you know if VOA did that on this
12  project or they hired a consultant?
13      A   To my knowledge I think there was a code
14  consultant.
15      Q   Do you know who that was?
16      A   No, I don't.
17      Q   That code consultant would then take a
18  look at your drawings and make sure that they
19  were up to code?
20      A   Yeah, I think they would give us -- as
21  an example, I mean, there was -- the building
22  types may have differed from the theatre to the
23  school.  So, yes, they would review what kind of
24  building and what we're doing with the building

Page 155

1  and they would give us the recommendations, I
2  guess, like on fire ratings and things of that
3  nature.
4      Q   Before you handed those documents over
5  to the owner, you would make sure that they
6  were -- the drawings and specifications met
7  those codes?
8      A   Yes.
9      Q   And the design of a performing arts
10  theatre is a very specialized kind of
11  building?
12      A   Right.
13      Q   And the interior specifically is even
14  more specialized?
15      A   Yes.
16      Q   And that's not something -- that's
17  something that VOA would hire consultants to
18  take a look at?
19      A   Yes, we would.
20      Q   In this case you hired Schuler & Shook
21  to do that for you?
22      A   Yes.
23      Q   After consulting with Schuler & Shook,
24  the documents that you presented to the owner on

Page 156

1  this project, which included the interior
2  buildout such as the stage and the orchestra pit
3  and the seating and all of that, that was all up
4  to code as far as you know?
5      A   To my knowledge, yes.
6      Q   With regards to, you know, the field
7  observation that you do, you represented -- it
8  was your job to represent the owner with regards
9  to making sure that what was going on
10  construction wise met the specifications that
11  VOA produced?
12      A   That's correct.
13      Q   And that's in fact what you were doing
14  when you had a field observer at each high
15  school and specifically Elaine Fitzgerald at
16  Stagg?
17      A   Yes.
18      Q   And you would walk through and make sure
19  that the building was being built according to
20  the documents and specifications that were
21  produced in the design phase?
22      A   Yes.
23      Q   If they weren't, then you would make
24  sure that that was corrected?

Page 157

1      A   Yes.
2          Can I just clarify that?  What we
3  would do is we would notify Jacobs.  We wouldn't
4  go out and physically correct it.
5      Q   That's not what I meant.  You would make
6  sure that they would get corrected by the proper
7  entity?
8      A   Correct.  We would send a letter or an
9  E-mail or something saying that this doesn't
10  comply, and Jacobs then would be responsible to
11  contact the contractor, whoever it was, to
12  correct the work.
13      Q   Now, I know you didn't review any of the
14  contract documents for this particular job.
15  People started talking about contract documents.
16  Just so we're all clear, you indicated earlier
17  that an addendum to the contract is something
18  that occurs prior to construction?
19      A   That's typically --
20      Q   Just so we all get our terminology
21  correct.
22      A   Yes.
23      Q   So if there is a contract, before it
24  gets executed and there is a change, that would

40 (Pages 154 to 157)

FBFK 1710
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 158

1  be an addendum?
2      A   Yes.
3      Q   After the contract is already being
4  executed, construction is going on, and say
5  there is a change order, something like that.
6  What would the term that you would understand to
7  be for that sort of thing?
8      A   It would be -- well, we would issue like
9  an RFP, a request for a proposal.  That would
10  get sent to Jacobs, and they would distribute it
11  to whoever the change effected.  They would get,
12  you know, a quote back from a contractor and
13  they would then issue a change order saying --
14  they would issue the RFP back to us.  We would
15  look at it for the pricing, content, and
16  whatnot.  If there was any disagreements or any
17  questions that we had, we would talk to them.
18  Once everything was okay between what we looked
19  at and what Jacobs looked at, then a formal
20  change order was issued to the contractor, and
21  that was just to get that contractor paid.
22      MR. VELAZQUEZ:  Dean, was that last
23  question directed to changes in general or the
24  actual pit cover?

Page 159

1      MR. BARAKAT:  No, in general.  So far
2  I'm talking about in general, not even with
3  regards to this particular project.
4  BY MR. BARAKAT:
5      Q   Specifically when we are talking
6  specifically about the specifications for the
7  pit filler that was done, Schuler & Shook were
8  VOA's consultants?
9      A   Yes.
10      Q   So you didn't need to issue an RFP or do
11  any of that other stuff because they were VOA's
12  consultant?
13      A   That's correct.
14      Q   So any of that -- any dealings between
15  Schuler & Shook would have been internal between
16  VOA and Schuler & Shook?
17      A   That's correct.
18      Q   When you start talking about the owner
19  asked for a pit filler and then Schuler & Shook
20  told you that they -- Jeff Childs apparently
21  told you that that was something outside of the
22  scope of your contract between VOA and Schuler &
23  Shook and that there was additional money that
24  needed to be paid to pursue that project?

Page 160

1      A   Yes.
2      Q   And you went to the owner and indicated
3  that?
4      A   (Nonverbal response.)
5      Q   And they okayed it?
6      A   Yes.
7      Q   And that's indicated in those E-mails
8  that we've already discussed?
9      A   Right.
10      Q   And that's how that process came
11  about?
12      A   That's correct.
13      Q   And that's how that specification was
14  produced?
15      A   Right.
16          E X A M I N A T I O N
17  BY MS. ELRABADI:
18      Q   Al, you testified that to your knowledge
19  pit filler's main purpose is to expand the stage
20  floor?
21      A   Yes.
22      Q   Did you learn that from someone on the
23  project?
24      A   Well, Jeff was kind of the one that I

Page 161

1  talked to.  That's kind of the reason he gave
2  me.
3      Q   So your consultant, who is a theatre
4  expert, told you that pit filler's main purpose
5  is to expand stage floors to expand the usage of
6  that floor; is that correct?
7      A   Right, that's correct.
8      Q   And the school district was concerned
9  about getting a pit filler that can ultimately
10  be installed and uninstalled by someone -- by
11  their maintenance personnel, is that true?
12      A   Yes.
13      Q   So is it fair to say that as early as
14  these E-mails in April of 2002 you told Jeff
15  that the school district was concerned that -- I
16  will quote this.  This should be acceptable for
17  a few staff members to remove and reinstall.
18  Are you telling Jeff Childs at Schuler & Shook
19  that the school district was concerned about
20  getting pit fillers that can be easily installed
21  and reinstalled by District 230 staff and
22  maintenance personnel?
23      A   I don't know who was going to do it, but
24  ultimately it would be either the staff or maybe

41 (Pages 158 to 161)

FBFK 1711
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 162

1  students that, you know, would be involved in
2  any type of performance to remove these things.
3  So that was a concern of the Districts that they
4  didn't weigh too much.
5      Q   You're not exactly sure who the staff
6  members would be?
7      A   This refers to the District's staff
8  members.
9      Q   So is it possible that as early as April
10  of 2002 maintenance personnel were aware of the
11  presence of an orchestra pit?
12     A   That, I don't know.  I know that the
13  District was aware of what they were asking us
14  to do.
15     Q   And you said that the pit fillers that
16  were actually installed were -- you called them
17  a Ugo version?
18     A   Yes.
19     Q   Do you know if it was -- what actually
20  was involved in installation?
21     A   You mean to actually install them?
22     Q   Yes.
23     A   From what I recall, the trim that was on
24  the front of the stage and around the area had

Page 163

1  to be modified a little bit for them to be
2  placed flush with the stage floor.
3      Q   So there could be a number of pieces
4  that make up the entire pit cover?
5      A   Oh, yes, because it would be too heavy,
6  and I don't think anybody will be able to remove
7  it.
8      Q   So there could have been as many as
9  10?
10     A   As many as 10 or 20, yes.
11     Q   But you don't know exactly how many?
12     A   I don't know exactly how many.
13     Q   Each one needed to be installed and
14  taken out individually?
15     A   Right.  I guess -- my understanding is
16  there is an order.  You start out on one end and
17  each piece is bigger.  So there is a consecutive
18  order to how to put these things in.
19     Q   Do you know if there was ever any
20  discussion with the school district and, for
21  instance, maintenance personnel about how to
22  install these exact pit fillers?
23     A   No, I don't know.
24     Q   You also testified that you heard from

Page 164

1  Bob Hughes that Mr. Madden fell in August of
2  2002?
3      A   Yes.  It was through the District that I
4  heard about it.
5      Q   Do you recall any other details about
6  what he told you about how the accident might
7  have occurred?
8      A   He mentioned something about the
9  individual had backed into it, that there was
10  some performance going on or they were getting
11  ready for a performance and he backed into it.
12  That was what I recall Bob telling me.
13     Q   Do you know at that time if there were
14  actually barricades installed?
15     A   He mentioned something that there were
16  barricades there but they were moved either for
17  the stage installation or something for the set
18  installation.  If they were moved by him or by
19  somebody, I don't know.  He did mention that
20  there were barricades there and the person
21  backed into it.
22     Q   So you didn't here that he walked head
23  on into the pit?
24     A   No, that's not the story that I heard.

Page 165

1      Q   The document that was recently produced
2  by Mr. Hutchinson related to pit filler options.
3  I'm not sure which exhibit that is.
4          MR. O'CONNOR:  2.
5  BY MS. ELRABADI:
6      Q   It's dated August 4, 1999.  So is it
7  fair to say that the school district had an
8  option as early as '99 to install them --
9          MR. BARAKAT:  I'm going to object to
10  this.  This document, Migon Exhibit 2, is a
11  Schuler & Shook document that is to Tim McGrath
12  of VOA.  There has been no evidence that this
13  was ever presented to the school or the school
14  had any options.  This particular witness has
15  testified that he hasn't seen this document
16  before today, and I am going to object to
17  foundation and speculation.
18          If you know if the District had the
19  option of having pit fillers installed in August
20  of '99, you may answer.
21          THE WITNESS:  No, I don't know that.
22  BY MS. ELRABADI:
23     Q   My final question relates to Exhibit
24  Moss No. 9 in the Section Part 3, Execution,

42 (Pages 162 to 165)

FBFK 1712
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER

Page 166

1  Section 3.2 in the installation section.  Part A
2  says contractor shall employ only experienced
3  platform system installers for the installation
4  of this section.  A competent supervisor shall
5  be maintained on this project during the entire
6  installation.
7           Did you take that to mean anyone on
8  the current budget?
9      A   No, that would have been the contractor
10 that installs the pit fillers.
11     MS. ELRABADI:  Thank you.
12     MR. BARAKAT:  I've got two follow-ups.
13       E X A M I N A T I O N
14 BY MR. BARAKAT:
15     Q   Regarding the use of the terms addendum
16 and change order, were you aware of an addendum
17 to the agreement between VOA and Schuler & Shook
18 related to the investigation of the pit
19 filler?
20     A   No, I wasn't.
21     Q   And was there ever a formal change order
22 issued regarding getting a pit filler cover in
23 2002?
24     A   Not that I recall, no.  I don't know.

Page 167

1      MR. BARAKAT:  That's it.
2      MR. O'CONNOR:  Signature?
3      MS. ELRABADI:  We'll waive signature.
4      (AND FURTHER DEPONENT SAITH NOT.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 168

1  STATE OF ILLINOIS)
                    ) SS.
2  COUNTY OF COOK   )
3
4
5
6           I, SHERRY L. JONES, a
7  Certified Shorthand Reporter for the State of
8  Illinois, do hereby certify that the foregoing
9  was reported by stenographic and mechanical
10 means, which matter was held on the date, and at
11 the time and place set out on the title page
12 hereof and that the foregoing constitutes a true
13 and accurate transcript of same.
14          I further certify that I am not
15 related to any of the parties, nor am I an
16 employee of or related to any of the attorneys
17 representing the parties, and I have no
18 financial interest in the outcome of this
19 matter.
20
21
22     _____
23     C.S.R. No. 084-004024
24

43 (Pages 166 to 168)

FBFK 1713
PRIVILEGED-SUBJECT
TO PROTECTIVE ORDER