# EXHIBIT 25

## Page 1

```
 1          UNITED STATES DISTRICT COURT FOR THE
 2            NORTHERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4   UNITED STATES FIDELITY and    )
 5   GUARANTY COMPANY,             )
 6         Plaintiff,              )
 7      vs.                        ) No. 1:08-CV-00862
 8   VOA ASSOCIATES, INC., LIBERTY )
 9   INTERNATIONAL UNDERWRITERS,   )
10   MICHAEL J. MADDEN and JEAN    )
11   MADDEN,                       )
12         Defendants.             )
13          Deposition of JENNIFER KLOMANS, called
14   for examination, taken pursuant to notice,
15   agreement and by the provisions of the Rules of
16   Civil Procedure for the United States District
17   Courts pertaining to the taking of depositions,
18   taken before PATRICIA A. ARMSTRONG, a Notary
19   Public within and for the County of DuPage, State
20   of Illinois, and a Certified Shorthand Reporter,
21   No. 084-1766, of said state, taken at 200 South
22   Michigan Avenue, Chicago, Illinois, on the 6th day
23   of January, 2009 at 1:30 p.m.
24
```

## Page 2

```
 1   PRESENT:
 2      KARPAL, COHEN, ECONOMOU, SILK, DUNNE,
 3          (200 South Michigan Avenue, 20th Floor,
 4          Chicago, Illinois 60604,
 5          312-431-3700), by:
 6      MS. LINDA J. CARWILE,
 7             appeared on behalf of Plaintiff;
 8      SCHIFF, HARDIN, LLP,
 9          (6600 Sears Tower,
10          Chicago, Illinois 60606,
11          312-258-5728), by:
12      MS. AMY R. SKAGGS,
13          appeared on behalf of Defendant VOA
14          Associates;
15      LAW OFFICE OF JAMES T. NYESTE,
16          (1 North LaSalle Street, Suite 2100,
17          Chicago, Illinois 60602,
18          312-750-1814), by:
19      MR. JAMES T. NYESTE,
20          appeared on behalf of Defendant
21          Liberty Insurance Underwriters
22          Incorporated.
23   REPORTED BY: PATRICIA ARMSTRONG, CSR, RPR.
24          Certificate No. 84-1766.
```

## Page 3

```
 1           (WHEREUPON, the witness was
 2           duly sworn.)
 3        MS. CARWILE:  Let the record reflect this
 4   is the deposition of Jennifer Klomans taken
 5   pursuant to notice under the federal rules of
 6   Civil Procedure, Federal rules of evidence and all
 7   applicable local rules.
 8        Let's go off the record for a second.
 9           (WHEREUPON, discussion was had
10           off the record.)
11        MS. CARWILE:  Back on.
12        Would you mark these as Exhibits 1
13   and 2.
14           (WHEREUPON, certain documents
15           Were marked Klomans Exhibit Nos. 1
16           and 2 for identification as of
17           1/6/09.)
18        MS. CARWILE:  This deposition is taken
19   pursuant to a protective order in this case, a
20   copy which is marked as Klomans Exhibit No. 1.
21           JENNIFER KLOMANS,
22   called as a witness herein, having been first duly
23   sworn, was examined and testified as follows:
24               EXAMINATION
```

## Page 4

```
 1   BY MS. CARWILE:
 2      Q.  Ms. Klomans, would you please state
 3   and spell your name for the court reporter.
 4      A.  Jennifer Klomans, J-e-n-n-i-f-e-r
 5   K-l-o-m-a-n-s.
 6      Q.  Ms. Klomans, have you ever given your
 7   deposition before?
 8      A.  No.
 9      Q.  I will go ahead and explain a few
10   ground rules for you. I am going to be asking you
11   a series of questions.
12        As I ask the question and as you
13   answer, the court reporter will be typing
14   everything and putting it into the record.
15        If you do not understand a question,
16   I would ask that you ask for clarification.
17        If I ask a question and you answer
18   the question, I will assume that you understood
19   it; and if you need a break for anything at any
20   time, that is fine.
21        If there is a question pending, I
22   would ask that you answer it before taking a
23   break?
24        Also, I need to make sure that you
```

## Page 5

1 answer audibly as opposed to hand gestures, face
2 nodding your head or uh-huh or uh-uhs so that the
3 court reporter can clearly get down your answer?
4     A.   Okay.
5     Q.   Do you have any questions?
6     A.   No.
7     Q.   What is your current address?
8     A.   5620 North Oriole, Chicago, Illinois,
9 60631.
10     Q.   First of all, are you represented by
11 an attorney here today?
12     A.   Yes.
13     Q.   Who is your attorney?
14     A.   Schiff Hardin, Amy Skaggs.
15     Q.   Prior to this deposition did you have
16 any discussions with anyone other than your
17 attorneys about this case?
18     A.   No.
19     Q.   Did you review any documents prior to
20 your deposition?
21     A.   No.
22     Q.   What is your highest level of
23 education?
24     A.   Master's degree.

## Page 6

1     Q.   Where did you obtain that from?
2     A.   UIC.
3     Q.   What is that in?
4     A.   Education.
5     Q.   What was your undergraduate degree
6 in?
7     A.   Accountancy.
8     Q.   Where did you obtain that from?
9     A.   U of I Champaign.
10     Q.   What year?
11     A.   1996.
12     Q.   Did you have any other degrees or
13 certifications?
14     A.   No.
15     Q.   Any specialized training or seminars
16 in insurance?
17     A.   No.
18     Q.   What is your present employment?
19     A   Where?
20     Q.   Yes, where?
21     A.   VOA Associates.
22     Q.   How long have you worked there?
23     A.   Since 1999 with a six-month break to
24 go back to grad school.

## Page 7

1     Q.   When did you take that six-month
2 break?
3     A.   I believe it was January 2005.
4     Q.   That is when it started?
5     A.   Right.
6     Q.   Prior to VOA where did you work?
7     A.   Upshot Marketing.
8     Q.   What did you do there?
9     A.   Senior accountant.
10     Q.   What years did you work there?
11     A.   I only worked there six months
12 December of 1998 to June 1999.
13     Q.   What was your employment prior to
14 Upshot?
15     A.   Blackman, Kallick & Bartelstein.
16     Q.   What is that?
17     A.   It's a public accounting firm.
18     Q.   What was your position there?
19     A.   Staff accountant -- or staff auditor.
20 Excuse me.
21     Q.   Is that in Chicago?
22     A.   Yes.
23     Q.   When did you work there?
24     A.   July 1996 through December of 1998.

## Page 8

1     Q.   And what is your present position at
2 VOA?
3     A.   Assistant controller.
4     Q.   Now, how long have you held that
5 position?
6     A.   It has been pretty much the same
7 position the whole 10 years.
8     Q.   You were hired in as assistant
9 controller?
10     A.   I don't think I had a title when I
11 was hired in.
12     Q.   So describe your position to me.
13     What do you do everyday?
14     A.   Let's see. I handle month end close,
15 journal entries, bank reconciliations, supervision
16 of our accounting staff, accounts receivable,
17 follow-up, some insurance-related issues. I
18 handle our internship program, ran accounts
19 payable, accounts receivable issues.
20     Q.   Has that been your job duties for 10
21 years?
22     A.   Well, they have taken on an
23 increasing role, but that is what I do now.
24     Q.   When you say you have some

Page 9

1  insurance-related issues, what do you mean by
2  that?
3      A.   Getting insurance, what they call
4  certificates of liability insurance requests,
5  reporting of claims, that is kind of it.
6      Q.   Are you in charge of procuring
7  insurance?
8      A.   No.  I have just recently started off
9  in the past couple years helping our controller
10  fill out applications for insurance renewals,
11  gathering the information for insurance renewals.
12      Q.   How many years have you been doing
13  that?
14      A.   About two.
15      Q.   Who was the controller?
16      A.   Laura Martin.
17      Q.   Prior to Laura Martin, who did you
18  report to?
19      A.   Always Laura Martin.
20      Q.   What about Theodore Schnell, did you
21  ever report to him?
22      A.   I have worked with him.  He was the
23  CFO, but Laura more reported to him and then we
24  reported to Laura, we meaning the accounting

Page 10

1  staff.
2      Q.   How long has Laura been with VOA?
3      A.   Since 1988.
4      Q.   And Laura Martin reports to -- who
5  does she report to now?
6      A.   Mike Toolis, CEO.
7      Q.   Now, did you testify that Laura
8  Martin previously reported to Theodore Schnell?
9      A.   Right, to my knowledge.  Yes, she
10  did.
11      Q.   Is Mr. Schnell still with the
12  company?
13      A.   No.
14      Q.   When did he leave?
15      A.   I don't remember.
16      Q.   When Mr. Schnell left, who assumed
17  his duties?
18      A.   Laura Martin.  Some of his duties
19  were Laura Martin, and the rest I don't know.
20  They were divvied out to other people in the firm.
21      Q.   Was there a new CFO --
22      A.   No.
23      Q.   (Continuing.) -- after Mr. Schnell?
24      A.   No.

Page 11

1      Q.   So if there was someone in charge of
2  insurance, who would that be?
3      MS. SKAGGS: Lack of foundation, objection.
4  You can answer it.
5  BY THE WITNESS:
6      A.   What do you mean "in charge"?  I
7  don't understand.
8  BY MS. CARWILE:
9      Q.   Well, there would be procuring
10  insurance and dealing with insurance issues,
11  right, as claims come in and as suits come in?
12          Who was the person in charge of
13  handling those issues?
14      A.   Ted Schnell.
15      Q.   That was in the past; correct?
16      A.   Right.
17      Q.   What about now?
18      A.   When a claim comes in, I guess, a
19  summons or a lawsuit comes in, its served to Laura
20  Martin and then she usually passes on the
21  paperwork to me and then I pass on the paperwork
22  to Mike Toolis' admin assistant.
23      Q.   That is what happens now?
24      A.   Right.

Page 12

1      Q.   Can you explain that process for me
2  in approximately 2004 when Mr. Schnell was present
3  at VOA?
4      A.   I believe it was pretty much the
5  same, although I don't remember who was the
6  registered agent at the time.
7          I don't exactly remember how things
8  operated then; but if paperwork was given to me, I
9  would forward that on to our insurance broker, and
10  I believe usually any paperwork was also forwarded
11  to Mike Toolis' admin assistant, and she would
12  inform the lawyers, Schiff, Hardin.
13      Q.   Now, who was Mike Toolis' admin
14  assistant?
15      A.   I believe it was Karen Zwier.
16      Q.   I'm sorry.  Did you say Karen Zwier
17  would inform the lawyers?
18      A.   Right.
19      Q.   Who were VOA's lawyers?
20      A.   Schiff, Hardin.
21      Q.   Was Schiff, Hardin advised of every
22  lawsuit against VOA that you are aware of?
23      MS. SKAGGS: Objection, lack of foundation.
24  You can answer it.

3 (Pages 9 to 12)

Page 13

1   BY THE WITNESS:
2       A.   I don't know.
3   BY MS. CARWILE:
4       Q.   Now, is there a written procedure at
5   VOA for handling claims or lawsuits when they came
6   in?
7       A.   If there is one, I didn't see it.  I
8   didn't use it.
9       Q.   Does VOA have any kind of handbook,
10  employee handbook?
11      A.   Yes.
12      Q.   Were you involved in drafting the
13  handbook?
14      A.   No.
15      Q.   Do you know who would be?
16      A.   I believe human resources would
17  create it with upper management.
18      Q.   Have you read the handbook?
19      A.   Not recently.
20      Q.   Would there be any kind of handbook
21  that you are aware of that would be given to the
22  project architects or the project personnel that
23  would go out to construction sites?
24      A.   I believe they have something.

Page 14

1       Q.   Have you reviewed that type of
2   handbook?
3       A.   No.
4       MR. NYESTE:  Can we go off the record a
5   second?
6       MS. CARWILE:  Sure.
7              (WHEREUPON, discussion was had
8              off the record.)
9       MS. CARWILE:  Back on the record.
10             Can you repeat the last question for
11  me, please.
12             (WHEREUPON, the record was read
13             by the reporter.)
14  BY MS. CARWILE:
15      Q.   So you don't know one way or another
16  if there is a notice provision whereby these
17  project architects and people in charge of various
18  construction sites have to provide notice of any
19  injuries or any accidents to someone at VOA?
20      A.   If they have an injury?
21      Q.   No, no, not necessarily a VOA
22  personal injury, but just any type of accident or
23  injury on the site of, for instance, a
24  subcontractor?

Page 15

1       A.   Oh, I don't know.
2       Q.   Do you know who at VOA was in charge
3   of managing or overseeing lawsuits against VOA?
4       A.   I would say Mr. Toolis.
5       Q.   Back in 2004 and 2005 would it still
6   be Toolis?
7       A.   Yes.
8       Q.   Was Mr. Toolis also the main person
9   in charge of dealing with outside Counsel?
10      A.   Yes.
11      Q.   Does VOA have document retention and
12  destruction policies?
13      A.   Yes.
14      Q.   What are they?
15      A.   For every document you want to know
16  the retention policy?
17      Q.   There is different policies for each
18  categories of documents?
19      A.   Right.
20      Q.   What about lawsuits against the
21  company and things of that nature?
22      A.   Always retained.
23      Q.   Indefinitely?
24      A.   Right.

Page 16

1       Q.   How are those documents retained?
2       A.   Off site storage.
3       Q.   Who was the off site storage vendor?
4       A.   I don't remember.  I believe it was
5   Iron Mountain.
6       Q.   Would that be the same for claims but
7   not suits against VOA?
8       MR. NYESTE:  Objection as to vague.  I am
9   not sure what documents you are referring to.
10  BY THE WITNESS:
11      A.   I don't know.
12  BY MS. CARWILE:
13      Q.   What about insurance-related
14  documents?
15      A.   I don't know offhand.
16      Q.   What about documentation of any
17  accidents that occurred on project sites?
18      A.   I don't know.
19      Q.   Were these document retention and
20  destruction policies put in writing?
21      A.   Yes.
22      Q.   Did they change since 2004?
23      A.   I don't know.
24      MS. CARWILE:  I believe we asked for those

4 (Pages 13 to 16)

Page 17

1    documents in discovery.
2        MS. SKAGGS:  What documents?
3        MS. CARWILE:  Document retention and
4    document destruction.
5        MS. SKAGGS:  I don't recall that.
6        You are talking about a written
7    policy?
8        MS. CARWILE:  I thought we did, but maybe I
9    am mistaken.  Maybe that is another case.
10   BY MS. CARWILE:
11       Q.   Did you ever review the requests for
12   interrogatories and requests for documents that
13   were propounded against VOA in this suit?
14       A.   Can you say that again?
15       Q.   Did you ever review the requests for
16   interrogatories?  I don't need to mark this.  I
17   just want to show her copies of them.
18       Did you ever ask for interrogatories
19   and document production that USF&G propounded
20   against VOA in this lawsuit?
21       A.   No.
22       Q.   Were you ever asked to obtain
23   information for VOA's attorneys with respect to
24   collecting documents for this lawsuit?

Page 18

1        A.   I don't remember, but I don't think
2    so.
3        Q.   How is electronic data and e-mails
4    saved as opposed to paper documents?
5        MS. SKAGGS:  Lack of foundation.  You can
6    answer.
7    BY THE WITNESS:
8        A.   I don't know.
9    BY MS. CARWILE:
10       Q.   So that you were just telling me
11   about the document retention policies and that
12   they applied to all legal papers that VOA
13   received?
14       What about documents that were
15   received through electronic media, would the same
16   policies apply?
17       MS. SKAGGS:  Lack of foundation.
18   BY THE WITNESS:
19       A.   I don't know.
20   BY MS. CARWILE:
21       Q.   Who would know the answer to that
22   question?
23       A.   Maybe James Wright, director of IT.
24       Q.   In 2004 who was responsible for

Page 19

1    making sure that claims and suits against VOA were
2    reported to VOA's insurance carriers?
3        MS. SKAGGS:  Lack of foundation.  You can
4    answer.
5    BY THE WITNESS:
6        A.   I don't know who was ultimately
7    responsible.  I just know that anything that came
8    to me, I would report to HRH at AVA.
9    BY MS. CARWILE:
10       Q.   Were there certain designated people
11   at VOA that were responsible for receiving these
12   types of documents?
13       A.   I don't know if there was an ultimate
14   company procedure in place.  I just know what I
15   did when I received paperwork.
16       Q.   When you reported claims to AVA or
17   HRH AVA, who was your contact person there?
18       Was there anyone specific you talked
19   to on a routine basis?
20       A.   Rachel Buelow.
21       Q.   Was there anyone else?
22       A.   There was some other account reps I
23   dealt with before her.  I don't remember their
24   names, and I don't remember when I started dealing

Page 20

1    with Rachel either.  But at the time she became
2    our rep, she was the only person that I called.
3        Q.   Was there a process that you followed
4    when you reported claims to AVA?
5        A.   Well, usually it would either be a
6    phone call to her or an e-mail to her.
7        I would tell her what documents I had
8    and asked her what I should do or also if it was a
9    situation I would call her, for example, a car
10   accident and then she would guide me on either
11   forwarding her the paperwork or giving me the
12   phone number of the party to call.
13       Q.   Did you ever report claims or
14   lawsuits to insurance carriers directly?
15       A.   I believe only if they were an auto
16   claims or more recently we have had a few thefts,
17   business insurance claims.
18       But from what I can remember, I have
19   never made a claim, a professional liability claim
20   or a general liability claim.
21       Q.   Other than reporting claims and suits
22   filed against VOA to the broker AVA, did you have
23   any other involvement in those lawsuits?
24       A.   Back then?

5 (Pages 17 to 20)

Page 21

1    Q.  Yes, back in 2004, 2005,
2    A.  Like I said, sometimes I would get
3  insurance certificates which is a pretty basic
4  duty.
5       Occasionally I would work with Mike
6  Toolis' admin assistant to work on the accounting
7  for deductibles, and that is it.
8    Q.  I am speaking with respect to
9  lawsuits that are ongoing against the company.
10      Other than reporting the suit, would
11  you have any other involvement in those lawsuits
12  after they were reported?
13    A.  No.
14    Q.  Did you have any decision-making
15  authority with respect to which insurance
16  companies VOA would report claims or suits to?
17    A.  No.
18    Q.  Who did?
19    MS. SKAGGS:  Objection. Lack of
20  foundation.
21  BY THE WITNESS:
22    A.  I don't know.  Whenever I was served
23  with the summons, I would just forward it on to
24  Rachel and then to my knowledge she would forward

Page 22

1  it to all of the insurance companies.
2  BY MS. CARWILE:
3    Q.  Do you know what types of insurance
4  policies VOA had in 2004?
5    A.  Not for certain.
6    Q.  Do you know if VOA had a professional
7  liability policy in 2004?
8    A.  I believe so, yes.
9    Q.  Do you know if they had a commercial
10  general liability policy?
11    A.  I would believe so.
12    Q.  Do you know the difference between
13  those two policies?
14    A.  Not really.
15    Q.  Are you familiar with a project at
16  School District 230?
17    A.  Yes.
18    Q.  Specific to that project, are you
19  familiar with the work done at the Stagg High
20  School?
21    A.  I just know the name of the project.
22    Q.  As specifically District 230 or do
23  you also recall Stagg was part of District 230?
24    A.  Yes, I remember.

Page 23

1    Q.  Do you recall that there were claims
2  or suits filed against VOA arising out of the
3  Stagg part of District 230 project?
4    A.  I didn't know what high school it
5  related to.
6    Q.  But you are aware there were suits
7  arising out of the School District 230 project?
8    A.  Right.
9    Q.  Do you recall any particulars with
10  respect to the suit that arose out of the District
11  230 project?
12    A.  I believe I remember three different
13  lawsuits, and two of them were slip and falls, I
14  believe.
15    Q.  Can you tell me what they were?
16    A.  No.  The names of them?
17    Q.  Yes.  Do you recall the names?
18    A.  Madden and Madden and Regalado, I
19  believe.
20    Q.  You recall there being another one?
21    A.  I think that was actually District
22  230 versus VOA.
23    Q.  Were you involved in any of those
24  three suits?

Page 24

1    A.  Involved how?
2    Q.  Did you receive notice of those
3  lawsuits?
4    A.  I don't remember.
5    Q.  Do you recall when you first heard
6  that Mr. Regalado was allegedly injured at the
7  District 230 project?
8    A.  No.
9    Q.  I believe that you answered this, but
10  did you receive notice of the suit filed by
11  Regalado?
12    A.  I don't remember.
13    Q.  Do you know what attorneys
14  represented Regalado in that lawsuit against VOA?
15    A.  No.
16    Q.  Did you ever have anything to do with
17  the retention of attorneys to defend cases on
18  behalf of VOA?
19    A.  No.
20    Q.  With respect to the Madden claim,
21  when did you first learn of Madden's alleged
22  injury?
23    A.  I don't remember.
24    Q.  What is your first recollection of

6 (Pages 21 to 24)

Page 25

1  the Madden suit?
2      A.   I remember reading what you call the
3  summons.
4      Q.   So did the summons come to you at
5  VOA?
6      A.   I don't believe so. I believe it
7  came to Laura Martin.
8      Q.   But it was given to you to handle?
9      A.   I don't remember if it was given to
10 me to handle or if it was just given to me to
11 read.
12     Q.   Do you recall if you put AVA on
13 notice of the Madden lawsuit?
14     A.   I don't remember specifically doing
15 that.
16     MS. CARWILE:  Would you mark this as
17 Exhibit No. 3.
18         (WHEREUPON, a certain document
19         was marked Klomans Exhibit No. 3 for
20         identification as of 1/6/09.)
21 BY MS. CARWILE:
22     Q.   Ms. Klomans, I have just handed you
23 what has been marked as Klomans Exhibit No. 3.
24         Do you recognize this document?

Page 26

1      A.   It looks familiar.
2      Q.   I am just going to direct you to
3  probably one of the end pages of the summons.
4          Do you see that?
5      A   Yes.
6      Q.   That Laura Martin that you were
7  referring to, is she the registered agent on that
8  summons?
9          Do you see that where it says,
10 "Please serve"?
11     A.   Yes.
12     Q.   Does that mean that then Laura Martin
13 would have received the third amended complaint?
14     A.   I believe so. I'm sorry, the third
15 amended complaint?
16     Q.   Well, It's this document?
17     A.   The top document?
18     Q.   Yes.
19     A.   I don't know.
20     Q.   Do you recall ever receiving this
21 document before?
22     A.   Yes.
23     Q.   When do you recall receiving it?
24     A.   I don't know.

Page 27

1      Q.   Do you see the date -- well, there is
2  a fax date up there of 8/31/2004. It says, "AVA
3  Insurance Agency."
4          Would that be a line that would be
5  coming from AVA or to AVA; do you have any idea?
6      A.   No.
7      Q.   Do you see the date of service on the
8  summons 8/26/04 down at the bottom?
9      A.   Yes.
10     Q.   Does that refresh your recollection
11 on or about the time you might have seen this
12 document?
13     A.   No.
14     Q.   You just have no recollection one way
15 or another?
16     A.   I don't remember what date I saw this
17 document.
18     Q.   Do you know what you did after you
19 saw this document?
20     A.   I don't remember.
21     Q.   Do you recall any other document
22 coming in with this Michael Madden document,
23 Michael Madden caption that is at the top? It is
24 called the caption.

Page 28

1      A.   No.
2      Q.   Do you recall any other legal
3  document coming in prior to this document?
4      A.   No.
5      MS. CARWILE:  Would you mark this as
6  Exhibit No. 4.
7          (WHEREUPON, a certain document
8          was marked Klomans Exhibit No. 4 for
9          identification as of 1/6/09.)
10 BY MS. CARWILE:
11     Q.   Ms. Klomans, I have just handed you
12 what has been marked as Exhibit 4 to your
13 deposition.
14         Do you recognize this document?
15     A.   No, but it is my writing.
16     Q.   The handwriting is yours?
17     A.   Yes.
18     Q.   Just for identification, this is
19 Bates marked VOA-COO458, and your name is at the
20 top.
21         Does that indicate that it was
22 printed off your e-mail?
23     A.   Yes.
24     Q.   This is a document from Theodore

7 (Pages 25 to 28)

Page 29

1    Schnell, and he was the CFO at VOA on or about
2    August 2004; is that correct?
3        A.   Yes.
4        Q.   That is sent to you; is that correct?
5        A.   Yes.
6        Q.   He appears to be forwarding you an
7    e-mail from Paul Lurie.
8             Do you see that?
9        A.   Yes.
10       Q.   Do you see where it says, "Tricia
11   sent me the complaint"?
12       A.   Right.
13       Q.   Who was Tricia?
14       A.   That was Vic Veckrey's admin
15   assistant who also worked with Ted Schnell.
16       Q.   You said Vic.
17            What is the last name?
18       A.   Vic Veckrey, V-e-c-k-r-e-y.
19       Q.   I'm sorry, that was admin to
20   Mr. Schnell?
21       A.   To Tricia.
22       Q.   And who was Vic Veckrey?
23       A.   He was one of the founding fathers at
24   VOA.

Page 30

1        Q.   Do you see where it says, "I assume
2    you will report to Liberty, and that we will try
3    to get you out"?
4             Do you see that?
5        A.   Right.
6        Q.   Did you have a discussion with
7    Mr. Schnell about this e-mail?
8        A.   I don't remember.
9        Q.   You said that the handwriting on the
10   page -- could you just read it for me so I can
11   decipher it?
12       A.   Sure.  "File under general liability,
13   not professional case.  Contact them.  See if they
14   agree."
15       Q.   And this is your handwriting; is that
16   correct?
17       A.   Right.
18       Q.   How did you come to make this
19   handwritten note?
20       A.   I can only make an assumption that I
21   would have been meeting with Ted and that we had a
22   conversation.  I took notes.  When it says
23   "Contact them, see if they agree," it's probably
24   referring to AVA.

Page 31

1        Q.   You don't remember your meeting or
2    phone discussion with Mr. Schnell?
3        A.   No.
4        Q.   And you wouldn't remember if anyone
5    else was present at that meeting?
6        A.   No.
7        Q.   Do you recall if you contacted AVA?
8    You said "the them" in your handwritten note is
9    most likely AVA?
10       A.   Right.
11       Q.   Do you recall if you contacted AVA on
12   or about August 30th?
13       A.   I don't remember doing it, but that
14   would be in line with my typical protocol.
15       Q.   That was the protocol that you
16   explained to me earlier in this deposition of when
17   legal papers come to you, you would always call
18   Rachel or AVA?
19       A.   Right.
20       Q.   Do you recall any discussions with
21   Mike Toolis regarding this issue that is being
22   discussed in this e-mail?
23       A.   No.
24       Q.   Do you recall any discussions with

Page 32

1    anyone else at VOA regarding what is being
2    discussed in this e-mail?
3        A.   No.
4        MS. CARWILE:  Would you mark this as
5    Exhibit No. 5.
6             (WHEREUPON, a certain document
7             was marked Klomans Exhibit No. 5
8             for identification as of 1/6/09.)
9    BY MS. CARWILE:
10       Q.   Ms. Klomans, I have just handed you
11   what has been marked as Exhibit 5 to your
12   deposition for identification.  It's Bates marked
13   AVA002745.
14            Do you recognize this document?
15       A.   No.
16       Q.   Do you see where it says at the top
17   "from Jennifer Klomans."
18            Do you see that?
19       A.   Yes.
20       Q.   Do you recognize that as being your
21   facsimile cover sheet?
22       A.   It looks like it.  It probably could
23   be.
24       Q.   Is there any reason to believe that

8 (Pages 29 to 32)

Page 33

1    this isn't a fax that you drafted or had drafted?
2       A.   No.
3       Q.   It is to Rachel.  Who was the Rachel?
4       A.   Rachel Buelow.
5       Q.   And she is with AVA; correct?
6       A.   Right.
7       Q.   Although there is no attachment, it
8    says here, "The bodily injury lawsuits I
9    mentioned."
10          Does this indicate that you had a
11   telephone conversation with Ms. Buelow prior to
12   sending this fax on August 31, 2004?
13      A.   I don't remember, but probably.
14      Q.   So you don't recall any discussions
15   with Rachel Buelow regarding the --
16      A.   No.
17      Q.   Do you see the next sentence where it
18   says, "The lawyers seem to think it should be
19   filed with Liberty, but Ted commented it should be
20   filed under general liability."
21          Do you see that sentence?
22      A.   Right.
23      Q.   Who would the lawyers be?
24      A.   Schiff, Hardin.

Page 34

1       Q.   You don't recall writing this
2    message?
3       A.   I don't recall doing it, no.
4       Q.   Then the next part of the sentence
5    there is Ted commented it should be filed under
6    general liability.
7          Is that consistent with the prior
8    correspondence that I just showed you regarding
9    your meeting with Mr. Schnell?
10      A.   Right.
11      Q.   Is that consistent with your
12   handwritten note on Klomans Exhibit No. 4, which
13   is the very last exhibit that I showed you?
14      A.   Yes.
15      Q.   And, again, you didn't have any
16   decision-making authority as to what claims or
17   suits were purported to which carriers; is that
18   correct?
19      A.   Right.
20      Q.   In here in the very last part of that
21   sentence says, "So, AVA's input would be
22   appreciated."
23          Do you know what AVA's input was?
24      A.   No.

Page 35

1       Q.   Do you recall any discussions with
2    Rachel after this fax was sent?
3       A.   No.
4       Q.   Do you recall a person at St. Paul
5    Travellers by the name of Iris Robinson?
6       A.   No.
7       MS. CARWILE:  Would you mark this as
8    Exhibit No. 6.
9          (WHEREUPON, a certain document
10         was marked Klomans Exhibit No. 6 for
11         identification as of 1/6/09.)
12   BY MS. CARWILE:
13      Q.   Ms. Klomans, I have just handed you
14   what has been marked as Klomans Exhibit No. 6.
15          Do you recognize this document?
16      A.   I don't remember it.  It looks like a
17   claims form.
18      Q.   Do you see for identification it's
19   Bates marked as VOAC1166, and it appears to be
20   from St. Paul Fire and Marine Insurance Company?
21      A.   Right.
22      Q.   And it's to VOA Associates?
23      A.   Right.
24      Q.   Is that the correct address, 224

Page 36

1    South Michigan Avenue, Suite 1400?
2       A.   Right.
3       Q.   When this type of document came into
4    VOA, when it's addressed like this, where would it
5    go?
6       A.   I couldn't say for sure.  It could
7    come to me.
8       Q.   What kind of document if you had just
9    received this, what kind of document would you
10   categorize this as?
11      A.   Insurance form.
12      Q.   So it would go --
13      A.   I have a folder of claims forms.  So,
14   if it comes to me, I would file it in a folder
15   with claims forms.
16      Q.   Now, when you say you would file it,
17   do you have your own files or is there a central
18   filing for insurance claims and lawsuits at VOA?
19      A.   Everyone may have a little bit at
20   their desk.  I don't know if there is a central
21   place.
22      Q.   So there is not a central filing
23   where all of the suits will be categorized by a
24   Claimant's name or something like that?

9 (Pages 33 to 36)

Page 37

```
 1        A    Well, Karen Zwier, who is Mike
 2   Toolis' admin assistant, she has a file at her
 3   desk for every claim for every lawsuit, I should
 4   say; but these claims forms usually I keep.  So
 5   something like this probably wouldn't go in the
 6   lawsuit folder.
 7        Q.   When you say "a claim form," what do
 8   you mean by that?
 9        A.   It's just an acknowledgement of a new
10   claim.
11        Q.   You don't recall one way or another
12   if this form made its way to your desk?
13        A.   No.
14        Q.   This does not refresh your
15   recollection with respect to a woman named Iris
16   Robinson who is listed on the form?
17        A.   The name is familiar, but that is it.
18        Q.   When you received a claim
19   acknowledgement, do you typically do anything with
20   it?
21        A.   Typically, no, besides file it.
22        Q.   You don't have a practice of calling
23   that claim handler and discussing the claim or
24   anything of that nature?
```

Page 38

```
 1        A.   If it's something that I filed, if
 2   it's a claim that I filed, yes.
 3        Q.   Did you file the Madden claim?
 4        A.   No, I don't believe so.
 5        Q.   Because this claimant is listed here
 6   as Michael Madden on this particular form?
 7        A.   Right.
 8        Q.   Now, in the previous deposition
 9   exhibits that I showed you, do you recognize the
10   prior two documents which would be -- I know you
11   don't have marked exhibits there, but it would be
12   four and five.  It's the VOA document that was
13   from you to Rachel and the e-mail exchange between
14   you and Mr. Schnell?
15        A.   Right.
16        Q.   Do you recognize these documents as
17   being for the Madden claim?
18        A.   I believe so, right.
19        Q.   Does that indicate that you filed a
20   Madden claim?
21        MS. SKAGGS:  Objection, vague.  You can
22   answer it.
23   BY THE WITNESS:
24        A.   No.
```

Page 39

```
 1   BY MS. CARWILE:
 2        Q.   What do you mean by "filing the
 3   Madden claim"?
 4        A.   Reporting it to the insurance
 5   companies.
 6        Q.   In Exhibit No. 5, which is the VOA
 7   document, aren't you reporting the Madden claim to
 8   Rachel at AVA?
 9        A.   I am forwarding it on to Rachel for
10   her review.
11        Q.   Is there a difference between
12   forwarding the lawsuit to Rachel for her review
13   and noticing Rachel of a lawsuit filed against
14   VOA?
15        A.   No.
16        MR. NYESTE:  She mentioned that she reports
17   some types of claims, a narrow category directly
18   to insurers.
19        THE WITNESS:  Right.
20        MS. CARWILE:  Would you mark this as
21   Exhibit No. 7.
22        (WHEREUPON, a certain document
23         was marked Klomans Exhibit No. 7 for
24         identification as of 1/6/09.)
```

Page 40

```
 1   BY MS. CARWILE:
 2        Q.   Ms. Klamons, I have just handed you
 3   what has been marked as Exhibit No. 7 to your
 4   deposition.
 5        Do you recognize this document?
 6        A.   No.
 7        Q.   For identification purposes, it is
 8   Bates marked as VOAC456, and it appears to be from
 9   a Jennifer Klomans.
10        Is that you?
11        A.   Yes.
12        Q.   And to Paul Lurie at Schiff, Hardin
13   stated -- do you see there 10/22/2004?
14        A.   Right.
15        Q.   Do you recall sending this document
16   to Mr. Lurie?
17        A.   I don't remember doing it.
18        Q.   Is that your handwriting on the page?
19        A.   Yes.
20        Q.   All of it?
21        A.   Yes.
22        Q.   The very first handwritten note at
23   the top with the phone number it says, "Iris."
24        Can you tell me what the last part of
```

Page 41

```
 1    that is?
 2          The first part is Iris; is that
 3    correct?
 4          A.   Iris Zayas.  She is actually someone
 5    I worked with in Orlando.
 6          Q.   At VOA?
 7          A.   Yes.
 8          Q.   Do you know why her name and her
 9    number is on this document?
10          MS. SKAGGS:  Objection.
11    BY THE WITNESS:
12          A.   That is her name.  I don't know if
13    that is her number, and I don't know why it's on
14    that document.
15    BY MS. CARWILE:
16          Q.   So moving down, do you recognize the
17    phone number that is on the document above the
18    name "Iris"?
19          A.   No.
20          Q.   Sorry, there is two Irises.  Iris
21    Zayas?
22          A.   Right, no.
23          Q.   Down below there is Steve Welhouse.
24    Do you see that?
```

Page 42

```
 1          A.   Yes.
 2          Q.   Do you know who Mr. Welhouse is?
 3          A.   I believe he is an attorney at
 4    Schiff.
 5          Q.   Do you recall why you have
 6    Mr. Welhouse's name on this document?
 7          A.   No.
 8          Q.   Then moving on to the left-hand side
 9    of the page, do you see the name Iris Robinson?
10          A.   Right.
11          Q.   Can you just go through and read your
12    note to me, please?
13          A.   "St. Paul, lead with their lawyers.
14    Schnell knew of lawsuit, back-up attorney
15    covering, general liability carrier with lead,
16    seek dismissal."
17          Q.   Now, what do you mean when you say
18    "lead"?
19          A.   I don't know.
20          Q.   Would that be your term or would that
21    be somebody else's?
22          A.   I don't know.  It's not a term I
23    would use normally.
24          Q.   Could it be short for something else?
```

Page 43

```
 1          Q.   Do you have any idea if you were
 2    abbreviating?
 3          A.   If I was abbreviating, I would
 4    probably put a period.  I don't think so.
 5          Q.   When it says "Schnell knew of
 6    lawsuit," do you have a recollection of what that
 7    means?
 8          A.   No.
 9          Q.   With respect to the word "back up,"
10    you said the word circled is the word "back up";
11    is that correct?
12          A.   I believe it is.
13          Q.   Do you have any idea why that is
14    there and circled?
15          A.   No.
16          Q.   Do you know who that phone number --
17    do you know whose number that is?
18          A.   I don't recognize any of the phone
19    numbers on here besides my own or Laura's, I
20    should say.
21          Q.   The purpose of this correspondence to
22    Mr. Lurie is what?
23          A.   I don't know.
24          Q.   You don't know why you sent it?
```

Page 44

```
 1          A.   I don't remember why.
 2          Q.   Did you see the subject line "Motion
 3    for default"?
 4          A.   Right.
 5          Q.   Do you know what that is?
 6          A.   No.
 7          Q.   A motion for default judgment, that
 8    doesn't ring any bells with you?
 9          A.   No.
10          Q.   Do you recall that there was a motion
11    for a default judgment filed or threatened in the
12    Madden lawsuit?
13          A.   I don't remember.
14          Q.   And you don't know what a motion for
15    default judgment is?
16          A.   No.
17          Q.   If I told you that a motion for
18    default judgment means an automatic loss for VOA,
19    would that refresh your recollection of a motion
20    for default judgment, any impact of it?
21          A.   No.
22          MS. SKAGGS:  Objection to your
23    characterization in Cook County.
24          MS. CARWILE:  Would you mark this as
```

11 (Pages 41 to 44)

Page 45

1 Exhibit No. 8.
2 (WHEREUPON, a certain document
3 was marked Klomans Exhibit No. 8 for
4 identification as of 1/6/09.)
5 BY MS. CARWILE:
6 Q. Ms. Klamons, I have just handed you
7 what has been marked as Exhibit 8 to your
8 deposition. It's Bates marked VOA00047. Do you
9 recognize this document?
10 A. No.
11 Q. In the from line, is that your name?
12 A. Right.
13 Q. And it's to an Iris Robinson?
14 A. Yes.
15 Q. Do you see that at St. Paul dated
16 11/3/04?
17 A. Right.
18 Q. Here is copy of the motion for
19 default. So it appears to be -- although it's not
20 attached here, it appears to be attaching a motion
21 for default, and that is something that I take it
22 you would have attached?
23 A. Yes.
24 Q. And you still don't recall one way or

Page 46

1 anything about this fax?
2 A. No.
3 Q. It says, "I faxed this to our
4 corporate Counsel on 10/22/04."
5 Do you recall doing that?
6 A. No.
7 Q. Corporate counsel, again, would that
8 be Schiff, Hardin?
9 A. I believe so, yes.
10 Q. They contacted these attorneys within
11 a day or so, and the plaintiffs' attorneys are now
12 waiting to hear back from us.
13 Do you have any idea of what you
14 meant by that?
15 A. No.
16 Q. That writing at the bottom, is that
17 your handwriting?
18 A. Yes.
19 Q. And you have Iris Robinson there on
20 the bottom.
21 What does it say after that, "Call
22 after appointment."
23 Is that what you mean?
24 A. Yes.

Page 47

1 Q. Do you have any idea what that is
2 referring to?
3 A. No.
4 Q. You have a series of phone numbers.
5 Do you have any idea what those phone
6 numbers are, who they belong to?
7 A. I believe the one that says Jan is a
8 former employee. The rest of them I don't
9 recognize.
10 Q. Do you know why Jan's name would be
11 on this document?
12 A. No, I don't know for sure. I don't
13 know.
14 Q. Did Jan work with you at VOA in your
15 office?
16 A. Yes.
17 Q. Did she work in the accounting
18 department?
19 A. Right.
20 Q. Do you know what her duties were?
21 A. She is a file clerk.
22 Q. Do you see the DF and the BK?
23 A. Right.
24 Q. Do you know what those numbers are

Page 48

1 referring to?
2 A. No. I would be guessing.
3 Q. Do you recall any discussions with
4 Iris Robinson pursuant to this fax document,
5 Klomans Exhibit No. 8?
6 A. No.
7 MR. NYESTE: For the record, those numbers
8 correspond to the claim number and tracking number
9 on Exhibit 6.
10 BY MS. CARWILE:
11 Q. We are not going to mark this as an
12 exhibit.
13 Ms. Klamons, I am handing you some
14 documents to see if I can refresh your
15 recollection regarding discussions that you may
16 have had with Ms. Robinson at St. Paul.
17 So I am going to direct you to -- do
18 you see the numbers at the bottom, the USF&G
19 number at the bottom?
20 A. Yes.
21 Q. Can you go to the second page from
22 the back, so it's Page 37
23 Directing your attention to a note on
24 9/1/2004, these are notes that you have not seen,

12 (Pages 45 to 48)

Page 49

1  but it says, "Called insured, left a message with
2  Jennifer."
3       Do you see that on September 1, 2004?
4       A.  Yes.
5       Q.  Do you recall any conversations with
6  anyone at St. Paul on or about September 1, 2004?
7       A.  I'm sorry.  What was that again?
8       Q.  Do you recall any telephone
9  discussions with anyone at St. Paul or Travelers
10  on or about 9/1/2004?
11       A.  No.
12       Q.  Were you ever aware that Theodore
13  Schnell had any discussions with anyone at
14  St. Paul or Travelers?
15       A.  No.
16       Q.  Were you ever aware that Mr. Schnell
17  had a discussion with someone at St. Paul
18  Travelers, and they said they already had counsel
19  for the Madden case?
20       A.  I don't remember.
21       Q.  Can you go to Page 34 at the bottom.
22       Can you read the note at the very
23  bottom starting on Page 34 and continuing to
24  Page 35.  Actually I will read the note.  It's

Page 50

1  dated 11/4/2004, and it's a note created by Iris
2  Robinson who we discussed earlier.
3       It says, "I talked to Jennifer from
4  our insured yesterday and told her there were
5  coverage issues; and since I told her your
6  attorney would appear, I was going to close my
7  file."
8       Do you have any recollection of a
9  discussion with Iris Robinson regarding coverage
10  issues on or about 11/3/2004?
11       A.  No.
12       Q.  The next sentence says, "The CEO was
13  incorrect with information he gave out."
14       Do you have any recollection of
15  anyone at VOA giving incorrect information to
16  St. Paul?
17       A.  No.
18       Q.  Do you recall one way or another
19  whether you had this conversation with
20  Ms. Robinson?
21       A.  I can't remember.
22       Q.  The next sentence is "I asked her to
23  call her broker and give this to her professional
24  carrier as well."

Page 51

1       Do you have any recollection of
2  discussing the Madden claim and reporting to the
3  professional carrier with Ms. Robinson?
4       A.  No.
5       Q.  Next she said they did and were told
6  there is no coverage and their CGL should cover
7  the loss.
8       Do you have any recollection of
9  discussing that issue with Ms. Robinson?
10       A.  No.
11       Q.  Do you have any recollection of
12  having a discussion with anyone at Liberty
13  International Underwriters?
14       A.  No.
15       Q.  Do you have any recollection of a
16  discussion with Rachel at AVA regarding coverage
17  for the Liberty policy?
18       A.  No.
19       Q.  Then the finally the last sentence of
20  that note says, "insured will fax in the default
21  order today."
22       Does that refresh your recollection
23  with respect to any kind of default order that was
24  filed against VOA?

Page 52

1       A.  No.
2       Q.  You don't recall Mr. Schnell telling
3  you that he had any discussions with anyone at
4  St. Paul or Travelers?
5       A.  No.
6       Q.  I will go ahead and take that back.
7       Do you know one way or another
8  whether VOA reported the Madden suit to all of its
9  insurance carriers?
10       A.  No.
11       Q.  You don't know or no?
12       A.  I don't know.
13       Q.  Do you recall anything whatsoever
14  regarding the Madden claim and the Liberty policy?
15       A.  No.
16       Q.  Do you routinely keep notes or
17  records regarding your discussions when you have
18  discussions with Rachel Buelow?
19       A.  No.
20       Q.  Do you provide e-mails reports or any
21  other written reports to Mike Toolis or Ted
22  Schnell regarding any discussions you had with
23  AVA?
24       A.  No.

Page 53

1    Q.   Would you have kept any records
2  regarding your discussions with anyone such as
3  Ms. Robinson at St. Paul or Travelers?
4    A.   No.
5    Q.   Would you provide any kind of reports
6  or updates to Mike Toolis or Ted Schnell or anyone
7  in charge of insurance or legal issues after any
8  discussions with insurance companies?
9    A.   Anything I would have updated would
10 be through e-mail. Anything written I should say
11 would be an e-mail.
12   Q.   You don't recall one way or another
13 whether you had updated or sent any type of
14 e-mails to anyone else at VOA regarding
15 discussions you had with either AVA or St. Paul?
16   A.   I don't remember.
17   Q.   Do you recall that there was
18 confusion between the Madden litigation and the
19 Regalado litigation with respect to notice?
20   A.   I remember there being some confusion
21 between the two cases.
22   Q.   What do you recall?
23   A.   I just remember that they were both
24 slip and falls and that I believe in the

Page 54

1  beginning -- I don't know which case was served
2  first; but after the second one came in I think at
3  first we thought this is the first one; but then
4  we are like oh, no, this is really a new one.
5  That is all I really remember.
6    Q.   Do you know if that confusion carried
7  over into reporting of the claim?
8    A.   I don't know.
9    Q.   Now, those notes I showed you
10 reflecting discussions between Iris Robinson and
11 Ted Schnell regarding we already have an attorney
12 on the case, does that indicate to you that type
13 of confusion?
14   MS. SKAGGS: Objection, lack of foundation.
15 BY THE WITNESS:
16   A.   I don't know.
17 BY MS. CARWILE:
18   Q.   That note, do you want to see it
19 again?
20       That note where you had said my CEO
21 gave you the wrong information?
22   A.   I don't know.
23   Q.   Do you have any knowledge of who
24 defended VOA in the Madden litigation?

Page 55

1    A.   I don't know.
2    Q.   Do you recall the name Kurt Beranek?
3    A.   No.
4    Q.   What about Nadeth Elrabadi?
5    A.   No.
6    Q.   The Fraterrigo firm?
7    A.   I am vaguely familiar with that.
8    MS. CARWILE: Would you mark this as
9  Exhibit No. 9.
10       (WHEREUPON, a certain document
11       was marked Klomans Exhibit No. 9 for
12       identification as of 1/6/09.)
13 BY MS. CARWILE:
14   Q.   Ms. Klomans, I have just handed you
15 what has been marked as Exhibit 9 to your
16 deposition marks about FBFK0980 through 0981.
17       Do you recognize this document?
18   A.   No.
19   Q.   On the second page there is a cc to
20 your name.
21       Do you see that with your name
22 stating your name?
23       Do you see that on the second page?
24   A.   Yes.

Page 56

1    Q.   Do you have any reason to believe
2  that you would not have received this document on
3  or after December 8, 2004?
4    A.   No.
5    Q.   Do you see the law firm name at the
6  top Fraterrigo, Beranek?
7    A.   Yes.
8    Q.   Does that name refresh your
9  recollection as to who might have defended VOA in
10 the Madden litigation?
11   A.   No.
12   Q.   Do you know who represented VOA in
13 the Regalado litigation?
14   A.   No.
15   Q.   Again, assuming you received this
16 letter on or about December 8, 2004, what would
17 you do with the correspondence such as this?
18   A.   Probably show it to Ed or Laura
19 especially if I left at the end of December 2004,
20 which I believe I left VOA at that point.
21       I definitely would have been -- I
22 would always forward this on any ways, but I was
23 probably getting ready to leave around this point.
24   Q.   I'm sorry. Could you tell me again,

14 (Pages 53 to 56)

Page 57

1  you left VOA at the end of 2004?
2      A.   Right.  I believe so.
3      Q.   Was that for five or six months?
4      A.   I think it was about five months.
5      Q.   Do you know what happened to the
6  correspondence that was addressed to you?
7      A.   I don't know for sure.  It probably
8  would have gone to Laura Martin.
9      Q.   Did you have an assistant or
10  secretary at VOA at that time?
11      A.   No.
12      Q.   Did you type your own correspondence,
13  finalize your own letters and things of that
14  nature?
15      A.   Yes.
16      MS. CARWILE:  Would you mark this as
17  Exhibit No. 10.
18          (WHEREUPON, a certain document
19          was marked Klomans Exhibit No. 10 for
20          identification as of 1/6/09.)
21  BY MS. CARWILE:
22      Q.   Ms. Klomans, I have just handed you
23  what has been marked Exhibit No. 10 to your
24  deposition.  It's Bates marked FBFK0843 to 0846.

Page 58

1          Have you ever seen this document
2  before?
3      A.   I don't think so.
4      Q.   Do you see that it's addressed to VOA
5  & Associates, Inc.?
6      A.   Right.
7      Q.   Is that the correct address for VOA
8  Associates at the top?
9      A.   Correct.
10      Q.   The address doesn't state to the
11  attention of anyone, but down at the salutation it
12  says, "Dear Mr. Schnell."
13          Do you see that?
14      A.   Right.
15      Q.   Do you have any idea of how VOA would
16  have handled this when it came in assuming this
17  came in to VOA, how it would have been routed?
18      MR. NYESTE:  Objection, foundation.
19  BY THE WITNESS:
20      A.   The general procedure is that
21  accounting opens all mail unless it's marked
22  confidential or personal.
23          You also don't open some mail that is
24  addressed to Mike Toolis or Vic Vickery.  So the

Page 59

1  general procedures would be to open this and see
2  Ted's name on it and pass it on to Ted.
3  BY MS. CARWILE:
4      Q.   And that's assuming that someone
5  looked and saw Mr. Schnell in the salutation?
6      A.   Right.  Someone may not have opened
7  the envelope.  Well, then it would have come to
8  accounting anyways.
9          It probably would have been routed to
10  Ted, but that would be a general procedure.  I
11  can't say for sure that is what happened in this
12  case.
13      Q.   If something is just addressed to VOA
14  & Associates, who would it go to if it didn't have
15  any specific name on it?
16      A.   If it doesn't have any name on the
17  letter?
18      Q.   Yes.
19      A.   Back then it probably would have gone
20  to the admin assistant, to Rebel Roberts, who was
21  one of the partners at VOA.  He had been at VOA a
22  really long time.  So a lot of the unknown mail
23  would go to him because he had been there for so
24  long.  He would know where to route it.

Page 60

1      Q.   Do you have any recollection of
2  anyone at VOA discussing something called a
3  reservation of rights with respect so St. Paul for
4  the USF&G policy?
5      A.   No.
6      Q.   Did accounting keep copies of
7  documents that it forwarded on to someone else?
8      A.   No.
9      Q.   Were they put into any kind of log or
10  anything of that nature?
11      A.   No.
12      Q.   A computer system?
13      A.   No.
14      Q.   Were they scanned and sent
15  electronically?
16      A.   From the mail?
17      Q.   Yes.
18      A.   No.  Just the paper would be handed
19  to whoever it was being routed to.
20      Q.   And if there was a specific name on a
21  letter, it again would go to that person or that
22  person's assistant?
23          Which would it be?
24      A.   Usually the person's assistant.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 61

```
1        MS. CARWILE:  Would you mark this as
2   Exhibit No. 11.
3        (WHEREUPON, a certain document
4          was marked Klomans Exhibit No. 11 for
5          identification as of 1/6/09.)
6   BY MS. CARWILE:
7        Q.   I know the answer, but let me go
8   ahead and show her this anyway.
9           Ms. Klomans, I have just handed you
10  what has been marked as Klomans No. 11.
11          Have you ever seen this document
12  before?
13       A.   No.
14       Q.   Does the name Kenneth Hagedom ring
15  any bells with you?
16       A.   No.
17       Q.   A letter of this nature where it's
18  addressed to Paul Hansen, would that be given to
19  Mr. Hansen's typically back in -- well, this was
20  in 2007?
21       A.   You don't open Paul Hansen's mail.
22  Accounting doesn't open Paul Hansen's mail.  I
23  don't know if it goes to him, though, directly or
24  his assistant.
```

Page 62

```
1        Q.   What about Mr. Schnell's mail, does
2   accounting open up Mr. Schnell's mail?
3        A.   I don't remember.  I believe we did.
4        MS. CARWILE:  Would you mark this as
5   Exhibit No. 12.
6        (WHEREUPON, a certain document
7          was marked Klomans Exhibit No. 12 for
8          identification as of 1/6/09.)
9   BY MS. CARWILE:
10       Q.   Ms. Klomans, I have just handed you
11  what has been marked as Klomans Exhibit No. 12.
12          Have you ever seen this document
13  before?
14       A.   Is it the same document at the
15  beginning?
16       MS. SKAGGS:  No, it's different.
17  BY THE WITNESS:
18       A.   I don't think so.
19  BY MS. CARWILE:
20       Q.   For identification this document is
21  marked FBFK1090 through FBFK 1112, and it is
22  titled, "Plaintiff's Fourth Amended Complaint in
23  the Madden litigation."
24          Do you recall one way or another
```

Page 63

```
1   whether this document ever came in through
2   accounting?
3        A.   I don't remember.
4        Q.   Do you ever recall seeing any status
5   reports come in on the Madden litigation?
6        A.   Status reports?
7        Q.   Status reports from VOA's defense
8   counsel or anything of nature?
9        A.   No.
10       Q.   Do you recall that Schiff, Hardin
11  ever made an appearance in the Madden litigation?
12       A.   I don't know.
13       Q.   Did you ever have any discussions
14  with Schiff, Hardin regarding the Madden claim?
15       A.   I don't recall.  I don't think so.
16       Q.   Do you recall one way or another
17  whether you ever heard about another complaint
18  filed in the Madden litigation?
19       A.   Another complaint?
20       Q.   Yes.
21       A.   I don't think so, no.
22       Q.   Is there anything else that you can
23  recall about the Madden claim or the Madden
24  lawsuit that I haven't asked you about today?
```

Page 64

```
1        A.   No.
2        Q.   About how many claims, just an
3   estimate in lawsuits do you personally handle with
4   respect to claims against VOA?
5        A.   A year?
6        Q.   Yes, in a given year, average year.
7        A.   Maybe two.
8        Q.   And that is just with respect to what
9   you receive?
10       A.   Right, auto accidents or thefts.
11       Q.   Again, I think you said that other
12  than you, Laura Martin also received notices of
13  claims and suits; is that correct?
14       A.   Yes.
15       Q.   She was a registered agent as we
16  looked on a summons in the Madden suit.
17          Do you know if she is still
18  registered?
19       A.   She is.
20       Q.   Would she be the person most
21  knowledgeable about the claims received or claims
22  and lawsuits against VOA?
23       A.   No.
24       Q.   Who would be?
```

16 (Pages 61 to 64)

Page 65

```
 1        A.    Probably Mike Toolis.
 2        MS. CARWILE:  That is all I have.
 3        MR. NYESTE:  No questions.
 4        MS. SKAGGS:  No questions.
 5        MS. CARWILE:  Signature?
 6        MS. SKAGGS:  You can either reserve
 7   signature or review it to make sure everything has
 8   been taken down properly, or you can waive it.
 9   Most people waive it.
10        THE WITNESS:  That is fine.
11        MS. SKAGGS:  We will waive.
12        FURTHER DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 67

```
 1        IN WITNESS WHEREOF, I do hereunto set
 2   my hand and affix my seal of office at Chicago,
 3   Illinois this 14th day of January, 2009.
 4
 5
 6
 7
 8
 9        Notary Public, DuPage County, Illinois
10        My commission expires Martin 23, 2009.
11
12
13
14   C.S.R. Certificate No. 84-1766.
15
16
17
18
19
20
21
22
23
24
```

Page 66

```
 1   STATE OF ILLINOIS   )
 2                       )  SS.
 3   COUNTY OF DU PAGE   )
 4        I, PATRICIA A. ARMSTRONG, a Notary
 5   Public within and for the County of DuPage, State
 6   of Illinois, and a Certified Shorthand Reporter,
 7   CSR No. 084-001766, of said state, do hereby
 8   certify:
 9        That previous to the commencement of
10   the examination of the witness, the witness was
11   duly sworn to testify the whole truth concerning
12   the matters herein;
13        That the foregoing deposition
14   transcript was reported stenographically by me,
15   was thereafter reduced to typewriting under my
16   personal direction and constitutes a true record
17   of the testimony given and the proceedings had;
18        That the said deposition was taken
19   before me at the time and place specified;
20        That I am not a relative or employee
21   or attorney or do you know, nor a relative or
22   employee of such attorney of do you know for any
23   of the parties hereto, nor interested directly or
24   indirectly in the outcome of this action.
```

Page 68

```
 1              I N D E X
 2   WITNESS              EXAMINATION
 3   JENNIFER KLOMANS,
 4     By Ms. Carwile            3
 5         E X H I B I T S
 6   NUMBER              MARKED FOR ID
 7   No. 1                    3
 8   No. 2                    3
 9   No. 3                   25
10   No. 4                   28
11   No. 5                   32
12   No. 6                   35
13   No. 7                   39
14   No. 8                   45
15   No. 9                   55
16   No. 10                  57
17   No. 11                  60
18   No. 12                  61
19             ---
20
21
22
23
24
```

17 (Pages 65 to 68)