# EXHIBIT 31

## Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF ILLINOIS
3    EASTERN DIVISION
4
5    UNITED STATES FIDELITY          )
6    AND GUARANTY COMPANY,           )
7         Plaintiff,                 )
8    vs.                             ) No. 08 C 862
9    VOA ASSOCIATES, INC.,           )
10   LIBERTY INTERNATIONAL           )
11   UNDERWRITERS, MICHAEL J.        )
12   MADDEN and JEAN MADDEN,         )
13        Defendants.                )
14
15        The deposition of IRIS LISA ROBINSON,
16   called for examination, taken pursuant to the
17   Federal Rules of Civil Procedure of the United
18   States District Courts pertaining to the taking of
19   depositions, taken before JEANETTE F. RUTZ, a
20   Notary Public within and for the County of DuPage,
21   State of Illinois, and a Certified Shorthand
22   Reporter of said state, at Suite 2100, One North
23   LaSalle Street, Chicago, Illinois, on the 17th day
24   of February, A.D. 2009, at 2:13 p.m.

## Page 2

1    PRESENT:
2         KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC,
3         (200 South Michigan Avenue, 20th Floor,
4         Chicago, Illinois  60604,
5         312-431-3700), by:
6         MR. RODERICK T. DUNNE
7              appeared on behalf of the Plaintiff;
8
9         SCHIFF HARDIN, LLP,
10        (233 South Wacker Drive, Suite 6600,
11        Chicago, Illinois  60606,
12        312-258-5728), by:
13        MS. AMY R. SKAGGS,
14             appeared on behalf of Defendant
15             VOA Associates, Inc.;
16
17        MR. JAMES T. NYESTE, ESQ.,
18        (One North LaSalle Street, Suite 2100,
19        Chicago, Illinois  60602,
20        312-750-1814),
21             appeared on behalf of Defendant
22             Liberty International Underwriters.
23   REPORTED BY:  JEANETTE F. RUTZ, CSR, RPR,
24        CSR CERTIFICATE NO. 84-3809.

## Page 3

1         (WHEREUPON, certain documents
2         were marked Iris Robinson Deposition
3         Exhibit Nos. 1 through 10,
4         inclusive, for identification, as
5         of 2-17-09.)
6         (WHEREUPON, the witness was duly
7         sworn.)
8              IRIS LISA ROBINSON,
9    called as a witness herein, having been first duly
10   sworn, was examined and testified as follows:
11              EXAMINATION
12   BY MR. NYESTE:
13        Q.   Would you please state your full name
14   for the record.
15        A.   Iris Lisa Robinson.
16        Q.   I'll call you Ms. Robinson.  Is that
17   good?
18        A.   That's good.
19        Q.   My name is Jim Nyeste.
20        A.   Hi, Jim.
21        Q.   I represent Liberty Insurance
22   Underwriters.  And to my right is Amy Skaggs, who
23   represents VOA Associates, and I think you know the
24   gentleman to your left.

## Page 4

1         A.   Yes.
2         Q.   Ms. Robinson, this is going to be your
3    deposition, which is a question-and-answer session
4    under oath.  The attorneys get to ask you questions
5    and you respond under oath.  Let me know if my
6    questions are not good ones.  If there's something
7    that you can't understand, please ask me to
8    rephrase it.
9              Please let me get my whole question out
10   before you begin to answer.  If there is an
11   objection to my questions, allow the objection to
12   be made by one of the attorneys before you begin
13   your answer.  The whole objective of that
14   explanation is so that we get a nice transcript
15   without one person talking over the other.
16              Understand?
17        A.   Yes.
18        Q.   Also, please make your responses verbal,
19   "yeses," "nos," "I don't knows," verbal
20   explanations rather than nods of the head or a
21   gesture.  Okay?
22        A.   Yes.
23        Q.   Are you taking any medications that
24   would affect your ability to understand or answer

Page 5

1   my questions?
2       A.   No.
3       Q.   And you know, I may ask some questions
4   that are embarrassing, like that one, so just
5   excuse me. It's part of the routine.
6           Have you ever been convicted of a felony
7   or of a crime involving dishonesty?
8       A.   No.
9       Q.   Have you ever given a deposition before?
10      A.   A small -- I recall a small one in auto
11  liability.
12      Q.   And in your capacity as an insurance
13  claims adjuster did you give that?
14      A.   Correct.
15      Q.   When was that?
16      A.   It was many years ago, too. Maybe
17  seven, six years ago, something of that nature.
18      Q.   And was that the only one?
19      A.   And just arbitration and mediations.
20  That's all.
21      Q.   Are you represented by an attorney
22  today?
23      A.   Yes.
24      Q.   Rory Dunne?

Page 6

1       A.   Yes.
2       Q.   And did this come about recently that
3   Mr. Dunne became your attorney?
4       A.   Yes.
5       Q.   When was that?
6       A.   With this case. I was notified in '08.
7       Q.   In 2008?
8       A.   Yes, 2008.
9           MR. NYESTE: For the record, we have marked as
10  Iris Deposition Exhibit No. 1 the protective order
11  in this case, and so this deposition will be
12  subject to that order. We've marked as Exhibit 2
13  the notice and the subpoena to Ms. Robinson for her
14  deposition.
15  BY MR. NYESTE:
16      Q.   Ms. Robinson, do you reside at 151 West
17  83rd Street, Chicago?
18      A.   Correct.
19      Q.   Is that an apartment or a house?
20      A.   It's a house.
21      Q.   And who do you live there with?
22      A.   Taylor Robinson and Taylor Rance
23  Robinson.
24      Q.   And they are who?

Page 7

1       A.   My husband and son.
2       Q.   And how long have you lived there?
3       A.   Since -- 24, 23 years.
4       Q.   No intentions to move anytime soon?
5       A.   Not at this time.
6       Q.   What is your home phone number?
7       A.   773-651-6879.
8       Q.   And do you have a cell number?
9       A.   773-852-7983.
10      Q.   Ms. Robinson, what is your highest level
11  of education?
12      A.   High school and some college, three
13  years.
14      Q.   Where did you go to college?
15      A.   Chicago State, Roosevelt.
16      Q.   And you took various classes but not
17  culminating in a degree?
18      A.   Correct.
19      Q.   And I'm going to ask you to go through
20  your employment background, I think with the oldest
21  job first leading up to the present.
22      A.   Okay.
23      Q.   If you could do that for me, please.
24      A.   The oldest one from high school? Do you

Page 8

1   want me to go back that far?
2       Q.   Yeah, but the ones that are really old
3   I'm not going to ask many questions, if any, about.
4       A.   The first real one would have been USF&G
5   Insurance Company as a clerk.
6       Q.   And when was that?
7       A.   It would be '81 or '80. '80 or '81.
8       Q.   And how long did you have that
9   employment?
10      A.   Well, they merged with St. Paul, so they
11  kept my years. And St. Paul merged with Travelers,
12  so all my years were accumulated. So about 25
13  years. And then I did temporary work for about two
14  years and hired at Gallagher Bassett.
15      Q.   Okay. So you worked at USF&G St. Paul
16  Travelers from 1980 or '81 until 2005?
17      A.   Yeah, probably correct. And I did two
18  years of temp work at various insurance companies,
19  mostly all doing worker's comp adjusting and some
20  excess, but it was still in worker's comp. Excess
21  in worker's comp.
22      Q.   When did you graduate from high school?
23      A.   Boy, these are hard questions. This is
24  going back. I was 18, so '78. Thank God for even

2 (Pages 5 to 8)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 9

1 years.
2    Q.   And between your graduation from high
3 school and beginning at USF&G, were you mostly
4 taking classes in college?
5    A.   Yes, and some -- after I got into USF&G,
6 they paid for some school.
7    Q.   And after USF&G, you told us that you
8 did two years of temp work at various insurance
9 companies. And now you are at Gallagher Bassett;
10 is that right?
11    A.   Correct.
12    Q.   From what -- what date did you begin
13 there?
14    A.   I started 2008 at Gallagher Bassett, and
15 that was in January of '08. And I was hired
16 officially May of '08. It was still temporary work
17 I was doing for them, and hired in May of '08.
18    Q.   And what is your job there?
19    A.   Worker's comp adjuster.
20    Q.   Now, do you have any professional
21 certifications or licenses in the field of
22 insurance?
23    A.   AIC.
24    Q.   And what does that stand for?

Page 10

1    A.   Associate Insurance -- I don't know what
2 the C means anymore. Sorry.
3          And then I hold a Texas license for
4 worker's comp. That's all the licenses I hold.
5    Q.   Have you participated in any seminars or
6 training programs in the field of insurance?
7    A.   Yes.
8    Q.   Can you describe those for me.
9    A.   We had worker's comp seminars. We had
10 liability seminars. That was about it that I can
11 tell you.
12    Q.   Are these seminars or programs put on by
13 your employers?
14    A.   Yes, they were.
15    Q.   Any third party --
16    A.   And some were through the insurance
17 schools. Insurance schools, also.
18    Q.   Now, returning to your early employment
19 with USF&G, you started out as a clerk?
20    A.   Correct.
21    Q.   How long did you have that job?
22    A.   Approximately two years.
23    Q.   And what did you do in that position?
24    A.   Opened up files, maintaining files, and

Page 11

1 part of that was what they called a CS person. It
2 was medical only; worker's comp medical only. And
3 worker's comp -- that was all worker's comp.
4    Q.   And what was your next position?
5    A.   Then it was called TTD person, person
6 who just paid for lost time, people losing time
7 from their jobs.
8    Q.   Again, worker's comp related?
9    A.   Worker's comp related.
10    Q.   Temporary total disability payments?
11    A.   Correct.
12    Q.   How long did you do that?
13    A.   That was probably about a year and a
14 half or two years. Then it was a complete
15 adjuster, worker's comp adjuster.
16    Q.   How long did you function as a worker's
17 comp adjuster?
18    A.   That was a long time. Maybe 10 years or
19 more of that, 10 or 15. I can't remember all those
20 dates. And then it was an outside worker's comp
21 adjuster. So about ten years inside, I guess, and
22 about five years outside worker's comp.
23    Q.   What does that mean?
24    A.   I was an outside investigator, meaning I

Page 12

1 would take -- I would take recorded statements from
2 the claimants in their homes or hospital beds. I
3 would take pictures of the machines. If they were
4 involved with an industrial accident, if it was a
5 gate that had fallen, take witnesses' statements
6 outside.
7    Q.   So basically the investigation done in
8 the field?
9    A.   In the field, right, and working at home
10 on the computer. And at that time, they were
11 giving out company cars. That was a long time ago.
12    MR. DUNNE: Good old days.
13 BY MR. NYESTE:
14    Q.   How long did you do that?
15    A.   It was about five years being an outside
16 adjuster.
17    Q.   And what came next?
18    A.   Then it was switching to the liability
19 unit. They were opening up a liability unit and
20 they wanted an outside investigator.
21    Q.   In what year did you take that position?
22    A.   I knew you were going to ask that. I
23 don't recall exactly the year for that one. I'm
24 not certain.

3 (Pages 9 to 12)

Page 13

1    Q.   But we're getting up into the early
2 2000s, aren't we?
3    A.   It would have been the 2000s, correct.
4    Q.   How long did you hold that position?
5    A.   That was two years approximately, more
6 or less, because it was getting close to -- the
7 transition was also the merger of -- Travelers was
8 taking over, too.
9    Q.   What was your next position?
10    A.   Well, after that -- because it was
11 Travelers taking over. I had left Travelers. I
12 took their severance package. So I'm thinking
13 about -- was it 2005, 2006 taking the severance
14 package? And then like I said, two years of
15 working temp services.
16    Q.   So your last position with USF&G
17 St. Paul Travelers was as this outside investigator
18 for the liability unit?
19    A.   They had changed that. Then you were an
20 inside liability/auto person doing auto cases.
21 Back doing auto. In between that I should have
22 mentioned I did auto.
23    Q.   Okay. Your last position was inside?
24    A.   Inside.

Page 14

1    Q.   Claims representative or claims adjuster
2 inside?
3    A.   In Naperville.
4    Q.   And was it limited to auto or did it
5 include other types of liability claims?
6    A.   It included small liability cases. They
7 were rearranging some of our files.
8    Q.   And you were officed in Naperville?
9    A.   Correct. That was part of it. I was
10 also stationed downtown in Chicago for a little bit
11 still in liability. There were only two adjusters
12 they left downtown, myself and another person.
13    Q.   Okay. We're going to have to get into
14 this. What month did you leave the company
15 entirely?
16    A.   Entirely? I know I should have looked
17 at my resume. I can't tell you. I'm sorry. I
18 can't tell you the exact month I left.
19    Q.   Sometime in 2005?
20    A.   I think February or March, but I'm not
21 certain. I'm not certain.
22    Q.   How long had you been in Naperville, at
23 least part of the time, when you left the company?
24    A.   I came in April of '05. I must have

Page 15

1 left in '06, then. I must have left in February or
2 March of '06.
3       I hate to ask. I have a silly question.
4 When did the -- in London, when did he get married
5 to Camille? I'm sorry.
6    Q.   I'm sorry. That's not really at the top
7 of my list.
8    A.   Because I remember it was around my
9 daughter's wedding. It was around that time, and
10 it was within a year after that. I'm sorry, but
11 that's --
12    Q.   Okay. So you might not have left USF&G
13 St. Paul Travelers until February/March of 2006; is
14 that right?
15    A.   Uh-hmm.
16    Q.   And you think you had been officing in
17 Naperville, at least part of the time, since April
18 of 2005; is that what you were saying?
19    A.   Yes, in April of 2005 I was in
20 Naperville.
21    Q.   Now, you mentioned that you also were in
22 Chicago part of the time.
23    A.   Yes.
24    Q.   From when to when were you in Chicago?

Page 16

1    A.   See, that's what I'm talking about. The
2 wedding I can remember, because I was working on my
3 daughter's wedding a lot.
4       So I was in Chicago -- I must have been
5 in Chicago probably the early part of March of '05.
6 March or February '05 I should have been in
7 Chicago.
8    Q.   Before that where had you been located?
9    A.   Still in Chicago. St. Paul was still in
10 Chicago, because we had moved from the Citicorp
11 Bank Building to the other building on Lake.
12    Q.   So in February or March of '05 you moved
13 from one Chicago location to another?
14    A.   Correct.
15    Q.   Okay. When you took on these
16 responsibilities in Naperville, was that the auto
17 function that you were going there for?
18    A.   Well, they took the title away of
19 outside investigator a couple months after that.
20 We could not do any outside work. We were strictly
21 inside, and it was auto liability. And they were,
22 of course, taking files away and redistributing
23 files.
24    Q.   When did this redistribution of files

Page 17

1 and this transition occur?
2    A.   Well, it was starting a little bit
3 earlier than that in the Chicago branch office on
4 Lake Street. We were getting files ready to be
5 redistributed. I couldn't tell you the exact date,
6 but it started a little bit earlier. They were
7 taking a few files away already from us.
8    Q.   And the reason for that was --
9    A.   It was a couple reasons. Like I said,
10 they were reorganizing the units. And I was going
11 to be inside adjuster, no longer outside adjuster.
12 And certain cases that we were handling weren't
13 qualified and the dollar amount was beyond our
14 level of knowledge.
15    Q.   What was your reason for leaving USF&G?
16    MR. DUNNE: Objection, asked and answered.
17       Go ahead.
18 BY THE WITNESS:
19    A.   The travel. They were changing so many
20 things around.
21 BY MR. NYESTE:
22    Q.   Did you have any performance reviews in
23 the last couple of years before your --
24    A.   That's true.

Page 18

1    Q.   Yes?
2    A.   Yes.
3    Q.   Did you have any negative performance
4 reviews?
5    A.   Yes.
6    Q.   Tell me about those. Say from 2003
7 forward, do you recall some negative performance
8 reviews?
9    A.   Yes.
10    Q.   Okay. What do you recall about them?
11    A.   Steve Heckman, one of my supervisors,
12 that I didn't understand liability as well as I
13 should have.
14    Q.   And did he explain what he meant by
15 that?
16    A.   Probably so. In certain files he
17 probably pointed out that.
18    Q.   Was the Madden file one of the files?
19    A.   I couldn't recall.
20    Q.   When was this review by Steve Heckman
21 that was negative?
22    A.   I couldn't recall exact year.
23    Q.   How long prior to your departure from
24 USF&G?

Page 19

1    A.   Maybe a year or so before. Maybe.
2    Q.   Did you have any negative reviews from
3 any other persons?
4    A.   My supervisor, John Vogel.
5    Q.   And what was the nature of his review?
6    A.   Handling of cases and contacts, I
7 believe.
8    Q.   Ms. Robinson, let me apologize. I don't
9 mean to embarrass you or to, you know, go into this
10 in great depth, but it's part of what I have to do.
11    A.   I understand.
12    Q.   With respect to Mr. Vogel's review, did
13 it relate to any particular claims that you can
14 recall?
15    A.   Quite a few with him.
16    Q.   And Mr. Heckman's review, did it also
17 involve negative comments on quite a few claims?
18    A.   His was more overall. I think it was
19 overall and training. That's what I took away from
20 his review.
21    Q.   Whereas Vogel's was more claim specific;
22 is that right?
23    A.   Yes, he tried to be specific.
24    Q.   And on specific claims you were handling

Page 20

1 as opposed to your general understanding of
2 liability insurance?
3    A.   I believe his was more specific of
4 claims that I was handling.
5    Q.   Okay. Now, was Mr. Vogel your immediate
6 supervisor?
7    A.   In Naperville, yes.
8    Q.   And Mr. Heckman, how did -- in what way
9 was he your supervisor, if at all?
10    A.   While we were in Chicago, he was
11 off-site. He was in Dixon and we were in Chicago.
12    Q.   How many years in total did you have
13 responsibility for liability claims?
14    A.   I couldn't tell you that without really
15 looking.
16    Q.   It sounds like most of your experience
17 was worker's comp?
18    A.   Correct.
19    Q.   And then in the early 2000s -- I don't
20 know what year, but in the early 2000s you moved
21 into the liability area; is that fair to say?
22    A.   Yes, in the summer of 2000 it would be
23 liability.
24    Q.   Okay. So if I was to say something like

5 (Pages 17 to 20)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 21

1    two to four years experience in liability claims,
2    would that be fair?
3        A.   If you want to do it that way, I would
4    say you have to -- there's a part that I was in
5    auto liability.  Then there was a part much later,
6    like the later part of 2000, where I get into more
7    the CGL or the commercial liability.
8        Q.   Right.
9        A.   Where I got in commercial liability.
10       Q.   How long were you in CGL claims?
11       A.   That would be about -- yeah, between a
12   year or two.  It would be pressing it if I said
13   three, but a year or two I'm more comfortable with
14   saying CGL only.  Because there was a while I was
15   doing worker's comp and a little bit of liability
16   in there.  I still had my worker's comp.  They
17   didn't want me to leave worker's comp.
18       Q.   When you worked on CGL claims, what
19   would the St. Paul Travelers CGL claim file consist
20   of?
21       A.   I couldn't recall all of that
22   information.
23       Q.   Okay.  We'll pick away at it.
24            There would be electronic notes of some

Page 22

1    sort?
2        A.   Yes.
3        Q.   Was there a name for that system?
4        A.   I don't remember that name.
5        Q.   Let me show you what I've marked as
6    Exhibit 3.  This is a printout that we've received
7    from USF&G of what looks to be like a set of
8    electronic notes.
9        A.   Okay.
10       Q.   Is this the sort of thing you're
11   referring to when --
12       A.   That would be the electronic notes,
13   right.
14       Q.   Okay.  And you could enter a note in
15   this system through your computer, right?
16       A.   Correct.
17       Q.   Was there a name to this system?  I know
18   I asked that, but maybe you've had your memory
19   refreshed.
20       A.   I don't remember the name of the system.
21       Q.   Okay.  Who would have access to that
22   system?
23       A.   It would be the clerk who would set up a
24   file; the adjuster who input notes; the supervisor.

Page 23

1    If we had anyone else over it looking it over,
2    claims -- VP of claims department could look in the
3    notes, add a note.
4        Q.   And they might be in various physical
5    locations?  They may not be in Chicago?  They might
6    be in Dixon?  They might be in Maryland?
7        A.   Correct.
8        Q.   So that's true?
9        A.   That's very true.
10       Q.   Now, in addition to these electronic
11   notes, I imagine there's paper; is that correct?
12       A.   Paper file, correct.
13       Q.   And that would be correspondence that
14   went out from your office, that came in from
15   brokers, from lawyers, that sort of thing, right?
16       A.   Correct.
17       Q.   Would there also be e-mail --
18       A.   Correct.
19       Q.   -- relating to a claim file?
20       A.   Correct.
21       Q.   What other sources of documents or
22   information would there be that relate to a claim
23   file?
24       A.   For liability?

Page 24

1        Q.   Yes, talking about a CGL claim.
2        A.   We should try to get the policy for
3    coverage.  Insured's information would be on the
4    coverage page and contact.  We would get a contact,
5    whoever set up the file.  We should have a contact
6    person.  And if there was an active -- a very
7    active file, if they were treating medically, you
8    would get medical bills, you would get medical
9    reports, things of that nature.
10       Q.   And if they were paper, they would be in
11   the paper file, right?
12       A.   Correct.
13       Q.   Would there be any other source of
14   electronic information?  You have this electronic
15   notes system.  There would be e-mails, correct?
16       A.   Uh-hmm.
17       Q.   Would there be files on your computer at
18   work?
19       A.   Everything would be in the file or in
20   the file notes, because you're subject to audits.
21       Q.   In other words, would you make a memo to
22   yourself on your computer, for example, separate
23   from this electronic note system?
24       A.   There shouldn't be, unless you had a

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 25

1　paper and you're scribbling something down, a note.
2　　Q.　And in all likelihood that would go into
3　the paper file?
4　　A.　In the file.
5　　Q.　On correspondence that you sent out in
6　your role as a claims adjuster, would you sign your
7　name "Iris Robinson"? Would you initial the
8　correspondence or how would you sign it?
9　　A.　I used various techniques. Sometimes I
10　will initial depending on how the work is -- if
11　it's just IR, just IR. Sometimes -- now you're
12　talking about letters going -- for letters?
13　　Q.　Well, it sounds like there could be a
14　difference depending on the type of communication.
15　So if you would explain that, I'd appreciate it.
16　　　Suppose it's a letter to the insured,
17　the policyholder. How would you sign that? By
18　initials? By your name? Just a check mark?
19　　A.　I used both. I used initials and I used
20　my name.
21　　Q.　Okay. Are there any circumstances that
22　would tell us when you would use one versus the
23　other?
24　　A.　No.

Page 26

1　　Q.　Did you have a practice of keeping a
2　file copy of your correspondence?
3　　A.　Can you rephrase that.
4　　Q.　Did you have a practice of keeping a
5　paper copy of your correspondence?
6　　A.　Yes, we tried to keep anything that
7　needs to be in the file to go in the file, that
8　belongs in the file.
9　　Q.　Ms. Robinson, I'm going to ask you, if
10　you would, on this blank sheet of paper that we're
11　going to mark as, I think --
12　　MR. DUNNE: Don't do it.
13　　MR. NYESTE: No?
14　　MR. DUNNE: No.
15　　MR. NYESTE: You're not going to do it?
16　　MR. DUNNE: No. You can ask her if she
17　recognizes her signature.
18　　MR. NYESTE: Well, I'm going to ask her to
19　give an exemplar of her signature and her initials.
20　　MR. DUNNE: I'll instruct her not to do it.
21　　MR. NYESTE: I don't think this is a criminal
22　proceeding.
23　　MR. DUNNE: Why is it relevant?
24　　MR. NYESTE: Oh, come on.

Page 27

1　　MR. DUNNE: She hasn't said the signature on
2　the letter is not hers.
3　　MR. NYESTE: So you're instructing her not to
4　give an exemplar of her initials or her signature?
5　　MR. DUNNE: Sure, yes. This is an oral
6　deposition.
7　　MR. NYESTE: Okay.
8　BY MR. NYESTE:
9　　Q.　When you were in CGL claims, you had
10　occasion to send faxes from time to time; is that
11　right?
12　　A.　Yes.
13　　Q.　Now, in this office we have to
14　physically run to a fax machine and feed the fax
15　into the machine and dial a number.
16　　A.　Yes.
17　　Q.　Did you do it that way?
18　　A.　Yes. And then if I was in the Chicago
19　branch office, our fax was even closer to our desk.
20　　Q.　But you did have to go to a separate fax
21　machine?
22　　A.　You did have to go to a separate
23　machine.
24　　Q.　On the other hand, I was in another law

Page 28

1　office awhile back where we could fax directly from
2　our computers in our office.
3　　A.　We did not have that sophistication.
4　　Q.　So you would have to take the piece of
5　paper that you're faxing --
6　　A.　Correct.
7　　Q.　-- and go to a fax machine?
8　　A.　Correct.
9　　Q.　Did you make it a practice to keep --
10　let me start over.
11　　　Did you make it a practice to print out
12　a fax transmission report after each fax that you
13　sent?
14　　MR. DUNNE: Objection, assumes facts not in
15　evidence.
16　　THE WITNESS: I still have to answer?
17　　MR. DUNNE: Please, go ahead.
18　　THE WITNESS: Okay.
19　　MR. DUNNE: If you understand his question, go
20　ahead.
21　BY THE WITNESS:
22　　A.　I'm trying to make sure if I understood
23　you right. Did I have a fax sheet? No. Sometimes
24　I just did deliberately the copy of -- if it was a

7 (Pages 25 to 28)

Page 29

1  form, send it directly to them.
2  BY MR. NYESTE:
3      Q.  Okay.  Without a cover sheet?
4      A.  Without a cover sheet.
5      Q.  But it's not the cover sheet I'm really
6  asking about.  After you send the fax, did you ask
7  the machine to generate a transmission report?
8      A.  A confirmation report?
9      Q.  A confirmation report.
10      A.  Yes, and some of them did it
11  automatically.
12      Q.  True, true.  Ours is here set up so it's
13  automatic.  After you send the fax, the
14  confirmation report comes up.
15          Was it set up that way in your Chicago
16  office?
17      A.  I can't recall.
18      Q.  Was it set up that way in the Naperville
19  office?
20      A.  I can't recall.
21      Q.  Well, whether it was automatic or not,
22  did you make it a practice to get a confirmation
23  report after each fax you sent?
24      A.  I tried to.

Page 30

1      Q.  Ms. Robinson, what is a reservation of
2  rights letter?
3      A.  When I worked in liability -- I'm not
4  certain of all the terminologies like I used to.  I
5  used to try to keep up with it.  It would be
6  reserving the rights, as I understood, with -- on
7  liability on a coverage issue, we would go to Adam
8  Lutz.  And it would be -- our supervisor, Steve
9  Heckman, would help me on those letters for
10  reservation of rights letters.
11          So it would be reserving our rights
12  to -- not to defend and to defend or to provide
13  coverage.
14      Q.  Is this something that relates more to
15  the CGL field than to the worker's comp field?
16      A.  Absolutely.
17      Q.  And I don't know -- I don't have a lot
18  of worker's comp experience myself, but did you
19  have any occasion to do reservation of rights
20  letters in the worker's comp adjuster positions you
21  had?
22      A.  Only one time, and my supervisor and an
23  attorney did that one.
24      Q.  Okay.  And on the other hand, in the

Page 31

1  area of CGL claims, did you have occasion to do
2  reservation of rights letters?
3      A.  At first when we came to -- with
4  St. Paul, their attorneys were doing our
5  reservation of rights letters.  And then they
6  switched midstream and said no more attorney
7  reservation of rights letters.  The adjusters had
8  to do reservation of rights letters.
9      Q.  And did you, yourself, do some in the
10  CGL area?
11      A.  Not without assistance.
12      Q.  Do you recall how many that you prepared
13  with assistance?
14      A.  Nothing without assistance.
15      Q.  You didn't do any entirely on your own;
16  is that fair?
17      A.  Fair.
18      Q.  And the few that you did were all with
19  assistance?
20      A.  Yes.
21      Q.  And how few were they?
22      A.  I couldn't recall the exact number.
23      Q.  Now, you mentioned that there was a
24  change from having reservation of rights letters

Page 32

1  prepared by the attorney to then having them done
2  by the claims representative with assistance from
3  someone else.  Do you recall when that took
4  place --
5      A.  No.
6      Q.  -- or what were the circumstances around
7  which this change happened?
8      A.  I believe when Travelers was starting to
9  take over with St. Paul.
10      Q.  Okay.  And do you recall when that was?
11      A.  I couldn't give you an exact year.  I
12  just know we were downtown when it happened, around
13  that time.
14      Q.  Did St. Paul Travelers USF&G have any
15  procedures or rules or guidelines relevant to
16  preparing reservation of rights letters?
17      A.  I couldn't recall all the procedures,
18  but I know we were instructed to go to our
19  advisors.  Coverage was Adam Lutz in Baltimore.  I
20  believe he was in Baltimore at that time.
21      Q.  And is he a lawyer?
22      A.  I don't know.
23      Q.  So that was one procedure, run it by or
24  get his input?

8 (Pages 29 to 32)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 33

1    A.   Correct, any issues that you had a
2  question.
3    Q.   Was there a practice as to timing as to
4  when reservation of rights letters should be sent
5  out?
6    A.   I don't recall.
7    Q.   Was there a practice, procedure, rules,
8  guidelines -- whatever you want to call it -- as to
9  what materials should be reviewed before the
10  reservation of rights letter was prepared?
11    A.   I'm not certain.
12    MR. DUNNE:  Don't speculate.
13  BY MR. NYESTE:
14    Q.   Was there any practice, procedure, rule,
15  guideline concerning having a copy of the policy
16  available before or at the time of preparing the
17  reservation of rights letter?
18    A.   I cannot recall.
19    Q.   Now, when it did become a procedure to
20  have the letter reviewed or to get input from
21  another person -- and in your case, it was Adam
22  Lutz that you were to get input from, right?
23    A.   And my supervisor's directions, right,
24  correct.

Page 34

1    Q.   Was there any practice, procedure, rule,
2  guideline about whether reservation of rights
3  letters should be sent by fax or by certified mail
4  or by FedEx or by regular mail?
5    A.   There may have been.  I don't recall.
6    Q.   Was there any procedure, rule, practice,
7  guideline as to maintaining some sort of proof that
8  the reservation of rights letter was actually sent?
9    A.   I'm having a problem with that question.
10    Q.   Yeah, I can understand.  Let me give you
11  a for-instance.
12    A.   Okay.
13    Q.   Suppose that the reservation of rights
14  letter went out by fax.  Now, one could ask the fax
15  machine to generate a confirmation transmission
16  report.  Was there a practice or a rule or a
17  procedure at St. Paul Travelers USF&G that for a
18  reservation of rights letter you should get that
19  transmission or confirmation report and put it in
20  the file?
21    MR. DUNNE:  Objection to form of the question.
22       You can answer.
23  BY THE WITNESS:
24    A.   I don't recall that as being their

Page 35

1  criteria.
2  BY MR. NYESTE:
3    Q.   In your experience, when a reservation
4  of rights letter was sent, a copy of that letter
5  was maintained in the paper file; is that correct?
6    A.   Yes.
7    Q.   Was there any practice or procedure or
8  rule or guideline about following up with the
9  insured, the policyholder, after a reservation of
10  rights letter was sent?
11    A.   I don't recall.
12    Q.   And I'll give you a for-instance.  You
13  call up Company X and say, "I just want to confirm
14  that you got a reservation of rights letter.  Do we
15  need to discuss it?"
16       Was there anything like that that was a
17  practice?
18    A.   I would say because I didn't do many
19  reservation of rights letters, I didn't have that
20  to do.  Most of the files were being taken away by
21  the time they got to be that serious, the heavier
22  ones.  I didn't handle most of my liability cases
23  to the end.  I don't think I've handled any of them
24  to the end.

Page 36

1    Q.   In some that you handled -- well, let me
2  start that over.
3       You know, in a liability case in a CGL
4  claim, there would be a complaint by the plaintiff,
5  the injured person, for example, against the
6  defendant, your insured.  There would be a lawsuit
7  complaint.  You're aware of that, right?
8    A.   Yes.
9    Q.   And then in some cases the plaintiff,
10  the injured person, amends his complaint, files an
11  amended lawsuit with the court.  You're aware of
12  that?
13    A.   Yes.
14    Q.   While you were at St. Paul Travelers
15  USF&G, was there any practice or procedure or rule
16  about supplementing a reservation of rights letter
17  when the plaintiff amended his complaint?
18    MR. DUNNE:  Objection to the form of the
19  question.
20  BY THE WITNESS:
21    A.   I don't recall.
22  BY MR. NYESTE:
23    Q.   Ms. Robinson, do you remember a St. Paul
24  Travelers insured by the name of VOA Associates?

9 (Pages 33 to 36)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 37

1    A.    Yes.
2    Q.    And it was an architectural firm here in
3  Chicago; is that right?
4    A.    From the address, yes.
5    Q.    Do you recall ever speaking with anyone
6  at VOA?
7    A.    Yes.
8    Q.    Who did you speak with?
9    A.    Mr. Schnell.  At the beginning of this
10  claim, Mr. Schnell.
11    Q.    Do you recall anyone else?
12    A.    Later on, a person named Jennifer.
13    Q.    Jennifer Klomans?
14    A.    Sounds correct.
15    Q.    And "this" claim, you're referring to
16  the Madden -- the Michael Madden claim?
17    A.    Yes.
18    Q.    Do you recall who VOA's insurance broker
19  was in connection -- well, let me just stop the
20  question right there.  Do you recall who their
21  insurance broker was?
22    A.    I saw something before.
23    Q.    Let me ask you of your independent
24  memory, because we'll get to these documents.

Page 38

1    A.    Okay.
2    Q.    So I just want to find out what you
3  recall independently right now.
4    A.    Was it AVA something?
5    Q.    A-V-A?
6    A.    A-V-A.
7    Q.    Do you recall any person's name there in
8  particular?
9    A.    Not at all.
10    Q.    Do you recall the nature of VOA's CGL
11  coverage with St. Paul Travelers; that is, the
12  limits of liability, for example?
13    A.    Not off -- not without looking at a
14  document.
15    Q.    Now, you do remember the Michael Madden
16  claim or the name of that claim, right?
17    A.    The name of the claim.
18    Q.    Do you recall by name any other claims
19  against VOA?
20    A.    Can I look on the documents.
21    Q.    No.  I'm quizzing you on your memory
22  first.
23    A.    Okay.  Not without looking at it for
24  sure.

Page 39

1    Q.    Does the Regalado name sound familiar,
2  Raul Regalado?
3    A.    That, I had seen before.
4    Q.    Were you the adjuster on that claim?
5    A.    No, no.
6    Q.    Do you remember who was?
7    A.    No.
8    Q.    Do you recall the names of any other
9  claims against VOA?  CGL claims.
10    A.    I just remember this one I handled,
11  Madden.
12    Q.    Now, what did Mr. Madden claim against
13  VOA, to the best of your memory?
14    A.    I didn't know until we got the complaint
15  that came in.  He fell through a pit or stage or
16  something.  There was a hole and he fell.
17    Q.    Do you recall when VOA was sued by
18  Mr. Madden?
19    A.    I remember briefly when I received the
20  file.
21    Q.    When was that?
22    A.    I just looked over, September.
23    Q.    Of 2004?
24    A.    Yes.

Page 40

1    Q.    Do you recall how long the Madden
2  claim -- let me start over.
3          So if that was in September of 2004, do
4  you recall how long before that Mr. Madden had been
5  injured?
6    A.    No.
7    Q.    So did you begin working on the Madden
8  claim in September of 2004?
9    A.    If the complaint came in, yes, I would
10  have been working on it, liability.  And if it was
11  any issues, then sending it up for review.
12    Q.    And when would the last time be that you
13  had any responsibility on the Madden claim?
14    A.    We went to Naperville.  Naperville, I
15  handled a few of the claims until they started
16  taking them away.  So it would be sometime in '05.
17    Q.    And do you recall what month?
18    A.    The last I seen of the file?  Because I
19  think around July I was strictly auto.  So it
20  should have been before July '05.
21    Q.    What was going on in the claim at the
22  last time you had anything to do with it?
23    A.    In '05?
24    Q.    Yeah.

10 (Pages 37 to 40)

Page 41

1    A.  It would have been probably the last
2  one; to do the reservation of rights letter before
3  it left my desk.
4    Q.  And is that the last activity on the
5  file that you can recall?
6    A.  That would be it that I can think of,
7  that I could recall.  Because you mentioned the
8  phone calls.  I don't -- after that letter.
9    Q.  Do you have a memory as we sit here
10  today of preparing a reservation of rights letter
11  on the Madden claim?
12    A.  It would be with the assistance of Adam
13  Lutz and my supervisor.
14    Q.  Do you have a memory of preparing the
15  text in a reservation of rights letter relating to
16  the Madden claim?
17    A.  If normal circumstances, I would have
18  been getting assistance from Lutz and been copying
19  and pasting.
20    Q.  That would be what ordinarily happened,
21  right?
22    A.  Because I couldn't draft a letter by
23  myself.
24    Q.  And with respect to the Madden claim, do

Page 42

1  you have a memory of doing cutting and pasting from
2  material that Mr. Lutz sent you?
3    A.  I know he sent me materials.  I know
4  Mr. Lutz sent me materials.  And if it would be
5  that letter or other letters, it would have been
6  still a combination of letters, and we had to get
7  approval before the letter went out.
8    MR. NYESTE:  Can I have the answer read back.
9        (WHEREUPON, the record was read
10        by the reporter as requested.)
11  BY MR. NYESTE:
12    Q.  You recall Mr. Lutz sending you text or
13  material for a reservation of rights letter
14  relating to the Madden claim; is that fair?
15    A.  Yes.
16    Q.  Okay.  Do you have an independent
17  memory -- can you sit here and recall yourself
18  putting that letter together based on the text or
19  language that he sent you?
20    A.  I recall he sent me -- in fact, in
21  Chicago I have a better memory than in Naperville.
22  In Chicago he sent me information, and in
23  Naperville -- I couldn't recall all the information
24  in Naperville, but in Chicago I could recall more.

Page 43

1  Because Naperville was more stressful than Chicago.
2    Q.  Do you have a memory of doing the
3  cutting and pasting of a Madden reservation of
4  rights letter in either Chicago or Naperville?
5    A.  In Chicago I remember it more so doing
6  the reservation of rights letter.  In Naperville, I
7  remember it, also.
8    Q.  And does that memory relate to the
9  Madden claim?
10    A.  Uh-hmm.
11    Q.  Did you prepare more than one
12  reservation of rights letter for the Madden claim?
13    A.  Yes, there would have been.
14    Q.  And how did they differ?
15    A.  I couldn't recall on the specifics of
16  the difference.
17    Q.  When was the first one prepared?
18    A.  I couldn't recall the date.
19    Q.  Sometime in the Chicago office?
20    A.  Yeah, sometime in the Chicago office.
21    Q.  And then you say your -- you have a
22  memory of preparing one in the Naperville office,
23  and that came later?
24    A.  Yes, it would have been later.

Page 44

1    Q.  And you can't recall what the
2  differences were?
3    A.  If there was a difference, I couldn't
4  recall.
5    Q.  Now, when you were preparing these
6  letters -- let's take the Chicago one.  What did
7  you have in front of you as you prepared it?
8    A.  Probably the way we communicated with
9  Adam Lutz would have been e-mail; an e-mail and
10  there might have been some phone conferences.
11    Q.  Did you have a copy of the policy in
12  front of you?
13    A.  I can't recall for certain.
14    Q.  Did you have a copy of Mr. Madden's
15  complaint in front of you?
16    A.  I can't recall for certain.  You said
17  don't speculate.
18    Q.  Is there anything apart from some text
19  from Mr. Lutz that you recall having as you
20  prepared this letter?
21    A.  The reason why I remember some of
22  Mr. Lutz is because I had a hard time copying and
23  pasting some things.
24    Q.  Why was that?

11 (Pages 41 to 44)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 45

1    A.   I was just having a hard time.
2    Q.   Sometimes I indeed have a hard time
3  because of the format that I'm trying to take the
4  text from.  If I'm trying to take text from a PDF
5  file, for example, sometimes it doesn't work very
6  well to take that text and put it into another
7  file.
8    A.   Right.
9    Q.   Is there any reason that you can recall
10  why you were having trouble?
11    A.   No, I can't recall the exact one, but
12  there was some difficulty.
13    Q.   Why do you seem to have that
14  recollection?  Why do you have that specific
15  recollection that you had difficulty cutting and
16  pasting?
17    A.   I know this sounds a little bit -- the
18  other person or the other adjuster who was there,
19  Christine, she had a form that was working so well
20  with hers, and I couldn't do mine the same as
21  Christine could do hers.  I had a more difficult
22  time than Christine.  That's why I say I remember
23  it, because sometimes Christine -- we called her
24  Chris -- would help.

Page 46

1    Q.   Okay.  You got some text from Mr. Lutz.
2  You prepared a reservation of rights letter.
3    A.   Right.
4    Q.   Did you -- and this is in the Chicago
5  office.  Did you then have it reviewed by someone
6  within Travelers St. Paul USF&G?
7    A.   It should have been by Adam Lutz or
8  Steve Heckman or both.
9    Q.   Do you recall sending it to them for
10  review?
11    A.   That, I would have for certain.
12    Q.   As an ordinary practice?
13    A.   Because I don't do reservation of rights
14  letters.
15    Q.   But do you have a specific memory of
16  clicking/sending to Heckman and/or Lutz for their
17  review?
18    A.   I couldn't recall.
19    Q.   Do you recall that Chicago reservation
20  of rights letter going through any revisions?
21    A.   I can't recall that either.
22    Q.   I've been trying to explore the one that
23  you prepared in the Chicago office.  I'm going to
24  try and switch gears and ask you about what you can

Page 47

1  recall about preparing one in the Naperville
2  office.  Correct me if I'm wrong, but you said you
3  have a recollection of preparing one while in
4  Naperville?
5    A.   Correct.
6    Q.   Again, it was based on language or text
7  supplied by Mr. Lutz?
8    A.   It would have been.
9    Q.   And do you recall whether you had
10  anything else available to you or in front of you
11  as you were preparing this letter?
12    A.   Just the file.
13    Q.   Do you recall if you had the policy in
14  front of you?
15    A.   I couldn't recall definitely that, but
16  the file should have been in front of me; whatever
17  was in the file.
18    Q.   All right.  Do you know whether that
19  letter went through any revisions?
20    A.   I don't know.
21    Q.   Do you recall sending it back to either
22  Lutz or Heckman for review?
23    A.   I'm not certain.
24    Q.   With respect to the first one -- I think

Page 48

1  that's correct.  The Chicago one was the first one?
2    A.   Yes.
3    Q.   Do you have a specific memory of sending
4  that reservation of rights letter out to the
5  insured?
6    A.   The first one?
7    Q.   Yes.
8    A.   I don't know.  I'm not certain on that
9  one.
10    Q.   Okay.  With respect to the one you
11  prepared in Naperville, do you have a specific
12  memory of sending that one out to the insured?
13    A.   That one, I'm pretty certain that went
14  out.
15    Q.   And how was it sent?
16    A.   Regular mail.
17    Q.   Was a file copy kept?
18    A.   It should have been, because Steve was
19  on me to make sure.
20    Q.   Do you recall to whom it was addressed?
21    A.   It would have been addressed to VOA.
22    Q.   And was it addressed to anyone in
23  particular at VOA?
24    A.   I was talking to Mr. Schnell, so it

12 (Pages 45 to 48)

Page 49

1   would have been to him.
2       Q.   And that would have gone regular mail to
3   Mr. Schnell?
4       A.   Yes.
5       Q.   And would you have signed that letter
6   "Iris Robinson" or would you have initialed it?
7       A.   If I was rushing, more than likely
8   initials. And sometimes, if not, it's an "I" and
9   an "R" with a line.
10      MR. DUNNE: Are you doing okay? It's a little
11  warm in here.
12      THE WITNESS: It is a little.
13      MS. SKAGGS: It's ironic, given your
14  conference room.
15      MR. DUNNE: Why do you think I don't take the
16  deps?
17          Sorry, you can go off.
18          (WHEREUPON, discussion was had
19          off the record.)
20  BY MR. NYESTE:
21      Q.   Do you recall whether there were any
22  copies -- either CCs or blind CCs with respect to
23  that letter?
24      A.   That, I don't recall.

Page 50

1       Q.   Do you recall whether it was sent to
2   anyone other than Mr. Schnell?
3       A.   The attorney.
4       Q.   And who was that?
5       A.   I've seen it before. Kurt?
6       Q.   Beranek?
7       A.   Yes.
8       Q.   If you will turn to Exhibit 9, please.
9       A.   Okay.
10      Q.   Would you turn to the last page. Can
11  you testify with certainty that those are your
12  initials?
13      A.   Yes.
14      Q.   Is there anything that you recall, any
15  circumstances or anything that makes you confident
16  that they are your initials?
17      A.   That's my signature.
18      Q.   Now, note that this Exhibit 9 is a copy
19  of a fax that was sent from Travelers Claims in
20  Chicago. Do you see that?
21      A.   Okay.
22      Q.   So where was this letter prepared?
23      A.   It could have been in Chicago because
24  it's a 312. It would have been Chicago.

Page 51

1       Q.   Well, the 312-782-4537, is that the
2   number you're referring to?
3       A.   Yeah, I guess so.
4       Q.   That's the number that it's going to.
5       A.   Going to? Okay.
6       Q.   And just so that we're all clear, that
7   number corresponds to the fax number at Kurt
8   Beranek's office.
9       A.   Okay.
10      Q.   So this is a copy of a fax that was sent
11  to Kurt Beranek.
12      A.   Okay.
13      Q.   Do you have a specific recollection of
14  having this letter sent to Mr. Beranek?
15      A.   I remember it. No, I don't want to say
16  that. VOA at this point -- when they sent the
17  default, I was very -- I was upset getting a
18  default notice, of course. I was just trying to
19  make sure that copies were sent where they should
20  be sent and that people had notice of it.
21      Q.   Is this the reservation of rights letter
22  or one of them that you were speaking of earlier?
23      A.   That was composed, yes.
24      Q.   Is this the one you prepared in Chicago

Page 52

1   or Naperville?
2       A.   From what it has here, it should have
3   been Chicago.
4       Q.   If it was sent from Naperville, would it
5   show Naperville in the fax header?
6       A.   I don't know with Naperville.
7       Q.   On May 4, 2005, where were you
8   physically officed?
9       A.   May? I think I should have been in
10  Naperville.
11      Q.   Did you ever speak with Kurt Beranek
12  about this letter?
13      A.   I don't recall.
14      Q.   He has an associate, Nadehr -- I forgot
15  her last name.
16      MS. SKAGGS: Elrabadi.
17  BY MR. NYESTE:
18      Q.   Elrabadi. Do you recall speaking with
19  Mr. Beranek's associate about this letter?
20      A.   I remember with his office. I would
21  speak with someone from his office.
22      Q.   A female attorney?
23      A.   From there.
24      Q.   Do you recall speaking with her about

13 (Pages 49 to 52)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 53

1    this letter?
2        A.   I remember asking for contracts.
3        Q.   Why would this have been faxed to
4    Beranek but, you say, sent by regular mail to VOA?
5        A.   That's what -- I'm surprised that I
6    didn't have a fax copy to VOA.
7        Q.   Do you recall speaking with Mr. Schnell
8    about whether he got this letter?
9        A.   No.
10       Q.   Now that you have the letter in front of
11   you, do you recall anything more about its
12   preparation?
13       A.   I do remember cutting and pasting it in
14   Chicago for certain, because of Adam and sending
15   things to Steve Heckman. I'm just remembering
16   sending the file to Steve Heckman for review.
17       Q.   Do you have any recollection as to
18   whether Heckman or Lutz reviewed this letter?
19       A.   I remember getting information from Lutz
20   and cutting and pasting it in this letter.
21       Q.   But that's really the extent of your
22   recollection?
23       A.   No, because reservation of rights
24   letters had to be approved, had to be seen.

Page 54

1        Q.   But you don't have a specific memory of
2    getting that done here; is that fair to say?
3        A.   That's fair to say.
4        Q.   I mean, I don't want to beat a dead
5    horse here, Ms. Robinson.
6        A.   Okay.
7        Q.   I just want to make sure we're clear.
8            Since leaving St. Paul Travelers USF&G,
9    have you had any conversations with anyone about
10   the Madden claim?
11       A.   No.
12       Q.   You met with Mr. Dunne before your
13   deposition?
14       A.   That's true. I'm sorry. I meant like
15   an adjuster.
16       Q.   That's okay.
17           And that was recently, in the last week
18   or so?
19       A.   Yes.
20       Q.   How long did you meet for?
21       A.   Maybe an hour or so or more.
22       Q.   Only one occasion?
23       A.   Twice.
24       Q.   And both times within the last week or

Page 55

1    so?
2        A.   No.
3        Q.   Okay. When was the first time?
4        A.   When he presented that this was a
5    lawsuit.
6        Q.   And when was that? Last summer?
7        A.   September or October or something of
8    that nature.
9        Q.   How long did you meet with him then?
10       A.   About an hour, little over an hour.
11       Q.   Have you prepared or have you been given
12   an affidavit for your signature or potential
13   signature?
14       A.   Just received the subpoena. Nothing
15   else.
16       Q.   You haven't signed anything?
17       A.   No.
18       Q.   Or asked for -- been asked to review or
19   sign a statement or an affidavit?
20       A.   Not that I can recall.
21       Q.   Apart from Mr. Dunne, have you spoken
22   about the Madden case or this lawsuit with anyone
23   else?
24       A.   Just to get permission to get off for

Page 56

1    today.
2        Q.   With Gallagher Bassett?
3        A.   Yes.
4        MR. DUNNE:  So the record is clear,
5    Ms. Carwile was in the room with us today.
6        MR. NYESTE:  Okay.
7        MR. DUNNE:  Don't want to do a Roland Burris.
8        MR. NYESTE:  Want to take a little break?
9        MR. DUNNE:  Please.
10       MR. NYESTE:  Okay. Good, because then we'll
11   go through some documents.
12           (WHEREUPON, a recess was had.)
13   BY MR. NYESTE:
14       Q.   Ms. Robinson, would you turn to
15   Exhibit 8, please. I will tell you that, as far as
16   I can determine, these letters are identical but
17   for their dates and, you know, the fax header on
18   Exhibit 9 and the numbering on the bottom of the
19   pages. But otherwise, the text of these two
20   letters, to me, seems identical.
21           Now, do you recall this letter dated
22   February 24, 2005, that we've marked as Exhibit 8?
23       A.   Yes.
24       Q.   Do you know whether this one was sent to

14 (Pages 53 to 56)

Page 57

1    Mr. Schnell?
2        A.   The February one?
3        Q.   Yes.
4        A.   As I recall, we were waiting on the
5    contracts.  It shouldn't have been sent.
6        Q.   The contracts between VOA and the school
7    district?
8        A.   The complete contract they had with
9    everyone on this project.
10       Q.   And why did you want to receive that?
11       A.   I believe it was from Adam's and Steve
12   Heckman's recommendation that we get this letter to
13   see the role VOA had.
14       Q.   Okay.  And do you believe that you
15   received the contracts between the dates of the two
16   letters on Exhibit 8 and Exhibit 9?
17       A.   Yes.
18       Q.   And apparently nothing about the
19   contracts caused any change in the letters?
20       A.   I guess not.
21       MR. DUNNE:  I don't want you to guess.
22       THE WITNESS:  I'm sorry.
23   BY THE WITNESS:
24       A.   When the contract came in, then the

Page 58

1    reservation of rights letter went out.
2    BY MR. NYESTE:
3        Q.   Okay.  In the first paragraph of
4    Exhibit 8 it says, "St. Paul Travelers has reviewed
5    the allegations."  Do you see that here at the
6    bottom of the first paragraph?
7        A.   Okay.
8        Q.   "And other relevant information,
9    including USF&G Policy Number BK 01116165."
10           Do you see that?
11       A.   Uh-hmm.
12       Q.   Did you review that policy?
13       A.   Not really.
14       Q.   Do you know whether Mr. Lutz reviewed
15   the policy?
16       A.   Yes, it was sent to him.
17       Q.   Okay.  You recall sending him the
18   policy?
19       A.   I had to wait awhile on the policy, the
20   full policy.
21       Q.   Why was that?
22       A.   I don't know why.  For the full policy.
23       Q.   Where was the policy obtained from?
24       A.   I don't recall that.

Page 59

1        Q.   And you don't recall what the wait was
2    for?
3        A.   He wanted a complete policy.
4        Q.   Yes.
5        A.   We had to get a complete policy.
6        Q.   And there was some delay involved in
7    getting the complete policy?
8        A.   I don't remember what it was, but we had
9    to get a complete policy.
10       Q.   Ms. Robinson, let me show you Exhibit
11   10, which is part of the policy for VOA.  It is the
12   liability coverage part.  If you turn to the second
13   page -- I want you to have that policy part in
14   front of you, as well as Exhibit 8, the letter.
15       A.   8?
16       Q.   Yeah, the February 24, 2005, document.
17       A.   Okay.
18       Q.   On the second page of the letter there's
19   some text quoted from the policy, "What This
20   Agreement Covers," et cetera, "Bodily Injury
21   Means."  Do you see those quotations?
22       A.   Uh-hmm.
23       Q.   What policy did that come from?
24       A.   I don't recall what that was from.

Page 60

1        Q.   This policy, Exhibit 10, or the
2    liability part of the policy, is written on an
3    occurrence basis.  Do you know what that means?
4        A.   I don't deal with those terms very much.
5        Q.   Well, let me just suffice it to
6    represent to you that the -- what appears to be
7    quotations from the policy do not come from the
8    policy that USF&G has submitted to the court in
9    this case.  Do you have an explanation for that?
10       A.   Cutting and pasting.  I was cutting and
11   pasting.  That's all I could tell you.
12       Q.   Is everything in this Exhibit 8
13   something that was sent to you by Mr. Lutz?
14       A.   I don't recall that it was all of it,
15   but I know I was cutting and pasting from his
16   e-mails.
17       Q.   Would you have independently cut and
18   pasted from any document that Mr. Lutz did not send
19   you?
20       MR. DUNNE:  I'm going to object.  I think it's
21   been asked and answered.
22           But go ahead.
23   BY THE WITNESS:
24       A.   I don't recall.  I recall his e-mails.

15 (Pages 57 to 60)

Page 61

BY MR. NYESTE:

Q. Based on your familiarity with Mr. Lutz and Mr. Heckman, do you believe that they would have reviewed and allowed to be sent a reservation of rights letter that did not accurately quote the insurance policy?

MR. DUNNE: Object to the form of the question, calls for speculation.

But you can go ahead.

BY THE WITNESS:

A. I know Steve Heckman would not.

BY MR. NYESTE:

Q. And Mr. Lutz?

A. I'm not certain.

Q. In Footnote Number 1 in Exhibit 8 and Footnote Number 1 in Exhibit 9 -- they're identical -- there's reference to a $2 million policy limit in the general liability policy.

Were you responsible for putting that limit in there? Did you find that limit yourself?

A. I don't recall.

Q. It does not correspond to the Each Occurrence limit in the liability coverage part of the policy that USF&G has submitted to the court.

Page 62

Do you have any understanding as to where the $2 million limit came from?

A. No, I don't know.

Q. In the middle of the second page of Exhibit 8 and of Exhibit 9, there's a line that reads, "Event means an accident, including continuous or repeated exposure to," and then the quote just ends right there.

Do you have any understanding as to why that sentence is not completed?

A. No.

Q. On Page 3 of Exhibit 8 or on Page 3 of Exhibit 9, the second paragraph from the top which begins, "Since these allegations potentially constitute a claim," do you see that?

A. Yes.

Q. What allegations are being referred to?

A. I couldn't tell you if I was cutting and pasting.

Q. On the same page further down, there's a paragraph that begins, "The complaint alleges that VOA failed to properly inspect the site."

Is this the allegation on which you were reserving rights to possibly deny coverage?

Page 63

A. If that's what Mr. Lutz told me to, that's what I did.

Q. Well, what was your understanding of the position being taken by St. Paul Travelers USF&G in this letter?

A. That the architects or engineers, surveyor, this exclusion endorsement, as there was an exclusion.

Q. Were there particular allegations in Mr. Madden's complaint that, to your understanding, made that exclusion applicable?

A. I'm not sure if I understand your question, because -- I just want to say I was just giving whatever Mr. Lutz gave me.

Q. Let me show you Exhibit 4. This is Mr. Madden's third amended complaint in his lawsuit. Is there any scribbling or handwriting or anything on this document that is yours? You know, there's a few marginal notes, squiggles and things. I just want to know if you can identify any markings by yourself on here.

A. There's one.

MR. DUNNE: Referring to Page --

THE WITNESS: 4 of 21.

Page 64

BY MR. NYESTE:

Q. And what markings are yours?

A. The one that says S-U-B, SUB, project manager.

Q. I see.

A. I can recognize the handwriting.

Q. Do you recall reviewing this document, this complaint?

A. I reviewed that particular portion of mine.

Q. Do you recall reviewing the allegations against VOA?

A. Reviewing some of it, yes.

Q. Do you recall considering whether any of the allegations made against VOA in this complaint potentially made the architects and engineers exclusion applicable?

A. I left that up to the analysts.

Q. Ms. Robinson, would you turn to Exhibit 7, please. Do you recall receiving this fax from Rachel Buelow at HRH AVA?

A. I don't until seeing it now.

Q. Do you have a recollection of not being able to locate the policy conditions of the VOA

16 (Pages 61 to 64)

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 65

1 insurance policy?
2    A.   I don't recall.
3    Q.   Was it a practice at St. Paul Travelers
4 USF&G to indicate in the electronic notes when a
5 reservation of rights letter was being sent out?
6    A.   I don't recall those specifics.
7    Q.   If you would turn to Exhibit 3, please,
8 and turn to Page 32 of 38.  In the middle of the
9 page there's an entry by you dated March 7, 2005.
10       Do you see that?
11   A.   Yes.
12   Q.   And the next entry above that is dated
13 July 6, 2005.  Do you see that?
14   A.   Uh-hmm.
15   Q.   What explains why there is a four-month
16 gap in the electronic notes?
17   A.   I don't know.  With the transition, I
18 wouldn't know.
19   Q.   Are there any entries by you after
20 March 7, 2005?  I don't believe so.  I'm asking
21 whether you can confirm that for me.
22   A.   I see from here there's nothing else on
23 there.
24   Q.   There are, of course, earlier entries by

Page 66

1 you?
2    A.   Uh-hmm.
3    Q.   "Yes"?
4    A.   Yes, that's true.
5    Q.   Is it possible that March 7, 2005, was
6 the last time you had any occasion to handle the
7 Madden file?
8    A.   No, because my letter is initialed in
9 here from May of '05.  That's definitely my
10 initials.
11   Q.   Would you turn back to the earliest
12 notes, Page 37 of 38, the note dated September 1,
13 2004.  I guess it's the third note from the bottom.
14   MR. DUNNE:  Is there a time?
15   MR. NYESTE:  15:50:18.
16 BY MR. NYESTE:
17   Q.   "Called insured, left a message with
18 Jennifer."
19   A.   Okay.
20   Q.   Is that your note?
21   A.   Yes, it is.  It would be.
22   Q.   And how did you know to call Jennifer?
23   A.   Was it on the loss sheet that came in or
24 the number -- I had something on there with her

Page 67

1 number.  I had to have her number somewhere.
2 Because I have two numbers for her.
3    Q.   The next note above that, "This was sent
4 to Adam to review coverage."  Is that Adam Lutz?
5    A.   Yes, that would be Adam Lutz.
6    Q.   And is that your entry?
7    A.   Yes.
8    Q.   And what was sent to him?
9    A.   It would have been the lawsuits
10 underneath it.  I would have sent the lawsuit or a
11 complaint was to be sent to Adam.
12   Q.   Okay.  How would that be sent?
13   A.   Either by fax or e-mail.  I don't want
14 to speculate.
15   Q.   If the complaint came in to your office
16 by fax, would your fax machine capture a digital
17 image of that transmission in addition to printing
18 out the paper?
19   A.   I don't know that.
20   Q.   The entry above that one, "Our insured
21 is the architect," is that your entry?
22   A.   Yes, that's what it has.
23   Q.   And above that there's an entry by Steve
24 Heckman, "Have you inquired from insured and agent

Page 68

1 who insured professional liability carrier is?
2 Have they turned this suit in to them?  When is
3 appearance due?"
4       Ms. Robinson, do you recall ever finding
5 out who the professional liability carrier was for
6 VOA with respect to the Madden claim?
7    A.   I don't recall.
8    Q.   What did you do to try and find out?
9    A.   I contacted the insured.  I talked to,
10 the note above that, Theodore Schnell.
11   Q.   The note that begins, "I spoke to
12 Theodore Schnell"?
13   A.   9-17-04, 13:53.
14   Q.   Tell me what you can recall about that
15 conversation.
16   A.   He said they have an attorney on the
17 case and it will be dismissed.  So I was assuming,
18 during that earlier part, that this case was going
19 to be dismissed; that he had his attorney already
20 there.
21   Q.   Okay.  And that was not Mr. Beranek?
22 That was a different attorney?
23   A.   I didn't know which attorney.  He just
24 said he had his attorney.

17 (Pages 65 to 68)

Page 69

1    Q.   Do you know whether that was an attorney
2  from the Schiff Hardin firm?
3    A.   I didn't know.  I didn't recall.
4    Q.   Did you ever have any conversations with
5  Mr. Schnell's attorney on the Madden claim?
6    A.   I don't recall any.
7    Q.   The next entry at the bottom of Page 36
8  is also by you, correct?
9    A.   "A note from Adam on 9-16"?
10   Q.   Yes.  Could you read that.
11   A.   "A note from Adam on 9-16-04.  Iris:
12  Let me know if the professional liability carrier
13  has accepted the defense or retained defense
14  counsel to protect the answer date.  If the answer
15  date has not been protect, you'll need to contact
16  the PH," policyholder, "and have them retain
17  defense counsel to protect their legal interests.
18  You can tell them that we are evaluating coverage
19  and if we decide to defend, we will reimburse them
20  for any incurred costs.  I recommend you do the
21  following:  Contact the PH and secure any contract
22  they have for their work at this location.  The
23  complaint alleges a contract between VOA and Amos
24  Alonzo Stagg High School.  The PH may have been

Page 70

1  hired solely to provide architectural services.
2  Secure a copy of the complaint so we know for
3  certain, et cetera, et cetera."
4       So I copied and paste part of an e-mail.
5    Q.   And what did you do to respond to his
6  request, "Let me know if the professional liability
7  carrier has accepted the defense"?
8    A.   That was 9-17.  Some kind of letter went
9  out.
10       MR. DUNNE:  Are you asking for her
11  recollection or do you want her to look at the file
12  notes?
13       MR. NYESTE:  No.  I'm asking for her
14  recollection.
15  BY MR. NYESTE:
16   Q.   What did you do to respond to Mr. Lutz's
17  request?
18       MR. DUNNE:  If you know.
19  BY THE WITNESS:
20   A.   I don't recall.
21   Q.   On Exhibit 5 on the fourth page,
22  numbered at the bottom USF&G 01565 -- do you have
23  that page in front of you?

Page 71

1    A.   Yes.
2    Q.   There's a message from Mr. Heckman.
3  "Iris, please review for professional exclusion, BK
4  policy, who has insured professional liability?"
5       What did you do in response to
6  Mr. Heckman's inquiry about who has the insured's
7  professional liability?
8    A.   Calling Mr. Schnell.
9    Q.   Do you recall asking Mr. Schnell
10  specifically who VOA's professional liability
11  insurer was?
12   A.   I don't recall.  I'm looking in my
13  notes.  "Mr. Schnell does not think we will need
14  additional investigation.  I asked to take pictures
15  and statements.  He said I should wait."
16   Q.   Returning to the electronic notes,
17  there's an entry dated September 17, 2004, on
18  Page 36 of 38.
19   A.   Okay.
20   Q.   And the first line reads, "FC37017."
21       What does that refer to?
22   A.   Some kind of letter or form letter.
23   Q.   If you would turn to Exhibit 5, and
24  specifically the fifth page of that.  Does FC37017

Page 72

1  refer to the Litigation Referral Form?
2    A.   Okay.  Yes, it's down here.
3    Q.   Now, who prepared this form?
4    A.   It's a standard form.  We go in and we
5  put in information, just fill it in.  I don't know
6  who prepared the actual form, but I filled in the
7  information.
8    Q.   Okay.  It's not all filled in at the
9  same time, though; is that fair?  You come back to
10  it from time to time to put information in it?
11   A.   It would have been, correct.
12   Q.   So this would not have been filled out
13  as we see it completely on September 17, 2004; is
14  that fair?
15   A.   There's a possibility I could use it
16  over and over again.
17   Q.   For example, on the second page of the
18  referral form, there's a line about the default or
19  possible default.  Would that indicate to you that
20  that was added to this form at a later date?
21   A.   Because when did I speak to her about
22  it?  Whenever Jennifer told me about the default,
23  right.
24   Q.   And that was sometime after September

18 (Pages 69 to 72)

Page 73

1    17th, correct?
2        A.   Right, right.
3        Q.   Also on the Litigation Referral Form
4    there's a line for reservation of rights and an X
5    next to "Yes."  That doesn't necessarily mean that
6    a reservation of rights letter had been sent as of
7    the date on this document, September 17, 2004?
8        A.   I can't speculate.  I don't recall.
9    "Excess letter sent?  No."
10       Q.   You don't recall when that would have
11   been filled in or X'd, correct?
12       A.   Correct.
13       Q.   Back to Exhibit 3, the electronic notes.
14   On Page 35 of 38, the entry at the bottom, that's
15   an entry by you; is that correct?
16       MR. DUNNE:  Time?
17       MR. NYESTE:  October 8, 2004, at 14:31:45.
18       MR. DUNNE:  Thank you.
19   BY THE WITNESS:
20       A.   Okay.  October 8th.
21   BY MR. NYESTE:
22       Q.   That note is by you?
23       A.   That's me, yes.
24       Q.   In the middle of that note it says,

Page 74

1    "Coverage:  Lyric Opera of Chicago is the named
2    insured, with limits 2 million each occurrence."
3        A.   So that's a cut and paste from the wrong
4    document.
5        Q.   That was going to be my question.
6    What's the explanation for that?
7        A.   It must have been a previous form or
8    something; a previous form and I didn't clear that
9    out.
10       Q.   The next entry just above that dated
11   October 8, 2004, is that, again, referring to some
12   letter?
13       A.   Correct, claim reassignment letter.
14       Q.   Within Exhibit 5 on Page 1571, is this
15   the October 8, 2004, letter that corresponds to the
16   electronic note?
17       A.   Yes.
18       Q.   To whom were you sending this letter?
19       A.   VOA.
20       Q.   You write, "In our last conversation you
21   mentioned."  Who had you been speaking with?
22       A.   Either Jennifer or Mr. Schnell.
23       Q.   How do you know whether this letter got
24   to either Jennifer or Mr. Schnell's attention?

Page 75

1        A.   We were waiting on the contracts, that's
2    how.  I can just say we were waiting on contracts
3    for that entire time.
4        Q.   Do you know whether VOA ever received
5    this letter of October 8, 2004?
6        A.   A note that was sent above that,
7    10-22-04, 17:27:44, "I sent a letter and insured
8    has not responded."
9        Q.   And that refers to this October 8th
10   letter on Page USF&G 01571, right?
11       A.   That would be an assumption.
12       Q.   Well, is that your understanding; that
13   in the electronic note of October 22nd at 17:27:44
14   you were referring to this October 8, 2004, letter
15   on Page USF&G 01571?
16       A.   Right.
17       Q.   And the insured had not responded to
18   that letter as of October 22nd, correct?
19       A.   Correct.
20       Q.   Again, on November 4th Mr. Heckman is
21   asking you to find out about who the professional
22   liability carrier is, correct?
23       A.   Correct.
24       Q.   And do you recall what you did in

Page 76

1    response to that request?
2        A.   My next note, I spoke to Jennifer.
3        Q.   Would that be Jennifer Klomans?
4        A.   "Jennifer from our insured," I put on
5    the note.  "Yesterday," on 11-3, "I told her that
6    there was coverage issues and since I was told your
7    attorney would appear, I was going to close my
8    file," from speaking to Mr. Schnell.
9             "She said her CEO was incorrect with the
10   information he gave out.  I asked her to call her
11   broker and give this to their professional carrier,
12   as well.  She said they did and were told there is
13   no coverage and their CGL should cover the loss.
14   Insured will fax in the default order today."
15       Q.   Okay.  "Their CGL," referring to you,
16   St. Paul Travelers, right?
17       A.   Correct.
18       Q.   And did you ask her who the professional
19   liability carrier was?
20       A.   From that conversation, I'm not certain.
21   I do recall we made a joke about her boss.
22       Q.   Mr. Schnell?
23       A.   Yes.
24       Q.   Do you recall the nature of the joke?

19 (Pages 73 to 76)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 77

1     A.    About the boss getting things wrong.
2     Q.    I've got that problem being my own boss.
3           The next entry in the electronic notes
4    is yours?
5     A.    The one up above it?
6     Q.    Yes.
7     A.    The 11-10 at 11:50, yes, "Walking the
8    file over to Cassidy's office."
9     Q.    Who is Cassidy?
10    A.    It's a law firm.
11    Q.    Cassiday Schade or a different Cassidy?
12    A.    Cassiday Schade's.
13    Q.    And did you take the file over there or
14   not?
15    A.    I would -- from this note, I walked it
16   over.  I have walked a couple files over to
17   Cassidy's office at that time.
18    Q.    Well, they didn't end up being the
19   defense attorney here.
20    A.    I cannot recall why.
21    Q.    Returning to Exhibit 5, and if you would
22   turn to the page that has the number USF&G 01576.
23   Do you see this November 9, 2004, letter?
24    A.    Right.

Page 78

1     Q.    What do you recall, if anything, about
2    the circumstances of this letter?
3     A.    I don't recall.
4     Q.    Did it go out?
5     A.    I wouldn't think so with an X there, no.
6     Q.    And there are empty blanks, also?
7     A.    Right.
8     Q.    But do you recall whether a letter like
9    this, revised perhaps, was sent out?
10    A.    I don't recall.
11    Q.    And you've indicated you don't recall
12   why the Cassiday firm did not end up defending the
13   Madden claim?
14    A.    No, I don't recall.
15    Q.    Returning to the electronic notes,
16   there's a note dated December 3, 2004, at 13:32:31,
17   "Called attorney for status."  And then there's a
18   phone number, 312-782-9255.  That number
19   corresponds to the Fraterrigo Beranek law firm and
20   to Kurt Beranek.
21    A.    Okay.
22    Q.    Although your message -- your note here
23   talks about status, "Called attorney for status,"
24   was this really the initial assignment of the

Page 79

1    matter to Mr. Beranek?
2     A.    I don't know.  I can't recall.
3     Q.    How did -- or who decided to use
4    Mr. Beranek?
5     A.    I can't recall that information.
6     Q.    Would that have been your responsibility
7    or someone else's?
8     A.    We have a panel of attorneys.  I don't
9    know.
10         MS. SKAGGS:  I'm sorry.  Could you repeat
11   that.
12         THE WITNESS:  We have panels of attorneys that
13   we're given.  Sometimes Mr. Lutz would suggest an
14   attorney.
15   BY MR. NYESTE:
16    Q.    Back on the Litigation Referral Form
17   within Exhibit 5 --
18         MR. DUNNE:  What number again?
19         MR. NYESTE:  Page 1566.
20   BY THE WITNESS:
21    A.    Okay.  I got on there Kurt.
22   BY MR. NYESTE:
23    Q.    Yeah.  You have, "Kurt Beranek is the
24   attorney."  Is that your handwriting?

Page 80

1     A.    Yes, it is.
2     Q.    But to the left of that there's the firm
3    Maisel & Associates?
4     A.    Right.
5     Q.    Do you recall anything about how it came
6    to be that they were not used?
7     A.    Because that was a law firm that was
8    St. Paul's law firm, employed by St. Paul.
9     Q.    Okay.  So that was wrapped up in this
10   transition and merger business; is that right?
11    A.    Part of it.
12    Q.    Returning to the electronic notes, a
13   note dated December 7, 2004, at 16:34:35, a note by
14   Mr. Heckman, "Please send me a copy of this lawsuit
15   and any contracts.  Have contracts insured had been
16   supplied to you?  What is your reserve
17   recommendation?  Also, send me a copy of the
18   reservation of rights letter you sent to insured.
19   Also, a copy of Adam's coverage review."
20         As of December 7, 2004, you hadn't sent
21   any reservation of rights letter, had you?
22    A.    I don't think so.
23    Q.    And what was Adam's coverage review?
24    A.    It's not in here.  It would be an

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 81

1 e-mail.
2 Q. Do you recall a coverage review by
3 e-mail from Mr. Lutz?
4 A. I remember him sending me the language
5 for the reservation of rights letter.
6 Q. Within Exhibit 5, on Page 01579 there's
7 a letter dated December 8, 2004, from Kurt Beranek,
8 the attorney. Do you recall that this letter would
9 have been at or about the time that Mr. Beranek was
10 retained?
11 A. Yes, because they say they have the
12 captioned case filed to protect the interests of
13 VOA.
14 Q. The way that is worded would indicate to
15 you that they have recently been retained. They're
16 acknowledging their assignment; is that fair to
17 say?
18 A. Correct.
19 Q. Mr. Beranek refers to this other case
20 involving Mr. Regalado. Do you recall doing
21 anything to coordinate the claim handling
22 responsibilities on the Madden case with the claim
23 handling on Regalado?
24 A. I didn't handle anything with Regalado.

Page 82

1 Q. And do you recall ever talking with --
2 A. But if I had talked to -- I have a
3 message that's in my note of 12-3-04. I called
4 Kurt then for the status of the lawsuit. So 12-3,
5 I must have talked to Kurt. He responded five days
6 later with a note.
7 Q. Okay. Is it likely that December 3rd
8 was the date on which Mr. Beranek was assigned?
9 A. Well, I asked him for a status. I'm
10 speculating. I can't say. I can't speculate. And
11 then again I called him on 12-8, and that's when I
12 get a letter.
13 Q. Returning to the Regalado case and
14 Mr. Beranek's reference to Regalado in his
15 December 8, 2004, letter, you don't recall any
16 contact with that claim file or the adjuster
17 handling it?
18 A. I'm trying to -- I'm not sure.
19 Q. Were you aware that the Regalado claim
20 was being treated as both a CGL claim and a
21 professional liability claim; that is, that two
22 insurance companies were involved? Were you ever
23 aware of that?
24 A. I don't recall now, but looking at the

Page 83

1 letter -- looking at the letter it would be common
2 sense.
3 Q. Returning to the electronic notes, you
4 have a note dated December 9, 2004, at 17:57:44, "I
5 will request CAR from him." Do you see that?
6 A. Yes, I do.
7 Q. What is a CAR?
8 A. It's a report that the attorney sends
9 us.
10 Q. And what does CAR stand for?
11 A. I don't recall the initials, what it
12 means.
13 MR. DUNNE: Case Assessment Report.
14 THE WITNESS: Thank you.
15 BY MR. NYESTE:
16 Q. The next entry, December 11, 2004, was
17 that -- that's by you, correct?
18 A. Correct.
19 Q. And that is -- relates to the
20 preparation of some letter. True?
21 A. Correct.
22 Q. Do you know what letter that was?
23 A. Not from this entry I do not.
24 Q. Was it the start of a reservation of

Page 84

1 rights letter?
2 A. I have it here, requesting a policy. I
3 was sending a letter to Adam Lutz -- well, and
4 sending him the policy.
5 Q. And that relates to your electronic note
6 of the same day?
7 A. Correct, December 11th, and the same
8 37155 is underneath.
9 Q. Yes, indeed.
10 Where did you get the policy?
11 A. I don't recall where.
12 Q. And do you recall whether the policy in
13 its liability part was the same as Exhibit 10?
14 A. No, I don't recall that.
15 MR. DUNNE: You need a break?
16 THE WITNESS: I'm okay.
17 BY MR. NYESTE:
18 Q. On January 4, 2005, Mr. Heckman has an
19 electronic note, "Where is CAR, contracts, and
20 ROR," reservation of rights letter, "that was
21 supposed to be sent for review?"
22 Do you see that?
23 A. Yes, I do.
24 Q. And is he referring -- was it your

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 85

1   understanding that he was asking you to send to him
2   a draft reservation of rights letter for his
3   review?
4       A.   That would be my understanding.
5       Q.   Okay.  The next note above that is from
6   yourself, "Letter in file.  The policy was sent to
7   Adam."
8          What does "letter in file" mean?
9       A.   Assuming, because the one below that, it
10  should have been the ROR letter.
11      MS. SKAGGS:  Could you point me to what you're
12  asking her about.
13      MR. DUNNE:  January 19th note.
14      MS. SKAGGS:  Okay.
15  BY MR. NYESTE:
16      Q.   Was that a paper letter in the paper
17  file?
18      A.   The reservation of rights letter should
19  have been a letter for them to review that I should
20  have cut and pasted.
21      Q.   And when you say, "Letter in file,"
22  you're referring to a draft reservation of rights
23  letter, right?
24      A.   That's --

Page 86

1       Q.   Yes?
2       A.   Yes, it should have been.
3       Q.   And are you referring to a paper copy, a
4   paper version of that letter?
5       A.   Yes.  From these notes, it should have
6   been a paper copy.  And he says no.
7       Q.   All right.  The next note above that is
8   from Mr. Heckman, "File is here in Dixon.  No ROR
9   letter to insured is in the file.  Did you keep a
10  copy?  Secure CAR from DC."
11          Does that mean defense counsel?
12      A.   Right.
13      Q.   "Does DC have contracts insured had for
14  this job?  Possible tender to anyone?  Secure
15  copies of the contracts.  What are injuries here if
16  we don't get out on motion for summary judgment?"
17          What did you do in response to
18  Mr. Heckman's message?
19      A.   On 1-26, I just have that note in here.
20  "The file will be back soon.  I will get the ROR
21  letter out."
22      Q.   From your note, is it your recollection
23  that the ROR letter had not yet been reviewed by
24  Mr. Heckman?  You were going to get it out to him

Page 87

1   for his review, correct?
2       A.   Correct.
3       Q.   Now, explain to me about the file being
4   here in Dixon.  The paper file was moving around;
5   is that right?
6       A.   Yes.  Yes, it was.
7       Q.   Where was it going from?
8       A.   From Chicago to Dixon and any other
9   parts to Adam.
10      Q.   When did it go to Dixon?
11      A.   Between December and January.
12      Q.   Okay.  And did the paper file return to
13  Chicago?
14      A.   The next note above it says, "The file
15  will be back soon.  I will get ROR letter out."
16  That would be my note.
17      Q.   So you were anticipating the paper file
18  coming back from Mr. Heckman in Dixon back to your
19  office in Chicago, right?
20      A.   Yes.
21      Q.   And then you were going to cut and paste
22  together a draft reservation of rights letter for
23  his review?
24      A.   If I had everything that he asked me

Page 88

1   for, the contracts and --
2       Q.   Now, the next electronic note above that
3   is by you, right, "ROR will go out"?
4       A.   Correct.
5       Q.   And the meaning of that is that the ROR
6   will go out to Mr. Heckman for his review?
7       A.   I'm not certain.  I can't say.  I don't
8   recall.
9       Q.   Well, as of a few entries before that,
10  January 4th, Mr. Heckman was still looking for an
11  ROR letter that was supposed to be sent for review,
12  correct?
13      A.   Correct.
14      Q.   Between that date, January 4th, and the
15  date of this most recent entry, February 24, 2005,
16  is there any indication that he had reviewed a
17  draft reservation of rights letter and that --
18  well, let me stop there.
19      A.   I don't recall if we had it.  We hadn't
20  received a CAR either, Case Assessment Report.
21      Q.   Would it then be fair to say that as of
22  February 24, 2004, no reservation of rights letter
23  had been sent to the insured?
24      A.   As of February 2005, no letter to the

22 (Pages 85 to 88)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 89

1  insured, that would seem correct, yeah, from this.
2      Q.   That would be correct, yes?
3      A.   I'm assuming that, so I'm going to have
4  to say I don't recall. We were waiting on the CAR
5  and the contracts.
6      Q.   Mr. Heckman was also asking you about
7  possible tenders to anyone. Do you see that on
8  January 24th?
9      A.   Yes.
10     Q.   And do you understand that to mean a
11  tender to VOA's professional liability carrier?
12     A.   I understand a little bit of that term,
13  yes.
14     Q.   Did you explain to Mr. Heckman that
15  Mr. Schnell had told you that he expected the case
16  to be dismissed and that there wouldn't be any need
17  for any tender?
18     MS. SKAGGS: I'm sorry. Could you read that
19  question back.
20         (WHEREUPON, the record was read
21          by the reporter as requested.)
22     MR. DUNNE: Objection to form, asked and
23  answered.
24

Page 90

1  BY THE WITNESS:
2      A.   You could see in the notes what I've
3  written in the notes.
4  BY MR. NYESTE:
5      Q.   Did you take any steps towards making a
6  tender to the professional liability carrier?
7      A.   I don't recall.
8      Q.   Again, in the electronic notes, now on
9  March 3, 2005, there's an entry by Mr. Heckman,
10  which includes, "Where is CAR from DC," or defense
11  counsel. "Contracts received? Any possible
12  tenders?"
13         Is it fair to say that Mr. Heckman was
14  pretty hot about tendering this to the professional
15  liability carrier?
16     MR. DUNNE: Objection to the form of the
17  question.
18  BY THE WITNESS:
19     A.   I know he wanted us to get the contracts
20  for sure, contracts and the CAR.
21  BY MR. NYESTE:
22     Q.   But you understood the "possible tender"
23  note to mean a tender to the professional liability
24  carrier, right?

Page 91

1      A.   Right. Well, I know when I told
2  Jennifer about that and what she had told me.
3      Q.   Do you recall when you received the
4  contracts from either the insured or the Beranek
5  firm?
6      A.   I don't remember the exact timing of the
7  contract, but it came in late.
8      Q.   If you'll turn to Page 1606 of
9  Exhibit 5, do you recall getting this letter from
10  Naderh Elrabadi?
11     A.   Yes. So the contracts came in in April
12  into the Naperville office.
13     Q.   Okay. And I think, as we've discussed,
14  the reservation of rights letter was not going to
15  go out until those contracts had been received; is
16  that fair?
17     A.   That's correct.
18     Q.   Okay. Other than looking at Exhibit 9,
19  which is a copy of a fax to Mr. Beranek's office of
20  a reservation of rights letter dated May 4, 2005,
21  is there anything else either in the electronic
22  notes or within Exhibit 5 that will tell me when a
23  reservation of rights letter went out to the
24  insured?

Page 92

1      MR. DUNNE: Can you read that question back.
2         (WHEREUPON, the record was read
3          by the reporter as requested.)
4      MR. DUNNE: Exhibit 5, referring to all of
5  these documents?
6      MR. NYESTE: Right.
7      MR. DUNNE: Object to the form of the
8  question.
9      MR. NYESTE: Okay.
10     MR. DUNNE: Go ahead and look through the
11  documents.
12         I'll also object because I think it was
13  just asked and answered, misstates her testimony.
14  BY THE WITNESS:
15     A.   Just that I know that I mailed this
16  letter out because of Steve Heckman's comments. I
17  believe the letter went out.
18  BY MR. NYESTE:
19     Q.   In the electronic notes there's no
20  mention on May 4th of the reservation of rights
21  having been sent, right?
22     A.   You said there's a gap.
23     Q.   Yes.
24     MR. NYESTE: I'm running out of steam, Amy. I

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 93

1  need to collect my thoughts.  Do you have any
2  questions you want to ask?
3     MS. SKAGGS:  Well, let's take a quick break.
4     THE WITNESS:  That sounds good this time.
5     (WHEREUPON, a recess was had.)
6     MR. NYESTE:  I think I have just a couple.
7  BY MR. NYESTE:
8     Q.   Within Exhibit 5, on Page 1582 there is
9  an e-mail at the bottom from yourself to Adam Lutz;
10  is that correct?
11     A.   Correct.
12     Q.   And it says, "No, I did not send the
13  letter you sent on September 16, 2004, since
14  Mr. Schnell said his attorney was going to appear
15  and should be dismissed."
16        Now, what I want to get at is:  What
17  letter of September 16, 2004, are you talking
18  about?  And for that I want you to take a look at
19  the electronic notes.
20     MR. DUNNE:  Which number?
21     MR. NYESTE:  The electronic notes are No. 3,
22  and it's the third page from the end.
23     THE WITNESS:  Page 37?
24     MR. NYESTE:  36.

Page 94

1  BY MR. NYESTE:
2     Q.   It says, "A note from Adam on 9-16,
3  2004."  Do you see that?
4     A.   Uh-hmm.
5     Q.   So in your e-mail of November 9, 2004,
6  were you referring back to the note from Mr. Lutz
7  on 9-16, 2004, in the electronic notes?
8     A.   Uh-hmm.
9     Q.   And within his note he is making a
10  recommendation about a letter that might be sent to
11  VOA.  Do you see that?
12     A.   Uh-hmm.
13     Q.   And that's the letter that you're
14  referring to in your e-mail of November 9, 2004; is
15  that right?
16     A.   Correct.
17     Q.   And within Exhibit 5, on Pages 1599 to
18  1600, is that an e-mail from you to Mr. Beranek?
19     A.   Correct.
20     Q.   Which reads, "Hello, Kurt.  I need a
21  copy of all contracts and additional insured
22  certificates for my file.  I can pick it up at your
23  office.  Tell me when and I will be there.  I need
24  to do an ROR letter."

Page 95

1     A.   What was that date again?
2     Q.   March 30, 2005, correct?
3     A.   Okay.  Yes.
4     Q.   As of that date, you had not prepared a
5  reservation of rights letter?
6     A.   We were waiting on the contracts, that's
7  right.
8     Q.   Had an ROR letter been prepared by that
9  point?
10     A.   Well, because Adam sent me something
11  9-16, he must have sent something that I was
12  cutting and pasting.
13     Q.   Well, I think the 9-16 note from Adam
14  was with respect to a letter that would read, "You
15  can tell them that we are evaluating coverage, and
16  if we decide to defend we will reimburse them for
17  any incurred costs."  That's what his note of
18  September 16, 2004, had read.
19        You don't mean to imply that he had sent
20  you a draft ROR as of that date, do you?
21     MR. DUNNE:  "That date" being the 16th?
22     MR. NYESTE:  September 16th.
23  BY THE WITNESS:
24     A.   I'm not certain what 9-16 was.

Page 96

1  BY MR. NYESTE:
2     Q.   All right.  Well, let's just return to
3  your e-mail of March 30, 2005, on Pages 1599 to
4  1600.  The last line of that, "I need to do an ROR
5  letter," would that indicate to you that as of
6  March 30th you had not yet done the cut and pasting
7  for an ROR letter?
8     A.   It would indicate I couldn't do an ROR
9  letter without the contracts.
10     Q.   If you would turn to Page 1617 in
11  Exhibit 5, this is a page of handwriting.  Do you
12  know whose handwriting it is?
13     A.   I'm not sure.
14     Q.   Can you say that it is not yours?
15     A.   That, I can say.
16     MR. NYESTE:  I don't think I have anything
17  more, Ms. Robinson.  I want to thank you.
18  Ms. Skaggs may have some questions, though.
19        EXAMINATION
20  BY MS. SKAGGS:
21     Q.   Ms. Robinson, I'm Amy Skaggs.  I
22  represent VOA Associates.  Some of this may sound
23  like I'm covering old ground, but I just want to
24  make sure I understand your testimony.

24 (Pages 93 to 96)

Page 97

1    There appears to be two ROR letters, one
2  dated February 24, 2005, and one dated May 4, 2005,
3  and those have been marked as exhibits, Iris
4  Robinson Deposition Exhibits 8 and 9.
5    A.   Correct.
6    Q.   Now, it's your testimony that you
7  drafted both of these letters, Deposition Exhibit 8
8  and Deposition Exhibit 9?
9    A.   With the assistance of Adam Lutz.
10    Q.   Was the first one, Deposition Exhibit 8,
11  drafted around February 24, 2005?
12    A.   That's what the date has, yes.
13    Q.   Do you have any specific recollection of
14  drafting that letter, Deposition Exhibit 8?
15    A.   Yes.
16    Q.   Okay.  And what do you recall about
17  drafting that letter?
18    A.   Cutting and pasting.
19    Q.   Okay.  Now, you were cutting and pasting
20  based on an e-mail you received from Adam Lutz,
21  correct?
22    A.   Yes.
23    Q.   And was this a form that he sent you or
24  was it your standard e-mail where he wrote, "Iris,

Page 98

1  say this in the letter"?  Do you recall?
2    A.   I don't recall.
3    Q.   Were there forms that were downloaded
4  that just had blanks to fill in?  When you refer to
5  "forms," is that what you're referring to?
6    A.   There were some blanks, I remember,
7  because we had to put in whatever insurance,
8  St. Paul here.  I remember that portion.  And you
9  had to put in the policy information.
10    Q.   Okay.  So you recall receiving a form
11  around February 2005 from Mr. Lutz with blanks that
12  you were to fill in, correct?
13    A.   Some were blanks, yes.
14    Q.   But sometime before February 24, 2005,
15  you filled in those blanks and crafted this letter,
16  I guess, that's reflected in Deposition Exhibit 8,
17  correct?
18    A.   Correct, with Adam Lutz's material.
19    Q.   Okay.  Now, after crafting the letter
20  that's reflected in Deposition Exhibit No. 8, did
21  you send that to Mr. Lutz or Mr. Heckman for their
22  review?
23    A.   I don't want to speculate.  I would have
24  sent it to Mr. Lutz.

Page 99

1    Q.   Okay.  But you don't have a specific
2  recollection of sending it to Mr. Lutz for his
3  review?
4    A.   Correct.
5    Q.   Do you have any specific recollection of
6  faxing or e-mailing this letter that's reflected in
7  Deposition Exhibit No. 8 to anyone?
8    A.   It would have been Mr. Lutz.
9    Q.   Okay.  To anyone from VOA?
10    A.   I don't recall.
11    Q.   You don't recall sending it to Mr. Kurt
12  Beranek?
13    A.   February '05?
14    Q.   Yeah.  I'm just focusing on that letter.
15    A.   I don't recall specifics.
16    Q.   Okay.  Do you know why this particular
17  letter dated February 24, 2005, was not sent to
18  anyone outside of St. Paul Travelers or USF&G?
19    MR. DUNNE:   I'll object that that has been
20  asked and answered, but go ahead.
21  BY THE WITNESS:
22    A.   That it was sent to Adam Lutz and it
23  was -- well, I see this one was faxed to our
24  attorney.

Page 100

1  BY MS. SKAGGS:
2    Q.   "This one," you're pointing to --
3    A.   To Kurt.
4    Q.   And you are indicating Deposition
5  Exhibit 9 was sent to Kurt?
6    A.   Correct.
7    Q.   Okay.  But my question is:  Why is it
8  that this February 24, 2005, letter was not sent to
9  anyone outside of your company, meaning VOA or
10  VOA's assigned defense counsel, Kurt Beranek?
11    A.   We were waiting for contracts.
12    Q.   Okay.  And it appears that you got
13  contracts from VOA's assigned defense counsel in
14  April 2005; is that correct?
15    A.   That's correct.  He showed the e-mail.
16    Q.   So it's your testimony that --
17    A.   It was a letter, right.
18    Q.   So it's your testimony that USF&G could
19  not send a reservation of rights letter to VOA
20  until you received those contracts that you
21  received in April 2005, correct?
22    A.   Correct.
23    Q.   Do you recall actually receiving the
24  contracts in April 2005?

25 (Pages 97 to 100)

MS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 101

1    A.   By the letter, I must have received the
2   contracts.
3    Q.   Do you have a specific recollection of
4   having received the contracts?
5    A.   By the letter, I received it.  And in
6   some letter I wrote to Adam -- I don't remember
7   that date -- that was the policy.  No, that was
8   just the policy.  So the contract -- by the letter,
9   she sent the contracts.
10    Q.   Do you have a specific recollection of
11   reviewing those contracts when you received them in
12   April 2005?
13    A.   No, I don't recall.
14    Q.   Do you recall reviewing the contracts
15   and then using them to craft a second reservation
16   of rights letter?
17    A.   I don't recall.
18    Q.   Did you send the contracts to Adam Lutz
19   or Steve Heckman or anyone else for their review?
20    A.   I don't recall specifics.
21    Q.   So your answer is you don't recall?
22    A.   I would have sent them to Adam.
23    Q.   So your standard policy and practice
24   would have been, upon receiving the contracts from

Page 102

1   the insured, to send them to Steve Heckman or Adam?
2    A.   To Adam.
3    Q.   And in order for him to complete his
4   coverage analysis?
5    A.   Yes.
6    Q.   But you don't have a specific
7   recollection of having done that?
8    A.   No, I don't recall.
9    Q.   Now, is it your testimony that upon
10   receiving the contracts in April 2005, you were
11   then able to craft the letter that is reflected in
12   Deposition Exhibit No. 9?  That's the May 4, 2005,
13   letter.
14    A.   Once the contracts were received, a
15   reservation of rights letter would have went out.
16    Q.   But as you testified previously, there's
17   nothing changed in the May 4, 2005, letter versus
18   the February 24, 2005, letter, correct?
19    A.   When we reviewed it here, I don't see
20   any changes.
21    Q.   Do you see in Exhibit No. 9 any
22   reference to -- specific reference to the contracts
23   that you had been waiting for?
24    A.   I couldn't answer that if I don't know

Page 103

1   if I recall reviewing the contracts.
2    Q.   I'm just asking you to look at the
3   letter and asking whether or not there's any
4   reference to contracts in that letter.
5    A.   I'm not the coverage analysis person for
6   this.  I don't see anything -- I don't see any
7   reference to contracts.
8    Q.   What was your understanding of why you
9   needed to wait for the contracts in order to craft
10   a reservation of rights letter or this reservation
11   of rights letter?
12    MR. DUNNE:  Objection, asked and answered.
13   BY THE WITNESS:
14    A.   VOA's role in the project.
15   BY MS. SKAGGS:
16    Q.   So your understanding is that you needed
17   to find out what they were hired to do for the
18   project in order to craft a reservation of rights
19   letter?
20    MR. DUNNE:  Objection as to form of the
21   question.
22   BY THE WITNESS:
23    A.   To send this to Adam Lutz and to have
24   him review it.

Page 104

1   BY MS. SKAGGS:
2    Q.   Okay.  So your understanding was that
3   you could not send out a letter under your
4   signature until Adam had completed his review of
5   VOA's contracts; is that your testimony?
6    A.   That was it, yes.
7    Q.   Okay.  So you were holding a draft of a
8   reservation of rights letter waiting for contracts
9   so that they could be sent to Adam or Steve, your
10   supervisors, and they would give you the okay to
11   send out the reservation of rights letter; is that
12   your testimony?
13    MR. DUNNE:  Objection to the form of the
14   question.
15   BY THE WITNESS:
16    A.   That was my understanding.
17   BY MS. SKAGGS:
18    Q.   Okay.  So your understanding of St. Paul
19   Travelers' policy was that no reservation of rights
20   letter could be sent out until someone reviewed the
21   insured's contract for the project?
22    MR. DUNNE:  Can you read that question back.
23    (WHEREUPON, the record was read
24    by the reporter as requested.)

26 (Pages 101 to 104)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 105

1    MR. DUNNE: Object to the form of the
2  question, lacks foundation, assumes facts not in
3  evidence.
4    Go ahead.
5  BY THE WITNESS:
6    A.  It was under my understanding, yes, Adam
7  would have reviewed it.
8  BY MS. SKAGGS:
9    Q.  Adam would need to review the contract?
10    A.  Would need to review the contracts.
11    Q.  Okay.  Now, at some point between April
12  2005 and before, I guess, May 4, 2005, your
13  testimony is that you sent a draft of the letter
14  that is Deposition Exhibit No. 9 to Steve or Adam
15  for their review, correct?
16    MR. DUNNE: Can you read that question back.
17  That was a long one.
18    (WHEREUPON, the record was read
19    by the reporter as requested.)
20  BY THE WITNESS:
21    A.  Correct.
22  BY MS. SKAGGS:
23    Q.  Okay.  Do you have any specific
24  recollection of sending Deposition Exhibit No. 9 to

Page 106

1  Steve or Adam or anyone else for their review?
2    MR. DUNNE: Objection, asked and answered.
3    Go ahead.
4  BY THE WITNESS:
5    A.  I don't recall specifics.
6  BY MS. SKAGGS:
7    Q.  Do you recall having any conversation
8  with them about the letter that's reflected in
9  Deposition Exhibit No. 9?
10    A.  I just remember recalling an e-mail,
11  cutting and pasting, and I had phone conversations,
12  but not specifics.
13    Q.  Okay.  So you recall that between April
14  and before May 4, 2005, you had a phone
15  conversation or received e-mails from Adam or Steve
16  related to the letter that's Deposition Exhibit
17  No. 9?
18    MR. DUNNE: Objection, misstates her
19  testimony.
20    Go ahead.
21  BY THE WITNESS:
22    A.  It could have been both letters, 8 or 9,
23  but we've had conversations regarding the letters
24  and the reservation of rights.

Page 107

1  BY MS. SKAGGS:
2    Q.  Okay.  Can you recall anything
3  specifically about those conversations?
4    A.  And with the default coming in from
5  Jennifer, when we noticed -- because at first I was
6  telling Steve, again, in notes that we were going
7  to get dismissed.  That was my understanding.  We
8  were going to get dismissed and nothing had to be
9  done.
10    Q.  Okay.  But my question is very specific.
11  Can you recall any specific conversations you had
12  about the reservation of rights letter that you
13  drafted, either one, February or May 2005?
14    A.  I don't recall any specifics about the
15  letters.
16    Q.  Okay.  Did you draft any portion of
17  either one of these letters?
18    A.  Cutting and pasting I would be charged
19  with, yes, cutting and pasting.
20    Q.  But did you actually type any of the
21  sentences that are contained in either one of these
22  letters?
23    A.  This is all cut and paste.
24    Q.  Exhibit No. 5 at USF&G 01582, at the

Page 108

1  top, the December 21, 2004, letter -- or I'm
2  sorry -- e-mail from Adam Lutz to you, apparently.
3  It says, "I see that you have Peppers counsel
4  assigned to this matter.  I never saw the ROR
5  letter for this matter, so I'm presuming you sent
6  it already.  Let me know if this is not the case,
7  Adam."
8    Do you recall receiving this e-mail from
9  Adam?
10    A.  Just now looking at it.
11    Q.  Do you understand what he meant when he
12  said, "I see that you have Peppers counsel assigned
13  to this matter"?
14    A.  That's probably sending the file to
15  Kurt's office.
16    Q.  Do you have any understanding of what
17  Peppers counsel is?
18    A.  We were giving them the choice of their
19  own counsel.  They didn't have to choose Kurt's
20  firm.  They could choose their own firm.
21    Q.  Okay.  Kurt Beranek is -- was the
22  attorney that USF&G assigned to defend VOA in this
23  matter, correct?
24    A.  They were supposed to defend our

27 (Pages 105 to 108)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 109

1   insured, VOA Associates.
2       Q.   And Kurt Beranek's firm was from this
3   panel of attorneys that you referred to earlier in
4   your testimony; is that correct?
5       A.   They would have been one of them.
6       Q.   Along with Cassiday?
7       A.   Correct.
8       Q.   Okay.  And Kurt Beranek or Beranek's
9   firm had done other work for USF&G in the past?
10      A.   I'm sure, yes.
11      MR. DUNNE:  Don't speculate.  Only if you
12  know.
13  BY THE WITNESS:
14      A.   I'm speculating here.
15  BY MS. SKAGGS:
16      Q.   But that's why they're on this panel of
17  attorneys that USF&G would use --
18      MR. DUNNE:  Objection to the form of the
19  question, lacks foundation.
20      MS. SKAGGS:  I haven't finished the question.
21  BY MS. SKAGGS:
22      Q.   Kurt Beranek was listed on the panel of
23  attorneys that USF&G would use because they had an
24  ongoing business relationship with him and his

Page 110

1   firm, correct?
2       MR. DUNNE:  Objection to the form of the
3   question.
4   BY THE WITNESS:
5       A.   I don't have knowledge of that.
6   BY MS. SKAGGS:
7       Q.   Is that your understanding of how these
8   panels of attorneys worked?
9       MR. DUNNE:  Objection, lacks foundation, form
10  of the question.
11  BY MS. SKAGGS:
12      Q.   I'm just asking for your understanding.
13      A.   We're given a list of panels to choose,
14  and sometimes Adam also would choose a panel.
15      Q.   Do you have a recollection of how Kurt
16  Beranek was chosen to represent VOA in this matter?
17      A.   No, I do not know how they were chosen.
18      Q.   Do you know why Adam would have referred
19  to Peppers counsel?  Do you have any understanding
20  of what he was -- what he meant by that?
21      A.   I'm not sure of all the liability terms
22  now.
23      Q.   "I never saw the ROR letter for this
24  matter, so I'm presuming you sent it already.  Let

Page 111

1   me know if this is not the case."
2       Did you let him know upon receiving this
3   e-mail that the ROR had not been sent to VOA?
4       A.   I don't know.  Is there another e-mail
5   after 12-21?
6       Q.   Well, do you have any recollection of
7   letting him know after receiving this e-mail that
8   VOA -- excuse me -- that the ROR had not been sent?
9       A.   I don't know.  Can I also go back to the
10  notes, the electronic notes.
11      MR. DUNNE:  She's asking for your independent
12  recollection.
13  BY THE WITNESS:
14      A.   No, I don't have any recall.
15  BY MS. SKAGGS:
16      Q.   Why is it that he would say, "I presume
17  it's been sent already," if it was the policy that
18  he had to review all RORs before they went out?
19      MR. DUNNE:  Objection, form of the question,
20  calls for speculation.
21      If you know.
22  BY THE WITNESS:
23      A.   If he sent me the information on 9-16-04
24  for cutting and pasting.

Page 112

1   BY MS. SKAGGS:
2       Q.   No.  My question is:  If the policy was
3   that he had to review all letters before they went
4   out, why would he just presume in this e-mail that
5   you sent it out without his knowledge?
6       MR. DUNNE:  Objection, form of the question.
7   BY THE WITNESS:
8       A.   I'm not clear.
9   BY MS. SKAGGS:
10      Q.   Okay.  And you don't recall letting him
11  know as of at least around the time of
12  December 21, 2004, that the ROR had not been sent
13  out, correct?
14      A.   I don't recall.
15      Q.   The May 4, 2005, letter, Deposition
16  Exhibit No. 9, do you have a specific recollection
17  of mailing that letter to anyone at VOA Associates?
18      A.   Just that I see Mr. Schnell's name down
19  here.
20      Q.   I'm asking for a specific recollection.
21  Do you remember sending this letter?
22      A.   I remember sending the letter out
23  because of Steve Heckman.
24      Q.   Okay.  So what is it about Steve Heckman

28 (Pages 109 to 112)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 113

1    that makes you think you sent this letter out?
2        A.   The notes, the calls.
3        Q.   Okay.  But at least based on the call
4    log, the notes and calls had been months and months
5    prior to this letter.  So what is it about Steve
6    Heckman that makes you remember sending out this
7    letter on May 4, 2005?
8        MR. DUNNE:  Objection to form of the question.
9        You can answer.
10   BY THE WITNESS:
11       A.   The importance of getting this
12   reservation of rights letter out.
13   BY MS. SKAGGS:
14       Q.   But I guess I'm asking you very
15   specifically.  Do you remember actually composing
16   the letter, the May 4, 2005, letter?  Do you
17   remember composing that letter?
18       MR. DUNNE:  Objection, asked and answered.
19       Go ahead.
20   BY THE WITNESS:
21       A.   Vaguely.
22   BY MS. SKAGGS:
23       Q.   Do you remember signing the letter?
24       A.   Yes.

Page 114

1        Q.   You have a specific recollection of --
2        A.   That was my signature, yes.
3        Q.   Did you have an assistant or secretary?
4        A.   We did in Naperville.
5        Q.   Did you give it to someone else to mail
6    out?
7        A.   No.  I would have.
8        Q.   So you remember typing the envelope?
9    You have a specific recollection of doing that?
10       A.   It would have been a window envelope.
11       Q.   Okay.  A window envelope?
12       A.   Correct.
13       Q.   Why would it have been a window
14   envelope?
15       A.   Because it was the address printed right
16   here.
17       Q.   And you remember putting the stamp on
18   it?
19       A.   I don't have to do that.  Just put it in
20   a bin.
21       Q.   Put it in a bin.  Okay.
22       Why did you fax this letter to Kurt
23   Beranek on May 6, 2005?
24       MR. DUNNE:  Objection.  I think it's been

Page 115

1    asked and answered.
2        Go ahead.
3    BY THE WITNESS:
4        A.   Because VOA surprising -- that they said
5    they were going to be dismissed and not taking a
6    chance on VOA.
7    BY MS. SKAGGS:
8        Q.   I don't understand how that's responsive
9    to my question.
10       A.   To make sure that --
11       MR. DUNNE:  Is there a question pending?
12   BY MS. SKAGGS:
13       Q.   Can you explain your answer.
14       A.   It was to make sure VOA would have a
15   copy of the letter.
16       Q.   Okay.  So in order to make sure that VOA
17   got a copy of the letter, you faxed it to Kurt
18   Beranek, your assigned defense counsel in this
19   matter?
20       A.   Kurt was defending VOA, so he received a
21   fax of the letter, too.
22       Q.   So you were faxing it to Kurt Beranek to
23   make sure that VOA got a copy of the letter; is
24   that your testimony?

Page 116

1        A.   Yes, that's what's here.
2        Q.   Okay.  So rather than send it certified
3    mail or fax it to VOA, you decided to send it to
4    VOA's assigned defense counsel, Kurt Beranek,
5    correct?
6        A.   We faxed it to Kurt, correct.  Faxed it
7    and mailed it directly to VOA, the address.
8        Q.   Is it typically your practice to send
9    ROR letters just in the mail?
10       MR. DUNNE:  Objection to the form of the
11   question.
12   BY THE WITNESS:
13       A.   I didn't do too many RORs.
14   BY MS. SKAGGS:
15       Q.   The ones that you did, did you always
16   just mail them?
17       A.   I couldn't recall all of them.  I
18   couldn't recall.  There weren't that many that I
19   can recall.
20       Q.   Do you recall ever sending one via
21   certified mail?
22       A.   No, I can't recall that either.
23       Q.   Do you recall ever sending one via DHL?
24       A.   No, I can't recall.

29 (Pages 113 to 116)

Page 117

1    Q.   I don't know that we need to mark this,
2  but I'm going to show you -- maybe we'll mark it.
3  I don't know.
4        This is USF&G 01556.  This came out of
5  USF&G's file and is apparently a confirmation of
6  receipt of a letter sent by Mr. Ken Hagedorn to VOA
7  on June 6, 2007.  This apparently was tracking a
8  letter that Mr. Hagedorn sent at that time.
9        Had you ever done anything like this
10  when you were sending reservation of rights
11  letters?
12    A.   I don't recall sending anything like
13  that.
14    Q.   Were you ever instructed to do that?
15    A.   I don't recall.
16    Q.   The way that you were insuring that VOA
17  got a copy of the letter was to fax it to Mr. Kurt
18  Beranek, correct?
19    MR. DUNNE:  Objection, asked and answered.
20  BY THE WITNESS:
21    A.   That was part of my thinking of that,
22  yes.
23  BY MS. SKAGGS:
24    Q.   Did you ever have a discussion of this

Page 118

1  letter with Mr. Beranek?
2    A.   I don't think I had the file after this.
3    Q.   You didn't have the file on May 4, 2005?
4    A.   I don't remember anything after this
5  letter in dealing with this file, because they were
6  reassigning files constantly.
7    Q.   So the answer as to whether or not you
8  ever had a conversation with Mr. Beranek about this
9  letter is "no"?
10    A.   I don't recall any conversations with
11  him on this letter.
12    Q.   Did Mr. Beranek ever call you and say,
13  "Hey, why are you sending me this letter?"
14    A.   I don't recall.
15    Q.   Do you typically send reservation of
16  rights letters to assigned defense counsel?
17    MR. DUNNE:  Objection, form of the question.
18  BY THE WITNESS:
19    A.   I don't recall.
20  BY MS. SKAGGS:
21    Q.   I think we talked about this, but you
22  don't have any explanation for why it is that there
23  was no notation made in the file around May 4th
24  about sending out this reservation of rights

Page 119

1  letter, correct?  Do you have any explanation for
2  that?
3    A.   I have no explanation why.
4    Q.   Do you have any explanation for why
5  there was no notation about sending the contracts
6  and/or the letter to Adam Lutz or Steve Heckman for
7  their review?
8    MR. DUNNE:  Can you read that one back.
9        (WHEREUPON, the record was read
10         by the reporter as requested.)
11  BY THE WITNESS:
12    A.   I don't recall why.
13  BY MS. SKAGGS:
14    Q.   Okay.  Would it be standard to send out
15  a letter without making a note in the claims log?
16    MR. DUNNE:  Objection, asked and answered.
17  Object to the form of the question.
18  BY THE WITNESS:
19    A.   I don't recall why it wasn't done.
20  BY MS. SKAGGS:
21    Q.   Would that be standard procedure?
22    MR. DUNNE:  Same objection.
23  BY THE WITNESS:
24    A.   We try to enter the most important

Page 120

1  things.
2  BY MS. SKAGGS:
3    Q.   A reservation of rights letter was
4  pretty important, though, right?
5    A.   Correct.
6    Q.   You may have answered this.  Do you
7  remember physically walking the file over to the
8  Cassiday firm in November of 2004?
9    A.   I don't recall.  My notes had it in
10  there.
11    Q.   Do you recall why Cassiday did not
12  defend VOA in this matter?
13    A.   I don't recall why.
14    Q.   Do you recall that they were counsel for
15  another party in the matter?
16    A.   No, I don't recall.
17    Q.   Did you ever have any conversations with
18  Kurt Beranek about claims for contribution against
19  some of the other parties in the action?
20    A.   I don't recall that.
21    Q.   Did you ever have a conversation with
22  him about a claim against School District 230?
23    A.   We discussed this, the Madden case, and
24  230 is part of it.

30 (Pages 117 to 120)

Page 121

1    Q.   Right. But did you ever discuss
2  specifically Beranek's decision to make the claim
3  for contribution against some of the other parties
4  in the action, including District 230?
5    A.   I wouldn't direct his counsel.
6    Q.   So you never had any conversations with
7  him about that?
8    A.   I thought we were getting out on MSJ.
9  That was my recollection of this one.
10   Q.   Did you ever make anyone at VOA aware
11 prior to May 2005 that USF&G had an ongoing
12 business relationship with Kurt Beranek?
13   MR. DUNNE:  Objection, lacks foundation, calls
14 for speculation, form of the question.
15      Go ahead.
16 BY MS. SKAGGS:
17   Q.   I'm just asking if you ever spoke to
18 anyone at VOA about that subject.
19   A.   About Kurt's ongoing -- not that I can
20 recall.
21   Q.   Did you ever obtain a written consent
22 from VOA to -- for USF&G to assign Kurt Beranek as
23 defense counsel in light of the ongoing business
24 relationship?

Page 122

1    MR. DUNNE:  Objection, form of the question.
2  BY THE WITNESS:
3    A.   Just when the reservation of rights
4  letter went out on May the 4th, and I don't know
5  who handled the file pretty much after that.
6  BY MS. SKAGGS:
7    Q.   But you never had that conversation with
8  VOA or obtained that consent, correct?
9    A.   Written consent?  In this letter he
10 mentions 14 days that they had to choose.
11   Q.   Prior to that purported letter.
12   A.   I mentioned telling Jennifer to submit
13 this to her agent.
14   Q.   Okay.  So the answer is "no"?
15   A.   That's all I remember, what I had
16 written there.
17   Q.   Did you ever discuss this May 4, 2005,
18 Exhibit No. 9 with anyone from VOA?
19   A.   I don't recall.
20   MS. SKAGGS:  I'd like five minutes. I think I
21 might be very close. We're very close. Thank you.
22   MR. DUNNE:  Are you going to have any more,
23 Jim?
24   MR. NYESTE:  Just a couple.

Page 123

1      Amy, can I ask them now.
2    MS. SKAGGS:  Sure.
3      FURTHER EXAMINATION
4  BY MR. NYESTE:
5    Q.   Ms. Robinson, do you know a Debbie
6  Dillon at St. Paul Travelers USF&G?
7    A.   There were two Debbies.
8    Q.   A Debbie Dillon and a Deborah Murano?
9    A.   Right.
10   Q.   Did you ever discuss the Madden claim
11 with either of those?
12   A.   I don't recall.
13   Q.   Did you ever discuss it with Fred Swift?
14   A.   I remember Fred was a person with
15 oversight of some claims.
16   Q.   And did you ever discuss this Madden
17 claim with Mr. Swift?
18   A.   I don't recall.
19   Q.   And how about a man by the name of
20 Robert Walker at St. Paul Travelers USF&G?  Did you
21 ever discuss it with him?
22   A.   I don't know who that is.
23   Q.   How about with Ken Hagedorn?
24   A.   I'm not sure. I might have heard his

Page 124

1  name before.
2    Q.   Since you left the company, has anyone
3  gotten in touch with you and asked you, "Iris,
4  where is the reservation of rights letter?"
5    A.   I've only had discussions with Rory
6  Dunne when he mentioned the case on appeal.
7    MR. NYESTE:  I don't have anything else.
8    MR. DUNNE:  Are you ready, Amy? I have just
9  one thing I want to clarify.
10   MS. SKAGGS:  Okay.
11   MR. DUNNE:  Go ahead.
12   MS. SKAGGS:  Do you want to go last?
13   MR. DUNNE:  Sure.
14   MS. SKAGGS:  I'm ready, yeah.
15      FURTHER EXAMINATION
16 BY MS. SKAGGS:
17   Q.   Did you ever have any conversations with
18 anyone from Schiff Hardin regarding the Madden
19 claim?
20   A.   I don't recall anything.
21   Q.   Okay. So your recollection is you don't
22 recall any conversations with anyone from Schiff
23 Hardin.
24   MS. SKAGGS:  I think I'm done.

31 (Pages 121 to 124)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 125

1       EXAMINATION
2   BY MR. DUNNE:
3       Q.    Iris, if you could, could you look at
4   Exhibit No. 3, and specifically Page 32,
5   Mr. Heckman's note of March 3, 2005.  And you
6   recall Mr. Nyeste asked you some questions about
7   tendering to Liberty Insurance Company.  Is it
8   possible that Mr. Heckman was following up on
9   possible tenders to other defendants to see if
10  there was insurance coverage?
11      A.    That would be always with Steve, if
12  there's possibility of any other coverages or any
13  other policy out there.
14      Q.    And what's the purpose of tendering to
15  other policies or other defendants?
16      A.    If they have a portion of liability, so
17  what portion would they pay for the total claim.
18      MR. DUNNE:  I have nothing further.
19          We'll reserve signature.  Thank you.
20      FURTHER DEPONENT SAITH NOT.
21
22
23
24

Page 126

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4   UNITED STATES FIDELITY          )
5   AND GUARANTY COMPANY,           )
6          Plaintiff,       )
7   vs.                    )  No. 08 C 862
8   VOA ASSOCIATES, INC.,          )
9   LIBERTY INTERNATIONAL          )
10  UNDERWRITERS, MICHAEL J.       )
11  MADDEN and JEAN MADDEN,          )
12          Defendants.       )
13      I hereby certify that I have read the
14  foregoing transcript of my deposition given at the
15  time and place aforesaid, consisting of Pages 1 to
16  125, inclusive, and I do again subscribe and make
17  oath that the same is a true, correct and complete
18  transcript of my deposition so given as aforesaid,
19  and includes changes, if any, so made by me.
20
21          IRIS LISA ROBINSON
22  SUBSCRIBED AND SWORN TO before me
23  this   day of      , A.D. 2009.
24      Notary Public

Page 127

1   STATE OF ILLINOIS  )
2                   ) SS:
3   COUNTY OF DUPAGE  )
4       I, JEANETTE F. RUTZ, a Notary Public
5   within and for the County of DuPage, State of
6   Illinois, and a Certified Shorthand Reporter of
7   said state, do hereby certify:
8       That previous to the commencement of the
9   examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12      That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony
16  given and the proceedings had;
17      That the said deposition was taken
18  before me at the time and place specified;
19      That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24      IN WITNESS WHEREOF, I do hereunto set my

Page 128

1   hand and affix my seal of office at Chicago,
2   Illinois, this 4th day of March, 2009.
3
4
5       Notary Public,
6       DuPage County, Illinois
7       My commission expires 12/01/10.
8
9   CSR Certificate No. 84-3809.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

32 (Pages 125 to 128)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 129

```
 1              I N D E X
 2    WITNESS              EXAMINATION
 3    IRIS LISA ROBINSON
 4        By Mr. Nyeste        3, 123
 5        By Ms. Skaggs        96, 124
 6        By Mr. Dunne         125
 7
 8           E X H I B I T S
 9    NUMBER              MARKED FOR ID
10    IRIS ROBINSON DEPOSITION EXHIBIT
11        No. 1                3
12        No. 2                3
13        No. 3                3
14        No. 4                3
15        No. 5                3
16        No. 6                3
17        No. 7                3
18        No. 8                3
19        No. 9                3
20        No. 10               3
21
22
23
24
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950