# EXHIBIT 34

Page 130

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ILLINOIS
3              EASTERN DIVISION
4
5   UNITED STATES FIDELITY        )
6   AND GUARANTY COMPANY,          )
7          Plaintiff,      )
8   vs.                     ) No. 08 C 862
9   VOA ASSOCIATES, INC.,         )
10  LIBERTY INTERNATIONAL          )
11  UNDERWRITERS, MICHAEL J.      )
12  MADDEN and JEAN MADDEN,       )
13          Defendants.    )
14
15              March 17, 2009
16                5:48 p.m.
17
18        The deposition of IRIS LISA ROBINSON,
19  resumed pursuant to adjournment, taken before
20  JEANETTE F. RUTZ, a Notary Public within and for
21  the County of DuPage, State of Illinois, and a
22  Certified Shorthand Reporter of said state, on the
23  2nd Floor, 215 Shuman Boulevard, Naperville,
24  Illinois.
```

Page 131

```
1   PRESENT:
2       KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC,
3       (200 South Michigan Avenue, 20th Floor,
4       Chicago, Illinois 60604,
5       312-431-3700), by:
6       MR. RODERICK T. DUNNE,
7          appeared on behalf of the Plaintiff;
8
9       SCHIFF HARDIN, LLP,
10      (233 South Wacker Drive, Suite 6600,
11      Chicago, Illinois 60606,
12      312-258-5728), by:
13      MS. AMY R. SKAGGS,
14          appeared on behalf of Defendant
15          VOA Associates, Inc.;
16
17      MR. JAMES T. NYESTE, ESQ.,
18      (One North LaSalle Street, Suite 2100,
19      Chicago, Illinois 60602,
20      312-750-1814),
21          appeared on behalf of Defendant
22          Liberty International Underwriters.
23  REPORTED BY: JEANETTE F. RUTZ, CSR, RPR,
24          CSR CERTIFICATE NO. 84-3809.
```

Page 132

```
1           (WHEREUPON, the witness was duly
2       sworn.)
3           IRIS LISA ROBINSON,
4   called as a witness herein, having been previously
5   duly sworn and having testified, was examined and
6   testified further as follows:
7           FURTHER EXAMINATION
8   BY MR. NYESTE:
9       Q.  Would you state your name again, please.
10      A.  Iris Robinson.
11      Q.  Ms. Robinson, my name is Jim Nyeste. I
12  represent Liberty Insurance Underwriters.
13      A.  Okay.
14      Q.  And to my right is --
15      MS. SKAGGS:  Amy Skaggs, representing VOA
16  Associates.
17      THE WITNESS:  All right.
18  BY MR. NYESTE:
19      Q.  And you're represented again today by
20  Rory Dunne, right?
21      A.  Yes.
22      Q.  And this is going to be a short
23  supplemental deposition, no more than an hour, by
24  agreement among everyone here --
```

Page 133

```
1       A.  Okay.
2       Q.  -- and probably much less than that, to
3   follow up on -- well, after our initial deposition
4   session you called my office and left me a voice
5   mail, right?
6       A.  Correct.
7       Q.  And you also sent me an e-mail, I
8   believe?
9       A.  Correct.
10      Q.  Okay.  And I deduced from the voice mail
11  and the e-mail that you had some second thoughts
12  about some of the things you testified to.
13      A.  Correct.
14      MR. DUNNE:  Objection to the form of the
15  question.
16  BY MR. NYESTE:
17      Q.  And this is going to focus on the
18  reservation of rights letter.  We're not going to
19  cover all the other ground in the deposition, but
20  we're going to focus on that -- the spring of 2005.
21  There was a draft reservation of rights letter
22  dated February 24th, I believe, 2005, and then
23  there was another reservation of rights letter
24  dated May 4, 2005.  And those are, respectively,
```

1 (Pages 130 to 133)

Page 134

1 Exhibits 8 and 9 that we looked at the first time.
2       Now, you had some second thoughts about
3 whether these were sent out or the circumstances
4 surrounding their preparation; is that right?
5   MR. DUNNE: Objection to the form of the
6 question, but go ahead.
7 BY THE WITNESS:
8   A.  Yes, I had some concerns.
9 BY MR. NYESTE:
10   Q.  All right.  With respect to Exhibit 8,
11 the reservation of rights letter dated February 24,
12 2005, I believe it was your testimony in the first
13 deposition that this one was not sent out to
14 anyone?
15   A.  That, I can't recall, because I -- I
16 can't recall that.  I would have to look at the
17 deposition to remember that part.  Because I want
18 to say this one did go out, but I want to make
19 sure.
20   Q.  I knew I was taking a risk there by
21 bringing up Exhibit 8.
22       Let's fast forward a little,
23 Ms. Robinson.  I know Mr. Dunne is going to object
24 to the form of this question, but what is it you

Page 135

1 want to tell me?
2   MR. DUNNE: I'll object to the form of the
3 question just because you said I would.
4       Go ahead.
5 BY THE WITNESS:
6   A.  That May the 4th, I have definite
7 recollection that the letter was faxed.  It was
8 faxed and it was mailed out.  It did not go
9 certified.
10 BY MR. NYESTE:
11   Q.  The May 4th letter, Exhibit 9, right?
12   A.  Correct.
13   Q.  You're confident that it was faxed to
14 whom?
15   A.  It was faxed to the attorney.  Was it
16 Kurt --
17   Q.  Beranek?
18   A.  Beranek.  It was faxed to him.  And that
19 the letter -- more than likely, I did not let Steve
20 Heckman or Adam Lutz review it.  Because of the
21 pressure, I sent it out.  That's what I was saying
22 in the e-mail.
23   Q.  You sent it out without them having
24 reviewed it?

Page 136

1   A.  Yes.
2   Q.  That's one of the things you wanted to
3 clarify?
4   A.  That's what I wanted to clarify.
5   Q.  Okay.  Now, you also mentioned just a
6 minute ago that you believe that this Exhibit 9 was
7 mailed.  To whom?
8   A.  VOA would have had a copy and -- I'm
9 sure VOA would have had a copy, and I would have
10 thought my attorney should get a copy of it, too,
11 or the attorney that we had, Kurt Beranek.
12   Q.  Okay.  Well, I'll tell you that this
13 copy of Exhibit 9, or this document, Exhibit 9,
14 that has this fax header at the top that bears the
15 number 9-1-312-782-4537, that's the fax number of
16 Kurt Beranek.
17   A.  Okay.
18   Q.  So I would accept that this document,
19 Exhibit 9, was faxed to Mr. Beranek's office.  All
20 right?
21   A.  Okay.
22   Q.  Do you have any note, any certified
23 mailing receipt, any evidence of any sort that this
24 May 4, 2005, reservation of rights letter was

Page 137

1 indeed mailed to VOA?
2   MR. DUNNE: Objection, asked and answered.
3 BY THE WITNESS:
4   A.  No certified.
5 BY MR. NYESTE:
6   Q.  Any other evidence?
7   MR. DUNNE: Objection to the form of the
8 question.
9 BY THE WITNESS:
10   A.  Pardon me?
11 BY MR. NYESTE:
12   Q.  Do you have any other evidence --
13   A.  No.
14   Q.  -- that this was mailed to VOA?
15   A.  Just what you have here.
16   Q.  Do you have a specific memory of putting
17 it in -- of taking it to a post office, perhaps?
18   MR. DUNNE: Objection, asked and answered.
19 BY MR. NYESTE:
20   Q.  Your answer is --
21   A.  No.
22   Q.  Do you have a specific memory of putting
23 it in a mailbox on the street?
24   MR. DUNNE: Objection, asked and answered.

2 (Pages 134 to 137)

Page 138

1  BY THE WITNESS:
2      A.  No.
3  BY MR. NYESTE:
4      Q.  Do you have a specific memory of handing
5  it to the postman at your home?
6      A.  No.
7      Q.  Do you have a specific memory of somehow
8  putting this in the mail, one way or the other?
9      MR. DUNNE:  Objection, asked and answered.
10          Go ahead.
11  BY THE WITNESS:
12      A.  We had a bin at that time.  It was
13  located on top of a bookshelf or file cabinets
14  where we would put the mail in.
15  BY MR. NYESTE:
16      Q.  Okay.  And where was this?  In
17  Naperville?  In Chicago?  Somewhere else?
18      A.  In Chicago.
19      Q.  So you believe you mailed this letter,
20  the May 4, 2005, reservation of rights letter, from
21  the St. Paul Travelers office in Chicago?
22      A.  Yes.
23      Q.  Is there anything that would confirm
24  that for you or that would show that to me?

Page 139

1      MR. DUNNE:  Objection, form of the question.
2  BY THE WITNESS:
3      A.  No, I have nothing to show that to you.
4  BY MR. NYESTE:
5      Q.  When you testified before in your first
6  deposition session, I believe you were uncertain as
7  to where you were in May of 2005; whether in the
8  Chicago office, the Naperville office, or perhaps
9  acting as an outside adjuster or investigator.  Has
10  your memory been refreshed since our first session?
11      A.  Yes.
12      Q.  Okay.  Tell me where you were generally
13  in May of 2005; where you were working, that is.
14      A.  It would have been at the Chicago office
15  on LaSalle Street.
16      Q.  And what was it that has refreshed your
17  recollection?
18      A.  It was getting the dates straight with
19  my daughter and her marriage.
20      Q.  And the date of her marriage was when?
21      A.  It was April the 8th, '05.
22      Q.  Okay.  So just about a month before this
23  letter?
24      A.  Correct.

Page 140

1      Q.  And where were you working as of
2  April 8, 2005?
3      A.  In the Chicago branch office.
4      Q.  And a month later you are confident that
5  you were still working in the Chicago office?
6      A.  Yes.
7      Q.  When did you begin working in the
8  Naperville office?
9      A.  I didn't clarify that date yet.  I'm
10  sorry.
11      Q.  Was there a time in the spring of 2005
12  when you weren't working in either the Chicago or
13  Naperville office but instead were an outside
14  investigator?
15      A.  I was outside.  I was still considered
16  an outside adjuster May of '05 and April '05.  I
17  was still doing outside work and inside, but mostly
18  inside.
19      Q.  As of May 4, 2005, did you have a
20  regular cubicle or an office at the Chicago office
21  of St. Paul Travelers?
22      A.  Yes, I had a regular cubicle.
23      Q.  Did you have a computer?
24      A.  Yes.

Page 141

1      Q.  I believe you were thinking at one point
2  that this letter may have been on a diskette or a
3  floppy --
4      A.  Correct.
5      Q.  -- and not on a computer hard drive.
6  What is your thinking on that issue today?
7      A.  Yes.  As an outside, I kept floppies so
8  I could go back and forth with my letters.
9      Q.  Why did you need to have floppies when
10  you were still working in the office?  Why did you
11  need to take them home with you?
12      A.  I saved quite a few letters over the
13  years on a floppy.
14      Q.  Do you still have this letter on a
15  floppy disk?
16      A.  I did not find the floppy disk.
17      Q.  Now, this letter was printed from -- let
18  me back up.
19          Do you believe this letter was printed
20  from a floppy or printed from the hard drive of
21  your computer in the office?
22      MR. DUNNE:  Objection, form of the question.
23  BY THE WITNESS:
24      A.  I believe it was on a floppy.

3 (Pages 138 to 141)

Page 142

1  BY MR. NYESTE:
2      Q.  Would the hard drive of your computer in
3  the Chicago office have had a file corresponding to
4  this letter?
5      A.  It could have.  I think those computers
6  probably would be destroyed by now.
7      MR. DUNNE:  Iris, please don't speculate.
8  BY MR. NYESTE:
9      Q.  Was it your practice to keep the
10  principal file on the hard drive and only put
11  copies or certain files on the floppies?
12      MR. DUNNE:  Objection to the form of the
13  question.
14          If you understand the question, you can
15  answer it.
16  BY THE WITNESS:
17      A.  I couldn't recall.
18  BY MR. NYESTE:
19      Q.  What would determine whether the
20  letter -- a letter or other document was on the
21  floppy versus on the hard drive?
22      A.  Reservation of rights letters I would
23  try to keep and compose on the floppy.
24      Q.  So you believe you put this letter

Page 143

1  addressed to VOA in a mailing bin on top of a file
2  cabinet; is that right?
3      A.  Correct.
4      Q.  And then what was the ordinary practice
5  of what would happen to the items in that bin?
6      A.  Usually, at a certain time one of the
7  clerks or the assistants would come by and pick
8  them up and take them out to be stamped and mailed
9  out.
10      Q.  So you didn't have to do the stamping
11  and the mailing?  You would just put your outgoing
12  mail in this bin and someone else in the office
13  would take care of it?
14      A.  Correct.
15      Q.  But it would be all addressed and sealed
16  when you put it in the bin?
17      A.  They're not even sealed.  It would be
18  just in an envelope, and they seal them and send
19  them out.
20      Q.  Okay.  Were you going into the office
21  every day in May of 2005?
22      A.  Just about.
23      Q.  How about in April?
24      A.  Yes.  Even if --

Page 144

1      MR. DUNNE:  Wait for him to ask a question.
2  BY MR. NYESTE:
3      Q.  And in March?
4      A.  Yes.
5      Q.  During March, April, May of 2005, did
6  there come a point in time when you no longer had
7  access to the electronic notes system?
8      A.  Those months again?
9      Q.  March, April, and May of 2005.
10      A.  I would have had access to the
11  electronic notes.
12      Q.  Do you have any explanation as to why
13  there is no entry in the electronic notes that this
14  May 4, 2005, reservation of rights letter was sent
15  out?
16      MR. DUNNE:  Objection, asked and answered.
17          Go ahead.
18  BY THE WITNESS:
19      A.  It should have been an entry.
20  BY MR. NYESTE:
21      Q.  And if there is no entry, what would
22  that indicate?
23      MR. DUNNE:  Objection to the form of the
24  question, calls for speculation.

Page 145

1  BY THE WITNESS:
2      A.  There should have been an entry later on
3  by either Steve or me.
4  BY MR. NYESTE:
5      Q.  And if there wasn't, would that indicate
6  that it wasn't sent; that the letter wasn't sent?
7      MR. DUNNE:  Objection, form of the question.
8  BY THE WITNESS:
9      A.  Steve kept a tight diary.  He was in
10  every file, so there should have been a note from
11  him.
12  BY MR. NYESTE:
13      Q.  Do you recall Kurt Beranek ever calling
14  you and requesting a copy of a reservation of
15  rights letter?
16      MR. DUNNE:  Objection.  This is getting beyond
17  the scope of our agreement, but you can answer the
18  question.
19  BY THE WITNESS:
20      A.  No, I don't recall.
21          FURTHER EXAMINATION
22  BY MS. SKAGGS:
23      Q.  Ms. Robinson, your testimony today is
24  that you recall mailing the May 2005 letter from

4 (Pages 142 to 145)

Page 146

1   the Chicago office, correct?
2       A.   Correct.
3       Q.   Okay. Now, in your voice mail to
4   Mr. Nyeste, you had indicated that you were unclear
5   as to which office you were in and you speculated
6   that the letter must have been on a disk. Now, do
7   you recall leaving that message in a voice mail?
8       A.   On the voice mail.
9       Q.   And you speculated it may have been on a
10  disk because when you transferred from Chicago to
11  Naperville, your computer was not transferred with
12  you. Do you recall leaving that on the voice mail
13  message?
14      A.   No, I don't remember that part.
15      Q.   Okay. If you were mailing this letter
16  from the Chicago office, why were you saving it on
17  a disk?
18      A.   I was saving most of my letters on disk,
19  reservation of rights and other letters, also,
20  doctors and different forms, the language, to keep
21  the lingo the same.
22      Q.   And why were you doing that?
23      A.   Because I was outside/inside adjuster,
24  also. So I had letters I had done at home. I

Page 147

1   would bring them into the office.
2       Q.   So at the time that you left your
3   message on Mr. Nyeste's voice mail, just so that
4   I'm clear, you were speculating about whether or
5   not you had saved something on a floppy disk. Are
6   you now clear as to that recollection?
7       A.   Yes, pretty much so, yes.
8       Q.   So today you think that you had it on
9   disk and printed it off of a disk in Chicago?
10  That's what you think today?
11      MR. DUNNE:  Objection to the form of the
12  question.
13          Go ahead.
14  BY THE WITNESS:
15      A.   Yes.
16  BY MS. SKAGGS:
17      Q.   Why isn't a copy of the May 2005
18  reservation of rights letter in USF&G's file?
19      MR. DUNNE:  Objection, asked and answered,
20  calls for speculation. I think this is the fourth
21  or fifth time it's been asked, so I'm going to
22  instruct her not to answer.
23      MS. SKAGGS:  I don't know if that question has
24  ever been asked, actually. Do you want my question

Page 148

1   read back?
2       MR. DUNNE:  Sure.
3          Read back the question.
4          (WHEREUPON, the record was read
5          by the reporter as requested.)
6   BY THE WITNESS:
7       A.   I didn't know it was not in their file.
8   BY MS. SKAGGS:
9       Q.   Did you print it out and put it in the
10  file?
11      A.   It would have been, yes.
12      Q.   So your recollection is that you printed
13  out a copy of this letter and put it in USF&G's
14  file?
15      A.   Yes.
16      Q.   Okay. Did you do that at the same time
17  that you mailed it to VOA?
18      A.   Yes, should have been.
19      Q.   You have a specific recollection of
20  doing that, as well?
21      A.   Yes.
22      Q.   Was this the same day that you faxed it
23  to Kurt Beranek?
24      A.   Yes.

Page 149

1       Q.   Do you have a specific recollection of
2   faxing it to Kurt Beranek?
3       A.   Yes.
4       Q.   So is it your testimony that in May 2005
5   you were working both out of Chicago and Naperville
6   or you had not yet gone to Naperville?
7       A.   I don't believe I had gone to Naperville
8   yet. I'm pretty sure.
9       MS. SKAGGS:  Do you have anything else, Jim?
10          Go off the record.
11          (WHEREUPON, discussion was had
12          off the record.)
13      MS. SKAGGS:  I don't have any more questions
14  at this time.
15      MR. NYESTE:  I think we're done.
16          Rory, do you have any?
17      MR. DUNNE:  Yeah.
18          FURTHER EXAMINATION
19  BY MR. DUNNE:
20      Q.   Do you know whether Mr. Heckman knew
21  that you sent the reservation of rights letter out
22  in May of 2005?
23      A.   I don't want to speculate.
24      Q.   So you don't know whether or not he knew

5 (Pages 146 to 149)

**Page 150**

1  that you sent out the reservation of rights in May
2  of 2005?
3      A.   I can't speculate.  I don't know.
4      Q.   Do you recall talking to Mr. Heckman in
5  or around May of 2005 advising him that you were
6  sending out the reservation of rights letter?
7      A.   No, I don't recall.
8      Q.   And if he wasn't aware that you sent out
9  the reservation of rights letter, there would be no
10 way for him to notate it in the file; isn't that
11 correct?
12     A.   Correct.
13     MR. DUNNE:  I have nothing further.
14     MR. NYESTE:  We're done.
15     MS. REPORTER:  Signature?
16     MR. NYESTE:  Do you want to reserve or waive?
17     MR. DUNNE:  I reserved on the other one, so
18 I'll reserve.
19         FURTHER DEPONENT SAITH NOT.
20
21
22
23
24

**Page 151**

1           IN THE UNITED STATES DISTRICT COURT
2        FOR THE NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4  UNITED STATES FIDELITY       )
5  AND GUARANTY COMPANY,        )
6         Plaintiff,    )
7  vs.                 ) No. 08 C 862
8  VOA ASSOCIATES, INC.,        )
9  LIBERTY INTERNATIONAL        )
10 UNDERWRITERS, MICHAEL J.     )
11 MADDEN and JEAN MADDEN,      )
12        Defendants.   )
13        I hereby certify that I have read the
14 foregoing transcript of my resumed deposition given
15 at the time and place aforesaid, consisting of
16 Pages 130 to 150, inclusive, and I do again
17 subscribe and make oath that the same is a true,
18 correct and complete transcript of my resumed
19 deposition so given as aforesaid, and includes
20 changes, if any, so made by me.
21            IRIS LISA ROBINSON
22 SUBSCRIBED AND SWORN TO before me
23 this   day of    , A.D. 2009.
24    Notary Public

**Page 152**

1  STATE OF ILLINOIS  )
2                ) SS:
3  COUNTY OF DUPAGE  )
4        I, JEANETTE F. RUTZ, a Notary Public
5  within and for the County of DuPage, State of
6  Illinois, and a Certified Shorthand Reporter of
7  said state, do hereby certify:
8        That previous to the commencement of the
9  examination of the witness, the witness was duly
10 sworn to testify the whole truth concerning the
11 matters herein;
12       That the foregoing deposition transcript
13 was reported stenographically by me, was thereafter
14 reduced to typewriting under my personal direction
15 and constitutes a true record of the testimony
16 given and the proceedings had;
17       That the said deposition was taken
18 before me at the time and place specified;
19       That I am not a relative or employee or
20 attorney or counsel, nor a relative or employee of
21 such attorney or counsel for any of the parties
22 hereto, nor interested directly or indirectly in
23 the outcome of this action.
24       IN WITNESS WHEREOF, I do hereunto set my

**Page 153**

1  hand and affix my seal of office at Chicago,
2  Illinois, this 20th day of March, 2009.
3
4
5       Notary Public,
6       DuPage County, Illinois
7       My commission expires 12/01/10.
8
9  CSR Certificate No. 84-3809.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

IRIS LISA ROBINSON, MARCH 17, 2009

Page 154

```
 1            I N D E X
 2   WITNESS              EXAMINATION
 3   IRIS LISA ROBINSON (resumed)
 4      By Mr. Nyeste          132
 5      By Ms. Skaggs          145
 6      By Mr. Dunne           149
 7
 8          E X H I B I T S
 9   NUMBER            MARKED FOR ID
10         NO EXHIBITS MARKED.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

7 (Page 154)