# EXHIBIT 12

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3                     EASTERN DIVISION

4

5    UNITED STATES FIDELITY          )

6    AND GUARANTY COMPANY,           )

7                Plaintiff,          )

8    vs.                             )   No. 08 C 862

9    VOA ASSOCIATES, INC.,           )

10   LIBERTY INTERNATIONAL           )

11   UNDERWRITERS, MICHAEL J.        )

12   MADDEN and JEAN MADDEN,         )

13                Defendants.        )

14

15           The deposition of IRIS LISA ROBINSON,

16   called for examination, taken pursuant to the

17   Federal Rules of Civil Procedure of the United

18   States District Courts pertaining to the taking of

19   depositions, taken before JEANETTE F. RUTZ, a

20   Notary Public within and for the County of DuPage,

21   State of Illinois, and a Certified Shorthand

22   Reporter of said state, at Suite 2100, One North

23   LaSalle Street, Chicago, Illinois, on the 17th day

24   of February, A.D. 2009, at 2:13 p.m.

Page 2

1  PRESENT:
2      KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC,
3      (200 South Michigan Avenue, 20th Floor,
4      Chicago, Illinois 60604,
5      312-431-3700), by:
6  MR. RODERICK T. DUNNE,
7      appeared on behalf of the Plaintiff;
8
9  SCHIFF HARDIN, LLP,
10      (233 South Wacker Drive, Suite 6600,
11      Chicago, Illinois 60606,
12      312-258-5728), by:
13  MS. AMY R. SKAGGS,
14      appeared on behalf of Defendant
15      VOA Associates, Inc.;
16
17  MR. JAMES T. NYESTE, ESQ.,
18      (One North LaSalle Street, Suite 2100,
19      Chicago, Illinois 60602,
20      312-750-1814),
21      appeared on behalf of Defendant
22      Liberty International Underwriters.
23  REPORTED BY:  JEANETTE F. RUTZ, CSR, RPR,
24      CSR CERTIFICATE NO. 84-3809.

Page 3

1      (WHEREUPON, certain documents
2      were marked Iris Robinson Deposition
3      Exhibit Nos. 1 through 10,
4      inclusive, for identification, as
5      of 2-17-09.)
6      (WHEREUPON, the witness was duly
7      sworn.)
8  IRIS LISA ROBINSON,
9  called as a witness herein, having been first duly
10  sworn, was examined and testified as follows:
11          EXAMINATION
12  BY MR. NYESTE:
13      Q.  Would you please state your full name
14  for the record.
15      A.  Iris Lisa Robinson.
16      Q.  I'll call you Ms. Robinson.  Is that
17  good?
18      A.  That's good.
19      Q.  My name is Jim Nyeste.
20      A.  Hi, Jim.
21      Q.  I represent Liberty Insurance
22  Underwriters.  And to my right is Amy Skaggs, who
23  represents VOA Associates, and I think you know the
24  gentleman to your left.

Page 4

1      A.  Yes.
2      Q.  Ms. Robinson, this is going to be your
3  deposition, which is a question-and-answer session
4  under oath.  The attorneys get to ask you questions
5  and you respond under oath.  Let me know if my
6  questions are not good ones.  If there's something
7  that you can't understand, please ask me to
8  rephrase it.
9          Please let me get my whole question out
10  before you begin to answer.  If there is an
11  objection to my questions, allow the objection to
12  be made by one of the attorneys before you begin
13  your answer.  The whole objective of that
14  explanation is so that we get a nice transcript
15  without one person talking over the other.
16          Understand?
17      A.  Yes.
18      Q.  Also, please make your responses verbal,
19  "yeses," "nos," "I don't knows," verbal
20  explanations rather than nods of the head or a
21  gesture.  Okay?
22      A.  Yes.
23      Q.  Are you taking any medications that
24  would affect your ability to understand or answer

Page 5

1  my questions?
2      A.  No.
3      Q.  And you know, I may ask some questions
4  that are embarrassing, like that one, so just
5  excuse me.  It's part of the routine.
6          Have you ever been convicted of a felony
7  or of a crime involving dishonesty?
8      A.  No.
9      Q.  Have you ever given a deposition before?
10      A.  A small -- I recall a small one in auto
11  liability.
12      Q.  And in your capacity as an insurance
13  claims adjuster did you give that?
14      A.  Correct.
15      Q.  When was that?
16      A.  It was many years ago, too.  Maybe
17  seven, six years ago, something of that nature.
18      Q.  And was that the only one?
19      A.  And just arbitration and mediations.
20  That's all.
21      Q.  Are you represented by an attorney
22  today?
23      A.  Yes.
24      Q.  Rory Dunne?

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

1    A.    Yes.
2    Q.    And did this come about recently that
3  Mr. Dunne became your attorney?
4    A.    Yes.
5    Q.    When was that?
6    A.    With this case.  I was notified in '08.
7    Q.    In 2008?
8    A.    Yes, 2008.
9         MR. NYESTE:  For the record, we have marked as
10  Iris Deposition Exhibit No. 1 the protective order
11  in this case, and so this deposition will be
12  subject to that order.  We've marked as Exhibit 2
13  the notice and the subpoena to Ms. Robinson for her
14  deposition.
15  BY MR. NYESTE:
16    Q.    Ms. Robinson, do you reside at 151 West
17  83rd Street, Chicago?
18    A.    Correct.
19    Q.    Is that an apartment or a house?
20    A.    It's a house.
21    Q.    And who do you live there with?
22    A.    Taylor Robinson and Taylor Rance
23  Robinson.
24    Q.    And they are who?

Page 7

1    A.    My husband and son.
2    Q.    And how long have you lived there?
3    A.    Since -- 24, 23 years.
4    Q.    No intentions to move anytime soon?
5    A.    Not at this time.
6    Q.    What is your home phone number?
7    A.    773-651-6879.
8    Q.    And do you have a cell number?
9    A.    773-852-7983.
10    Q.    Ms. Robinson, what is your highest level
11  of education?
12    A.    High school and some college, three
13  years.
14    Q.    Where did you go to college?
15    A.    Chicago State, Roosevelt.
16    Q.    And you took various classes but not
17  culminating in a degree?
18    A.    Correct.
19    Q.    And I'm going to ask you to go through
20  your employment background, I think with the oldest
21  job first leading up to the present.
22    A.    Okay.
23    Q.    If you could do that for me, please.
24    A.    The oldest one from high school?  Do you

Page 8

1  want me to go back that far?
2    Q.    Yeah, but the ones that are really old
3  I'm not going to ask many questions, if any, about.
4    A.    The first real one would have been USF&G
5  Insurance Company as a clerk.
6    Q.    And when was that?
7    A.    It would be '81 or '80.  '80 or '81.
8    Q.    And how long did you have that
9  employment?
10    A.    Well, they merged with St. Paul, so they
11  kept my years.  And St. Paul merged with Travelers,
12  so all my years were accumulated.  So about 25
13  years.  And then I did temporary work for about two
14  years and hired at Gallagher Bassett.
15    Q.    Okay.  So you worked at USF&G St. Paul
16  Travelers from 1980 or '81 until 2005?
17    A.    Yeah, probably correct.  And I did two
18  years of temp work at various insurance companies,
19  mostly all doing worker's comp adjusting and some
20  excess, but it was still in worker's comp.  Excess
21  in worker's comp.
22    Q.    When did you graduate from high school?
23    A.    Boy, these are hard questions.  This is
24  going back.  I was 18, so '78.  Thank God for even

Page 9

1  years.
2    Q.    And between your graduation from high
3  school and beginning at USF&G, were you mostly
4  taking classes in college?
5    A.    Yes, and some -- after I got into USF&G,
6  they paid for some school.
7    Q.    And after USF&G, you told us that you
8  did two years of temp work at various insurance
9  companies.  And now you are at Gallagher Bassett;
10  is that right?
11    A.    Correct.
12    Q.    From what -- what date did you begin
13  there?
14    A.    I started 2008 at Gallagher Bassett, and
15  that was in January of '08.  And I was hired
16  officially May of '08.  It was still temporary work
17  I was doing for them, and hired in May of '08.
18    Q.    And what is your job there?
19    A.    Worker's comp adjuster.
20    Q.    Now, do you have any professional
21  certifications or licenses in the field of
22  insurance?
23    A.    AIC.
24    Q.    And what does that stand for?

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Page 10

1    A.    Associate Insurance -- I don't know what
2  the C means anymore.  Sorry.
3         And then I hold a Texas license for
4  worker's comp.  That's all the licenses I hold.
5    Q.    Have you participated in any seminars or
6  training programs in the field of insurance?
7    A.    Yes.
8    Q.    Can you describe those for me.
9    A.    We had worker's comp seminars.  We had
10  liability seminars.  That was about it that I can
11  tell you.
12    Q.    Are these seminars or programs put on by
13  your employers?
14    A.    Yes, they were.
15    Q.    Any third party --
16    A.    And some were through the insurance
17  schools.  Insurance schools, also.
18    Q.    Now, returning to your early employment
19  with USF&G, you started out as a clerk?
20    A.    Correct.
21    Q.    How long did you have that job?
22    A.    Approximately two years.
23    Q.    And what did you do in that position?
24    A.    Opened up files, maintaining files, and

Page 11

1  part of that was what they called a CS person.  It
2  was medical only; worker's comp medical only.  And
3  worker's comp -- that was all worker's comp.
4    Q.    And what was your next position?
5    A.    Then it was called TTD person, person
6  who just paid for lost time, people losing time
7  from their jobs.
8    Q.    Again, worker's comp related?
9    A.    Worker's comp related.
10    Q.    Temporary total disability payments?
11    A.    Correct.
12    Q.    How long did you do that?
13    A.    That was probably about a year and a
14  half or two years.  Then it was a complete
15  adjuster, worker's comp adjuster.
16    Q.    How long did you function as a worker's
17  comp adjuster?
18    A.    That was a long time.  Maybe 10 years or
19  more of that, 10 or 15.  I can't remember all those
20  dates.  And then it was an outside worker's comp
21  adjuster.  So about ten years inside, I guess, and
22  about five years outside worker's comp.
23    Q.    What does that mean?
24    A.    I was an outside investigator, meaning I

Page 12

1  would take -- I would take recorded statements from
2  the claimants in their homes or hospital beds.  I
3  would take pictures of the machines.  If they were
4  involved with an industrial accident, if it was a
5  gate that had fallen, take witnesses' statements
6  outside.
7    Q.    So basically the investigation done in
8  the field?
9    A.    In the field, right, and working at home
10  on the computer.  And at that time, they were
11  giving out company cars.  That was a long time ago.
12    MR. DUNNE:  Good old days.
13  BY MR. NYESTE:
14    Q.    How long did you do that?
15    A.    It was about five years being an outside
16  adjuster.
17    Q.    And what came next?
18    A.    Then it was switching to the liability
19  unit.  They were opening up a liability unit and
20  they wanted an outside investigator.
21    Q.    In what year did you take that position?
22    A.    I knew you were going to ask that.  I
23  don't recall exactly the year for that one.  I'm
24  not certain.

Page 13

1    Q.    But we're getting up into the early
2  2000s, aren't we?
3    A.    It would have been the 2000s, correct.
4    Q.    How long did you hold that position?
5    A.    That was two years approximately, more
6  or less, because it was getting close to -- the
7  transition was also the merger of -- Travelers was
8  taking over, too.
9    Q.    What was your next position?
10    A.    Well, after that -- because it was
11  Travelers taking over.  I had left Travelers.  I
12  took their severance package.  So I'm thinking
13  about -- was it 2005, 2006 taking the severance
14  package?  And then like I said, two years of
15  working temp services.
16    Q.    So your last position with USF&G
17  St. Paul Travelers was as this outside investigator
18  for the liability unit?
19    A.    They had changed that.  Then you were an
20  inside liability/auto person doing auto cases.
21  Back doing auto.  In between that I should have
22  mentioned I did auto.
23    Q.    Okay.  Your last position was inside?
24    A.    Inside.

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 14

1     Q.     Claims representative or claims adjuster
2  inside?
3     A.     In Naperville.
4     Q.     And was it limited to auto or did it
5  include other types of liability claims?
6     A.     It included small liability cases. They
7  were rearranging some of our files.
8     Q.     And you were officed in Naperville?
9     A.     Correct. That was part of it. I was
10 also stationed downtown in Chicago for a little bit
11 still in liability. There were only two adjusters
12 they left downtown, myself and another person.
13    Q.     Okay. We're going to have to get into
14 this. What month did you leave the company
15 entirely?
16    A.     Entirely? I know I should have looked
17 at my resume. I can't tell you. I'm sorry. I
18 can't tell you the exact month I left.
19    Q.     Sometime in 2005?
20    A.     I think February or March, but I'm not
21 certain. I'm not certain.
22    Q.     How long had you been in Naperville, at
23 least part of the time, when you left the company?
24    A.     I came in April of '05. I must have

Page 15

1  left in '06, then. I must have left in February or
2  March of '06.
3         I hate to ask. I have a silly question.
4  When did the -- in London, when did he get married
5  to Camille? I'm sorry.
6     Q.     I'm sorry. That's not really at the top
7  of my list.
8     A.     Because I remember it was around my
9  daughter's wedding. It was around that time, and
10 it was within a year after that. I'm sorry, but
11 that's --
12    Q.     Okay. So you might not have left USF&G
13 St. Paul Travelers until February/March of 2006; is
14 that right?
15    A.     Uh-hmm.
16    Q.     And you think you had been officing in
17 Naperville, at least part of the time, since April
18 of 2005; is that what you were saying?
19    A.     Yes, in April of 2005 I was in
20 Naperville.
21    Q.     Now, you mentioned that you also were in
22 Chicago part of the time.
23    A.     Yes.
24    Q.     From when to when were you in Chicago?

Page 16

1     A.     See, that's what I'm talking about. The
2  wedding I can remember, because I was working on my
3  daughter's wedding a lot.
4         So I was in Chicago -- I must have been
5  in Chicago probably the early part of March of '05.
6  March or February '05 I should have been in
7  Chicago.
8     Q.     Before that where had you been located?
9     A.     Still in Chicago. St. Paul was still in
10 Chicago, because we had moved from the Citicorp
11 Bank Building to the other building on Lake.
12    Q.     So in February or March of '05 you moved
13 from one Chicago location to another?
14    A.     Correct.
15    Q.     Okay. When you took on these
16 responsibilities in Naperville, was that the auto
17 function that you were going there for?
18    A.     Well, they took the title away of
19 outside investigator a couple months after that.
20 We could not do any outside work. We were strictly
21 inside, and it was auto liability. And they were,
22 of course, taking files away and redistributing
23 files.
24    Q.     When did this redistribution of files

Page 17

1  and this transition occur?
2     A.     Well, it was starting a little bit
3  earlier than that in the Chicago branch office on
4  Lake Street. We were getting files ready to be
5  redistributed. I couldn't tell you the exact date,
6  but it started a little bit earlier. They were
7  taking a few files away already from us.
8     Q.     And the reason for that was --
9     A.     It was a couple reasons. Like I said,
10 they were reorganizing the units. And I was going
11 to be inside adjuster, no longer outside adjuster.
12 And certain cases that we were handling weren't
13 qualified and the dollar amount was beyond our
14 level of knowledge.
15    Q.     What was your reason for leaving USF&G?
16    MR. DUNNE: Objection, asked and answered.
17         Go ahead.
18 BY THE WITNESS:
19    A.     The travel. They were changing so many
20 things around.
21 BY MR. NYESTE:
22    Q.     Did you have any performance reviews in
23 the last couple of years before your --
24    A.     That's true.

5 (Pages 14 to 17)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 18

1    Q.    Yes?
2    A.    Yes.
3    Q.    Did you have any negative performance
4  reviews?
5    A.    Yes.
6    Q.    Tell me about those.  Say from 2003
7  forward, do you recall some negative performance
8  reviews?
9    A.    Yes.
10    Q.    Okay.  What do you recall about them?
11    A.    Steve Heckman, one of my supervisors,
12  that I didn't understand liability as well as I
13  should have.
14    Q.    And did he explain what he meant by
15  that?
16    A.    Probably so.  In certain files he
17  probably pointed out that.
18    Q.    Was the Madden file one of the files?
19    A.    I couldn't recall.
20    Q.    When was this review by Steve Heckman
21  that was negative?
22    A.    I couldn't recall exact year.
23    Q.    How long prior to your departure from
24  USF&G?

Page 19

1    A.    Maybe a year or so before.  Maybe.
2    Q.    Did you have any negative reviews from
3  any other persons?
4    A.    My supervisor, John Vogel.
5    Q.    And what was the nature of his review?
6    A.    Handling of cases and contacts, I
7  believe.
8    Q.    Ms. Robinson, let me apologize.  I don't
9  mean to embarrass you or to, you know, go into this
10  in great depth, but it's part of what I have to do.
11    A.    I understand.
12    Q.    With respect to Mr. Vogel's review, did
13  it relate to any particular claims that you can
14  recall?
15    A.    Quite a few with him.
16    Q.    And Mr. Heckman's review, did it also
17  involve negative comments on quite a few claims?
18    A.    His was more overall.  I think it was
19  overall and training.  That's what I took away from
20  his review.
21    Q.    Whereas Vogel's was more claim specific;
22  is that right?
23    A.    Yes, he tried to be specific.
24    Q.    And on specific claims you were handling

Page 20

1  as opposed to your general understanding of
2  liability insurance?
3    A.    I believe his was more specific of
4  claims that I was handling.
5    Q.    Okay.  Now, was Mr. Vogel your immediate
6  supervisor?
7    A.    In Naperville, yes.
8    Q.    And Mr. Heckman, how did -- in what way
9  was he your supervisor, if at all?
10    A.    While we were in Chicago, he was
11  off-site.  He was in Dixon and we were in Chicago.
12    Q.    How many years in total did you have
13  responsibility for liability claims?
14    A.    I couldn't tell you that without really
15  looking.
16    Q.    It sounds like most of your experience
17  was worker's comp?
18    A.    Correct.
19    Q.    And then in the early 2000s -- I don't
20  know what year, but in the early 2000s you moved
21  into the liability area; is that fair to say?
22    A.    Yes, in the summer of 2000 it would be
23  liability.
24    Q.    Okay.  So if I was to say something like

Page 21

1  two to four years experience in liability claims,
2  would that be fair?
3    A.    If you want to do it that way, I would
4  say you have to -- there's a part that I was in
5  auto liability.  Then there was a part much later,
6  like the later part of 2000, where I get into more
7  the CGL or the commercial liability.
8    Q.    Right.
9    A.    Where I got in commercial liability.
10    Q.    How long were you in CGL claims?
11    A.    That would be about -- yeah, between a
12  year or two.  It would be pressing it if I said
13  three, but a year or two I'm more comfortable with
14  saying CGL only.  Because there was a while I was
15  doing worker's comp and a little bit of liability
16  in there.  I still had my worker's comp.  They
17  didn't want me to leave worker's comp.
18    Q.    When you worked on CGL claims, what
19  would the St. Paul Travelers CGL claim file consist
20  of?
21    A.    I couldn't recall all of that
22  information.
23    Q.    Okay.  We'll pick away at it.
24         There would be electronic notes of some

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 22

1   sort?
2       A.   Yes.
3       Q.   Was there a name for that system?
4       A.   I don't remember that name.
5       Q.   Let me show you what I've marked as
6   Exhibit 3.  This is a printout that we've received
7   from USF&G of what looks to be like a set of
8   electronic notes.
9       A.   Okay.
10      Q.   Is this the sort of thing you're
11  referring to when --
12      A.   That would be the electronic notes,
13  right.
14      Q.   Okay.  And you could enter a note in
15  this system through your computer, right?
16      A.   Correct.
17      Q.   Was there a name to this system?  I know
18  I asked that, but maybe you've had your memory
19  refreshed.
20      A.   I don't remember the name of the system.
21      Q.   Okay.  Who would have access to that
22  system?
23      A.   It would be the clerk who would set up a
24  file; the adjuster who input notes; the supervisor.

Page 23

1   If we had anyone else over it looking it over,
2   claims -- VP of claims department could look in the
3   notes, add a note.
4       Q.   And they might be in various physical
5   locations?  They may not be in Chicago?  They might
6   be in Dixon?  They might be in Maryland?
7       A.   Correct.
8       Q.   So that's true?
9       A.   That's very true.
10      Q.   Now, in addition to these electronic
11  notes, I imagine there's paper; is that correct?
12      A.   Paper file, correct.
13      Q.   And that would be correspondence that
14  went out from your office, that came in from
15  brokers, from lawyers, that sort of thing, right?
16      A.   Correct.
17      Q.   Would there also be e-mail --
18      A.   Correct.
19      Q.   -- relating to a claim file?
20      A.   Correct.
21      Q.   What other sources of documents or
22  information would there be that relate to a claim
23  file?
24      A.   For liability?

Page 24

1       Q.   Yes, talking about a CGL claim.
2       A.   We should try to get the policy for
3   coverage.  Insured's information would be on the
4   coverage page and contact.  We would get a contact,
5   whoever set up the file.  We should have a contact
6   person.  And if there was an active -- a very
7   active file, if they were treating medically, you
8   would get medical bills, you would get medical
9   reports, things of that nature.
10      Q.   And if they were paper, they would be in
11  the paper file, right?
12      A.   Correct.
13      Q.   Would there be any other source of
14  electronic information?  You have this electronic
15  notes system.  There would be e-mails, correct?
16      A.   Uh-hmm.
17      Q.   Would there be files on your computer at
18  work?
19      A.   Everything would be in the file or in
20  the file notes, because you're subject to audits.
21      Q.   In other words, would you make a memo to
22  yourself on your computer, for example, separate
23  from this electronic note system?
24      A.   There shouldn't be, unless you had a

Page 25

1   paper and you're scribbling something down, a note.
2       Q.   And in all likelihood that would go into
3   the paper file?
4       A.   In the file.
5       Q.   On correspondence that you sent out in
6   your role as a claims adjuster, would you sign your
7   name "Iris Robinson"?  Would you initial the
8   correspondence or how would you sign it?
9       A.   I used various techniques.  Sometimes I
10  will initial depending on how the work is -- if
11  it's just IR, just IR.  Sometimes -- now you're
12  talking about letters going -- for letters?
13      Q.   Well, it sounds like there could be a
14  difference depending on the type of communication.
15  So if you would explain that, I'd appreciate it.
16           Suppose it's a letter to the insured,
17  the policyholder.  How would you sign that?  By
18  initials?  By your name?  Just a check mark?
19      A.   I used both.  I used initials and I used
20  my name.
21      Q.   Okay.  Are there any circumstances that
22  would tell us when you would use one versus the
23  other?
24      A.   No.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1    Q.    Did you have a practice of keeping a
2  file copy of your correspondence?
3    A.    Can you rephrase that.
4    Q.    Did you have a practice of keeping a
5  paper copy of your correspondence?
6    A.    Yes, we tried to keep anything that
7  needs to be in the file to go in the file, that
8  belongs in the file.
9    Q.    Ms. Robinson, I'm going to ask you, if
10  you would, on this blank sheet of paper that we're
11  going to mark as, I think --
12    MR. DUNNE: Don't do it.
13    MR. NYESTE: No?
14    MR. DUNNE: No.
15    MR. NYESTE: You're not going to do it?
16    MR. DUNNE: No. You can ask her if she
17  recognizes her signature.
18    MR. NYESTE: Well, I'm going to ask her to
19  give an exemplar of her signature and her initials.
20    MR. DUNNE: I'll instruct her not to do it.
21    MR. NYESTE: I don't think this is a criminal
22  proceeding.
23    MR. DUNNE: Why is it relevant?
24    MR. NYESTE: Oh, come on.

Page 27

1    MR. DUNNE: She hasn't said the signature on
2  the letter is not hers.
3    MR. NYESTE: So you're instructing her not to
4  give an exemplar of her initials or her signature?
5    MR. DUNNE: Sure, yes. This is an oral
6  deposition.
7    MR. NYESTE: Okay.
8  BY MR. NYESTE:
9    Q.    When you were in CGL claims, you had
10  occasion to send faxes from time to time; is that
11  right?
12    A.    Yes.
13    Q.    Now, in this office we have to
14  physically run to a fax machine and feed the fax
15  into the machine and dial a number.
16    A.    Yes.
17    Q.    Did you do it that way?
18    A.    Yes. And then if I was in the Chicago
19  branch office, our fax was even closer to our desk.
20    Q.    But you did have to go to a separate fax
21  machine?
22    A.    You did have to go to a separate
23  machine.
24    Q.    On the other hand, I was in another law

Page 28

1  office awhile back where we could fax directly from
2  our computers in our office.
3    A.    We did not have that sophistication.
4    Q.    So you would have to take the piece of
5  paper that you're faxing --
6    A.    Correct.
7    Q.    -- and go to a fax machine?
8    A.    Correct.
9    Q.    Did you make it a practice to keep --
10  let me start over.
11         Did you make it a practice to print out
12  a fax transmission report after each fax that you
13  sent?
14    MR. DUNNE: Objection, assumes facts not in
15  evidence.
16    THE WITNESS: I still have to answer?
17    MR. DUNNE: Please, go ahead.
18    THE WITNESS: Okay.
19    MR. DUNNE: If you understand his question, go
20  ahead.
21  BY THE WITNESS:
22    A.    I'm trying to make sure if I understood
23  you right. Did I have a fax sheet? No. Sometimes
24  I just did deliberately the copy of -- if it was a

Page 29

1  form, send it directly to them.
2  BY MR. NYESTE:
3    Q.    Okay. Without a cover sheet?
4    A.    Without a cover sheet.
5    Q.    But it's not the cover sheet I'm really
6  asking about. After you send the fax, did you ask
7  the machine to generate a transmission report?
8    A.    A confirmation report?
9    Q.    A confirmation report.
10    A.    Yes, and some of them did it
11  automatically.
12    Q.    True, true. Ours is here set up so it's
13  automatic. After you send the fax, the
14  confirmation report comes up.
15         Was it set up that way in your Chicago
16  office?
17    A.    I can't recall.
18    Q.    Was it set up that way in the Naperville
19  office?
20    A.    I can't recall.
21    Q.    Well, whether it was automatic or not,
22  did you make it a practice to get a confirmation
23  report after each fax you sent?
24    A.    I tried to.

8 (Pages 26 to 29)

Page 30

1    Q.    Ms. Robinson, what is a reservation of
2  rights letter?
3    A.    When I worked in liability -- I'm not
4  certain of all the terminologies like I used to.  I
5  used to try to keep up with it.  It would be
6  reserving the rights, as I understood, with -- on
7  liability on a coverage issue, we would go to Adam
8  Lutz.  And it would be -- our supervisor, Steve
9  Heckman, would help me on those letters for
10  reservation of rights letters.
11       So it would be reserving our rights
12  to -- not to defend and to defend or to provide
13  coverage.
14    Q.    Is this something that relates more to
15  the CGL field than to the worker's comp field?
16    A.    Absolutely.
17    Q.    And I don't know -- I don't have a lot
18  of worker's comp experience myself, but did you
19  have any occasion to do reservation of rights
20  letters in the worker's comp adjuster positions you
21  had?
22    A.    Only one time, and my supervisor and an
23  attorney did that one.
24    Q.    Okay.  And on the other hand, in the

Page 31

1  area of CGL claims, did you have occasion to do
2  reservation of rights letters?
3    A.    At first when we came to -- with
4  St. Paul, their attorneys were doing our
5  reservation of rights letters.  And then they
6  switched midstream and said no more attorney
7  reservation of rights letters.  The adjusters had
8  to do reservation of rights letters.
9    Q.    And did you, yourself, do some in the
10  CGL area?
11    A.    Not without assistance.
12    Q.    Do you recall how many that you prepared
13  with assistance?
14    A.    Nothing without assistance.
15    Q.    You didn't do any entirely on your own;
16  is that fair?
17    A.    Fair.
18    Q.    And the few that you did were all with
19  assistance?
20    A.    Yes.
21    Q.    And how few were they?
22    A.    I couldn't recall the exact number.
23    Q.    Now, you mentioned that there was a
24  change from having reservation of rights letters

Page 32

1  prepared by the attorney to then having them done
2  by the claims representative with assistance from
3  someone else.  Do you recall when that took
4  place --
5    A.    No.
6    Q.    -- or what were the circumstances around
7  which this change happened?
8    A.    I believe when Travelers was starting to
9  take over with St. Paul.
10    Q.    Okay.  And do you recall when that was?
11    A.    I couldn't give you an exact year.  I
12  just know we were downtown when it happened, around
13  that time.
14    Q.    Did St. Paul Travelers USF&G have any
15  procedures or rules or guidelines relevant to
16  preparing reservation of rights letters?
17    A.    I couldn't recall all the procedures,
18  but I know we were instructed to go to our
19  advisors.  Coverage was Adam Lutz in Baltimore.  I
20  believe he was in Baltimore at that time.
21    Q.    And is he a lawyer?
22    A.    I don't know.
23    Q.    So that was one procedure, run it by or
24  get his input --

Page 33

1    A.    Correct, any issues that you had a
2  question.
3    Q.    Was there a practice as to timing as to
4  when reservation of rights letters should be sent
5  out?
6    A.    I don't recall.
7    Q.    Was there a practice, procedure, rules,
8  guidelines -- whatever you want to call it -- as to
9  what materials should be reviewed before the
10  reservation of rights letter was prepared?
11    A.    I'm not certain.
12    MR. DUNNE:  Don't speculate.
13  BY MR. NYESTE:
14    Q.    Was there any practice, procedure, rule,
15  guideline concerning having a copy of the policy
16  available before or at the time of preparing the
17  reservation of rights letter?
18    A.    I cannot recall.
19    Q.    Now, when it did become a procedure to
20  have the letter reviewed or to get input from
21  another person -- and in your case, it was Adam
22  Lutz that you were to get input from, right?
23    A.    And my supervisor's directions, right,
24  correct.

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 34

1    Q.    Was there any practice, procedure, rule,
2  guideline about whether reservation of rights
3  letters should be sent by fax or by certified mail
4  or by FedEx or by regular mail?
5    A.    There may have been. I don't recall.
6    Q.    Was there any procedure, rule, practice,
7  guideline as to maintaining some sort of proof that
8  the reservation of rights letter was actually sent?
9    A.    I'm having a problem with that question.
10    Q.    Yeah, I can understand. Let me give you
11  a for-instance.
12    A.    Okay.
13    Q.    Suppose that the reservation of rights
14  letter went out by fax. Now, one could ask the fax
15  machine to generate a confirmation transmission
16  report. Was there a practice or a rule or a
17  procedure at St. Paul Travelers USF&G that for a
18  reservation of rights letter you should get that
19  transmission or confirmation report and put it in
20  the file?
21    MR. DUNNE: Objection to form of the question.
22    You can answer.
23  BY THE WITNESS:
24    A.    I don't recall that as being their

Page 35

1  criteria.
2  BY MR. NYESTE:
3    Q.    In your experience, when a reservation
4  of rights letter was sent, a copy of that letter
5  was maintained in the paper file; is that correct?
6    A.    Yes.
7    Q.    Was there any practice or procedure or
8  rule or guideline about following up with the
9  insured, the policyholder, after a reservation of
10  rights letter was sent?
11    A.    I don't recall.
12    Q.    And I'll give you a for-instance. You
13  call up Company X and say, "I just want to confirm
14  that you got a reservation of rights letter. Do we
15  need to discuss it?"
16    Was there anything like that that was a
17  practice?
18    A.    I would say because I didn't do many
19  reservation of rights letters, I didn't have that
20  to do. Most of the files were being taken away by
21  the time they got to be that serious, the heavier
22  ones. I didn't handle most of my liability cases
23  to the end. I don't think I've handled any of them
24  to the end.

Page 36

1    Q.    In some that you handled -- well, let me
2  start that over.
3    You know, in a liability case in a CGL
4  claim, there would be a complaint by the plaintiff,
5  the injured person, for example, against the
6  defendant, your insured. There would be a lawsuit
7  complaint. You're aware of that, right?
8    A.    Yes.
9    Q.    And then in some cases the plaintiff,
10  the injured person, amends his complaint, files an
11  amended lawsuit with the court. You're aware of
12  that?
13    A.    Yes.
14    Q.    While you were at St. Paul Travelers
15  USF&G, was there any practice or procedure or rule
16  about supplementing a reservation of rights letter
17  when the plaintiff amended his complaint?
18    MR. DUNNE: Objection to the form of the
19  question.
20  BY THE WITNESS:
21    A.    I don't recall.
22  BY MR. NYESTE:
23    Q.    Ms. Robinson, do you remember a St. Paul
24  Travelers insured by the name of VOA Associates?

Page 37

1    A.    Yes.
2    Q.    And it was an architectural firm here in
3  Chicago; is that right?
4    A.    From the address, yes.
5    Q.    Do you recall ever speaking with anyone
6  at VOA?
7    A.    Yes.
8    Q.    Who did you speak with?
9    A.    Mr. Schnell. At the beginning of this
10  claim, Mr. Schnell.
11    Q.    Do you recall anyone else?
12    A.    Later on, a person named Jennifer.
13    Q.    Jennifer Klomans?
14    A.    Sounds correct.
15    Q.    And "this" claim, you're referring to
16  the Madden -- the Michael Madden claim?
17    A.    Yes.
18    Q.    Do you recall who VOA's insurance broker
19  was in connection -- well, let me just stop the
20  question right there. Do you recall who their
21  insurance broker was?
22    A.    I saw something before.
23    Q.    Let me ask you of your independent
24  memory, because we'll get to these documents.

10 (Pages 34 to 37)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 38

1      A.   Okay.
2      Q.   So I just want to find out what you
3   recall independently right now.
4      A.   Was it AVA something?
5      Q.   A-V-A?
6      A.   A-V-A.
7      Q.   Do you recall any person's name there in
8   particular?
9      A.   Not at all.
10     Q.   Do you recall the nature of VOA's CGL
11  coverage with St. Paul Travelers; that is, the
12  limits of liability, for example?
13     A.   Not off -- not without looking at a
14  document.
15     Q.   Now, you do remember the Michael Madden
16  claim or the name of that claim, right?
17     A.   The name of the claim.
18     Q.   Do you recall by name any other claims
19  against VOA?
20     A.   Can I look on the documents.
21     Q.   No. I'm quizzing you on your memory
22  first.
23     A.   Okay. Not without looking at it for
24  sure.

Page 39

1      Q.   Does the Regalado name sound familiar,
2   Raul Regalado?
3      A.   That, I had seen before.
4      Q.   Were you the adjuster on that claim?
5      A.   No, no.
6      Q.   Do you remember who was?
7      A.   No.
8      Q.   Do you recall the names of any other
9   claims against VOA? CGL claims.
10     A.   I just remember this one I handled,
11  Madden.
12     Q.   Now, what did Mr. Madden claim against
13  VOA, to the best of your memory?
14     A.   I didn't know until we got the complaint
15  that came in. He fell through a pit or stage or
16  something. There was a hole and he fell.
17     Q.   Do you recall when VOA was sued by
18  Mr. Madden?
19     A.   I remember briefly when I received the
20  file.
21     Q.   When was that?
22     A.   I just looked over, September.
23     Q.   Of 2004?
24     A.   Yes.

Page 40

1      Q.   Do you recall how long the Madden
2   claim -- let me start over.
3           So if that was in September of 2004, do
4   you recall how long before that Mr. Madden had been
5   injured?
6      A.   No.
7      Q.   So did you begin working on the Madden
8   claim in September of 2004?
9      A.   If the complaint came in, yes, I would
10  have been working on it, liability. And if it was
11  any issues, then sending it up for review.
12     Q.   And when would the last time be that you
13  had any responsibility on the Madden claim?
14     A.   We went to Naperville. Naperville, I
15  handled a few of the claims until they started
16  taking them away. So it would be sometime in '05.
17     Q.   And do you recall what month?
18     A.   The last I seen of the file? Because I
19  think around July I was strictly auto. So it
20  should have been before July '05.
21     Q.   What was going on in the claim at the
22  last time you had anything to do with it?
23     A.   In '05?
24     Q.   Yeah.

Page 41

1      A.   It would have been probably the last
2   one; to do the reservation of rights letter before
3   it left my desk.
4      Q.   And is that the last activity on the
5   file that you can recall?
6      A.   That would be it that I can think of,
7   that I could recall. Because you mentioned the
8   phone calls. I don't -- after that letter.
9      Q.   Do you have a memory as we sit here
10  today of preparing a reservation of rights letter
11  on the Madden claim?
12     A.   It would be with the assistance of Adam
13  Lutz and my supervisor.
14     Q.   Do you have a memory of preparing the
15  text in a reservation of rights letter relating to
16  the Madden claim?
17     A.   If normal circumstances, I would have
18  been getting assistance from Lutz and been copying
19  and pasting.
20     Q.   That would be what ordinarily happened,
21  right?
22     A.   Because I couldn't draft a letter by
23  myself.
24     Q.   And with respect to the Madden claim, do

11 (Pages 38 to 41)

Page 42

1  you have a memory of doing cutting and pasting from
2  material that Mr. Lutz sent you?
3      A.   I know he sent me materials.  I know
4  Mr. Lutz sent me materials.  And if it would be
5  that letter or other letters, it would have been
6  still a combination of letters, and we had to get
7  approval before the letter went out.
8      MR. NYESTE:  Can I have the answer read back.
9          (WHEREUPON, the record was read
10          by the reporter as requested.)
11 BY MR. NYESTE:
12     Q.   You recall Mr. Lutz sending you text or
13 material for a reservation of rights letter
14 relating to the Madden claim; is that fair?
15     A.   Yes.
16     Q.   Okay.  Do you have an independent
17 memory -- can you sit here and recall yourself
18 putting that letter together based on the text or
19 language that he sent you?
20     A.   I recall he sent me -- in fact, in
21 Chicago I have a better memory than in Naperville.
22 In Chicago he sent me information, and in
23 Naperville -- I couldn't recall all the information
24 in Naperville, but in Chicago I could recall more.

Page 43

1  Because Naperville was more stressful than Chicago.
2      Q.   Do you have a memory of doing the
3  cutting and pasting of a Madden reservation of
4  rights letter in either Chicago or Naperville?
5      A.   In Chicago I remember it more so doing
6  the reservation of rights letter.  In Naperville, I
7  remember it, also.
8      Q.   And does that memory relate to the
9  Madden claim?
10     A.   Uh-hmm.
11     Q.   Did you prepare more than one
12 reservation of rights letter for the Madden claim?
13     A.   Yes, there would have been.
14     Q.   And how did they differ?
15     A.   I couldn't recall on the specifics of
16 the difference.
17     Q.   When was the first one prepared?
18     A.   I couldn't recall the date.
19     Q.   Sometime in the Chicago office?
20     A.   Yeah, sometime in the Chicago office.
21     Q.   And then you say your -- you have a
22 memory of preparing one in the Naperville office,
23 and that came later?
24     A.   Yes, it would have been later.

Page 44

1      Q.   And you can't recall what the
2  differences were?
3      A.   If there was a difference, I couldn't
4  recall.
5      Q.   Now, when you were preparing these
6  letters -- let's take the Chicago one.  What did
7  you have in front of you as you prepared it?
8      A.   Probably the way we communicated with
9  Adam Lutz would have been e-mail; an e-mail and
10 there might have been some phone conferences.
11     Q.   Did you have a copy of the policy in
12 front of you?
13     A.   I can't recall for certain.
14     Q.   Did you have a copy of Mr. Madden's
15 complaint in front of you?
16     A.   I can't recall for certain.  You said
17 don't speculate.
18     Q.   Is there anything apart from some text
19 from Mr. Lutz that you recall having as you
20 prepared this letter?
21     A.   The reason why I remember some of
22 Mr. Lutz is because I had a hard time copying and
23 pasting some things.
24     Q.   Why was that?

Page 45

1      A.   I was just having a hard time.
2      Q.   Sometimes I indeed have a hard time
3  because of the format that I'm trying to take the
4  text from.  If I'm trying to take text from a PDF
5  file, for example, sometimes it doesn't work very
6  well to take that text and put it into another
7  file.
8      A.   Right.
9      Q.   Is there any reason that you can recall
10 why you were having trouble?
11     A.   No, I can't recall the exact one, but
12 there was some difficulty.
13     Q.   Why do you seem to have that
14 recollection?  Why do you have that specific
15 recollection that you had difficulty cutting and
16 pasting?
17     A.   I know this sounds a little bit -- the
18 other person or the other adjuster who was there,
19 Christine, she had a form that was working so well
20 with hers, and I couldn't do mine the same as
21 Christine could do hers.  I had a more difficult
22 time than Christine.  That's why I say I remember
23 it, because sometimes Christine -- we called her
24 Chris -- would help.

12 (Pages 42 to 45)

Page 46

1    Q.    Okay.  You got some text from Mr. Lutz.
2  You prepared a reservation of rights letter.
3    A.    Right.
4    Q.    Did you -- and this is in the Chicago
5  office.  Did you then have it reviewed by someone
6  within Travelers St. Paul USF&G?
7    A.    It should have been by Adam Lutz or
8  Steve Heckman or both.
9    Q.    Do you recall sending it to them for
10  review?
11    A.    That, I would have for certain.
12    Q.    As an ordinary practice?
13    A.    Because I don't do reservation of rights
14  letters.
15    Q.    But do you have a specific memory of
16  clicking/sending to Heckman and/or Lutz for their
17  review?
18    A.    I couldn't recall.
19    Q.    Do you recall that Chicago reservation
20  of rights letter going through any revisions?
21    A.    I can't recall that either.
22    Q.    I've been trying to explore the one that
23  you prepared in the Chicago office.  I'm going to
24  try and switch gears and ask you about what you can

Page 47

1  recall about preparing one in the Naperville
2  office.  Correct me if I'm wrong, but you said you
3  have a recollection of preparing one while in
4  Naperville?
5    A.    Correct.
6    Q.    Again, it was based on language or text
7  supplied by Mr. Lutz?
8    A.    It would have been.
9    Q.    And do you recall whether you had
10  anything else available to you or in front of you
11  as you were preparing this letter?
12    A.    Just the file.
13    Q.    Do you recall if you had the policy in
14  front of you?
15    A.    I couldn't recall definitely that, but
16  the file should have been in front of me; whatever
17  was in the file.
18    Q.    All right.  Do you know whether that
19  letter went through any revisions?
20    A.    I don't know.
21    Q.    Do you recall sending it back to either
22  Lutz or Heckman for review?
23    A.    I'm not certain.
24    Q.    With respect to the first one -- I think

Page 48

1  that's correct.  The Chicago one was the first one?
2    A.    Yes.
3    Q.    Do you have a specific memory of sending
4  that reservation of rights letter out to the
5  insured?
6    A.    The first one?
7    Q.    Yes.
8    A.    I don't know.  I'm not certain on that
9  one.
10    Q.    Okay.  With respect to the one you
11  prepared in Naperville, do you have a specific
12  memory of sending that one out to the insured?
13    A.    That one, I'm pretty certain that went
14  out.
15    Q.    And how was it sent?
16    A.    Regular mail.
17    Q.    Was a file copy kept?
18    A.    It should have been, because Steve was
19  on me to make sure.
20    Q.    Do you recall to whom it was addressed?
21    A.    It would have been addressed to VOA.
22    Q.    And was it addressed to anyone in
23  particular at VOA?
24    A.    I was talking to Mr. Schnell, so it

Page 49

1  would have been to him.
2    Q.    And that would have gone regular mail to
3  Mr. Schnell?
4    A.    Yes.
5    Q.    And would you have signed that letter
6  "Iris Robinson" or would you have initialed it?
7    A.    If I was rushing, more than likely
8  initials.  And sometimes, if not, it's an "I" and
9  an "R" with a line.
10        MR. DUNNE:  Are you doing okay?  It's a little
11  warm in here.
12        THE WITNESS:  It is a little.
13        MS. SKAGGS:  It's ironic, given your
14  conference room.
15        MR. DUNNE:  Why do you think I don't take the
16  deps?
17            Sorry, you can go off.
18            (WHEREUPON, discussion was had
19             off the record.)
20  BY MR. NYESTE:
21    Q.    Do you recall whether there were any
22  copies -- either CCs or blind CCs with respect to
23  that letter?
24    A.    That, I don't recall.

13 (Pages 46 to 49)

Page 50

1    Q.    Do you recall whether it was sent to
2  anyone other than Mr. Schnell?
3    A.    The attorney.
4    Q.    And who was that?
5    A.    I've seen it before.  Kurt?
6    Q.    Beranek?
7    A.    Yes.
8    Q.    If you will turn to Exhibit 9, please.
9    A.    Okay.
10    Q.    Would you turn to the last page.  Can
11  you testify with certainty that those are your
12  initials?
13    A.    Yes.
14    Q.    Is there anything that you recall, any
15  circumstances or anything that makes you confident
16  that they are your initials?
17    A.    That's my signature.
18    Q.    Now, note that this Exhibit 9 is a copy
19  of a fax that was sent from Travelers Claims in
20  Chicago.  Do you see that?
21    A.    Okay.
22    Q.    So where was this letter prepared?
23    A.    It could have been in Chicago because
24  it's a 312.  It would have been Chicago.

Page 51

1    Q.    Well, the 312-782-4537, is that the
2  number you're referring to?
3    A.    Yeah, I guess so.
4    Q.    That's the number that it's going to.
5    A.    Going to?  Okay.
6    Q.    And just so that we're all clear, that
7  number corresponds to the fax number at Kurt
8  Beranek's office.
9    A.    Okay.
10    Q.    So this is a copy of a fax that was sent
11  to Kurt Beranek.
12    A.    Okay.
13    Q.    Do you have a specific recollection of
14  having this letter sent to Mr. Beranek?
15    A.    I remember it.  No, I don't want to say
16  that.  VOA at this point -- when they sent the
17  default, I was very -- I was upset getting a
18  default notice, of course.  I was just trying to
19  make sure that copies were sent where they should
20  be sent and that people had notice of it.
21    Q.    Is this the reservation of rights letter
22  or one of them that you were speaking of earlier?
23    A.    That was composed, yes.
24    Q.    Is this the one you prepared in Chicago

Page 52

1  or Naperville?
2    A.    From what it has here, it should have
3  been Chicago.
4    Q.    If it was sent from Naperville, would it
5  show Naperville in the fax header?
6    A.    I don't know with Naperville.
7    Q.    On May 4, 2005, where were you
8  physically officed?
9    A.    May?  I think I should have been in
10  Naperville.
11    Q.    Did you ever speak with Kurt Beranek
12  about this letter?
13    A.    I don't recall.
14    Q.    He has an associate, Nadehr -- I forgot
15  her last name.
16    MS. SKAGGS:  Elrabadi.
17  BY MR. NYESTE:
18    Q.    Elrabadi.  Do you recall speaking with
19  Mr. Beranek's associate about this letter?
20    A.    I remember with his office.  I would
21  speak with someone from his office.
22    Q.    A female attorney?
23    A.    From there.
24    Q.    Do you recall speaking with her about

Page 53

1  this letter?
2    A.    I remember asking for contracts.
3    Q.    Why would this have been faxed to
4  Beranek but, you say, sent by regular mail to VOA?
5    A.    That's what -- I'm surprised that I
6  didn't have a fax copy to VOA.
7    Q.    Do you recall speaking with Mr. Schnell
8  about whether he got this letter?
9    A.    No.
10    Q.    Now that you have the letter in front of
11  you, do you recall anything more about its
12  preparation?
13    A.    I do remember cutting and pasting it in
14  Chicago for certain, because of Adam and sending
15  things to Steve Heckman.  I'm just remembering
16  sending the file to Steve Heckman for review.
17    Q.    Do you have any recollection as to
18  whether Heckman or Lutz reviewed this letter?
19    A.    I remember getting information from Lutz
20  and cutting and pasting it in this letter.
21    Q.    But that's really the extent of your
22  recollection?
23    A.    No, because reservation of rights
24  letters had to be approved, had to be seen.

14 (Pages 50 to 53)

Page 54

1    Q.    But you don't have a specific memory of
2  getting that done here; is that fair to say?
3    A.    That's fair to say.
4    Q.    I mean, I don't want to beat a dead
5  horse here, Ms. Robinson.
6    A.    Okay.
7    Q.    I just want to make sure we're clear.
8          Since leaving St. Paul Travelers USF&G,
9  have you had any conversations with anyone about
10  the Madden claim?
11    A.    No.
12    Q.    You met with Mr. Dunne before your
13  deposition.
14    A.    That's true. I'm sorry. I meant like
15  an adjuster.
16    Q.    That's okay.
17          And that was recently, in the last week
18  or so?
19    A.    Yes.
20    Q.    How long did you meet for?
21    A.    Maybe an hour or so or more.
22    Q.    Only one occasion?
23    A.    Twice.
24    Q.    And both times within the last week or

Page 55

1  so?
2    A.    No.
3    Q.    Okay. When was the first time?
4    A.    When he presented that this was a
5  lawsuit.
6    Q.    And when was that? Last summer?
7    A.    September or October or something of
8  that nature.
9    Q.    How long did you meet with him then?
10    A.    About an hour, little over an hour.
11    Q.    Have you prepared or have you been given
12  an affidavit for your signature or potential
13  signature?
14    A.    Just received the subpoena. Nothing
15  else.
16    Q.    You haven't signed anything?
17    A.    No.
18    Q.    Or asked for -- been asked to review or
19  sign a statement or an affidavit?
20    A.    Not that I can recall.
21    Q.    Apart from Mr. Dunne, have you spoken
22  about the Madden case or this lawsuit with anyone
23  else?
24    A.    Just to get permission to get off for

Page 56

1  today.
2    Q.    With Gallagher Bassett?
3    A.    Yes.
4    MR. DUNNE:  So the record is clear,
5  Ms. Carwile was in the room with us today.
6    MR. NYESTE:  Okay.
7    MR. DUNNE:  Don't want to do a Roland Burris.
8    MR. NYESTE:  Want to take a little break?
9    MR. DUNNE:  Please.
10    MR. NYESTE:  Okay. Good, because then we'll
11  go through some documents.
12          (WHEREUPON, a recess was had.)
13  BY MR. NYESTE:
14    Q.    Ms. Robinson, would you turn to
15  Exhibit 8, please. I will tell you that, as far as
16  I can determine, these letters are identical but
17  for their dates and, you know, the fax header on
18  Exhibit 9 and the numbering on the bottom of the
19  pages. But otherwise, the text of these two
20  letters, to me, seems identical.
21          Now, do you recall this letter dated
22  February 24, 2005, that we've marked as Exhibit 8?
23    A.    Yes.
24    Q.    Do you know whether this one was sent to

Page 57

1  Mr. Schnell?
2    A.    The February one?
3    Q.    Yes.
4    A.    As I recall, we were waiting on the
5  contracts. It shouldn't have been sent.
6    Q.    The contracts between VOA and the school
7  district?
8    A.    The complete contract they had with
9  everyone on this project.
10    Q.    And why did you want to receive that?
11    A.    I believe it was from Adam's and Steve
12  Heckman's recommendation that we get this letter to
13  see the role VOA had.
14    Q.    Okay. And do you believe that you
15  received the contracts between the dates of the two
16  letters on Exhibit 8 and Exhibit 9?
17    A.    Yes.
18    Q.    And apparently nothing about the
19  contracts caused any change in the letters?
20    A.    I guess not.
21    MR. DUNNE:  I don't want you to guess.
22    THE WITNESS:  I'm sorry.
23  BY THE WITNESS:
24    A.    When the contract came in, then the

15 (Pages 54 to 57)

Page 58

1    reservation of rights letter went out.
2    BY MR. NYESTE:
3        Q.    Okay.  In the first paragraph of
4    Exhibit 8 it says, "St. Paul Travelers has reviewed
5    the allegations."  Do you see that here at the
6    bottom of the first paragraph?
7        A.    Okay.
8        Q.    "And other relevant information,
9    including USF&G Policy Number BK 01116165."
10        Do you see that?
11        A.    Uh-hmm.
12        Q.    Did you review that policy?
13        A.    Not really.
14        Q.    Do you know whether Mr. Lutz reviewed
15    the policy?
16        A.    Yes, it was sent to him.
17        Q.    Okay.  You recall sending him the
18    policy?
19        A.    I had to wait awhile on the policy, the
20    full policy.
21        Q.    Why was that?
22        A.    I don't know why.  For the full policy.
23        Q.    Where was the policy obtained from?
24        A.    I don't recall that.

Page 59

1        Q.    And you don't recall what the wait was
2    for?
3        A.    He wanted a complete policy.
4        Q.    Yes.
5        A.    We had to get a complete policy.
6        Q.    And there was some delay involved in
7    getting the complete policy?
8        A.    I don't remember what it was, but we had
9    to get a complete policy.
10        Q.    Ms. Robinson, let me show you Exhibit
11    10, which is part of the policy for VOA.  It is the
12    liability coverage part.  If you turn to the second
13    page -- I want you to have that policy part in
14    front of you, as well as Exhibit 8, the letter.
15        A.    8?
16        Q.    Yeah, the February 24, 2005, document.
17        A.    Okay.
18        Q.    On the second page of the letter there's
19    some text quoted from the policy, "What This
20    Agreement Covers," et cetera, "Bodily Injury
21    Means."  Do you see those quotations?
22        A.    Uh-hmm.
23        Q.    What policy did that come from?
24        A.    I don't recall what that was from.

Page 60

1        Q.    This policy, Exhibit 10, or the
2    liability part of the policy, is written on an
3    occurrence basis.  Do you know what that means?
4        A.    I don't deal with those terms very much.
5        Q.    Well, let me just suffice it to
6    represent to you that the -- what appears to be
7    quotations from the policy do not come from the
8    policy that USF&G has submitted to the court in
9    this case.  Do you have an explanation for that?
10        A.    Cutting and pasting.  I was cutting and
11    pasting.  That's all I could tell you.
12        Q.    Is everything in this Exhibit 8
13    something that was sent to you by Mr. Lutz?
14        A.    I don't recall that it was all of it,
15    but I know I was cutting and pasting from his
16    e-mails.
17        Q.    Would you have independently cut and
18    pasted from any document that Mr. Lutz did not send
19    you?
20        MR. DUNNE:  I'm going to object.  I think it's
21    been asked and answered.
22        But go ahead.
23    BY THE WITNESS:
24        A.    I don't recall.  I recall his e-mails.

Page 61

1    BY MR. NYESTE:
2        Q.    Based on your familiarity with Mr. Lutz
3    and Mr. Heckman, do you believe that they would
4    have reviewed and allowed to be sent a reservation
5    of rights letter that did not accurately quote the
6    insurance policy?
7        MR. DUNNE:  Object to the form of the
8    question, calls for speculation.
9        But you can go ahead.
10    BY THE WITNESS:
11        A.    I know Steve Heckman would not.
12    BY MR. NYESTE:
13        Q.    And Mr. Lutz?
14        A.    I'm not certain.
15        Q.    In Footnote Number 1 in Exhibit 8 and
16    Footnote Number 1 in Exhibit 9 -- they're
17    identical -- there's reference to a $2 million
18    policy limit in the general liability policy.
19        Were you responsible for putting that
20    limit in there?  Did you find that limit yourself?
21        A.    I don't recall.
22        Q.    It does not correspond to the Each
23    Occurrence limit in the liability coverage part of
24    the policy that USF&G has submitted to the court.

16 (Pages 58 to 61)

Page 62

1  Do you have any understanding as to where the
2  $2 million limit came from?
3      A.   No, I don't know.
4      Q.   In the middle of the second page of
5  Exhibit 8 and of Exhibit 9, there's a line that
6  reads, "Event means an accident, including
7  continuous or repeated exposure to," and then the
8  quote just ends right there.
9          Do you have any understanding as to why
10 that sentence is not completed?
11     A.   No.
12     Q.   On Page 3 of Exhibit 8 or on Page 3 of
13 Exhibit 9, the second paragraph from the top which
14 begins, "Since these allegations potentially
15 constitute a claim," do you see that?
16     A.   Yes.
17     Q.   What allegations are being referred to?
18     A.   I couldn't tell you if I was cutting and
19 pasting.
20     Q.   On the same page further down, there's a
21 paragraph that begins, "The complaint alleges that
22 VOA failed to properly inspect the site."
23         Is this the allegation on which you were
24 reserving rights to possibly deny coverage?

Page 63

1      A.   If that's what Mr. Lutz told me to,
2  that's what I did.
3      Q.   Well, what was your understanding of the
4  position being taken by St. Paul Travelers USF&G in
5  this letter?
6      A.   That the architects or engineers,
7  surveyor, this exclusion endorsement, as there was
8  an exclusion.
9      Q.   Were there particular allegations in
10 Mr. Madden's complaint that, to your understanding,
11 made that exclusion applicable?
12     A.   I'm not sure if I understand your
13 question, because -- I just want to say I was just
14 giving whatever Mr. Lutz gave me.
15     Q.   Let me show you Exhibit 4. This is
16 Mr. Madden's third amended complaint in his
17 lawsuit. Is there any scribbling or handwriting or
18 anything on this document that is yours? You know,
19 there's a few marginal notes, squiggles and things.
20 I just want to know if you can identify any
21 markings by yourself on here.
22     A.   There's one.
23     MR. DUNNE: Referring to Page --
24     THE WITNESS: 4 of 21.

Page 64

1  BY MR. NYESTE:
2      Q.   And what markings are yours?
3      A.   The one that says S-U-B, SUB, project
4  manager.
5      Q.   I see.
6      A.   I can recognize the handwriting.
7      Q.   Do you recall reviewing this document,
8  this complaint?
9      A.   I reviewed that particular portion of
10 mine.
11     Q.   Do you recall reviewing the allegations
12 against VOA?
13     A.   Reviewing some of it, yes.
14     Q.   Do you recall considering whether any of
15 the allegations made against VOA in this complaint
16 potentially made the architects and engineers
17 exclusion applicable?
18     A.   I left that up to the analysts.
19     Q.   Ms. Robinson, would you turn to
20 Exhibit 7, please. Do you recall receiving this
21 fax from Rachel Buelow at HRH AVA?
22     A.   I don't until seeing it now.
23     Q.   Do you have a recollection of not being
24 able to locate the policy conditions of the VOA

Page 65

1  insurance policy?
2      A.   I don't recall.
3      Q.   Was it a practice at St. Paul Travelers
4  USF&G to indicate in the electronic notes when a
5  reservation of rights letter was being sent out?
6      A.   I don't recall those specifics.
7      Q.   If you would turn to Exhibit 3, please,
8  and turn to Page 32 of 38. In the middle of the
9  page there's an entry by you dated March 7, 2005.
10         Do you see that?
11     A.   Yes.
12     Q.   And the next entry above that is dated
13 July 6, 2005. Do you see that?
14     A.   Uh-hmm.
15     Q.   What explains why there is a four-month
16 gap in the electronic notes?
17     A.   I don't know. With the transition, I
18 wouldn't know.
19     Q.   Are there any entries by you after
20 March 7, 2005? I don't believe so. I'm asking
21 whether you can confirm that for me.
22     A.   I see from here there's nothing else on
23 there.
24     Q.   There are, of course, earlier entries by

17 (Pages 62 to 65)

Page 66

1 you?
2    A.  Uh-hmm.
3    Q.  "Yes"?
4    A.  Yes, that's true.
5    Q.  Is it possible that March 7, 2005, was
6 the last time you had any occasion to handle the
7 Madden file?
8    A.  No, because my letter is initialed in
9 here from May of '05.  That's definitely my
10 initials.
11    Q.  Would you turn back to the earliest
12 notes, Page 37 of 38, the note dated September 1,
13 2004.  I guess it's the third note from the bottom.
14 MR. DUNNE:  Is there a time?
15 MR. NYESTE:  15:50:18.
16 BY MR. NYESTE:
17    Q.  "Called insured, left a message with
18 Jennifer."
19    A.  Okay.
20    Q.  Is that your note?
21    A.  Yes, it is.  It would be.
22    Q.  And how did you know to call Jennifer?
23    A.  Was it on the loss sheet that came in or
24 the number -- I had something on there with her

Page 67

1 number.  I had to have her number somewhere.
2 Because I have two numbers for her.
3    Q.  The next note above that, "This was sent
4 to Adam to review coverage."  Is that Adam Lutz?
5    A.  Yes, that would be Adam Lutz.
6    Q.  And is that your entry?
7    A.  Yes.
8    Q.  And what was sent to him?
9    A.  It would have been the lawsuits
10 underneath it.  I would have sent the lawsuit or a
11 complaint was to be sent to Adam.
12    Q.  Okay.  How would that be sent?
13    A.  Either by fax or e-mail.  I don't want
14 to speculate.
15    Q.  If the complaint came in to your office
16 by fax, would your fax machine capture a digital
17 image of that transmission in addition to printing
18 out the paper?
19    A.  I don't know that.
20    Q.  The entry above that one, "Our insured
21 is the architect," is that your entry?
22    A.  Yes, that's what it has.
23    Q.  And above that there's an entry by Steve
24 Heckman, "Have you inquired from insured and agent

Page 68

1 who insured professional liability carrier is?
2 Have they turned this suit in to them?  When is
3 appearance due?"
4       Ms. Robinson, do you recall ever finding
5 out who the professional liability carrier was for
6 VOA with respect to the Madden claim?
7    A.  I don't recall.
8    Q.  What did you do to try and find out?
9    A.  I contacted the insured.  I talked to,
10 the note above that, Theodore Schnell.
11    Q.  The note that begins, "I spoke to
12 Theodore Schnell"?
13    A.  9-17-04, 13:53.
14    Q.  Tell me what you can recall about that
15 conversation.
16    A.  He said they have an attorney on the
17 case and it will be dismissed.  So I was assuming,
18 during that earlier part, that this case was going
19 to be dismissed; that he had his attorney already
20 there.
21    Q.  Okay.  And that was not Mr. Beranek?
22 That was a different attorney?
23    A.  I didn't know which attorney.  He just
24 said he had his attorney.

Page 69

1    Q.  Do you know whether that was an attorney
2 from the Schiff Hardin firm?
3    A.  I didn't know.  I didn't recall.
4    Q.  Did you ever have any conversations with
5 Mr. Schnell's attorney on the Madden claim?
6    A.  I don't recall any.
7    Q.  The next entry at the bottom of Page 36
8 is also by you, correct?
9    A.  "A note from Adam on 9-16"?
10    Q.  Yes.  Could you read that.
11    A.  "A note from Adam on 9-16-04.  Iris:
12 Let me know if the professional liability carrier
13 has accepted the defense or retained defense
14 counsel to protect the answer date.  If the answer
15 date has not been protect, you'll need to contact
16 the PH," policyholder, "and have them retain
17 defense counsel to protect their legal interests.
18 You can tell them that we are evaluating coverage
19 and if we decide to defend, we will reimburse them
20 for any incurred costs.  I recommend you do the
21 following:  Contact the PH and secure any contract
22 they have for their work at this location.  The
23 complaint alleges a contract between VOA and Amos
24 Alonzo Stagg High School.  The PH may have been

18 (Pages 66 to 69)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 70

1  hired solely to provide architectural services.
2  Secure a copy of the complaint so we know for
3  certain, et cetera, et cetera."
4       So I copied and paste part of an e-mail.
5       Q.   And what did you do to respond to his
6  request, "Let me know if the professional liability
7  carrier has accepted the defense"?
8       A.   That was 9-17. Some kind of letter went
9  out.
10      MR. DUNNE: Are you asking for her
11  recollection or do you want her to look at the file
12  notes?
13      MR. NYESTE: No. I'm asking for her
14  recollection.
15  BY MR. NYESTE:
16      Q.   What did you do to respond to Mr. Lutz's
17  request?
18      MR. DUNNE: If you know.
19  BY THE WITNESS:
20      A.   I don't recall.
21  BY MR. NYESTE:
22      Q.   On Exhibit 5 on the fourth page,
23  numbered at the bottom USF&G 01565 -- do you have
24  that page in front of you?

Page 71

1       A.   Yes.
2       Q.   There's a message from Mr. Heckman.
3  "Iris, please review for professional exclusion, BK
4  policy, who has insured professional liability?"
5       What did you do in response to
6  Mr. Heckman's inquiry about who has the insured's
7  professional liability?
8       A.   Calling Mr. Schnell.
9       Q.   Do you recall asking Mr. Schnell
10  specifically who VOA's professional liability
11  insurer was?
12      A.   I don't recall. I'm looking in my
13  notes. "Mr. Schnell does not think we will need
14  additional investigation. I asked to take pictures
15  and statements. He said I should wait."
16      Q.   Returning to the electronic notes,
17  there's an entry dated September 17, 2004, on
18  Page 36 of 38.
19      A.   Okay.
20      Q.   And the first line reads, "FC37017."
21      What does that refer to?
22      A.   Some kind of letter or form letter.
23      Q.   If you would turn to Exhibit 5, and
24  specifically the fifth page of that. Does FC37017

Page 72

1  refer to the Litigation Referral Form?
2       A.   Okay. Yes, it's down here.
3       Q.   Now, who prepared this form?
4       A.   It's a standard form. We go in and we
5  put in information, just fill it in. I don't know
6  who prepared the actual form, but I filled in the
7  information.
8       Q.   Okay. It's not all filled in at the
9  same time, though; is that fair? You come back to
10  it from time to time to put information in it?
11      A.   It would have been, correct.
12      Q.   So this would not have been filled out
13  as we see it completely on September 17, 2004; is
14  that fair?
15      A.   There's a possibility I could use it
16  over and over again.
17      Q.   For example, on the second page of the
18  referral form, there's a line about the default or
19  possible default. Would that indicate to you that
20  that was added to this form at a later date?
21      A.   Because when did I speak to her about
22  it? Whenever Jennifer told me about the default,
23  right.
24      Q.   And that was sometime after September

Page 73

1  17th, correct?
2       A.   Right, right.
3       Q.   Also on the Litigation Referral Form
4  there's a line for reservation of rights and an X
5  next to "Yes." That doesn't necessarily mean that
6  a reservation of rights letter had been sent as of
7  the date on this document, September 17, 2004?
8       A.   I can't speculate. I don't recall.
9  "Excess letter sent? No."
10      Q.   You don't recall when that would have
11  been filled in or X'd, correct?
12      A.   Correct.
13      Q.   Back to Exhibit 3, the electronic notes.
14  On Page 35 of 38, the entry at the bottom, that's
15  an entry by you; is that correct?
16      MR. DUNNE: Time?
17      MR. NYESTE: October 8, 2004, at 14:31:45.
18      MR. DUNNE: Thank you.
19  BY THE WITNESS:
20      A.   Okay. October 8th.
21  BY MR. NYESTE:
22      Q.   That note is by you?
23      A.   That's me, yes.
24      Q.   In the middle of that note it says,

19 (Pages 70 to 73)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 74

1    "Coverage: Lyric Opera of Chicago is the named
2    insured, with limits 2 million each occurrence."
3         A.    So that's a cut and paste from the wrong
4    document.
5         Q.    That was going to be my question.
6    What's the explanation for that?
7         A.    It must have been a previous form or
8    something; a previous form and I didn't clear that
9    out.
10        Q.    The next entry just above that dated
11   October 8, 2004, is that, again, referring to some
12   letter?
13        A.    Correct, claim reassignment letter.
14        Q.    Within Exhibit 5 on Page 1571, is this
15   the October 8, 2004, letter that corresponds to the
16   electronic note?
17        A.    Yes.
18        Q.    To whom were you sending this letter?
19        A.    VOA.
20        Q.    You write, "In our last conversation you
21   mentioned." Who had you been speaking with?
22        A.    Either Jennifer or Mr. Schnell.
23        Q.    How do you know whether this letter got
24   to either Jennifer or Mr. Schnell's attention?

Page 75

1         A.    We were waiting on the contracts, that's
2    how. I can just say we were waiting on contracts
3    for that entire time.
4         Q.    Do you know whether VOA ever received
5    this letter of October 8, 2004?
6         A.    A note that was sent above that,
7    10-22-04, 17:27:44, "I sent a letter and insured
8    has not responded."
9         Q.    And that refers to this October 8th
10   letter on Page USF&G 01571, right?
11        A.    That would be an assumption.
12        Q.    Well, is that your understanding; that
13   in the electronic note of October 22nd at 17:27:44
14   you were referring to this October 8, 2004, letter
15   on Page USF&G 01571?
16        A.    Right.
17        Q.    And the insured had not responded to
18   that letter as of October 22nd, correct?
19        A.    Correct.
20        Q.    Again, on November 4th Mr. Heckman is
21   asking you to find out about who the professional
22   liability carrier is, correct?
23        A.    Correct.
24        Q.    And do you recall what you did in

Page 76

1    response to that request?
2         A.    My next note, I spoke to Jennifer.
3         Q.    Would that be Jennifer Klomans?
4         A.    "Jennifer from our insured," I put on
5    the note. "Yesterday," on 11-3, "I told her that
6    there was coverage issues and since I was told your
7    attorney would appear, I was going to close my
8    file," from speaking to Mr. Schnell.
9              "She said her CEO was incorrect with the
10   information he gave out. I asked her to call her
11   broker and give this to their professional carrier,
12   as well. She said they did and were told there is
13   no coverage and their CGL should cover the loss.
14   Insured will fax in the default order today."
15        Q.    Okay. "Their CGL," referring to you,
16   St. Paul Travelers, right?
17        A.    Correct.
18        Q.    And did you ask her who the professional
19   liability carrier was?
20        A.    From that conversation, I'm not certain.
21   I do recall we made a joke about her boss.
22        Q.    Mr. Schnell?
23        A.    Yes.
24        Q.    Do you recall the nature of the joke?

Page 77

1         A.    About the boss getting things wrong.
2         Q.    I've got that problem being my own boss.
3              The next entry in the electronic notes
4    is yours?
5         A.    The one up above it?
6         Q.    Yes.
7         A.    The 11-10 at 11:50, yes, "Walking the
8    file over to Cassidy's office."
9         Q.    Who is Cassidy?
10        A.    It's a law firm.
11        Q.    Cassiday Schade or a different Cassidy?
12        A.    Cassiday Schade's.
13        Q.    And did you take the file over there or
14   not?
15        A.    I would -- from this note, I walked it
16   over. I have walked a couple files over to
17   Cassiday's office at that time.
18        Q.    Well, they didn't end up being the
19   defense attorney here.
20        A.    I cannot recall why.
21        Q.    Returning to Exhibit 5, and if you would
22   turn to the page that has the number USF&G 01576.
23   Do you see this November 9, 2004, letter?
24        A.    Right.

20 (Pages 74 to 77)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 78

1    Q.    What do you recall, if anything, about
2  the circumstances of this letter?
3    A.    I don't recall.
4    Q.    Did it go out?
5    A.    I wouldn't think so with an X there, no.
6    Q.    And there are empty blanks, also?
7    A.    Right.
8    Q.    But do you recall whether a letter like
9  this, revised perhaps, was sent out?
10   A.    I don't recall.
11   Q.    And you've indicated you don't recall
12  why the Cassiday firm did not end up defending the
13  Madden claim?
14   A.    No, I don't recall.
15   Q.    Returning to the electronic notes,
16  there's a note dated December 3, 2004, at 13:32:31,
17  "Called attorney for status." And then there's a
18  phone number, 312-782-9255. That number
19  corresponds to the Fraterrigo Beranek law firm and
20  to Kurt Beranek.
21   A.    Okay.
22   Q.    Although your message -- your note here
23  talks about status, "Called attorney for status,"
24  was this really the initial assignment of the

Page 79

1  matter to Mr. Beranek?
2    A.    I don't know. I can't recall.
3    Q.    How did -- or who decided to use
4  Mr. Beranek?
5    A.    I can't recall that information.
6    Q.    Would that have been your responsibility
7  or someone else's?
8    A.    We have a panel of attorneys. I don't
9  know.
10   MS. SKAGGS: I'm sorry. Could you repeat
11  that.
12   THE WITNESS: We have panels of attorneys that
13  we're given. Sometimes Mr. Lutz would suggest an
14  attorney.
15  BY MR. NYESTE:
16   Q.    Back on the Litigation Referral Form
17  within Exhibit 5 --
18   MR. DUNNE: What number again?
19   MR. NYESTE: Page 1566.
20  BY THE WITNESS:
21   A.    Okay. I got on there Kurt.
22  BY MR. NYESTE:
23   Q.    Yeah. You have, "Kurt Beranek is the
24  attorney." Is that your handwriting?

Page 80

1    A.    Yes, it is.
2    Q.    But to the left of that there's the firm
3  Maisel & Associates?
4    A.    Right.
5    Q.    Do you recall anything about how it came
6  to be that they were not used?
7    A.    Because that was a law firm that was
8  St. Paul's law firm, employed by St. Paul.
9    Q.    Okay. So that was wrapped up in this
10  transition and merger business; is that right?
11   A.    Part of it.
12   Q.    Returning to the electronic notes, a
13  note dated December 7, 2004, at 16:34:35, a note by
14  Mr. Heckman, "Please send me a copy of this lawsuit
15  and any contracts. Have contracts insured had been
16  supplied to you? What is your reserve
17  recommendation? Also, send me a copy of the
18  reservation of rights letter you sent to insured.
19  Also, a copy of Adam's coverage review."
20   As of December 7, 2004, you hadn't sent
21  any reservation of rights letter, had you?
22   A.    I don't think so.
23   Q.    And what was Adam's coverage review?
24   A.    It's not in here. It would be an

Page 81

1  e-mail.
2    Q.    Do you recall a coverage review by
3  e-mail from Mr. Lutz?
4    A.    I remember him sending me the language
5  for the reservation of rights letter.
6    Q.    Within Exhibit 5, on Page 01579 there's
7  a letter dated December 8, 2004, from Kurt Beranek,
8  the attorney. Do you recall that this letter would
9  have been at or about the time that Mr. Beranek was
10  retained?
11   A.    Yes, because they say they have the
12  captioned case filed to protect the interests of
13  VOA.
14   Q.    The way that is worded would indicate to
15  you that they have recently been retained. They're
16  acknowledging their assignment; is that fair to
17  say?
18   A.    Correct.
19   Q.    Mr. Beranek refers to this other case
20  involving Mr. Regalado. Do you recall doing
21  anything to coordinate the claim handling
22  responsibilities on the Madden case with the claim
23  handling on Regalado?
24   A.    I didn't handle anything with Regalado.

21 (Pages 78 to 81)

Page 82

1    Q.   And do you recall ever talking with --
2    A.   But if I had talked to -- I have a
3  message that's in my note of 12-3-04. I called
4  Kurt then for the status of the lawsuit. So 12-3,
5  I must have talked to Kurt. He responded five days
6  later with a note.
7    Q.   Okay. Is it likely that December 3rd
8  was the date on which Mr. Beranek was assigned?
9    A.   Well, I asked him for a status. I'm
10  speculating. I can't say. I can't speculate. And
11  then again I called him on 12-8, and that's when I
12  get a letter.
13    Q.   Returning to the Regalado case and
14  Mr. Beranek's reference to Regalado in his
15  December 8, 2004, letter, you don't recall any
16  contact with that claim file or the adjuster
17  handling it?
18    A.   I'm trying to -- I'm not sure.
19    Q.   Were you aware that the Regalado claim
20  was being treated as both a CGL claim and a
21  professional liability claim; that is, that two
22  insurance companies were involved? Were you ever
23  aware of that?
24    A.   I don't recall now, but looking at the

Page 83

1  letter -- looking at the letter it would be common
2  sense.
3    Q.   Returning to the electronic notes, you
4  have a note dated December 9, 2004, at 17:57:44, "I
5  will request CAR from him." Do you see that?
6    A.   Yes, I do.
7    Q.   What is a CAR?
8    A.   It's a report that the attorney sends
9  us.
10    Q.   And what does CAR stand for?
11    A.   I don't recall the initials, what it
12  means.
13    MR. DUNNE: Case Assessment Report.
14    THE WITNESS: Thank you.
15  BY MR. NYESTE:
16    Q.   The next entry, December 11, 2004, was
17  that -- that's by you, correct?
18    A.   Correct.
19    Q.   And that is -- relates to the
20  preparation of some letter. True?
21    A.   Correct.
22    Q.   Do you know what letter that was?
23    A.   Not from this entry I do not.
24    Q.   Was it the start of a reservation of

Page 84

1  rights letter?
2    A.   I have it here, requesting a policy. I
3  was sending a letter to Adam Lutz -- well, and
4  sending him the policy.
5    Q.   And that relates to your electronic note
6  of the same day?
7    A.   Correct, December 11th, and the same
8  37155 is underneath.
9    Q.   Yes, indeed.
10    Where did you get the policy?
11    A.   I don't recall where.
12    Q.   And do you recall whether the policy in
13  its liability part was the same as Exhibit 10?
14    A.   No, I don't recall that.
15    MR. DUNNE: You need a break?
16    THE WITNESS: I'm okay.
17  BY MR. NYESTE:
18    Q.   On January 4, 2005, Mr. Heckman has an
19  electronic note, "Where is CAR, contracts, and
20  ROR," reservation of rights letter, "that was
21  supposed to be sent for review?"
22    Do you see that?
23    A.   Yes, I do.
24    Q.   And is he referring -- was it your

Page 85

1  understanding that he was asking you to send to him
2  a draft reservation of rights letter for his
3  review?
4    A.   That would be my understanding.
5    Q.   Okay. The next note above that is from
6  yourself, "Letter in file. The policy was sent to
7  Adam."
8    What does "letter in file" mean?
9    A.   Assuming, because the one below that, it
10  should have been the ROR letter.
11    MS. SKAGGS: Could you point me to what you're
12  asking her about.
13    MR. DUNNE: January 19th note.
14    MS. SKAGGS: Okay.
15  BY MR. NYESTE:
16    Q.   Was that a paper letter in the paper
17  file?
18    A.   The reservation of rights letter should
19  have been a letter for them to review that I should
20  have cut and pasted.
21    Q.   And when you say, "Letter in file,"
22  you're referring to a draft reservation of rights
23  letter, right?
24    A.   That's --

Page 86

1   Q.   Yes?
2   A.   Yes, it should have been.
3   Q.   And are you referring to a paper copy, a
4   paper version of that letter?
5   A.   Yes.  From these notes, it should have
6   been a paper copy.  And he says no.
7   Q.   All right.  The next note above that is
8   from Mr. Heckman, "File is here in Dixon.  No ROR
9   letter to insured in the file.  Did you keep a
10  copy?  Secure CAR from DC."
11        Does that mean defense counsel?
12  A.   Right.
13  Q.   "Does DC have contracts insured had for
14  this job?  Possible tender to anyone?  Secure
15  copies of the contracts.  What are injuries here if
16  we don't get out on motion for summary judgment?"
17        What did you do in response to
18  Mr. Heckman's message?
19  A.   On 1-26, I just have that note in here.
20  "The file will be back soon.  I will get the ROR
21  letter out."
22  Q.   From your note, is it your recollection
23  that the ROR letter had not yet been reviewed by
24  Mr. Heckman?  You were going to get it out to him

Page 87

1   for his review, correct?
2   A.   Correct.
3   Q.   Now, explain to me about the file being
4   here in Dixon.  The paper file was moving around;
5   is that right?
6   A.   Yes.  Yes, it was.
7   Q.   Where was it going from?
8   A.   From Chicago to Dixon and any other
9   parts to Adam.
10  Q.   When did it go to Dixon?
11  A.   Between December and January.
12  Q.   Okay.  And did the paper file return to
13  Chicago?
14  A.   The next note above it says, "The file
15  will be back soon.  I will get ROR letter out."
16  That would be my note.
17  Q.   So you were anticipating the paper file
18  coming back from Mr. Heckman in Dixon back to your
19  office in Chicago, right?
20  A.   Yes.
21  Q.   And then you were going to cut and paste
22  together a draft reservation of rights letter for
23  his review?
24  A.   If I had everything that he asked me

Page 88

1   for, the contracts and --
2   Q.   Now, the next electronic note above that
3   is by you, right, "ROR will go out"?
4   A.   Correct.
5   Q.   And the meaning of that is that the ROR
6   will go out to Mr. Heckman for his review?
7   A.   I'm not certain.  I can't say.  I don't
8   recall.
9   Q.   Well, as of a few entries before that,
10  January 4th, Mr. Heckman was still looking for an
11  ROR letter that was supposed to be sent for review,
12  correct?
13  A.   Correct.
14  Q.   Between that date, January 4th, and the
15  date of this most recent entry, February 24, 2005,
16  is there any indication that he had reviewed a
17  draft reservation of rights letter and that --
18  well, let me stop there.
19  A.   I don't recall if we had it.  We hadn't
20  received a CAR either, Case Assessment Report.
21  Q.   Would it then be fair to say that as of
22  February 24, 2004, no reservation of rights letter
23  had been sent to the insured?
24  A.   As of February 2005, no letter to the

Page 89

1   insured, that would seem correct, yeah, from this.
2   Q.   That would be correct, yes?
3   A.   I'm assuming that, so I'm going to have
4   to say I don't recall.  We were waiting on the CAR
5   and the contracts.
6   Q.   Mr. Heckman was also asking you about
7   possible tenders to anyone.  Do you see that on
8   January 24th?
9   A.   Yes.
10  Q.   And do you understand that to mean a
11  tender to VOA's professional liability carrier?
12  A.   I understand a little bit of that term,
13  yes.
14  Q.   Did you explain to Mr. Heckman that
15  Mr. Schnell had told you that he expected the case
16  to be dismissed and that there wouldn't be any need
17  for any tender?
18  MS. SKAGGS:  I'm sorry.  Could you read that
19  question back.
20        (WHEREUPON, the record was read
21        by the reporter as requested.)
22  MR. DUNNE:  Objection to form, asked and
23  answered.
24

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 90

1   BY THE WITNESS:
2       A.   You could see in the notes what I've
3   written in the notes.
4   BY MR. NYESTE:
5       Q.   Did you take any steps towards making a
6   tender to the professional liability carrier?
7       A.   I don't recall.
8       Q.   Again, in the electronic notes, now on
9   March 3, 2005, there's an entry by Mr. Heckman,
10  which includes, "Where is CAR from DC," or defense
11  counsel. "Contracts received? Any possible
12  tenders?"
13          Is it fair to say that Mr. Heckman was
14  pretty hot about tendering this to the professional
15  liability carrier?
16      MR. DUNNE: Objection to the form of the
17  question.
18  BY THE WITNESS:
19      A.   I know he wanted us to get the contracts
20  for sure, contracts and the CAR.
21  BY MR. NYESTE:
22      Q.   But you understood the "possible tender"
23  note to mean a tender to the professional liability
24  carrier, right?

Page 91

1       A.   Right. Well, I know when I told
2   Jennifer about that and what she had told me.
3       Q.   Do you recall when you received the
4   contracts from either the insured or the Beranek
5   firm?
6       A.   I don't remember the exact timing of the
7   contract, but it came in late.
8       Q.   If you'll turn to Page 1606 of
9   Exhibit 5, do you recall getting this letter from
10  Naderh Elrabadi?
11      A.   Yes. So the contracts came in in April
12  into the Naperville office.
13      Q.   Okay. And I think, as we've discussed,
14  the reservation of rights letter was not going to
15  go out until those contracts had been received; is
16  that fair?
17      A.   That's correct.
18      Q.   Okay. Other than looking at Exhibit 9,
19  which is a copy of a fax to Mr. Beranek's office of
20  a reservation of rights letter dated May 4, 2005,
21  is there anything else either in the electronic
22  notes or within Exhibit 5 that will tell me when a
23  reservation of rights letter went out to the
24  insured?

Page 92

1       MR. DUNNE: Can you read that question back?
2          (WHEREUPON, the record was read
3           by the reporter as requested.)
4       MR. DUNNE: Exhibit 5, referring to all of
5   these documents?
6       MR. NYESTE: Right.
7       MR. DUNNE: Object to the form of the
8   question.
9       MR. NYESTE: Okay.
10      MR. DUNNE: Go ahead and look through the
11  documents.
12          I'll also object because I think it was
13  just asked and answered, misstates her testimony.
14  BY THE WITNESS:
15      A.   Just that I know that I mailed this
16  letter out because of Steve Heckman's comments. I
17  believe the letter went out.
18  BY MR. NYESTE:
19      Q.   In the electronic notes there's no
20  mention on May 4th of the reservation of rights
21  having been sent, right?
22      A.   You said there's a gap.
23      Q.   Yes.
24      MR. NYESTE: I'm running out of steam, Amy. I

Page 93

1   need to collect my thoughts. Do you have any
2   questions you want to ask?
3       MS. SKAGGS: Well, let's take a quick break.
4       THE WITNESS: That sounds good this time.
5          (WHEREUPON, a recess was had.)
6       MR. NYESTE: I think I have just a couple.
7   BY MR. NYESTE:
8       Q.   Within Exhibit 5, on Page 1582 there is
9   an e-mail at the bottom from yourself to Adam Lutz;
10  is that correct?
11      A.   Correct.
12      Q.   And it says, "No, I did not send the
13  letter you sent on September 16, 2004, since
14  Mr. Schnell said his attorney was going to appear
15  and should be dismissed."
16          Now, what I want to get at is: What
17  letter of September 16, 2004, are you talking
18  about? And for that I want you to take a look at
19  the electronic notes.
20      MR. DUNNE: Which number?
21      MR. NYESTE: The electronic notes are No. 3,
22  and it's the third page from the end.
23      THE WITNESS: Page 37?
24      MR. NYESTE: 36.

24 (Pages 90 to 93)

Page 94

BY MR. NYESTE:
2    Q.    It says, "A note from Adam on 9-16,
3 2004." Do you see that?
4    A.    Uh-hmm.
5    Q.    So in your e-mail of November 9, 2004,
6 were you referring back to the note from Mr. Lutz
7 on 9-16, 2004, in the electronic notes?
8    A.    Uh-hmm.
9    Q.    And within his note he is making a
10 recommendation about a letter that might be sent to
11 VOA. Do you see that?
12    A.    Uh-hmm.
13    Q.    And that's the letter that you're
14 referring to in your e-mail of November 9, 2004; is
15 that right?
16    A.    Correct.
17    Q.    And within Exhibit 5, on Pages 1599 to
18 1600, is that an e-mail from you to Mr. Beranek?
19    A.    Correct.
20    Q.    Which reads, "Hello, Kurt. I need a
21 copy of all contracts and additional insured
22 certificates for my file. I can pick it up at your
23 office. Tell me when and I will be there. I need
24 to do an ROR letter."

Page 95

1    A.    What was that date again?
2    Q.    March 30, 2005, correct?
3    A.    Okay. Yes.
4    Q.    As of that date, you had not prepared a
5 reservation of rights letter?
6    A.    We were waiting on the contracts, that's
7 right.
8    Q.    Had an ROR letter been prepared by that
9 point?
10    A.    Well, because Adam sent me something
11 9-16, he must have sent something that I was
12 cutting and pasting.
13    Q.    Well, I think the 9-16 note from Adam
14 was with respect to a letter that would read, "You
15 can tell them that we are evaluating coverage, and
16 if we decide to defend we will reimburse them for
17 any incurred costs." That's what his note of
18 September 16, 2004, had read.
19       You don't mean to imply that he had sent
20 you a draft ROR as of that date, do you?
21    MR. DUNNE:  "That date" being the 16th?
22    MR. NYESTE:  September 16th.
23 BY THE WITNESS:
24    A.    I'm not certain what 9-16 was.

Page 96

BY MR. NYESTE:
2    Q.    All right. Well, let's just return to
3 your e-mail of March 30, 2005, on Pages 1599 to
4 1600. The last line of that, "I need to do an ROR
5 letter," would that indicate to you that as of
6 March 30th you had not yet done the cut and pasting
7 for an ROR letter?
8    A.    It would indicate I couldn't do an ROR
9 letter without the contracts.
10    Q.    If you would turn to Page 1617 in
11 Exhibit 5, this is a page of handwriting. Do you
12 know whose handwriting it is?
13    A.    I'm not sure.
14    Q.    Can you say that it is not yours?
15    A.    That, I can say.
16    MR. NYESTE:  I don't think I have anything
17 more, Ms. Robinson. I want to thank you.
18 Ms. Skaggs may have some questions, though.
19              EXAMINATION
20 BY MS. SKAGGS:
21    Q.    Ms. Robinson, I'm Amy Skaggs. I
22 represent VOA Associates. Some of this may sound
23 like I'm covering old ground, but I just want to
24 make sure I understand your testimony.

Page 97

1       There appears to be two ROR letters, one
2 dated February 24, 2005, and one dated May 4, 2005,
3 and those have been marked as exhibits, Iris
4 Robinson Deposition Exhibits 8 and 9.
5    A.    Correct.
6    Q.    Now, it's your testimony that you
7 drafted both of these letters, Deposition Exhibit 8
8 and Deposition Exhibit 9?
9    A.    With the assistance of Adam Lutz.
10    Q.    Was the first one, Deposition Exhibit 8,
11 drafted around February 24, 2005?
12    A.    That's what the date has, yes.
13    Q.    Do you have any specific recollection of
14 drafting that letter, Deposition Exhibit 8?
15    A.    Yes.
16    Q.    Okay. And what do you recall about
17 drafting that letter?
18    A.    Cutting and pasting.
19    Q.    Okay. Now, you were cutting and pasting
20 based on an e-mail you received from Adam Lutz,
21 correct?
22    A.    Yes.
23    Q.    And was this a form that he sent you or
24 was it your standard e-mail where he wrote, "Iris,

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 98

1  say this in the letter"?  Do you recall?
2      A.   I don't recall.
3      Q.   Were there forms that were downloaded
4  that just had blanks to fill in?  When you refer to
5  "forms," is that what you're referring to?
6      A.   There were some blanks, I remember,
7  because we had to put in whatever insurance,
8  St. Paul here.  I remember that portion.  And you
9  had to put in the policy information.
10     Q.   Okay.  So you recall receiving a form
11 around February 2005 from Mr. Lutz with blanks that
12 you were to fill in, correct?
13     A.   Some were blanks, yes.
14     Q.   But sometime before February 24, 2005,
15 you filled in those blanks and crafted this letter,
16 I guess, that's reflected in Deposition Exhibit 8,
17 correct?
18     A.   Correct, with Adam Lutz's material.
19     Q.   Now, after crafting the letter
20 that's reflected in Deposition Exhibit No. 8, did
21 you send that to Mr. Lutz or Mr. Heckman for their
22 review?
23     A.   I don't want to speculate.  I would have
24 sent it to Mr. Lutz.

Page 99

1      Q.   Okay.  But you don't have a specific
2  recollection of sending it to Mr. Lutz for his
3  review?
4      A.   Correct.
5      Q.   Do you have any specific recollection of
6  faxing or e-mailing this letter that's reflected in
7  Deposition Exhibit No. 8 to anyone?
8      A.   It would have been Mr. Lutz.
9      Q.   Okay.  To anyone from VOA?
10     A.   I don't recall.
11     Q.   You don't recall sending it to Mr. Kurt
12 Beranek?
13     A.   February '05?
14     Q.   Yeah.  I'm just focusing on that letter.
15     A.   I don't recall specifics.
16     Q.   Okay.  Do you know why this particular
17 letter dated February 24, 2005, was not sent to
18 anyone outside of St. Paul Travelers or USF&G?
19     MR. DUNNE:  I'll object that that has been
20 asked and answered, but go ahead.
21 BY THE WITNESS:
22     A.   That it was sent to Adam Lutz and it
23 was -- well, I see this one was faxed to our
24 attorney.

Page 100

1  BY MS. SKAGGS:
2      Q.   "This one," you're pointing to --
3      A.   To Kurt.
4      Q.   And you are indicating Deposition
5  Exhibit 9 was sent to Kurt?
6      A.   Correct.
7      Q.   Okay.  But my question is:  Why is it
8  that this February 24, 2005, letter was not sent to
9  anyone outside of your company, meaning VOA or
10 VOA's assigned defense counsel, Kurt Beranek?
11     A.   We were waiting for contracts.
12     Q.   Okay.  And it appears that you got
13 contracts from VOA's assigned defense counsel in
14 April 2005; is that correct?
15     A.   That's correct.  He showed the e-mail.
16     Q.   So it's your testimony that --
17     A.   It was a letter, right.
18     Q.   So it's your testimony that USF&G could
19 not send a reservation of rights letter to VOA
20 until you received those contracts that you
21 received in April 2005, correct?
22     A.   Correct.
23     Q.   Do you recall actually receiving the
24 contracts in April 2005?

Page 101

1      A.   By the letter, I must have received the
2  contracts.
3      Q.   Do you have a specific recollection of
4  having received the contracts?
5      A.   By the letter, I received it.  And in
6  some letter I wrote to Adam -- I don't remember
7  that date -- that was the policy.  No, that was
8  just the policy.  So the contract -- by the letter,
9  she sent the contracts.
10     Q.   Do you have a specific recollection of
11 reviewing those contracts when you received them in
12 April 2005?
13     A.   No, I don't recall.
14     Q.   Do you recall reviewing the contracts
15 and then using them to craft a second reservation
16 of rights letter?
17     A.   I don't recall.
18     Q.   Did you send the contracts to Adam Lutz
19 or Steve Heckman or anyone else for their review?
20     A.   I don't recall specifics.
21     Q.   So your answer is you don't recall?
22     A.   I would have sent them to Adam.
23     Q.   So your standard policy and practice
24 would have been, upon receiving the contracts from

26 (Pages 98 to 101)

Page 102

1  the insured, to send them to Steve Heckman or Adam?
2      A.   To Adam.
3      Q.   And in order for him to complete his
4  coverage analysis?
5      A.   Yes.
6      Q.   But you don't have a specific
7  recollection of having done that?
8      A.   No, I don't recall.
9      Q.   Now, is it your testimony that upon
10  receiving the contracts in April 2005, you were
11  then able to craft the letter that is reflected in
12  Deposition Exhibit No. 9?  That's the May 4, 2005,
13  letter.
14      A.   Once the contracts were received, a
15  reservation of rights letter would have went out.
16      Q.   But as you testified previously, there's
17  nothing changed in the May 4, 2005, letter versus
18  the February 24, 2005, letter, correct?
19      A.   When we reviewed it here, I don't see
20  any changes.
21      Q.   Do you see in Exhibit No. 9 any
22  reference to -- specific reference to the contracts
23  that you had been waiting for?
24      A.   I couldn't answer that if I don't know

Page 103

1  if I recall reviewing the contracts.
2      Q.   I'm just asking you to look at the
3  letter and asking whether or not there's any
4  reference to contracts in that letter.
5      A.   I'm not the coverage analysis person for
6  this.  I don't see anything -- I don't see any
7  reference to contracts.
8      Q.   What was your understanding of why you
9  needed to wait for the contracts in order to craft
10  a reservation of rights letter or this reservation
11  of rights letter?
12      MR. DUNNE:  Objection, asked and answered.
13  BY THE WITNESS:
14      A.   VOA's role in the project.
15  BY MS. SKAGGS:
16      Q.   So your understanding is that you needed
17  to find out what they were hired to do for the
18  project in order to craft a reservation of rights
19  letter?
20      MR. DUNNE:  Objection as to form of the
21  question.
22  BY THE WITNESS:
23      A.   To send this to Adam Lutz and to have
24  him review it.

Page 104

1  BY MS. SKAGGS:
2      Q.   Okay.  So your understanding was that
3  you could not send out a letter under your
4  signature until Adam had completed his review of
5  VOA's contracts; is that your testimony?
6      A.   That was it, yes.
7      Q.   Okay.  So you were holding a draft of a
8  reservation of rights letter waiting for contracts
9  so that they could be sent to Adam or Steve, your
10  supervisors, and they would give you the okay to
11  send out the reservation of rights letter; is that
12  your testimony?
13      MR. DUNNE:  Objection to the form of the
14  question.
15  BY THE WITNESS:
16      A.   That was my understanding.
17  BY MS. SKAGGS:
18      Q.   Okay.  So your understanding of St. Paul
19  Travelers' policy was that no reservation of rights
20  letter could be sent out until someone reviewed the
21  insured's contract for the project?
22      MR. DUNNE:  Can you read that question back.
23      (WHEREUPON, the record was read
24      by the reporter as requested.)

Page 105

1      MR. DUNNE:  Object to the form of the
2  question, lacks foundation, assumes facts not in
3  evidence.
4      Go ahead.
5  BY THE WITNESS:
6      A.   It was under my understanding, yes, Adam
7  would have reviewed it.
8  BY MS. SKAGGS:
9      Q.   Adam would need to review the contract?
10      A.   Would need to review the contracts.
11      Q.   Okay.  Now, at some point between April
12  2005 and before, I guess, May 4, 2005, your
13  testimony is that you sent a draft of the letter
14  that is Deposition Exhibit No. 9 to Steve or Adam
15  for their review, correct?
16      MR. DUNNE:  Can you read that question back.
17  That was a long one.
18      (WHEREUPON, the record was read
19      by the reporter as requested.)
20  BY THE WITNESS:
21      A.   Correct.
22  BY MS. SKAGGS:
23      Q.   Okay.  Do you have any specific
24  recollection of sending Deposition Exhibit No. 9 to

27 (Pages 102 to 105)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 106

1    Steve or Adam or anyone else for their review?
2        MR. DUNNE: Objection, asked and answered.
3        Go ahead.
4    BY THE WITNESS:
5        A.   I don't recall specifics.
6    BY MS. SKAGGS:
7        Q.   Do you recall having any conversation
8    with them about the letter that's reflected in
9    Deposition Exhibit No. 9?
10       A.   I just remember recalling an e-mail,
11   cutting and pasting, and I had phone conversations,
12   but not specifics.
13       Q.   Okay. So you recall that between April
14   and before May 4, 2005, you had a phone
15   conversation or received e-mails from Adam or Steve
16   related to the letter that's Deposition Exhibit
17   No. 9?
18       MR. DUNNE: Objection, misstates her
19   testimony.
20       Go ahead.
21   BY THE WITNESS:
22       A.   It could have been both letters, 8 or 9,
23   but we've had conversations regarding the letters
24   and the reservation of rights.

Page 107

1    BY MS. SKAGGS:
2        Q.   Okay. Can you recall anything
3    specifically about those conversations?
4        A.   And with the default coming in from
5    Jennifer, when we noticed -- because at first I was
6    telling Steve, again, in notes that we were going
7    to get dismissed. That was my understanding. We
8    were going to get dismissed and nothing had to be
9    done.
10       Q.   Okay. But my question is very specific.
11   Can you recall any specific conversations you had
12   about the reservation of rights letter that you
13   drafted, either one, February or May 2005?
14       A.   I don't recall any specifics about the
15   letters.
16       Q.   Okay. Did you draft any portion of
17   either one of these letters?
18       A.   Cutting and pasting I would be charged
19   with, yes, cutting and pasting.
20       Q.   But did you actually type any of the
21   sentences that are contained in either one of these
22   letters?
23       A.   This is all cut and paste.
24       Q.   Exhibit No. 5 at USF&G 01582, at the

Page 108

1    top, the December 21, 2004, letter -- or I'm
2    sorry -- e-mail from Adam Lutz to you, apparently.
3    It says, "I see that you have Peppers counsel
4    assigned to this matter. I never saw the ROR
5    letter for this matter, so I'm presuming you sent
6    it already. Let me know if this is not the case,
7    Adam."
8        Do you recall receiving this e-mail from
9    Adam?
10       A.   Just now looking at it.
11       Q.   Do you understand what he meant when he
12   said, "I see that you have Peppers counsel assigned
13   to this matter"?
14       A.   That's probably sending the file to
15   Kurt's office.
16       Q.   Do you have any understanding of what
17   Peppers counsel is?
18       A.   We were giving them the choice of their
19   own counsel. They didn't have to choose Kurt's
20   firm. They could choose their own firm.
21       Q.   Okay. Kurt Beranek is -- was the
22   attorney that USF&G assigned to defend VOA in this
23   matter, correct?
24       A.   They were supposed to defend our

Page 109

1    insured, VOA Associates.
2        Q.   And Kurt Beranek's firm was from this
3    panel of attorneys that you referred to earlier in
4    your testimony; is that correct?
5        A.   They would have been one of them.
6        Q.   Along with Cassiday?
7        A.   Correct.
8        Q.   Okay. And Kurt Beranek or Beranek's
9    firm had done other work for USF&G in the past?
10       A.   I'm sure, yes.
11       MR. DUNNE: Don't speculate. Only if you
12   know.
13   BY THE WITNESS:
14       A.   I'm speculating here.
15   BY MS. SKAGGS:
16       Q.   But that's why they're on this panel of
17   attorneys that USF&G would use --
18       MR. DUNNE: Objection to the form of the
19   question, lacks foundation.
20       MS. SKAGGS: I haven't finished the question.
21   BY MS. SKAGGS:
22       Q.   Kurt Beranek was listed on the panel of
23   attorneys that USF&G would use because they had an
24   ongoing business relationship with him and his

28 (Pages 106 to 109)

Page 110

1  firm, correct?
2      MR. DUNNE: Objection to the form of the
3  question.
4  BY THE WITNESS:
5      A.  I don't have knowledge of that.
6  BY MS. SKAGGS:
7      Q.  Is that your understanding of how these
8  panels of attorneys worked?
9      MR. DUNNE: Objection, lacks foundation, form
10  of the question.
11  BY MS. SKAGGS:
12      Q.  I'm just asking for your understanding.
13      A.  We're given a list of panels to choose,
14  and sometimes Adam also would choose a panel.
15      Q.  Do you have a recollection of how Kurt
16  Beranek was chosen to represent VOA in this matter?
17      A.  No, I do not know how they were chosen.
18      Q.  Do you know why Adam would have referred
19  to Peppers counsel?  Do you have any understanding
20  of what he was -- what he meant by that?
21      A.  I'm not sure of all the liability terms
22  now.
23      Q.  "I never saw the ROR letter for this
24  matter, so I'm presuming you sent it already.  Let

Page 111

1  me know if this is not the case."
2      Did you let him know upon receiving this
3  e-mail that the ROR had not been sent to VOA?
4      A.  I don't know.  Is there another e-mail
5  after 12-21?
6      Q.  Well, do you have any recollection of
7  letting him know after receiving this e-mail that
8  VOA -- excuse me -- that the ROR had not been sent?
9      A.  I don't know.  Can I also go back to the
10  notes, the electronic notes.
11      MR. DUNNE: She's asking for your independent
12  recollection.
13  BY THE WITNESS:
14      A.  No, I don't have any recall.
15  BY MS. SKAGGS:
16      Q.  Why is it that he would say, "I presume
17  it's been sent already," if it was the policy that
18  he had to review all RORs before they went out?
19      MR. DUNNE: Objection, form of the question,
20  calls for speculation.
21      If you know.
22  BY THE WITNESS:
23      A.  If he sent me the information on 9-16-04
24  for cutting and pasting.

Page 112

1  BY MS. SKAGGS:
2      Q.  No.  My question is:  If the policy was
3  that he had to review all letters before they went
4  out, why would he just presume in this e-mail that
5  you sent it out without his knowledge?
6      MR. DUNNE: Objection, form of the question.
7  BY THE WITNESS:
8      A.  I'm not clear.
9  BY MS. SKAGGS:
10      Q.  Okay.  And you don't recall letting him
11  know as of at least around the time of
12  December 21, 2004, that the ROR had not been sent
13  out, correct?
14      A.  I don't recall.
15      Q.  The May 4, 2005, letter, Deposition
16  Exhibit No. 9, do you have a specific recollection
17  of mailing that letter to anyone at VOA Associates?
18      A.  Just that I see Mr. Schnell's name down
19  here.
20      Q.  I'm asking for a specific recollection.
21  Do you remember sending this letter?
22      A.  I remember sending the letter out
23  because of Steve Heckman.
24      Q.  Okay.  So what is it about Steve Heckman

Page 113

1  that makes you think you sent this letter out?
2      A.  The notes, the calls.
3      Q.  Okay.  But at least based on the call
4  log, the notes and calls had been months and months
5  prior to this letter.  So what is it about Steve
6  Heckman that makes you remember sending out this
7  letter on May 4, 2005?
8      MR. DUNNE: Objection to form of the question.
9      You can answer.
10  BY THE WITNESS:
11      A.  The importance of getting this
12  reservation of rights letter out.
13  BY MS. SKAGGS:
14      Q.  But I guess I'm asking you very
15  specifically.  Do you remember actually composing
16  the letter, the May 4, 2005, letter?  Do you
17  remember composing that letter?
18      MR. DUNNE: Objection, asked and answered.
19      Go ahead.
20  BY THE WITNESS:
21      A.  Vaguely.
22  BY MS. SKAGGS:
23      Q.  Do you remember signing the letter?
24      A.  Yes.

29 (Pages 110 to 113)