IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 114

1    Q.   You have a specific recollection of --
2    A.   That was my signature, yes.
3    Q.   Did you have an assistant or secretary?
4    A.   We did in Naperville.
5    Q.   Did you give it to someone else to mail
6  out?
7    A.   No.  I would have.
8    Q.   So you remember typing the envelope?
9  You have a specific recollection of doing that?
10   A.   It would have been a window envelope.
11   Q.   Okay.  A window envelope?
12   A.   Correct.
13   Q.   Why would it have been a window
14  envelope?
15   A.   Because it was the address printed right
16  here.
17   Q.   And you remember putting the stamp on
18  it?
19   A.   I don't have to do that.  Just put it in
20  a bin.
21   Q.   Put it in a bin.  Okay.
22       Why did you fax this letter to Kurt
23  Beranek on May 6, 2005?
24   MR. DUNNE:  Objection.  I think it's been

Page 115

1  asked and answered.
2       Go ahead.
3  BY THE WITNESS:
4    A.   Because VOA surprising -- that they said
5  they were going to be dismissed and not taking a
6  chance on VOA.
7  BY MS. SKAGGS:
8    Q.   I don't understand how that's responsive
9  to my question.
10   A.   To make sure that --
11   MR. DUNNE:  Is there a question pending?
12  BY MS. SKAGGS:
13   Q.   Can you explain your answer.
14   A.   It was to make sure VOA would have a
15  copy of the letter.
16   Q.   Okay.  So in order to make sure that VOA
17  got a copy of the letter, you faxed it to Kurt
18  Beranek, your assigned defense counsel in this
19  matter?
20   A.   Kurt was defending VOA, so he received a
21  fax of the letter, too.
22   Q.   So you were faxing it to Kurt Beranek to
23  make sure that VOA got a copy of the letter; is
24  that your testimony?

Page 116

1    A.   Yes, that's what's here.
2    Q.   Okay.  So rather than send it certified
3  mail or fax it to VOA, you decided to send it to
4  VOA's assigned defense counsel, Kurt Beranek,
5  correct?
6    A.   We faxed it to Kurt, correct.  Faxed it
7  and mailed it directly to VOA, the address.
8    Q.   Is it typically your practice to send
9  ROR letters just in the mail?
10   MR. DUNNE:  Objection to the form of the
11  question.
12  BY THE WITNESS:
13   A.   I didn't do too many RORs.
14  BY MS. SKAGGS:
15   Q.   The ones that you did, did you always
16  just mail them?
17   A.   I couldn't recall all of them.  I
18  couldn't recall.  There weren't that many that I
19  can recall.
20   Q.   Do you recall ever sending one via
21  certified mail?
22   A.   No, I can't recall that either.
23   Q.   Do you recall ever sending one via DHL?
24   A.   No, I can't recall.

Page 117

1    Q.   I don't know that we need to mark this,
2  but I'm going to show you -- maybe we'll mark it.
3  I don't know.
4       This is USF&G 01556.  This came out of
5  USF&G's file and is apparently a confirmation of
6  receipt of a letter sent by Mr. Ken Hagedorn to VOA
7  on June 6, 2007.  This apparently was tracking a
8  letter that Mr. Hagedorn sent at that time.
9       Had you ever done anything like this
10  when you were sending reservation of rights
11  letters?
12   A.   I don't recall sending anything like
13  that.
14   Q.   Were you ever instructed to do that?
15   A.   I don't recall.
16   Q.   The way that you were insuring that VOA
17  got a copy of the letter was to fax it to Mr. Kurt
18  Beranek, correct?
19   MR. DUNNE:  Objection, asked and answered.
20  BY THE WITNESS:
21   A.   That was part of my thinking of that,
22  yes.
23  BY MS. SKAGGS:
24   Q.   Did you ever have a discussion of this

30 (Pages 114 to 117)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 118

1  letter with Mr. Beranek?
2       A.   I don't think I had the file after this.
3       Q.   You didn't have the file on May 4, 2005?
4       A.   I don't remember anything after this
5  letter in dealing with this file, because they were
6  reassigning files constantly.
7       Q.   So the answer as to whether or not you
8  ever had a conversation with Mr. Beranek about this
9  letter is "no"?
10      A.   I don't recall any conversations with
11 him on this letter.
12      Q.   Did Mr. Beranek ever call you and say,
13 "Hey, why are you sending me this letter?"
14      A.   I don't recall.
15      Q.   Do you typically send reservation of
16 rights letters to assigned defense counsel?
17      MR. DUNNE:  Objection, form of the question.
18 BY THE WITNESS:
19      A.   I don't recall.
20 BY MS. SKAGGS:
21      Q.   I think we talked about this, but you
22 don't have any explanation for why it is that there
23 was no notation made in the file around May 4th
24 about sending out this reservation of rights

Page 119

1  letter, correct?  Do you have any explanation for
2  that?
3       A.   I have no explanation why.
4       Q.   Do you have any explanation for why
5  there was no notation about sending the contracts
6  and/or the letter to Adam Lutz or Steve Heckman for
7  their review?
8       MR. DUNNE:  Can you read that one back.
9            (WHEREUPON, the record was read
10           by the reporter as requested.)
11 BY THE WITNESS:
12      A.   I don't recall why.
13 BY MS. SKAGGS:
14      Q.   Okay.  Would it be standard to send out
15 a letter without making a note in the claims log?
16      MR. DUNNE:  Objection, asked and answered.
17 Object to the form of the question.
18 BY THE WITNESS:
19      A.   I don't recall why it wasn't done.
20 BY MS. SKAGGS:
21      Q.   Would that be standard procedure?
22      MR. DUNNE:  Same objection.
23 BY THE WITNESS:
24      A.   We try to enter the most important

Page 120

1  things.
2  BY MS. SKAGGS:
3       Q.   A reservation of rights letter was
4  pretty important, though, right?
5       A.   Correct.
6       Q.   You may have answered this.  Do you
7  remember physically walking the file over to the
8  Cassiday firm in November of 2004?
9       A.   I don't recall.  My notes had it in
10 there.
11      Q.   Do you recall why Cassiday did not
12 defend VOA in this matter?
13      A.   I don't recall why.
14      Q.   Do you recall that they were counsel for
15 another party in the matter?
16      A.   No, I don't recall.
17      Q.   Did you ever have any conversations with
18 Kurt Beranek about claims for contribution against
19 some of the other parties in the action?
20      A.   I don't recall that.
21      Q.   Did you ever have a conversation with
22 him about a claim against School District 230?
23      A.   We discussed this, the Madden case, and
24 230 is part of it.

Page 121

1       Q.   Right.  But did you ever discuss
2  specifically Beranek's decision to make the claim
3  for contribution against some of the other parties
4  in the action, including District 230?
5       A.   I wouldn't direct his counsel.
6       Q.   So you never had any conversations with
7  him about that?
8       A.   I thought we were getting out on MSJ.
9  That was my recollection of this one.
10      Q.   Did you ever make anyone at VOA aware
11 prior to May 2005 that USF&G had an ongoing
12 business relationship with Kurt Beranek?
13      MR. DUNNE:  Objection, lacks foundation, calls
14 for speculation, form of the question.
15      Go ahead.
16 BY MS. SKAGGS:
17      Q.   I'm just asking if you ever spoke to
18 anyone at VOA about that subject.
19      A.   About Kurt's ongoing -- not that I can
20 recall.
21      Q.   Did you ever obtain a written consent
22 from VOA to -- for USF&G to assign Kurt Beranek as
23 defense counsel in light of the ongoing business
24 relationship?

31 (Pages 118 to 121)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 122

1       MR. DUNNE:  Objection, form of the question.
2  BY THE WITNESS:
3       A.    Just when the reservation of rights
4  letter went out on May the 4th, and I don't know
5  who handled the file pretty much after that.
6  BY MS. SKAGGS:
7       Q.    But you never had that conversation with
8  VOA or obtained that consent, correct?
9       A.    Written consent?  In this letter he
10  mentions 14 days that they had to choose.
11       Q.    Prior to that purported letter.
12       A.    I mentioned telling Jennifer to submit
13  this to her agent.
14       Q.    Okay.  So the answer is "no"?
15       A.    That's all I remember, what I had
16  written there.
17       Q.    Did you ever discuss this May 4, 2005,
18  Exhibit No. 9 with anyone from VOA?
19       A.    I don't recall.
20       MS. SKAGGS:  I'd like five minutes.  I think I
21  might be done.  We're very close.  Thank you.
22       MR. DUNNE:  Are you going to have any more,
23  Jim?
24       MR. NYESTE:  Just a couple.

Page 123

1       Amy, can I ask them now.
2       MS. SKAGGS:  Sure.
3       FURTHER EXAMINATION
4  BY MR. NYESTE:
5       Q.    Ms. Robinson, do you know a Debbie
6  Dillon at St. Paul Travelers USF&G?
7       A.    There were two Debbies.
8       Q.    A Debbie Dillon and a Deborah Murano?
9       A.    Right.
10       Q.    Did you ever discuss the Madden claim
11  with either of those?
12       A.    I don't recall.
13       Q.    Did you ever discuss it with Fred Swift?
14       A.    I remember Fred was a person with
15  oversight of some claims.
16       Q.    And did you ever discuss this Madden
17  claim with Mr. Swift?
18       A.    I don't recall.
19       Q.    And how about a man by the name of
20  Robert Walker at St. Paul Travelers USF&G?  Did you
21  ever discuss it with him?
22       A.    I don't know who that is.
23       Q.    How about with Ken Hagedorn?
24       A.    I'm not sure.  I might have heard his

Page 124

1  name before.
2       Q.    Since you left the company, has anyone
3  gotten in touch with you and asked you, "Iris,
4  where is the reservation of rights letter?"
5       A.    I've only had discussions with Rory
6  Dunne when he mentioned the case on appeal.
7       MR. NYESTE:  I don't have anything else.
8       MR. DUNNE:  Are you ready, Amy?  I have just
9  one thing I want to clarify.
10       MS. SKAGGS:  Okay.
11       MR. DUNNE:  Go ahead.
12       MS. SKAGGS:  Do you want to go last?
13       MR. DUNNE:  Sure.
14       MS. SKAGGS:  I'm ready, yeah.
15       FURTHER EXAMINATION
16  BY MS. SKAGGS:
17       Q.    Did you ever have any conversations with
18  anyone from Schiff Hardin regarding the Madden
19  claim?
20       A.    I don't recall anything.
21       Q.    Okay.  So your recollection is you don't
22  recall any conversations with anyone from Schiff
23  Hardin.
24       MS. SKAGGS:  I think I'm done.

Page 125

1       EXAMINATION
2  BY MR. DUNNE:
3       Q.    Iris, if you could, could you look at
4  Exhibit No. 3, and specifically Page 32,
5  Mr. Heckman's note of March 3, 2005.  And you
6  recall Mr. Nyeste asked you some questions about
7  tendering to Liberty Insurance Company.  Is it
8  possible that Mr. Heckman was following up on
9  possible tenders to other defendants to see if
10  there was insurance coverage?
11       A.    That would be always with Steve, if
12  there's possibility of any other coverages or any
13  other policy out there.
14       Q.    And what's the purpose of tendering to
15  other policies or other defendants?
16       A.    If they have a portion of liability, so
17  what portion would they pay for the total claim.
18       MR. DUNNE:  I have nothing further.
19       We'll reserve signature.  Thank you.
20       FURTHER DEPONENT SAITH NOT.
21
22
23
24

32 (Pages 122 to 125)

IRIS LISA ROBINSON, FEBRUARY 17, 2009
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 126

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE NORTHERN DISTRICT OF ILLINOIS
3   EASTERN DIVISION
4   UNITED STATES FIDELITY      )
5   AND GUARANTY COMPANY,       )
6        Plaintiff,      )
7   vs.                 )   No. 08 C 862
8   VOA ASSOCIATES, INC.,       )
9   LIBERTY INTERNATIONAL       )
10  UNDERWRITERS, MICHAEL J.    )
11  MADDEN and JEAN MADDEN,     )
12       Defendants.     )
13       I hereby certify that I have read the
14  foregoing transcript of my deposition given at the
15  time and place aforesaid, consisting of Pages 1 to
16  125, inclusive, and I do again subscribe and make
17  oath that the same is a true, correct and complete
18  transcript of my deposition so given as aforesaid,
19  and includes changes, if any, so made by me.
20
21              IRIS LISA ROBINSON
22  SUBSCRIBED AND SWORN TO before me
23  this    day of     , A.D. 2009.
24       Notary Public

Page 128

1   hand and affix my seal of office at Chicago,
2   Illinois, this 4th day of March, 2009.
3
4
5        Notary Public,
6        DuPage County, Illinois
7        My commission expires 12/01/10.
8
9   CSR Certificate No. 84-3809.

Page 127

1   STATE OF ILLINOIS   )
2             ) SS:
3   COUNTY OF DUPAGE    )
4        I, JEANETTE F. RUTZ, a Notary Public
5   within and for the County of DuPage, State of
6   Illinois, and a Certified Shorthand Reporter of
7   said state, do hereby certify:
8        That previous to the commencement of the
9   examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12       That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony
16  given and the proceedings had;
17       That the said deposition was taken
18  before me at the time and place specified;
19       That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24       IN WITNESS WHEREOF, I do hereunto set my

Page 129

1                 I N D E X
2   WITNESS                    EXAMINATION
3   IRIS LISA ROBINSON
4   By Mr. Nyeste               3, 123
5   By Ms. Skaggs               96, 124
6   By Mr. Dunne                125
7
8              E X H I B I T S
9   NUMBER                    MARKED FOR ID
10  IRIS ROBINSON DEPOSITION EXHIBIT
11      No. 1                    3
12      No. 2                    3
13      No. 3                    3
14      No. 4                    3
15      No. 5                    3
16      No. 6                    3
17      No. 7                    3
18      No. 8                    3
19      No. 9                    3
20      No. 10                   3

33 (Pages 126 to 129)

Page 130

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

3                      EASTERN DIVISION

4

5      UNITED STATES FIDELITY          )

6      AND GUARANTY COMPANY,           )

7                  Plaintiff,          )

8      vs.                             )   No. 08 C 862

9      VOA ASSOCIATES, INC.,           )

10     LIBERTY INTERNATIONAL           )

11     UNDERWRITERS, MICHAEL J.        )

12     MADDEN and JEAN MADDEN,         )

13                  Defendants.        )

14

15                    March 17, 2009

16                     5:48 p.m.

17

18         The deposition of IRIS LISA ROBINSON,

19     resumed pursuant to adjournment, taken before

20     JEANETTE F. RUTZ, a Notary Public within and for

21     the County of DuPage, State of Illinois, and a

22     Certified Shorthand Reporter of said state, on the

23     2nd Floor, 215 Shuman Boulevard, Naperville,

24     Illinois.

Page 131

```
1   PRESENT:
2       KARBAL, COHEN, ECONOMOU, SILK & DUNNE, LLC,
3       (200 South Michigan Avenue, 20th Floor,
4       Chicago, Illinois 60604,
5       312-431-3700), by:
6       MR. RODERICK T. DUNNE,
7           appeared on behalf of the Plaintiff;
8
9       SCHIFF HARDIN, LLP,
10      (233 South Wacker Drive, Suite 6600,
11      Chicago, Illinois 60606,
12      312-258-5728), by:
13      MS. AMY R. SKAGGS,
14          appeared on behalf of Defendant
15          VOA Associates, Inc.;
16
17      MR. JAMES T. NYESTE, ESQ.,
18      (One North LaSalle Street, Suite 2100,
19      Chicago, Illinois 60602,
20      312-750-1814),
21          appeared on behalf of Defendant
22          Liberty International Underwriters.
23  REPORTED BY:  JEANETTE F. RUTZ, CSR, RPR,
24          CSR CERTIFICATE NO. 84-3809.
```

Page 132

```
1           (WHEREUPON, the witness was duly
2       sworn.)
3           IRIS LISA ROBINSON,
4   called as a witness herein, having been previously
5   duly sworn and having testified, was examined and
6   testified further as follows:
7           FURTHER EXAMINATION
8   BY MR. NYESTE:
9       Q.   Would you state your name again, please.
10      A.   Iris Robinson.
11      Q.   Ms. Robinson, my name is Jim Nyeste.  I
12  represent Liberty Insurance Underwriters.
13      A.   Okay.
14      Q.   And to my right is --
15  MS. SKAGGS:  Amy Skaggs, representing VOA
16  Associates.
17  THE WITNESS:  All right.
18  BY MR. NYESTE:
19      Q.   And you're represented again today by
20  Rory Dunne, right?
21      A.   Yes.
22      Q.   And this is going to be a short
23  supplemental deposition, no more than an hour, by
24  agreement among everyone here --
```

Page 133

```
1       A.   Okay.
2       Q.   -- and probably much less than that, to
3   follow up on -- well, after our initial deposition
4   session you called my office and left me a voice
5   mail, right?
6       A.   Correct.
7       Q.   And you also sent me an e-mail, I
8   believe?
9       A.   Correct.
10      Q.   Okay.  And I deduced from the voice mail
11  and the e-mail that you had some second thoughts
12  about some of the things you testified to.
13      A.   Correct.
14  MR. DUNNE:  Objection to the form of the
15  question.
16  BY MR. NYESTE:
17      Q.   And this is going to focus on the
18  reservation of rights letter.  We're not going to
19  cover all the other ground in the deposition, but
20  we're going to focus on that -- the spring of 2005.
21  There was a draft reservation of rights letter
22  dated February 24th, I believe, 2005, and then
23  there was another reservation of rights letter
24  dated May 4, 2005.  And those are, respectively,
```

Page 134

```
1   Exhibits 8 and 9 that we looked at the first time.
2       Now, you had some second thoughts about
3   whether these were sent out or the circumstances
4   surrounding their preparation; is that right?
5   MR. DUNNE:  Objection to the form of the
6   question, but go ahead.
7   BY THE WITNESS:
8       A.   Yes, I had some concerns.
9   BY MR. NYESTE:
10      Q.   All right.  With respect to Exhibit 8,
11  the reservation of rights letter dated February 24,
12  2005, I believe it was your testimony in the first
13  deposition that this one was not sent out to
14  anyone?
15      A.   That, I can't recall, because I -- I
16  can't recall that.  I would have to look at the
17  deposition to remember that part.  Because I want
18  to say this one did go out, but I want to make
19  sure.
20      Q.   I knew I was taking a risk there by
21  bringing up Exhibit 8.
22      Let's fast forward a little,
23  Ms. Robinson.  I know Mr. Dunne is going to object
24  to the form of this question, but what is it you
```

2 (Pages 131 to 134)

IRIS LISA ROBINSON,  MARCH 17, 2009

Page 135

1  want to tell me?
2      MR. DUNNE:  I'll object to the form of the
3  question just because you said I would.
4      Go ahead.
5  BY THE WITNESS:
6      A.   That May the 4th, I have definite
7  recollection that the letter was faxed.  It was
8  faxed and it was mailed out.  It did not go
9  certified.
10 BY MR. NYESTE:
11     Q.   The May 4th letter, Exhibit 9, right?
12     A.   Correct.
13     Q.   You're confident that it was faxed to
14 whom?
15     A.   It was faxed to the attorney.  Was it
16 Kurt --
17     Q.   Beranek?
18     A.   Beranek.  It was faxed to him.  And that
19 the letter -- more than likely, I did not let Steve
20 Heckman or Adam Lutz review it.  Because of the
21 pressure, I sent it out.  That's what I was saying
22 in the e-mail.
23     Q.   You sent it out without them having
24 reviewed it?

Page 136

1      A.   Yes.
2      Q.   That's one of the things you wanted to
3  clarify?
4      A.   That's what I wanted to clarify.
5      Q.   Okay.  Now, you also mentioned just a
6  minute ago that you believe that this Exhibit 9 was
7  mailed.  To whom?
8      A.   VOA would have had a copy and -- I'm
9  sure VOA would have had a copy, and I would have
10 thought my attorney should get a copy of it, too,
11 or the attorney that we had, Kurt Beranek.
12     Q.   Okay.  Well, I'll tell you that this
13 copy of Exhibit 9, or this document, Exhibit 9,
14 that has this fax header at the top that bears the
15 number 9-1-312-782-4537, that's the fax number of
16 Kurt Beranek.
17     A.   Okay.
18     Q.   So I would accept that this document,
19 Exhibit 9, was faxed to Mr. Beranek's office.  All
20 right?
21     A.   Okay.
22     Q.   Do you have any note, any certified
23 mailing receipt, any evidence of any sort that this
24 May 4, 2005, reservation of rights letter was

Page 137

1  indeed mailed to VOA?
2      MR. DUNNE:  Objection, asked and answered.
3  BY THE WITNESS:
4      A.   No certified.
5  BY MR. NYESTE:
6      Q.   Any other evidence?
7      MR. DUNNE:  Objection to the form of the
8  question.
9  BY THE WITNESS:
10     A.   Pardon me?
11 BY MR. NYESTE:
12     Q.   Do you have any other evidence --
13     A.   No.
14     Q.   -- that this was mailed to VOA?
15     A.   Just what you have here.
16     Q.   Do you have a specific memory of putting
17 it in -- of taking it to a post office, perhaps?
18     MR. DUNNE:  Objection, asked and answered.
19 BY MR. NYESTE:
20     Q.   Your answer is --
21     A.   No.
22     Q.   Do you have a specific memory of putting
23 it in a mailbox on the street?
24     MR. DUNNE:  Objection, asked and answered.

Page 138

1  BY THE WITNESS:
2      A.   No.
3  BY MR. NYESTE:
4      Q.   Do you have a specific memory of handing
5  it to the postman at your home?
6      A.   No.
7      Q.   Do you have a specific memory of somehow
8  putting this in the mail, one way or the other?
9      MR. DUNNE:  Objection, asked and answered.
10     Go ahead.
11 BY THE WITNESS:
12     A.   We had a bin at that time.  It was
13 located on top of a bookshelf or file cabinets
14 where we would put the mail in.
15 BY MR. NYESTE:
16     Q.   Okay.  And where was this?  In
17 Naperville?  In Chicago?  Somewhere else?
18     A.   In Chicago.
19     Q.   So you believe you mailed this letter,
20 the May 4, 2005, reservation of rights letter, from
21 the St. Paul Travelers office in Chicago?
22     A.   Yes.
23     Q.   Is there anything that would confirm
24 that for you or that would show that to me?

3 (Pages 135 to 138)

MR. DUNNE: Objection, form of the question.
BY THE WITNESS:
A. No, I have nothing to show that to you.
BY MR. NYESTE:
Q. When you testified before in your first deposition session, I believe you were uncertain as to where you were in May of 2005; whether in the Chicago office, the Naperville office, or perhaps acting as an outside adjuster or investigator. Has your memory been refreshed since our first session?
A. Yes.
Q. Okay. Tell me where you were generally in May of 2005; where you were working, that is.
A. It would have been at the Chicago office on LaSalle Street.
Q. And what was it that has refreshed your recollection?
A. It was getting the dates straight with my daughter and her marriage.
Q. And the date of her marriage was when?
A. It was April the 8th, '05.
Q. Okay. So just about a month before this letter?
A. Correct.

Q. And where were you working as of April 8, 2005?
A. In the Chicago branch office.
Q. And a month later you are confident that you were still working in the Chicago office?
A. Yes.
Q. When did you begin working in the Naperville office?
A. I didn't clarify that date yet. I'm sorry.
Q. Was there a time in the spring of 2005 when you weren't working in either the Chicago or Naperville office but instead were an outside investigator?
A. I was outside. I was still considered an outside adjuster May of '05 and April '05. I was still doing outside work and inside, but mostly inside.
Q. As of May 4, 2005, did you have a regular cubicle or an office at the Chicago office of St. Paul Travelers?
A. Yes, I had a regular cubicle.
Q. Did you have a computer?
A. Yes.

Q. I believe you were thinking at one point that this letter may have been on a diskette or a floppy --
A. Correct.
Q. -- and not on a computer hard drive. What is your thinking on that issue today?
A. Yes. As an outside, I kept floppies so I could go back and forth with my letters.
Q. Why did you need to have floppies when you were still working in the office? Why did you need to take them home with you?
A. I saved quite a few letters over the years on a floppy.
Q. Do you still have this letter on a floppy disk?
A. I did not find the floppy disk.
Q. Now, this letter was printed from -- let me back up.
Do you believe this letter was printed from a floppy or printed from the hard drive of your computer in the office?
MR. DUNNE: Objection, form of the question.
BY THE WITNESS:
A. I believe it was on a floppy.

BY MR. NYESTE:
Q. Would the hard drive of your computer in the Chicago office have had a file corresponding to this letter?
A. It could have. I think those computers probably would be destroyed by now.
MR. DUNNE: Iris, please don't speculate.
BY MR. NYESTE:
Q. Was it your practice to keep the principal file on the hard drive and only put copies or certain files on the floppies?
MR. DUNNE: Objection to the form of the question.
If you understand the question, you can answer it.
BY THE WITNESS:
A. I couldn't recall.
BY MR. NYESTE:
Q. What would determine whether the letter -- a letter or other document was on the floppy versus on the hard drive?
A. Reservation of rights letters I would try to keep and compose on the floppy.
Q. So you believe you put this letter

IRIS LISA ROBINSON,  MARCH 17, 2009

Page 143

1   addressed to VOA in a mailing bin on top of a file
2   cabinet; is that right?
3       A.   Correct.
4       Q.   And then what was the ordinary practice
5   of what would happen to the items in that bin?
6       A.   Usually, at a certain time one of the
7   clerks or the assistants would come by and pick
8   them up and take them out to be stamped and mailed
9   out.
10      Q.   So you didn't have to do the stamping
11  and the mailing?  You would just put your outgoing
12  mail in this bin and someone else in the office
13  would take care of it?
14      A.   Correct.
15      Q.   But it would be all addressed and sealed
16  when you put it in the bin?
17      A.   They're not even sealed.  It would be
18  just in an envelope, and they seal them and send
19  them out.
20      Q.   Okay.  Were you going into the office
21  every day in May of 2005?
22      A.   Just about.
23      Q.   How about in April?
24      A.   Yes.  Even if --

Page 144

1       MR. DUNNE:  Wait for him to ask a question.
2   BY MR. NYESTE:
3       Q.   And in March?
4       A.   Yes.
5       Q.   During March, April, May of 2005, did
6   there come a point in time when you no longer had
7   access to the electronic notes system?
8       A.   Those months again?
9       Q.   March, April, and May of 2005.
10      A.   I would have had access to the
11  electronic notes.
12      Q.   Do you have any explanation as to why
13  there is no entry in the electronic notes that this
14  May 4, 2005, reservation of rights letter was sent
15  out?
16      MR. DUNNE:  Objection, asked and answered.
17          Go ahead.
18  BY THE WITNESS:
19      A.   It should have been an entry.
20  BY MR. NYESTE:
21      Q.   And if there is no entry, what would
22  that indicate?
23      MR. DUNNE:  Objection to the form of the
24  question, calls for speculation.

Page 145

1   BY THE WITNESS:
2       A.   There should have been an entry later on
3   by either Steve or me.
4   BY MR. NYESTE:
5       Q.   And if there wasn't, would that indicate
6   that it wasn't sent; that the letter wasn't sent?
7       MR. DUNNE:  Objection, form of the question.
8   BY THE WITNESS:
9       A.   Steve kept a tight diary.  He was in
10  every file, so there should have been a note from
11  him.
12  BY MR. NYESTE:
13      Q.   Do you recall Kurt Beranek ever calling
14  you and requesting a copy of a reservation of
15  rights letter?
16      MR. DUNNE:  Objection.  This is getting beyond
17  the scope of our agreement, but you can answer the
18  question.
19  BY THE WITNESS:
20      A.   No, I don't recall.
21          FURTHER EXAMINATION
22  BY MS. SKAGGS:
23      Q.   Ms. Robinson, your testimony today is
24  that you recall mailing the May 2005 letter from

Page 146

1   the Chicago office, correct?
2       A.   Correct.
3       Q.   Okay.  Now, in your voice mail to
4   Mr. Nyeste, you had indicated that you were unclear
5   as to which office you were in and you speculated
6   that the letter must have been on a disk.  Now, do
7   you recall leaving that message in a voice mail?
8       A.   On the voice mail.
9       Q.   And you speculated it may have been on a
10  disk because when you transferred from Chicago to
11  Naperville, your computer was not transferred with
12  you.  Do you recall leaving that on the voice mail
13  message?
14      A.   No, I don't remember that part.
15      Q.   Okay.  If you were mailing this letter
16  from the Chicago office, why were you saving it on
17  a disk?
18      A.   I was saving most of my letters on disk,
19  reservation of rights and other letters, also,
20  doctors and different forms, the language, to keep
21  the lingo the same.
22      Q.   And why were you doing that?
23      A.   Because I was outside/inside adjuster,
24  also.  So I had letters I had done at home.  I

5 (Pages 143 to 146)

Page 147

1  would bring them into the office.
2      Q.   So at the time that you left your
3  message on Mr. Nyeste's voice mail, just so that
4  I'm clear, you were speculating about whether or
5  not you had saved something on a floppy disk. Are
6  you now clear as to that recollection?
7      A.   Yes, pretty much so, yes.
8      Q.   So today you think that you had it on
9  disk and printed it off of a disk in Chicago?
10  That's what you think today?
11     MR. DUNNE: Objection to the form of the
12  question.
13        Go ahead.
14  BY THE WITNESS:
15     A.   Yes.
16  BY MS. SKAGGS:
17     Q.   Why isn't a copy of the May 2005
18  reservation of rights letter in USF&G's file?
19     MR. DUNNE: Objection, asked and answered,
20  calls for speculation. I think this is the fourth
21  or fifth time it's been asked, so I'm going to
22  instruct her not to answer.
23     MS. SKAGGS: I don't know if that question has
24  ever been asked, actually. Do you want my question

Page 148

1  read back?
2      MR. DUNNE: Sure.
3         Read back the question.
4         (WHEREUPON, the record was read
5          by the reporter as requested.)
6  BY THE WITNESS:
7      A.   I didn't know it was not in their file.
8  BY MS. SKAGGS:
9      Q.   Did you print it out and put it in the
10  file?
11     A.   It would have been, yes.
12     Q.   So your recollection is that you printed
13  out a copy of this letter and put it in USF&G's
14  file?
15     A.   Yes.
16     Q.   Okay. Did you do that at the same time
17  that you mailed it to VOA?
18     A.   Yes, should have been.
19     Q.   You have a specific recollection of
20  doing that, as well?
21     A.   Yes.
22     Q.   Was this the same day that you faxed it
23  to Kurt Beranek?
24     A.   Yes.

Page 149

1      Q.   Do you have a specific recollection of
2  faxing it to Kurt Beranek?
3      A.   Yes.
4      Q.   So is it your testimony that in May 2005
5  you were working both out of Chicago and Naperville
6  or you had not yet gone to Naperville?
7      A.   I don't believe I had gone to Naperville
8  yet. I'm pretty sure.
9      MS. SKAGGS: Do you have anything else, Jim?
10        Go off the record.
11        (WHEREUPON, discussion was had
12         off the record.)
13     MS. SKAGGS: I don't have any more questions
14  at this time.
15     MR. NYESTE: I think we're done.
16        Rory, do you have any?
17     MR. DUNNE: Yeah.
18        FURTHER EXAMINATION
19  BY MR. DUNNE:
20     Q.   Do you know whether Mr. Heckman knew
21  that you sent the reservation of rights letter out
22  in May of 2005?
23     A.   I don't want to speculate.
24     Q.   So you don't know whether or not he knew

Page 150

1  that you sent out the reservation of rights in May
2  of 2005?
3      A.   I can't speculate. I don't know.
4      Q.   Do you recall talking to Mr. Heckman in
5  or around May of 2005 advising him that you were
6  sending out the reservation of rights letter?
7      A.   No, I don't recall.
8      Q.   And if he wasn't aware that you sent out
9  the reservation of rights letter, there would be no
10  way for him to notate it in the file; isn't that
11  correct?
12     A.   Correct.
13     MR. DUNNE: I have nothing further.
14     MR. NYESTE: We're done.
15     MS. REPORTER: Signature?
16     MR. NYESTE: Do you want to reserve or waive?
17     MR. DUNNE: I reserved on the other one, so
18  I'll reserve.
19        FURTHER DEPONENT SAITH NOT.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

IRIS LISA ROBINSON,  MARCH  17,  2009

Page 151

```
1        IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF ILLINOIS
3               EASTERN DIVISION
4   UNITED STATES FIDELITY      )
5   AND GUARANTY COMPANY,       )
6           Plaintiff,     )
7   vs.                  ) No. 08 C 862
8   VOA ASSOCIATES, INC.,       )
9   LIBERTY INTERNATIONAL        )
10  UNDERWRITERS, MICHAEL J.    )
11  MADDEN and JEAN MADDEN,     )
12          Defendants.     )
13          I hereby certify that I have read the
14  foregoing transcript of my resumed deposition given
15  at the time and place aforesaid, consisting of
16  Pages 130 to 150, inclusive, and I do again
17  subscribe and make oath that the same is a true,
18  correct and complete transcript of my resumed
19  deposition so given as aforesaid, and includes
20  changes, if any, so made by me.
21              IRIS LISA ROBINSON
22  SUBSCRIBED AND SWORN TO before me
23  this     day of     , A.D. 2009.
24          Notary Public
```

Page 152

```
1   STATE OF ILLINOIS  )
2                 ) SS:
3   COUNTY OF DUPAGE   )
4           I, JEANETTE F. RUTZ, a Notary Public
5   within and for the County of DuPage, State of
6   Illinois, and a Certified Shorthand Reporter of
7   said state, do hereby certify:
8           That previous to the commencement of the
9   examination of the witness, the witness was duly
10  sworn to testify the whole truth concerning the
11  matters herein;
12          That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true record of the testimony
16  given and the proceedings had;
17          That the said deposition was taken
18  before me at the time and place specified;
19          That I am not a relative or employee or
20  attorney or counsel, nor a relative or employee of
21  such attorney or counsel for any of the parties
22  hereto, nor interested directly or indirectly in
23  the outcome of this action.
24          IN WITNESS WHEREOF, I do hereunto set my
```

Page 153

```
1   hand and affix my seal of office at Chicago,
2   Illinois, this 20th day of March, 2009.
3
4
5              Notary Public,
6              DuPage County, Illinois
7              My commission expires 12/01/10.
8
9   CSR Certificate No. 84-3809.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 154

```
1              I N D E X
2   WITNESS                   EXAMINATION
3   IRIS LISA ROBINSON (resumed)
4      By Mr. Nyeste             132
5      By Ms. Skaggs            145
6      By Mr. Dunne             149
7
8            E X H I B I T S
9   NUMBER               MARKED FOR ID
10           NO EXHIBITS MARKED.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

7 (Pages 151 to 154)

# EXHIBIT 13

STATE OF ILLINOIS
                          SS
COUNTY OF COOK        )

        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT, LAW DIVISION

MICHAEL J. MADDEN and JEAN MADDEN,  )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             )    NO 03 L 000433
                                    )
F.H. PASCHEN, S.N. NIELSON, INC.,   )
JACOBS FACILITIES, INC., CLIFFS AND )
CABLES, LLC and VOA & ASSOCIATES,   )
SCHULER & SHOOK, INC.               )
                Defendants.         )

            PLAINTIFF'S FOURTH AMENDED COMPLAINT

                        COUNT I
            NEGLIGENCE-F.H. PASCHEN, S.N. NIELSON, INC.

    NOW COMES the plaintiff, MICHAEL MADDEN, by his attorneys,
HARMAN, FEDICK & O'CONNOR, LTD. and complaining of the defendant,
F.H. PASCHEN, S.N. NIELSON, INC., (hereinafter referred to as
"PASCHEN"), states as follows:

        That on or about and before August 19, 2002, the
defendant, PASCHEN, was a general contractor, who individually and
by and through agents, servants and employees, owned and/or was in
charge of the erection, construction, repairs, alteration, removal,
and/or painting of a certain orchestra pit and/or hole in the stage
located at Amos Alonzo Stagg High School District 230, 8015 West
111th Street, in the City of Palos Hills, County of Cook, and State
of Illinois.

    2.   That on or about August 19, 2002, plaintiff, MICHAEL
MADDEN, was an employee of Amos Alonzo Stagg High School District
230 and was engaged in the performance of his duties at or near a



EXHIBIT 6
Ammon
1/13/09

LIUI

portion of the aforementioned certain orchestra pit and/or hole

3. That at the aforementioned time and place, there was in force and effect a contract between the defendant, PASCHEN, and Amos Alonzo Stagg High School District 230.

4 That at the aforesaid time and place and prior thereto, the defendant, individually and through his agents, servants employees, was present during the course of such erection, construction, repairs, alteration, removal, and/or painting. Further, the defendant, individually and through agents, servants and employees, participated in coordinating the work being done and designated various work methods, maintained and check work progress and participated in the scheduling of the work and the inspection of the work, and were likewise responsible for the work being performed pursuant to Section 1926.16 of the Occupational, Safety & Health Administration. In addition thereto, at that time and place, the defendant, individually and through agents, servants and employees, had the authority to stop the work, refuse the work and materials and order changes in the work, in the event the work was being performed in a dangerous manner or for any other reason. Furthermore, at that time and place, the defendant, individually and through agents, servants and employees, had supervision and control of the work, retention of the right to supervise and control the work, constant participation in ongoing activities at the construction site, supervision and coordination of subcontractors, responsibility for taking safety precautions at the job site, authority to issue change orders, the right to stop work,

2

09/20/2006 10:11 FAX 1312388114          HARMAN PEDICK & O'CONNOR                          ☒004

ownership of the equipment at the job site, familiarity with construction customs and practices and had been in a position to assure worker safety or alleviate equipment deficiencies or improper work habits

5.    That at the aforesaid time and place, and prior thereto, the defendant, individually and through agents, servants and employees, erected, constructed, placed or operated, or caused to be erected, constructed, placed or operated, a certain orchestra pit or hole in the stage floor, to facilitate and be used in the aforesaid erection, construction, repairs, alteration, removal, and/or painting.

6.    That at all times herein relevant, the defendant, PASCHEN, had a duty to exercise reasonable care for the safety of workers lawfully upon the premises.

7    That notwithstanding said duty, the defendant, PASCHEN, was then and there guilty of one or more of the following negligent acts or omissions:

      Placed the opening/pit in the floor in a location which created a danger for persons in the area;

(b)    Failed to warn of the placement of opening/pit in the floor in a location which created a danger for persons in the area;

(c)    Failed to erect warning signs, barricades, or block off said area;

      Failed to barricade or cover the opening/pit in the floor when they knew individuals were working and/or walking in that area;

      Failed to provide a barricade or cover or other device to prevent people from falling into the pit;

3

(f)   Failed to take adequate measures to prevent people from falling into the pit;

Failed to adequately train employees to correct, maintain, prevent the aforementioned;

(h)   Failed to have an adequate policy to correct, maintain, prevent the aforementioned.

Failed to provide the Plaintiff with a safe work area.

Failed to make a reasonable inspection of the premises

8.   That at said time and place and as a result of the aforementioned, plaintiff, MICHAEL MADDEN, was injured when he fell into the orchestra pit and/or hole in the floor

9   That as a proximate result of the conduct of the defendant, PASCHEN, as aforesaid, the plaintiff, MICHAEL MADDEN, was thereby injured internally, externally and otherwise, both temporarily and permanently; and plaintiff thereby became sick, sore, lame, diseased and disordered and so remained for a long time, to wit: from thence hitherto, during all of which time he suffered or will suffer great pain and was hindered and prevented from attending to his business and affairs, and thereby sustained the loss of divers earnings, gains or profits; and plaintiff was or will be thereby compelled to pay out, expend and become liable for divers large sums of money in and about endeavoring to be cured of his injuries, as aforesaid

WHEREFORE, the plaintiff, MICHAEL MADDEN, prays for judgment against the defendant, PASCHEN, in a sum in excess of Fifty Thousand Dollars ($50,000.00) plus the cost of this action

4

## COUNT II

### LOSS OF CONSORTIUM- F.H. PASCHEN, S.N. NIELSON, INC.

NOW COMES the plaintiff, JEAN MADDEN  by and through attorneys, HARMAN, FEDICK & O'CONNOR, LTD., and in complaining against the defendant, F.H. PASCHEN, S.N. NIELSON, INC., states as follows:

That the plaintiff  JEAN MADDEN,  realleges incorporates paragraphs 1 through 9 of Count I as and for paragraphs 1 through 9 in Count II

10.  That the plaintiff, JEAN MADDEN, is the wife of MICHAEL MADDEN, and as a result of the injuries to MICHAEL MADDEN, the plaintiff, JEAN MADDEN, was deprived of his services, society, affection and consortium.

WHEREFORE, the plaintiff, JEAN MADDEN, prays for judgment against the defendant, F.H. PASCHEN, S.N. NIELSON, INC., in an amount within the jurisdiction of the Circuit Court of Cook County, Illinois

## COUNT III

### NEGLIGENCE- JACOBS FACILITIES

NOW COMES the plaintiff, MICHAEL MADDEN, by his attorneys HARMAN, FEDICK & O'CONNOR, LTD., and complaining of the defendant JACOBS FACILITIES, INC., alleges as follows:

That on or about and before August 19, 2002, the defendant, JACOBS FACILITIES, INC., who individually and by and through agents, servants and employees, owned and/or was in charge of the erection, construction, repairs, alteration, removal, and/or

5

LIUI

42

painting of a certain orchestra pit and/or hole in the stage located at the aforementioned location.

2. That on or about and before August 19, 2002, the defendant, JACOBS FACILITIES, INC., served as the project manager and/or construction manager for the work at and near the orchestra pit and/or hole in the stage located at the aforementioned location

3. That on or about August 19, 2002, plaintiff, MICHAEL MADDEN, was an employee of Amos Alonzo Stagg High School District 230 and was engaged in the performance of his duties at or near a portion of the aforementioned certain orchestra pit and/or hole.

4. That at the aforementioned time and place, there was in force and effect a contract between the defendant, JACOBS FACILITIES, INC. and Amos Alonzo Stagg High School District 230.

5. That at the aforesaid time and place and prior thereto, the defendant, individually and through his agents, servants and employees, was present during the course of such erection, construction, repairs, alteration, removal, and/or painting. Further, the defendant, individually and through agents, servants and employees, participated in coordinating the work being done and designated various work methods, maintained and check work progress and participated in the scheduling of the work and the inspection of the work, and were likewise responsible for the work being performed pursuant to Section 1926.16 of the Occupational, Safety & Health Administration. In addition thereto, at that time and place, the defendant, individually and through agents, servants and employees, had the authority to stop the work, refuse the work and

6

materials and order changes in the work, in the event the work was
being performed in a dangerous manner or for any other reason.
Furthermore, at that time and place, the defendant, individually
and through agents, servants and employees, had supervision and
control of the work, retention of the right to supervise and
control the work, constant participation in ongoing activities at
the construction site, supervision and coordination of
subcontractors, responsibility for taking safety precautions at the
job site, authority to issue change orders, the right to stop work
ownership of the equipment at the job site, familiarity with
construction customs and practices and had been in a position to
assure worker safety or alleviate equipment deficiencies or
improper work habits

6    That at the aforesaid time and place, and prior thereto,
the defendant, individually and through agents, servants and
employees, erected, constructed, placed or operated, or caused to
be erected, constructed, placed or operated, a certain orchestra
pit or hole in the stage floor, to facilitate and be used in the
aforesaid erection, construction, repairs, alteration, removal,
and/or painting

7    That at all times herein relevant, the defendant, JACOBS
FACILITIES, INC., had a duty to exercise reasonable care for the
safety of workers lawfully upon the premises.

8.    That notwithstanding said duty, the defendant, JACOBS
FACILITIES, INC., was then and there guilty of one or more of the
following negligent acts or omissions:

7

LIUI                                                           44

persons in the area;

  (a)  Placed the opening/pit in the floor in a location which created a danger for persons in the area;

  (b)  Failed to warn of the placement of opening/pit in the floor in a location which created a danger for persons in the area;

  (c)  Failed to erect warning signs, barricades, or block off said area;

  (d)  Failed to barricade or cover the opening/pit in the floor when they knew individuals were working and/or walking in that area;

  (e)  Failed to provide a barricade or cover or other device to prevent people from falling into the pit;

  (f)  Failed to take adequate measures to prevent people from falling into the pit;

  (g)  Failed to adequately train employees to correct, maintain, prevent the aforementioned;

  (h)  Failed to have an adequate policy to correct, maintain, prevent the aforementioned.

  (i  Failed to provide the Plaintiff with a safe work area.

  (j)  Failed to make a reasonable inspection of premises.

9. That at said time and place and as a result of the aforementioned, plaintiff, MICHAEL MADDEN, was injured when he fell into the orchestra pit and/or hole in the floor

10. That as a proximate result of the conduct of the defendant, JACOBS FACILITIES, INC., as aforesaid, the plaintiff, MICHAEL MADDEN, was thereby injured internally, externally otherwise, both temporarily and permanently; and plaintiff thereby became sick, sore, lame, diseased and disordered and so remained for a long time, to wit: from thence hitherto, during all of which

8

time he suffered or will suffer great pain and was hindered
prevented from attending to his business and affairs, and thereby
sustained the loss of divers earnings, gains or profits;
plaintiff was or will be thereby compelled to pay out, expend
become liable for divers large sums of money in and about
endeavoring to be cured of his injuries, as aforesaid.

WHEREFORE, the plaintiff, MICHAEL MADDEN, prays for judgment
against the defendant, JACOBS FACILITIES, INC. , in a sum in excess
of Fifty Thousand Dollars ($50,000.00) plus the cost of
action.

### COUNT IV

### LOSS OF CONSORTIUM- JACOBS FACILITIES, INC.

NOW COMES the plaintiff, JEAN MADDEN, by and through
attorneys, HARMAN, FEDICK & O'CONNOR, LTD., and in complaining
against the defendant, JACOBS FACILITIES, INC., states as follows:

1.    That the plaintiff, JEAN MADDEN, realleges and
incorporates paragraphs 1 through 10 of Count III as and for her
paragraphs 1 through 10 in Count IV

11.    That the plaintiff, JEAN MADDEN, is the wife of MICHAEL
MADDEN, and as a result of the injuries to MICHAEL MADDEN, the
plaintiff, JEAN MADDEN, was deprived of his services, society,
affection and consortium.

WHEREFORE, the plaintiff, JEAN MADDEN, prays for judgment
against the defendant JACOBS FACILITIES, INC., in an amount within
the jurisdiction of the Circuit Court of Cook County, Illinois

9

LIUI

46

## COUNT V

## NEGLIGENCE- CLIFFS AND CABLES, LLC.

NOW COMES the plaintiff, MICHAEL MADDEN, by his attorneys, HARMAN, FEDICK & O'CONNOR, LTD., and complaining of the defendant, CLIFFS AND CABLES, LLC., alleges as follows:

1. That on or about and before August 19, 2002, the defendant, CLIFFS AND CABLES, LLC., who individually and by and through agents, servants and employees, owned and/or was in charge of the erection, construction, repairs, alteration, removal, and/or painting of a certain orchestra pit and/or hole in the stage located at the aforementioned location

2. That on or about and before August 19, 2002, the defendant, CLIFFS & CABLES, LLC., served as a sub-contractor for the work at and near the orchestra pit and/or hole in the stage located at the aforementioned location

3. That on or about August 19, 2002, plaintiff, MICHAEL MADDEN, was an employee of Amos Alonzo Stagg High School District 230 and was engaged in the performance of his duties at or near a portion of the aforementioned certain orchestra pit and/or hole.

4 That at the aforementioned time and place, there was in force and affect a contract between the defendant, CLIFFS AND CABLES, LLC and Amos Alonzo Stagg High School District 230

5. That at the aforesaid time and place and prior thereto, the defendant, individually and through his agents, servants and employees, was present during the course of such erection

10

LIUI

47

construction, repairs, alteration, removal, and/or painting
Further, the defendant, individually and through agents, servants
and employees, participated in coordinating the work being done and
designated various work methods, maintained and check work progress
and participated in the scheduling of the work and the inspection
of the work, and were likewise responsible for the work being
performed pursuant to Section 1926.16 of the Occupational, Safety
& Health Administration.  In addition thereto, at that time
place, the defendant, individually and through agents, servants and
employees, had the authority to stop the work, refuse the work and
materials and order changes in the work, in the event the work was
being performed in a dangerous manner or for any other reason
Furthermore, at that time and place, the defendant, individually
and through agents, servants and employees, had supervision
control of the work, retention of the right to supervise and
control the work, constant participation in ongoing activities at
the  construction  site,  supervision  and  coordination  of
subcontractors, responsibility for taking safety precautions at the
job site, authority to issue change orders, the right to stop work
ownership of the equipment at the job site, familiarity
construction customs and practices and had been in a position to
assure worker safety or alleviate equipment deficiencies or
improper work habits.

    6.   That at the aforesaid time and place, and prior thereto,
the defendant, individually and through agents, servants

11

employees, erected, constructed, placed or operated, or caused to be erected, constructed, placed or operated, a certain orchestra pit or hole in the stage floor, to facilitate and be used in the aforesaid erection, construction, repairs, alteration, removal, and/or painting.

7   That at all times herein relevant, the defendant, CLIFFS AND CABLES, LLC., had a duty to exercise reasonable care for the safety of workers lawfully upon the premises.

8.   That notwithstanding said duty, the defendant, CLIFFS AND CABLES, LLC., was then and there guilty of one or more of the following negligent acts or omissions:

(a)   Placed the opening/pit in the floor in a location which created a danger for persons in the area;

(b)   Failed to warn of the placement of opening/pit in the floor in a location which created a danger for persons in the area;

(c)   Failed to erect warning signs, barricades, or block off said area;

(d)   Failed to warn of the opening/pit in the floor;

(e)   Failed to barricade or cover the opening/pit in the floor when they knew individuals were working and/or walking in that area;

(f)   Failed to provide a barricade or cover or other device to prevent people from falling into the pit;

(g)   Failed to take adequate measures to prevent people from falling into the pit;

(h)   Failed to adequately train employees to correct, maintain, prevent the aforementioned;

i   Failed to have an adequate policy to correct, maintain, prevent the aforementioned.

12

LIUI

49

COUNT VI

LOSS OF CONSORTIUM- CLIFFE & GABLES, LLC.